No. 13-12625

United States Court of Appeals, Eleventh Circuit.

# Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.

765 F.3d 1277 (11th Cir. 2014)

Decided Aug 27, 2014

Nos. 13–12625 13–13914.

2014-08-27

Ajit BHOGAITA, Plaintiff–Appellee, v. ALTAMONTE HEIGHTS CONDOMINIUM ASS'N, INC., Defendant–Appellant.

Matthew W. Dietz, The Law Office of Matthew W. Dietz, Miami, FL, Aaron Carter Bates, Matthew Scott Mokwa, The Maher Law Firm, PA, Winter Park, FL, for Plaintiff–Appellee. Scott Allan Cole, Kathryn L. Smith, Cole Scott & Kissane, PA, Miami, FL, Gregory Ackerman, Robert Alden Swift, Cole Scott & Kissane, PA, Orlando, FL, for Defendant–Appellant.

DUBINA

1280\*1280

Matthew W. Dietz, The Law Office of Matthew W. Dietz, Miami, FL, Aaron Carter Bates, Matthew Scott Mokwa, The Maher Law Firm, PA, Winter Park, FL, for Plaintiff–Appellee. Scott Allan Cole, Kathryn L. Smith, Cole Scott & Kissane, PA, Miami, FL, Gregory Ackerman, Robert Alden Swift, Cole Scott & Kissane, PA, Orlando, FL, for Defendant–Appellant. Appeals from the United States District Court for the Middle District of Florida. D.C. Docket No. 6:11–cv–01637–GAP–DAB.

## Before ED CARNES, Chief Judge,

1281\*1281DUBINA, and SILER,

\* **Circuit Judges.**

**DUBINA, Circuit Judge:**

\* Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit Court of Appeals sitting by designation.

Appellee Ajit Bhogaita persuaded a jury that Appellant Altamonte Heights Condominium Association, Inc., ("the Association") violated the disability provisions of the Federal and Florida Fair Housing Acts, 42 U.S.C. § 3604(f)(3)(b) ("FHA") and Fla. Stat. § 760.23(9)(b), respectively, when it enforced its pet weight policy and demanded Bhogaita remove his emotional support dog from his condominium. The jury awarded Bhogaita $5,000 in damages, and the district court awarded Bhogaita more than $100,000 in attorneys' fees. The Association appealed both the judgment entered on the jury's verdict and the award of attorneys' fees. We consolidated the appeals and now affirm.

## I. BACKGROUND
### A. Factual History

The Association is a non-profit homeowner's association for a condominium complex located in Altamonte Springs, Florida. Bhogaita is a United States Air Force veteran who suffers from posttraumatic stress disorder ("PTSD") that developed after a sexual assault he endured during his military service.

In 2001, Bhogaita bought a condominium unit managed by the Association and subject to its rules. Among those rules, the Association prohibited occupants from keeping dogs weighing more than twenty-five pounds. In 2008, Bhogaita acquired a dog, Kane, that exceeded the weight limit. Though no medical professional prescribed the dog initially, Bhogaita's psychiatric symptoms improved with



Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.    765 F.3d 1277 (11th Cir. 2014)

Kane's presence, so much so that Bhogaita began to rely on the dog to help him manage his condition. He kept the dog for the next two years.

On May 4, 2010, the Association demanded that Bhogaita remove Kane from his unit, pursuant to the weight limit. Bhogaita responded by providing the first of three letters from Dr. Shih–Tzung Li, his treating psychiatrist, explaining that the dog was an emotional support animal. The first letter, written on May 7, read in relevant part:

Due to mental illness, Mr. Bhogaita has certain limitations regarding social interaction and coping with stress and anxiety. In order to help alleviate these difficulties, and to enhance his ability to live independently and to fully use and enjoy the dwelling unit, I am prescribing an emotional support animal that will assist Mr. Bhogaita in coping with his disability. (R. 36–6 at 2.)

[1] In the second letter, sent days later, Dr. Li added specific information about the dog. He wrote that Bhogaita "has a therapeutic relationship with this specific dog, Kane. As an emotional support animal, Kane serves to ameliorate otherwise difficult to manage day to day psychiatric symptoms in Mr. Bhogaita." (R. 36–6 at 3.)

[1] Document and page numbers in record citations refer to the document and page numbers assigned by the electronic filing system in the district court.

In July, the Association responded by sending Bhogaita its first request for additional information regarding his disability and the need for accommodation. Specifically, it asked him:

1. What is the exact nature of your impairment? How does it substantially limit a major life activity?

1282*1282

2. How long have you been receiving treatment for this specific impairment?

3. How many sessions have you had with Dr. Li?

4. What specific training has your dog received?

5. Why does it require a dog over 25 pounds toafford you an equal opportunity to use and enjoy your dwelling? (R. 36–7 at 2 (numbering added).)

Bhogaita responded later that month by providing a third letter from Dr. Li, in which the doctor indicated the nature and cause of the disability for the first time: He was treating Bhogaita for "Anxiety related to military trauma." (R. 36–6 at 4.) Dr. Li explained further:

... [Bhogaita's condition] limits his ability to work directly with other people, a major life activity. Currently he has been hired to perform technical support work from home. He is able to work with the assistance of his emotional support animal. Otherwise his social interactions would be so overwhelming that he would be unable to perform work of any kind.

I am familiar with the therapeutic benefits of assistance animals for people with disabilities such as that experienced by Mr. Bhogaita. Upon request, I would be happy to answer other questions you may have concerning my recommendation that Mr. Bhogaita have an emotional support animal. Should you have additional questions, please do not hesitate to contact me. (R. 36–6 at 4.)

Shortly thereafter, Bhogaita also sent a response to the Association in which he answered the Association's questions in turn. Bhogaita identified his diagnosis and incorporated by reference Dr. Li's third letter to explain how his PTSD "affects major life activities." (R. 35–5 at 17.) He also claimed an additional disability related to five knee surgeries and two separate knee injuries arising from his military service and stated that Kane "provides mobility assistance to compensate" for those injuries. (R. 35–5 at 17.)

After receiving Dr. Li's three letters and learning of Bhogaita's knee problems, the Association sent Bhogaita a second request for information on August 17, 2010. The

Association's second letter stated, in relevant part:

1.   Please list **each individual disability** that you feel your pet is required for in order for you to offset the effects of those individual disabilities. Originally you claimed one disability, now you are claiming another disability. Please list all related disabilities.

2.   Please provide documentation from a medical professional(s) that clearly supports that you have any of the disabilities noted above, disabilities that substantially limit a major life activity, *and that you are in need of a trained "support animal" that exceeds the 25 pound weight limit for that disability.* Please include contact physician information as well. (Note: You have already provided documentation regarding your claim related to mental health issues; however, your psychiatrist has not indicated that you need an oversized pet for this disability. This should be clarified by him if you want the exception for this particular condition considered.)

3.   If you add names of any additional medical professional(s) from your original submission only of Dr. Li, please include how many sessions you have had with those additional *1283 physicians similar to the information you provided regarding your sessions with Dr. Li.

4.   Please provide all information related to the professional training your pet has successfully completed regarding the assistance you claim he/she is required to offer you as a support animal. This requested information shall include the type of training the pet received specific to the disability, the dates of training, the location of training, names and contact name of the trainer(s), and copies of any certificates of successful completion.

(R. 36–8 at 2–3 (numbering added).)

Nearly two and a half months passed, during which time Bhogaita did not respond. On November 3, 2010, the Association sent a third request for information, this time requesting a sworn statement from Dr. Li to include "specific facts":

1. "[D]etail[ing] the exact nature of [Bhogaita's] alleged mental disability";

2. Listing the treatment he was receiving, including "a list of all medications, the number of counseling session per week, etc.";

3. Explaining "how the diagnosis was made";

4. Listing "the total number of hours and sessions of mental health treatment ... received from the psychiatrist";

5. Disclosing how long Dr. Li had been treating Bhogaita as well as how long Bhogaita had been in treatment generally;

6. Answering whether Bhogaita's "condition is permanent or temporary";

7. Listing treatments "prescribed ... moving forward";

8. Describing "how the mental disability substantially limits [Bhogaita's] major life activities"; and

9. Explaining why a smaller dog would not sufficiently provide Bhogaita "an equal opportunity to enjoy his unit."

(R. 35–5 at 24.) Additionally, the Association sought documentation on "the individualized training" the dog received, including dates, contact information for the trainer, and copies of any certifications. (R. 35–5 at 24.) That letter went on to state that Bhogaita was to respond by December 6, and if he did not, the letter would "serve as the Association's formal demand for [Bhogaita] to remove any dogs over 25 lbs from [his] unit no later than December 10, 2010." (R. 35–5 at 25.) If Bhogaita failed to comply, the Association said it would "be forced to file for Arbitration." (R. 35–5 at 25.) It instructed Bhogaita, "PLEASE GOVERN YOURSELF ACCORDINGLY." (R. 35–5 at 25.)

Rather than responding, Bhogaita filed a complaint with the United States Department of Housing and Urban Development ("HUD")

Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.   765 F.3d 1277 (11th Cir. 2014)

and the Florida Commission on Human Relations ("the Commission"). He claimed that the Association's conduct amounted to a failure to make a reasonable accommodation in violation of the disability provisions of the Federal and Florida Fair Housing Acts. In January 2011, HUD and the Commission issued findings of cause against the Association. Accordingly, the Association agreed to allow Bhogaita to keep Kane.

### B. Procedural History

In October 2011, Bhogaita brought suit. On the Association's motion, the district court dismissed Bhogaita's claim of disability discrimination brought under 42 U.S.C. § 3604(f)(2), while his reasonable accommodation claim, under § 3604(f) 1284(3) and analogous Florida law, survived. *1284

After discovery, the parties filed cross motions for summary judgment. Though the district court denied the Association's motion for summary judgment, it granted Bhogaita's motion in part, finding that Dr. Li's letters supplied "sufficient information," and concluding that the Association's indeterminate delay, evidenced by escalating requests for information, amounted to a constructive denial of Bhogaita's request. *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.,* No. 6:11–cv–1637, 2012 WL 6562766, at *7 (M.D.Fla. Dec. 17, 2012). The district court reasoned that the demand that Bhogaita remove his dog "if he did not provide [the Association] with information it was not entitled to receive" amounted, as a matter of law, to a constructive denial of the request for accommodation. *Id.*

Accordingly, the district court granted summary judgment in favor of Bhogaita on the refusal to accommodate element only.

A two-day jury trial followed. Because of the partial grant of summary judgment, the jury did not consider whether the Association had refused Bhogaita's request for accommodation. After presentation of the evidence, the jury returned a verdict in favor of Bhogaita: It found that Bhogaita was disabled and requested an accommodation for his disability, that the accommodation was necessary and reasonable, and that Bhogaita suffered damages because of the Association's refusal to accommodate. It awarded Bhogaita $5,000 in compensatory damages but declined to award punitive damages.

There were a number of post-trial motions. The district court denied the Association's motions for judgment as a matter of law and for a new trial, where the Association raised the same arguments it raises here. The district court also denied Bhogaita's motion for a permanent injunction, as the Association had already agreed to allow Kane to remain. Finally, the court ordered the Association to pay $127,512 in attorneys' fees, almost $70,000 less than the sum Bhogaita's lawyers sought. The Association timely appealed.

## II. ISSUES

(1)     Whether the district court properly granted partial summary judgment to Bhogaita on the refusal-to-accommodate element.

(2)     Whether there was sufficient evidence for the jury to find that Bhogaita has a disability that substantially limits a major life activity.

(3)     Whether there was sufficient evidence to support the conclusion that Bhogaita's requested accommodation was necessary.

(4)     Whether the district court erred in its jury instructions with respect to the FHA.

(5)     Whether the district court abused its discretion in allowing Bhogaita's dog to remain in the courtroom as a demonstrative exhibit.

(6)     Whether the district court erred in its award of attorneys' fees.

### III. STANDARDS OF REVIEW

"We review a district court's grant of summary judgment *de novo,* viewing the record and drawing all factual inferences in a light most favorable to" the nonmoving party. *Mazzeo v. Color Resolutions Int'l, LLC,* 746 F.3d 1264,

1266 (11th Cir.2014); *see also Sunbeam Television Corp. v. Nielsen Media Research, Inc.,* 711 F.3d 1264, 1270 (11th Cir.2013) (applying the same standard when reviewing a partial grant of summary judgment). A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the *1285 movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Likewise, we review the denial of judgment as a matter of law *de novo,* and disturb the jury's verdict only when there is no material conflict in the evidence, such that no reasonable person could agree to the verdict reached. *Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1275 (11th Cir.2008).

Our review of jury instructions is simultaneously *de novo* and deferential. *Id.* at 1276. "We review jury instructions *de novo* to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party" but give the district court "wide discretion as to the style and wording employed." *Id.* We "reverse only where we are left with a substantial and ineradicable doubt as to whether" the district court properly guided the jury. *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab.,* 739 F.3d 579, 585 (11th Cir.2013) (internal quotation marks omitted).

We review evidentiary rulings for abuse of discretion. *Fid. Interior Constr., Inc. v. Se. Carpenters Reg'l Council of the United Bhd. of Carpenters & Joiners of Am.,* 675 F.3d 1250, 1258 (11th Cir.2012). Likewise, "[w]e review the award of attorney's fees and costs for an abuse of discretion," examining underlying questions of law *de novo* and those of fact for clear error. *Goldsmith,* 513 F.3d at 1276.

## IV. DISCUSSION

The FHA prohibits discriminating against a person on the basis of a "handicap,"[2] or a disability, by refusing to make reasonable accommodations when necessary to afford the person equal opportunity to use and enjoy a dwelling. Fair Housing Amendments Act of 1988, Pub.L. No. 100–430, § 6, 102 Stat. 1619 (codified at 42 U.S.C. § 3604(f)(3)(B)). The FHA and the Florida Fair Housing Act are substantively identical, and therefore the same legal analysis applies to each. *Loren v. Sasser,* 309 F.3d 1296, 1299 n. 9 (11th Cir.2002).

[2] The FHA refers to discrimination based on "handicap" rather than disability. 42 U.S.C. § 3604(f). Disability scholars, however, generally prefer the term "disability" to handicap, and the Americans with Disabilities Act, Pub.L. No. 101–336, 104 Stat. 327 (1990) (codified as amended at 42 U.S.C. §§ 12101–12213) ("ADA"), reflects that preference. For this reason, we treat the terms interchangeably and elect to use "disability" and the preferred possessive construction. *See Giebeler v. M & B Assocs.,* 343 F.3d 1143, 1146 n. 2 (9th Cir.2003) (using the terms interchangeably and stating the same rationale for doing so); Michelle A. Travis, *Impairment as Protected Status: A New Universality for Disability Rights,* 46 GA. L. REV. 937 (2012) (referring throughout to persons "with disabilities" rather than "disabled persons").

A successful failure-to-accommodate claim has four elements. To prevail, one must prove that (1) he is disabled within the meaning of the FHA, (2) he requested a reasonable accommodation, (3) the requested accommodation was necessary to afford him an opportunity to use and enjoy his dwelling, and (4) the defendants refused to make the accommodation. *Schwarz v. City of Treasure Island,* 544 F.3d 1201, 1218–19 (11th Cir.2008).

casetext



### A. Bhogaita was entitled to partial summary judgment on the refusal-to-accommodate element.

The Association argues the district court erred when it granted partial summary judgment, precluding the jury from considering whether the Association denied Bhogaita's requested accommodation. The FHA does not demand that housing providers immediately grant all *1286 requests for accommodation. *Schwarz,* 544 F.3d at 1219 (" '[T]he duty to make a reasonable accommodation does not simply spring from the fact that the handicapped person wants such an accommodation made.' " (quoting *Prindable v. Ass'n of Apt. Owners,* 304 F.Supp.2d 1245, 1258 (D.Haw.2003), *aff'd sub nom. DuBois v. Ass'n of Apt. Owners,* 453 F.3d 1175 (9th Cir.2005))). Once a provider knows of an individual's request for accommodation, the provider has " 'an opportunity to make a final decision ..., which necessarily includes the ability to conduct a meaningful review' " to determine whether the FHA requires the requested accommodation. *Id.* (quoting *Prindable,* 304 F.Supp.2d at 1258).



The failure to make a timely determination after meaningful review amounts to constructive denial of a requested accommodation, "as an indeterminate delay has the same effect as an outright denial." *Groome Res. Ltd. v. Parish of Jefferson,* 234 F.3d 192, 199 (5th Cir.2000). The Joint Statement of two federal agencies [3] counsels similarly: "An undue delay in responding to a reasonable accommodation request may" constitute a failure to accommodate. Department of Justice and HUD, Joint Statement on Reasonable Accommodations at 11 (May 17, 2004), *available at* www. hud. gov/ offices/ fheo/ library/ huddoj statement. pdf (last visited August 7, 2014) ("Joint Statement").

---

[3]  Though the Joint Statement is a policy statement, rather than an authoritative interpretation of FHA and therefore does "not warrant *Chevron*-style deference," *Christensen v. Harris Cnty.,* 529 U.S. 576, 587, 120 S.Ct. 1655, 1662–63, 146 L.Ed.2d 621 (2000), it is nonetheless " 'entitled to respect' " to the extent it has the " 'power to persuade.' "

*Id.* (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944)).

Bhogaita requested an accommodation in May 2010. More than six months later, when he filed a complaint with HUD and the Commission, the Association had not responded to his request except to request additional information and to indicate that if Bhogaita failed to provide that information, the Association would file for arbitration. The Association insists that its deliberative process was ongoing and that its requests were only meant to help it discern whether Bhogaita had a disability requiring accommodation. To assess whether the partial grant of summary judgment was error, we ask whether a reasonable fact finder could have concluded—based on the record evidence—that the Association was still undertaking meaningful review.

We answer that question in the negative. The Association produced no evidence at the summary judgment stage to support its contention that it had not constructively denied Bhogaita's request. Neither Bhogaita's silence in the face of requests for information the Association already had nor his failure to provide information irrelevant to the Association's determination can support an inference that the Association's delay reflected an attempt at meaningful review.

Dr. Li's three letters, [4] all submitted to the Association before its August 17 letter, contained the information the Association needed to make a determination: They described the nature and cause of Bhogaita's PTSD diagnosis,

---

[4]  Though the Association offered evidence at trial suggesting that the letters were copied-and-pasted form letters, a fact that might have created a credibility question, it produced no

Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.    765 F.3d 1277 (11th Cir. 2014)

such evidence at the summary judgment stage.

1287[5] stated that Bhogaita *1287 was substantially impaired in the major life activity of working, and explained that the dog alleviated Bhogaita's symptoms. Though Dr. Li's letters identified a cognizable disability and explained the necessity of accommodation, the August 17 request sought the same information already provided. Bhogaita's failure to respond to that request cannot support the Association's position because the Association possessed all the information essential to its determination.

[5] It is of no moment that Bhogaita's own July letter to the Association mentioned his knee problems for the first time and without supporting medical documentation. If the Association had all the essential information to make a determination regarding one disabling condition—PTSD—it did not need proof of an additional disability.

Likewise, Bhogaita's failure to respond to the November 3 request for information cannot support an inference that the Association was still undertaking meaningful review. That it is "incumbent upon" a skeptical defendant "to request documentation or open a dialogue" rather than immediately refusing a requested accommodation, *Jankowski Lee & Associates v. Cisneros,* 91 F.3d 891, 895 (7th Cir.1996), does not entitle a defendant to extraneous information. Generally, housing providers need only the information necessary to apprise them of the disability and the desire and possible need for an accommodation. *See, e.g., Colwell v. Rite Aid Corp.,* 602 F.3d 495, 506 (3d Cir.2010) (holding in a reasonable accommodation claim brought under the ADA that employers need "enough information to know of both the disability and desire for an accommodation" (internal quotation marks omitted)); Joint Statement at 14

(counseling that, "[i]n most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary for" determining whether an accommodation is required).

The Association's critical inquiries were whether Bhogaita's PTSD amounted to a qualifying disability and whether Kane's presence alleviated the effects of the disorder. *Cf. Schwarz,* 544 F.3d at 1226 (holding that an accommodation is necessary under the FHA when it addresses the needs the disability creates). The November 3 letter requested, in addition to the pertinent information it already had thanks to Dr. Li's letters: "additional information regarding Bhogaita's treatment, medications, and the number of counseling sessions he attended per week; details about how the diagnosis was made; whether the condition was permanent or temporary; and 'details of the prescribed treatment moving forward.' " *Bhogaita,* 2012 WL 6562766, at *7 (quoting R. 35–5 at 24). The requested information exceeded that essential for the Associations' critical inquiries. On the record before it, the district court was correct in declining to hold Bhogaita's silence in the face of the last two letters against him and in determining that the Association had not pointed to evidence from which a jury could find that the Association had denied his request for a reasonable accommodation.

**B. Bhogaita offered sufficient evidence to show he has a disability within the meaning of the FHA.**

A person has a disability under the FHA if, among other things, he has "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602(h). The parties agree that Bhogaita suffers from a physical or mental impairment, and they agree that working is a major life activity. They depart company, however, on whether Bhogaita's impairment substantially limited his ability to work. When considering what it means for an

impairment to limit substantially *1288 one's ability to work, we find cases interpreting and applying the ADA relevant.

When interpreting the pre-ADAAA definition of "disability," a definition virtually identical to the FHA's definition of "handicap," the Supreme Court of the United States concluded that an impairment substantially limits one's ability to work only where it renders a person "unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491, 119 S.Ct. 2139, 2151, 144 L.Ed.2d 450 (1999). We apply the same interpretation here because of the similarity between the preamendment ADA and the FHA. *Compare*42 U.S.C. 12102(2)(A) (2008) (defining disability, with respect to an individual, as "a physical or mental impairment that substantially limits one or more of the major life activities of such an individual") *with*42 U.S.C. § 3602(h)(1) (defining "handicap" as "a physical or mental impairment which substantially limits one or more of such person's major life activities").

Bhogaita presented ample evidence at trial to show that his PTSD left him unable to work in a broad class of jobs. Bhogaita's own testimony revealed his belief that colleagues persecuted him, a belief that made it practically impossible for him to work outside his home. Dr. Li's letters stated that Bhogaita's condition "limits his ability to work directly with other people" and that social interactions had the tendency to be so overwhelming for Bhogaita, they could possibly render him "unable to perform work of any kind." For one to gain remuneration of any sort one must engage, at a minimum, with either a superior or a customer, and most jobs require much more. To note that the cloistered laboratory scientist occasionally presents his research to others and that the warehouse stocker takes some direction from supply managers is to acknowledge that the sales clerk, the teacher, and the construction foreman, for example, interact significantly and almost constantly. Certainly jobs requiring significant social interaction amount to a broad class.

Viewing the evidence in the light most favorable to the jury's verdict and drawing all inferences in its favor, a reasonable jury could agree to the verdict reached. *See Goldsmith,* 513 F.3d at 1275 ("We will reverse only if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." (internal quotation marks omitted)); *Chaney v. City of Orlando,* 483 F.3d 1221, 1228 (11th Cir.2007) (explaining that when considering a renewed motion for judgment as a matter of law, the court does not review the jury's findings except to consider whether there was sufficient evidence to support them). The district court did not err in denying judgment as a matter of law on the disability element.

### C. Bhogaita produced evidence supporting the conclusion that the requested accommodation was necessary.

A successful FHA accommodation claim requires that the accommodation sought be "necessary to afford [the claimant] equal opportunity to use and enjoy" the relevant dwelling. 42 U.S.C. § 3604(f)(3)(B). "The word 'equal' is a relative term that requires a comparator to have meaning." *Schwarz,* 544 F.3d at 1226. Under the FHA, the comparator is a person without a disability, and an accommodation extends an equal opportunity when it addresses the needs the disability creates. *Id.* Thus, a "necessary" accommodation is one that alleviates the effects of a disability. *Id.* The jury was properly instructed to that effect. (R. 131 at 9 (explaining that to prove necessity, Bhogaita had to "show, at a minimum, that the accommodation *1289affirmatively enhances [his] quality of life by ameliorating (or reducing) the effects of his disability").)

Some other arrangement, such as having a lighterweight dog permitted by the Association's policy, might similarly alleviate Bhogaita's symptoms, and evidence of such could be relevant to the reasonableness determination, which asks whether the

requested accommodation "is both efficacious and proportional to the costs to implement it." *Oconomowoc Residential Programs v. City of Milwaukee,* 300 F.3d 775, 784 (7th Cir.2002). It is not, however, relevant to the necessity determination, which asks whether the requested accommodation ameliorates the disability's effects. *Schwarz,* 544 F.3d at 1226. Both necessity and reasonableness are required, *id.* at 1218–19, but in this appeal, the Association does not raise the issue of reasonableness with respect to Bhogaita's requested accommodation. For that reason, we do not engage in the "highly factspecific" reasonableness inquiry, which would require a balancing of the parties' needs. *Oconomowoc,* 300 F.3d at 784. The question we address is a different, more limited one: whether Bhogaita offered sufficient evidence that having the dog would affirmatively enhance his quality of life by ameliorating the effects of his disability.

Bhogaita produced evidence from which a reasonable fact finder could conclude that his dog alleviated the effects of his PTSD. Specifically, Dr. Li's letters said that Kane assists Bhogaita "in coping with his disability," (R. 36–6), and "ameliorate[s]" Bhogaita's "psychiatric symptoms," (R. 36–7), and that without the dog, Bhogaita's "social interactions would be so overwhelming that he would be unable to perform work of any kind." (R. 46–6 at 2.) In sum, the letters directly support the jury's verdict: The requested "accommodation was necessary to afford [Bhogaita] an opportunity to use and enjoy the dwelling." (R. 131 at 1.)

### D. The jury instructions do not warrant reversal.

The Association argues that the district court erred in its jury instructions, identifying in one case language that it should not have included and in another language the Association says it should have. Neither amounts to reversible error.

We examine jury instructions in context, considering "the allegations of the complaint, the evidence presented, and the arguments of counsel when

determining whether the jury understood the issues or was misled." *Gowski v. Peake,* 682 F.3d 1299, 1315 (11th Cir.2012). So long as the "instructions, taken together, properly express the law applicable to the case, there is no error even though an isolated clause may be inaccurate, ambiguous, incomplete or otherwise subject to criticism." *State Farm Fire & Cas. Co.,* 739 F.3d at 585 (internal quotation marks omitted).

First, the court's instruction on "major life activities" was not overbroad in listing, among other examples, "interacting with others and essential capabilities necessary for working in a broad class of jobs" to explain that term. Considering the record as a whole, the instruction was sound. The court listed ten activities not as a comprehensive anthology but as an illustration of what it meant to be "of central importance to daily life as distinguished from tasks associated with a particular job." (R. 130 at 8.) It then directed the jury's attention to the issues before it by clarifying that Bhogaita "alleged that his impairment substantially limited [his] ability to work and interact with others." (R. 130 at 8.) The court did not tell the jury it could or should consider the other activities listed.*1290

Moreover, even if we assumed the inclusion of "interacting with others" in the instructions was technically incorrect, there was unlikely any prejudice to the Association. *Badger v. So. Farm Bureau Life Ins. Co.,* 612 F.3d 1334, 1339 (11th Cir.2010) ("We will not disturb a jury's verdict unless the charge, taken as a whole, is erroneous and prejudicial." (internal quotation marks omitted)). In closing argument, Bhogaita's counsel focused on Bhogaita's ability to interact with others as it related to his working, rather than as an independent activity. The court devoted thirteen lines of text in its jury instructions to what it meant for an impairment to limit substantially one's ability to work and never

mentioned interacting with others separately from working with others. "Our practice is not to nitpick the instructions for minor defects." *Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1283 (11th Cir.2008). Reversing based on the inclusion of "interacting with others" would require one to assume that the jury concluded that Bhogaita's PTSD substantially impaired his ability to interact with others but not his ability to work in a broad range of jobs, such as those requiring significant social interaction. That is a speculative assumption and, based on the evidence and argument, an unlikely one. Therefore, the instruction does not warrant reversal.

Nor does the court's refusal to give the Association's requested necessity instruction require reversal. The Association insists the instruction was incomplete because it did not refer to Bhogaita's "use[ ] and enjoy[ment]" of his unit.
(R. 121 at 2.) But establishing an accommodation's necessity requires only proof the accommodation "address[es] the needs created by the handicap," *Schwarz,* 544 F.3d at 1226, and the instruction given properly expressed that principle. (R. 130 at 9 ("To prove that the desired accommodation is necessary, [Bhogaita] must show, at a minimum, that the accommodation would affirmatively enhance [his] quality of life by ameliorating (or reducing) the effects of his disability.").) It affirmatively required the jury to find "an identifiable relationship, or nexus, between the requested accommodation and [Bhogaita's] disability." (R. 130 at 9.)

Moreover, based on the contents of the letters the Association concedes it received from Bhogaita and Dr. Li, no reasonable fact finder could conclude that the Association was unaware of Bhogaita's asserted need for an accommodation. Because nothing supported the Association's theory it lacked knowledge, it was not error for the court to refuse to instruct the jury on that theory. *Ad–Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.,* 849 F.2d 1336, 1349 (11th Cir.1987) (holding that a trial court must instruct the jury on a litigant's theory of the case only if the litigant makes a proper

request and "there is any competent evidence to support the theory").

### E.   In allowing the dog to remain in the courtroom, the court did not abuse its discretion.

The Association insists the dog's presence in the courtroom and at Bhogaita's side during his testimony was unfairly prejudicial, as it suggested that Bhogaita required the dog at all times, and that this prejudicial effect substantially outweighed any probative value the dog may have had. *See*Fed.R.Evid. 403 (permitting courts to "exclude relevant evidence" if the danger of "unfair prejudice" substantially outweighs its probative value). The district court hearing this case concluded otherwise, but that is the nature of the broad discretion granted to trial courts determining evidentiary matters. *1291 *Gray ex rel. Alexander v. Bostic,* 720 F.3d 887, 893 (11th Cir.2013) (explaining that the abuse of discretion standard implies a range of choices). And this discretion is particularly broad with respect to Rule 403 determinations. *Sprint/United Mgmt. Co. v. Mendelsohn,* 552 U.S. 379, 384–85, 128 S.Ct. 1140, 1145, 170 L.Ed.2d 1 (2008). A district court abuses its discretion to admit relevant evidence when its decision rests on a clearly erroneous factfinding, "an errant conclusion of law, or an improper application of law to fact." *Fid. Interior Constr., Inc.,* 675 F.3d at 1258 (internal quotation marks omitted). Nothing suggests that the district court's decision allowing the dog to remain present as a demonstrative exhibit rested on any of the three.

### F.   The district court did not err in awarding attorneys' fees.

The FHA allows a prevailing party to recover reasonable attorneys' fees and costs. 42 U.S.C. § 3613(c)(2). "[A] 'prevailing party' is one who has been awarded some relief." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.,* 532 U.S. 598, 603, 121 S.Ct. 1835, 1839, 149 L.Ed.2d 855 (2001). Bhogaita's award

of $5,000 in compensatory damages represents relief, and, despite the Association's insistence otherwise, was not nominal. *See Farrar v. Hobby,* 506 U.S. 103, 108, 113 S.Ct. 566, 571, 121 L.Ed.2d 494 (1992) (noting that an award of one dollar was nominal); *Black's Law Dictionary* 447 (9th ed.2009) (defining "nominal damages" as "[a] trifling sum awarded when a legal injury is suffered but there is no substantial loss or injury to be compensated"). Thus, he is entitled to reasonable fees and costs. We do not consider whether the amount of fees awarded was an abuse of discretion, as the Association contends only that Bhogaita should have been awarded no fees at all.

 casetext

Because we conclude from the record that there is no merit to any of the arguments the Association makes in this appeal, we affirm the judgment entered on the jury's verdict and the district court's order awarding Bhogaita attorneys' fees.

AFFIRMED.