Nos. 14-4776 & 14-4777 UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

# Revock v. Cowpet Bay W. Condo. Ass'n

853 F.3d 96 (3d Cir. 2017)
Decided Mar 31, 2017

Nos. 14-4776 & 14-4777

03-31-2017

Liana REVOCK, Executrix of the Estate of Barbara Walters, Appellant in case no. 14–4776 v.

COWPET BAY WEST CONDOMINIUM ASSOCIATION; the Board of the Cowpet Bay West Condominium Association; Max Harcourt, in his personal capacity; Alfred Felice; Lance Talkington; Robert Cockayne; Vincent Verdiramo Judith Kromenhoek, Appellant in case no. 14– 4777 v. Cowpet Bay West Condominium Association; the Board of the Cowpet Bay West Condominium Association; Max Harcourt, in his personal capacity; Alfred Felice; Lance Talkington; Robert Cockayne; Vincent Verdiramo

Karin A. Bentz, Esq. [ARGUED], Gregory A. Thorp, Esq., Law Offices of Karin A. Bentz, 5332 Raadets Gade, Suite 3, St. Thomas, VI 00802, Counsel for Appellants W. Todd Boyd, Esq., James K. Parker, Jr., Esq. [ARGUED], Yvette R. Lavelle, Esq., Boyd, Richards, Parker & Colonnelli, P.L., 100 Southeast Second Street, Suite 2600, Miami, FL 33131, Joseph G. Riopelle, Esq., Boyd Richards Parker & Colonnelli, 400 North Ashley Drive, Suite 1150, Tampa, FL 37606, Carl R. Williams, Esq., Birch de Jongh & Hindels, 1330 Estate Taarnebjerg, St. Thomas, VI 00802, Counsel for Appellees Cowpet Bay West Condominium Association, Inc., Board of the Cowpet Bay West Condominium Association, Robert Cockayne and Vincent Verdiramo ; former counsel for Appellee Max Harcourt, deceased John H.

Benham, III, Esq., Boyd L. Sprehn, Esq. [ARGUED], Benham & Chan, P.O. Box 11720, St. Thomas, VI 00801, Counsel for Appellee Lance Talkington Kyle R. Waldner, Esq. [ARGUED], Ryan C. Meade, Esq., Quintairos, Prieto, Wood & Boyer, P.A., 9300 South Dadeland Boulevard, Fourth Floor, Miami, FL 33156, Former counsel for Appellee Alfred Felice, deceased Vanita Gupta, Esq., Mark L. Gross, Esq., April J. Anderson, Esq. [ARGUED], United States Department of Justice, Civil Rights Division, Appellate Section, Ben Franklin Station, P.O. Box 14403, Ben Franklin Station, Washington, DC 20044, Counsel for Amicus Appellant United States of America

---

RESTREPO, Circuit Judge

Karin A. Bentz, Esq. [ARGUED], Gregory A. Thorp, Esq., Law Offices of Karin A. Bentz, 5332 Raadets Gade, Suite 3, St. Thomas, VI 00802, Counsel for Appellants

W. Todd Boyd, Esq., James K. Parker, Jr., Esq. [ARGUED], Yvette R. Lavelle, Esq., Boyd, Richards, Parker & Colonnelli, P.L., 100 Southeast Second Street, Suite 2600, Miami, FL 33131, Joseph G. Riopelle, Esq., Boyd Richards Parker & Colonnelli, 400 North Ashley Drive, Suite 1150, Tampa, FL 37606, Carl R. Williams, Esq., Birch de Jongh & Hindels, 1330 Estate Taarnebjerg, St. Thomas, VI 00802, Counsel for Appellees Cowpet Bay West Condominium Association, Inc., Board of the Cowpet Bay West Condominium Association, Robert Cockayne and Vincent Verdiramo ; former counsel for Appellee Max Harcourt, deceased



John H. Benham, III, Esq., Boyd L. Sprehn, Esq. [ARGUED], Benham & Chan, P.O. Box 11720, St. Thomas, VI 00801, Counsel for Appellee Lance Talkington

Kyle R. Waldner, Esq. [ARGUED], Ryan C. Meade, Esq., Quintairos, Prieto, Wood & Boyer, P.A., 9300 South Dadeland Boulevard, Fourth Floor, Miami, FL 33156, Former counsel for Appellee Alfred Felice, deceased

Vanita Gupta, Esq., Mark L. Gross, Esq., April J. Anderson, Esq. [ARGUED], United States Department of Justice, Civil Rights Division, Appellate Section, Ben Franklin Station, P.O. Box 14403, Ben Franklin Station, Washington, DC 20044, Counsel for Amicus Appellant United States of America

Before:    FUENTES,[*]    VANASKIE    and RESTREPO, Circuit Judges

[*] Honorable Julio M. Fuentes assumed senior status on July 18, 2016.

OPINION OF THE COURT

RESTREPO, Circuit Judge

Appellants Barbara Walters and Judith Kromenhoek filed these civil rights actions under the Fair Housing Act. Walters and Kromenhoek sought accommodations for their disabilities in the form of emotional support animals, which were not permitted under the rules of their condominium association. They allege violations of their right to a reasonable accommodation of their disabilities, 42 U.S.C. § 3604(f)(3)(B), and interference with the exercise of their fair housing rights, 42 U.S.C. § 3617. They also allege supplemental territorial claims.

Among other issues, these cases raise the question whether a Fair Housing Act claim survives the death of a party. We hold that the District Court improperly answered this question by applying a limited gap-filler statute, 42 U.S.C. § 1988(a), and, in turn, territorial law. We conclude that the survival of claims under the Fair Housing Act is not governed by Section 1988(a), but rather by federal common law, under which a Fair Housing Act claim survives the death of a party.

100 Accordingly, *100 we will reverse the District Court's grant of summary judgment against Walters' executrix.

On the merits of the summary judgment motions, we will reverse in part and vacate in part. We will remand to the District Court with instructions to consider whether to permit substitution for two

deceased Appellees.

**I** [1]

[1] In our recitation of the facts, we consider as affidavits Walters and Kromenhoek's sworn verified complaints, to the extent that they are based upon personal knowledge and set out facts that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(4) ; *see also Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985) (treating verified complaint as affidavit for summary judgment purposes).

Appellants Walters and Kromenhoek suffered from disabilities, for which each was prescribed an emotional support animal. Each woman obtained a dog. This violated the "no dogs" rule of their condominium association, Cowpet Bay West. Cowpet's "no dogs" rule provided that "Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors." App. 104. The rule had no exceptions and Cowpet had no policy regarding assistive

animals, such as emotional support animals.[1] The "no dogs" rule was enforced by the Cowpet Board of Directors, which has the authority to enforce the Cowpet "Rules and Regulations with monetary fines and other sanctions...." App. 100.

> Elderly and Persons with Disabilities, 73 Fed. Reg. 63834, 63834–36 (Oct. 27, 2008) (discussing the role of assistive animals, but noting that HUD regulations do not provide a specific definition).
>
> What we are *not* referring to is a "service animal" under the Americans with Disabilities Act (ADA). *See* 28 C.F.R. § 35.104 (2016) ("Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability.... [T]he provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks for the purposes of this definition."). We use the phrases "service animal" and "service dog" only when quoting the parties directly.

Walters and Kromenhoek each attempted to request an accommodation for an emotional support animal by filing paperwork with Cowpet's office manager, Louanne Schechter. The paperwork included a doctor's letter prescribing an emotional support animal, and a dog certification. Each certification stated that the dog was "prescribed and deemed necessary to assist ... the confirmed disabled handler" and that "property managers and landlords are required to make reasonable accommodation" under the Fair Housing Act. App. 1304, 2231. Walters submitted her paperwork in February 2011 and Kromenhoek in July 2011. Cowpet took no action at the time.

The presence of dogs at Cowpet drew the ire of some residents. One resident, Appellee Lance Talkington, fanned the flames by writing about dogs at Cowpet on his blog about the community. In October 2011, Talkington wrote on his blog that "Barbara[ ] [Walters] has a dog and claims to have 'papers' that allow her to have it." App. 1904. He also wrote that he had asked the office manager "whether the office has Barbara[ ] [Walters'] paperwork in their files and whether monetary fines have been assessed if not," but had not received an answer. *Id.*

In response to this blog post, Appellee Alfred Felice posted the first of many inflammatory comments on Talkington's *101 blog.[3] Felice wrote that dog owners might be "happier in another community rather than ostracized at [Cowpet], which would be another fine recourse, besides a significant $ $ fine, with progressive amounts." App. 1905.

> [3] Neither Talkington nor Felice were on the Cowpet Board. Walters was a Board member.

Walters, having been named by Talkington, responded on the blog. She wrote that "[s]ince you so tactfully used my name in this blog, I am required to defend myself, not as a 'violator' of any laws, but a person with a disability...." App. 1906. Walters also wrote that she was "mortified, that my personal business has been laid out over the internet without my permission or forewarning." App. 1912. Felice replied that someone who needed an emotional support dog "might go off his/her gourd without the pet at his/her side" in a "violent reaction. We don't even know we need protection![ ] Bad Law![ ]" App. 1906–07. Talkington also commented that

---

[1] We use the term "emotional support animal" colloquially to refer to an animal that assists a person with a

disabilityrelated need for emotional support. This is not a term of art under the Fair Housing Act. *See generally* Pet Ownership for the

Walters "has a pet and should be fined." App. 1910.

There followed a flurry of emails among the Cowpet Board, Walters and Kromenhoek. On October 27, 2011, Walters emailed the members of the Board that "[m]y paperwork is on file in the office, but my medical information is no ones [sic] business and since this board has a history of violating confidentiality, how the hell can I trust any one of you to keep their mouth shut. Am I going to find my information on Lance[ ] [Talkington's] blog again?" App. 492.

On October 28, 2011, the Board president, Appellee Max Harcourt, notified Walters and Kromenhoek by email that they were in violation of the "no dogs" rule. Harcourt wrote that the office manager "tells me that both you have 'papers in the office' regarding service dogs; however you have not applied for an exception to the rule." App. 495. Harcourt gave Walters and Kromenhoek ten days to submit a request to the Board or be fined. Harcourt copied his email to Talkington, who posted it on his blog.

The same day, Walters emailed the Board that "I am in possession of a service dog, and under the disabilities act set forth in the Fair Housing Amendment ... I qualify to keep [a] service animal even when policy explicitly prohibits pets.... If any medical information is disclosed to Anderson, Talkington or any one [sic] else, that will be taken as violation of privacy, and will be dealt with accordingly." App. 581.

Kromenhoek also emailed Harcourt, although the copy of the email in the record is undated. Like Walters, Kromenhoek wrote that she had "filed the necessary paperwork in the office and according to the Disabilities Act set forth in the Fair Housing Amendment ... I qualify to keep a service animal even when policy explicitly prohibits pets." App. 583. She further wrote that she trusted the office manager with her medical information, but not the Board "as you have proved time and again that you cannot be

trusted.... This is not a request for you to consider but this is informing you that I have a service dog and I am not in any violation." *Id.* Kromenhoek wrote that she would "disclose my history and paperwork [to Harcourt] provided you sign a confidentiality agreement with a monetary penalty for disclosure...." App. 584. Kromenhoek avers that she personally spoke to Harcourt and "invited him" to review her paperwork and to sign a confidentiality agreement, which he refused to sign. App. 110.

Significantly, the parties dispute how the Board responded. According to Walters and Kromenhoek, Harcourt did review their paperwork in the Cowpet office. They *102 point to the affidavit of the office manager, Schechter, who avers that Harcourt "came to the office and reviewed the documents...." App. 263, 349. Schechter further avers that Harcourt "also sent his 'representative' Bill Canefield, another Board member to review the documents." App. 263–64, 349–50.

Appellees deny that the Board reviewed the paperwork on file in the Cowpet office. They rely on the affidavit of Board treasurer, Sharon Koehler, who avers that the Board "neither reviewed nor discussed the content of [Walters and Kromenhoek]'s medical verification and accommodation request, until March 2012, when Plaintiff submitted same to then president, Ed Wardwell." App. 526, 612. There is no testimony from Harcourt, who died while the case was pending in the District Court.

The Board did not grant an accommodation to Walters or Kromenhoek in the fall of 2011. To the contrary, at a January 2012 Board meeting, Appellee Vincent Verdiramo moved to impose fines on dog owners. The Board voted to fine Walters and Kromenhoek for violating the "no dogs" rule. The fine was fifty dollars per day. These fines were held in abeyance, pending legal advice.[4]

[4] Shortly after Cowpet imposed fines on them, Walters and Kromenhoek each filed a complaint with the United States Department of Housing and Urban Development ("HUD"). HUD subsequently reviewed the merits of their reasonable accommodation claims against Cowpet and dismissed them for lack of "reasonable cause." 42 U.S.C. § 3610(g)(3). This ruling does not foreclose a private civil action. 42 U.S.C. § 3613(a)(2) ; *see also Turner v. Sec'y U.S. Dep't Hous. & Urban Dev.*, 449 F.3d 536, 540 (3d Cir. 2006). Talkington posted the HUD complaints on his blog.

On Talkington's blog, Felice and Talkington continued to denigrate dog owners at Cowpet. For example, in November 2011, Felice wrote "If you can't remove the guilty, you can certainly ostracize them." App. 1920. In December 2011, Talkington wrote a blog post naming and labeling Walters and Kromenhoek as "known violators" and their emotional support animals as "illegal neighborhood puppy dogs." App. 1924.

Talkington also reported that a neighbor heard one dog barking and added, sarcastically, that "trained service dogs are specifically trained to not bark unless the owner is in imminent danger. Maybe one of the pups pooped in the owner's unit and was warning the owner to watch out?" App. 1924.

Talkington subsequently wrote a blog post stating that Walters and Kromenhoek have "certified" emotional support dogs, but that such certifications are issued without "verify[ing] either the animal's credentials or the purported disability." App. 1930. Talkington later posted that "[t]hese r[i]diculous puppy dog diplomas from the paper mills are out of line." App. 1934. Talkington wrote that the "diploma mill" would accept "stress" as "a disability that qualifies for their certification" without any doctor confirmation. App. 1935. Felice echoed this sentiment in belligerent terms. He wrote: "PAY a few $'s on the internet and 'PRESTO' a service

dog is born ... I could 'certify' my ceramic toy with THAT process." App. 1935.

Later that winter, Talkington wrote on his blog that Cowpet should "go on the offensive and lawyer up to pursue an action against owners who are noncompliant with the policy on service dogs.... This is the type of action where each party will bear their own legal costs regardless of the outcome, so each party will have to decide how badly they want to pursue it." App. 1938. Felice then posted a comment, describing Walters and Kromenhoek as "miscreants." App. 1939. Felice wrote that "failure to comply [with the no dogs rule] *103 must lead to liens and even foreclosure, if needed, for compliance to be effective. These ungracious owners are totally selfish, spoiled, brats, willing to flaunt their illegality in every one[']s face.... Such gall and nerve require full responce [sic], with ostracizing the offenders in every manner at our disposal![ ] Isolate them completely to their little 'dog patch' on the beach and ignore them at every venue or occasion![ ]" *Id.* Talkington followed up by writing that Walters and Kromenhoek are "playground bullie[s]" attempting to "hang onto their puppies." App. 1940. He wrote that "it is time for the association to go on the offensive and file suit in a court of law to force the issue. When these ladies have to start spending their own cash ... the rubber will meet the road on how far everyone is willing to go on this issue." App. 1940–41.

The ferment finally came to a close after Harcourt completed his term as President of the Cowpet Board and was succeeded by a new President, Ed Wardwell. In March 2012, Walters and Kromenhoek submitted to Wardwell formal requests for accommodation. In April 2012, the Board granted the requests and waived the accrued fines.

Walters and Kromenhoek, nevertheless, filed these civil rights cases under the Fair Housing Act. They raised two federal claims: (1) that Cowpet denied their reasonable requests for accommodation in violation of 42 U.S.C. § 3604(f)(3)(B) and (2) that

Cowpet and three individual Appellees (Talkington, Felice and Harcourt) interfered with the exercise of their fair housing rights in violation of 42 U.S.C. § 3617.

Walters and Kromenhoek also asserted supplemental territorial law claims against all Appellees.[2]

> 6 We granted substitution of Liana Walters Revock as personal representative under Federal Rule of Appellate Procedure 43(a). We refer to Walters by name for ease of reference.

Walters and Kromenhoek now appeal the District Court's dismissal of their claims at summary judgment. In addition, Walters and Kromenhoek have filed motions to substitute representatives for Appellees Felice and Harcourt, who died while these cases were pending in the District Court.[7]

> 7 We refer to Felice and Harcourt by name for ease of reference. On appeal, former counsel for Felice purports to represent Felice and explains that he is being paid by Felice's insurer. Harcourt is purportedly represented by counsel for Cowpet, Cockayne and Verdiramo. As is consistent with our precedent, we do not refer to counsel in the caption as "representing" Felice or Harcourt. *Giles v. Campbell*, 698 F.3d 153, 158 n.3 (3d Cir. 2012) (citing *Bass v. Attardi*, 868 F.2d 45, 50 n.12 (3d Cir. 1989) ).

## II

---

> [2] Walters and Kromenhoek have conceded their claims against the Board. They have also conceded previously-raised ADA claims.

Tragically, Walters committed suicide while her case was pending in the District Court.[6] Appellees moved for summary judgment. The District Court dismissed

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 48 U.S.C. § 1612(a). We have jurisdiction under 28 U.S.C. § 1291.

The existence and scope of our jurisdiction are disputed issues because, some Appellees *104 contend, Walters and Kromenhoek filed their notices of appeal prematurely. However, to the extent that the initial judgment Walters and Kromenhoek appealed was non-final, it was later replaced with revised judgments on both dockets that ended the litigation on the merits for all parties. *See Morton Int'l, Inc. v. A.E. Staley Mfg. Co.* , 460 F.3d 470, 476 (3d Cir. 2006) (explaining that a decision is "final" under § 1291 when all claims against all parties have been resolved). Within thirty days of the entry of the revised judgments, and at the request of the Clerk of our Court, Walters and Kromenhoek filed jurisdictional statements identifying these final judgments as the decisions to be challenged on appeal.

The simplest route to finding jurisdiction and defining its scope is thus through *Smith v. Barry* , 502 U.S. 244, 112 S.Ct. 678, 116 L.Ed.2d 678 (1992), under which we may consider a document to be the equivalent of a notice of appeal so long as it meets the requirements of Federal Rule of Appellate Procedure 3(c) and is filed within the time limits of Federal Rule of Appellate Procedure 4(a). *See id.* at 248–49, 112 S.Ct. 678 ; *In re FMC Corp. Packaging Sys. Div.* , 208 F.3d 445, 451 (3d Cir. 2000) (treating petition for mandamus that satisfied Rule 3 as notice of appeal "provided that it was filed, as it was, within the 30–day limit set by Fed. R. App. P. 4(a)(1)"); *see also Benn v. First Judicial Dist. of Pa.* , 426 F.3d 233,

Walters' Fair Housing Act claims entirely due to her death. As to Kromenhoek, the District Court denied her Fair Housing Act claims on the merits. The District Court declined to exercise supplemental jurisdiction over the territorial claims in both cases because no federal claims remained. *See* 28 U.S.C. § 1367(c)(3).

237 (3d Cir. 2005) (emphasizing liberal construction of *Rule 3* ); *Intel Corp. v. Terabyte Int'l, Inc.* , 6 F.3d 614, 618 (9th Cir. 1993) (treating opening brief as amended notice of appeal that extended appellate jurisdiction over post-judgment attorney's fees order). The jurisdictional responses were both timely under Rule 4 and appropriately fashioned under Rule 3. We thus have jurisdiction over the appeal extending to all of the Appellees.[8]

[8] Felice's pending motion to dismiss the appeal is denied.

## III

We exercise plenary review over the question whether a Fair Housing Act claim survives the death of a party, as this is an issue of law. We also exercise plenary review over a grant of a motion for summary judgment. *Goldenstein v. Repossessors Inc.* , 815 F.3d 142, 146 (3d Cir. 2016). We draw all reasonable inferences in favor of the nonmoving party. *Id.* at 146. We will affirm if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## IV

The Fair Housing Act was enacted in 1968 "to eradicate discriminatory practices within a sector of our Nation's economy." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.* , ——U.S. ——, 135 S.Ct. 2507, 2521, 192 L.Ed.2d 514 (2015). The stated policy is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. In 1988, Congress extended the Fair Housing Act to protect against discrimination on the basis of disability. *City of Edmonds v. Oxford House, Inc.* , 514 U.S. 725, 728 n.1, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995) ; Fair Housing Amendments Act of 1988, Pub. L.

No. 100–430, 102 Stat. 1619 (1988). This was "a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream." *Hovsons, Inc. v. Twp. of Brick* , 89 F.3d 1096, 1105 (3d Cir. 1996) (emphasis and citations omitted).

The Supreme Court has held that when *105 construing the Fair Housing Act, "we are to give a 'generous construction' to the statute's 'broad and inclusive' language." *Lakeside Resort Enters., LP v. Bd. of Supervisors of Palmyra Twp.* , 455 F.3d 154, 156 (3d Cir. 2006) (quoting *Trafficante v. Metro. Life Ins. Co.* , 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) ).

These cases require us to address an issue of first impression—whether claims under the Fair Housing Act survive the death of a party.[3] The Fair Housing Act is silent as to survival. In the face of this interstice, the District Court answered the survival question by applying a limited gapfiller statute, 42 U.S.C. § 1988(a), which in turn led the District Court to apply territorial law. The District Court applied a Virgin Islands statute, V.I. Code Ann. tit. 5, § 77, under which it held that Walters' Fair Housing Act claims did not survive her death.[10]

with respect to Walters and Kromenhoek, as both cases involve the deceased Appellees, Felice and Harcourt.

[10] V.I. Code Ann. tit. 5, § 77 states, in relevant part: "A thing in action arising out of a wrong which results in physical injury to the person or out of a statute imposing liability for such injury shall not abate by reason of the death of the wrongdoer or any other person liable for damages for such injury, nor by reason of the death of the person injured or of any other person who owns any such thing in action."

[3] The issue of survival was paramount in Walters' case and formed the basis for

the District Court's ruling against her. However, we address the survival issue

We disagree with the District Court's decision to apply Section 1988(a) and, in turn, territorial law. For the reasons below, we conclude that Section 1988(a) does not apply to the issue of whether a Fair Housing Act claim survives the death of a party. Rather, we apply a uniform rule of federal common law. We will reverse the judgment of the District Court dismissing Walters' case due to her death.

## A

Section 1988(a) of Title 42 provides:

> The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of *titles 13, 24, and 70 of the Revised Statutes* for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; *but in all cases where they are not adapted to the object, or are deficient* in the provisions necessary to furnish suitable remedies and punish offenses against law, *the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern* the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

42 U.S.C. § 1988(a) (2016) (emphasis added).[4]

*106 Section 1988(a) provides that where *certain* federal laws "are deficient" the federal courts may apply "common law, as modified and changed by the constitutions and statutes of the State," provided that the state law is "not inconsistent with the Constitution and laws of the United States." 42 U.S.C. § 1988(a). For the reasons below, Section 1988(a) does not apply to the Fair Housing Act.

> analysis.

> The slight difference between the two texts consists of how they refer to three Titles of the Revised Statutes. Section 1988(a) refers to them by *number* and Section 722 of the Revised Statutes, by *name*. Compare 42 U.S.C. § 1988(a) (2016) ("titles 13, 24, and 70 of the Revised Statutes...."), *with* R.S. § 722 ("this Title [The Judiciary], and of Title 'Civil Rights,' and of Title 'Crimes' "). The alteration is an editorial decision by the publishers of the United States Code, as we explain in more detail below.

## 1

Our holding is based on the text of Section 1988(a). On its face, the statute applies to certain statutes—those found within three Titles of the Revised Statutes, "titles 13, 24, and 70." 42 U.S.C. § 1988(a). If the Fair Housing Act had been contained within one of these three Titles, it would fall within Section 1988(a). Of course, the Fair Housing Act was enacted almost a century after the Revised Statutes. It was never codified in its Titles 13, 24 or 70. *Trafficante* , 409 U.S. at 205, 93 S.Ct. 364 (citing Civil Rights Act of 1968, Pub. L. No. 90–284, 82 Stat. 73 (1968)). Therefore, Section 1988(a) by its plain meaning does not apply to the Fair Housing Act.

---

[4] Section 1988(a) is published at 42 U.S.C. § 1988(a), which is only "prima facie" evidence of the law, as Title 42 has not been enacted into positive law. 1 U.S.C. § 204(a). The authoritative text is Section 722 of the Revised Statutes of 1874, which is positive law. *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 449, 449 n.4, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993). The texts are substantively the same, and so is our

*Cf. Carlson v. Green* , 446 U.S. 14, 24 n.11, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (observing that " Section 1988 does not in terms apply to *Bivens* [*v. Six Unknown Named Agents of Federal Bureau of Narcotics* , 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) ] actions....").

Cowpet concedes this point, but urges us to ignore the plain text of the statute. For the reasons below, we will not do so.

## 2

Our text-based conclusion that Section 1988(a) does not apply to the Fair Housing Act is consistent with the legislative history, which shows that Section 1988(a) has always applied to designated statutes only. Section 1988(a) has never applied globally to any statute that could be labelled a "civil rights" law.

Section 1988(a) was enacted as Section 3 of the Civil Rights Act of April 9, 1866. *Moor v. Cty. of Alameda* , 411 U.S. 693, 704, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973) (citing Civil Rights Act of April 9, 1866, ch. 31, § 3, 14 Stat. 27 (1866) (current version at 42 U.S.C. § 1988(a) )). It was "intended to do nothing more than to explain the source of law to be applied in actions brought to enforce the substantive provisions of the [same] Act, including [Section] 1." *Moor* , 411 U.S. at 705, 93 S.Ct. 1785. Those substantive provisions later became 42 U.S.C. §§ 1981 and 1982. *CBOCS West, Inc. v. Humphries* , 553 U.S. 442, 448, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008) (citation omitted).

In 1870 and 1871, Congress "directed ... that § 1988 would guide courts in the enforcement of" particular statutes, which later became 42 U.S.C. §§ 1981 and 1983. *Moor* , 411 U.S. at 705 n.19, 93 S.Ct. 1785 (citing Act of May 31, 1870, ch. 114, § 16, 16 Stat. 140, 144 (1870) (current version at 42 U.S.C. § 1981 ) and Act of April 20, 1871, ch. 22, § 1, 17 Stat. 13, 13 (1871) (current version at 42 U.S.C. § 1983 )).

Finally, in the Revised Statutes of 1874, Congress made Section 1988 more "generally applicable" to three specified Titles of the Revised Statutes. *Moor* , 411 U.S. at 705 n.19, 93 S.Ct. 1785. Those three Titles are "this Title [The Judiciary], and of Title 'Civil Rights,' and of Title 'Crimes.' " R.S. § 722. Of these three, Title "Civil Rights" contains the Reconstruction-era civil rights statutes, including what are now *107 42 U.S.C. §§ 1981, 1982 and 1983. 42 U.S.C. § 1981 (original version at R.S. § 1977); 42 U.S.C. § 1982 (original version at R.S. § 1978); 42 U.S.C. § 1983 (original version at R.S. § 1979).

Here the amendments end. Congress has never again amended the phrase "this Title [The Judiciary], and of Title 'Civil Rights,' and of Title 'Crimes.' " R.S. § 722. As a result, Section 1988(a) continues to apply only those laws codified within these three Titles, Titles 13, 24 and 70, of the Revised Statutes of 1874.[12]

---

[12] The text of the United States Code, 42 U.S.C. § 1988(a), *has* changed. The editors of the United States Code have used different phrases, always to refer to the same three Titles of the Revised Statutes. The current phrase, "the provisions of titles 13, 24, and 70 of the Revised Statutes," first appeared in 1988. 42 U.S.C. § 1988 (1988). Prior to that, the editors used these three phrases: (i) "of this Title, and of Title 'CIVIL RIGHTS,' and of Title 'CRIMES,' " 42 U.S.C. § 1988 (1982) and (1976); (ii) "this chapter and Title 18," 42 U.S.C. § 1988 (1970), (1964), (1958) and 8 U.S.C. § 49a (Supp. II 1948); and (iii) "chapter 3 of Title 8, and Title 18," 28 U.S.C. § 729 (1940), (1934) and (1926).

We conclude that these are editorial changes for two reasons. First, the changes were not made by congressional amendment. *Cf.* Religious Land Use and Institutionalized Persons Act of 2000, Pub. L. No. 106–274, § 4(d), 114 Stat. 804 (2000) ; Federal Courts

Improvement Act of 1996, Pub. L. No. 104–317, Title III, § 309(b), 110 Stat. 3847 (1996); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103–322, Title IV, § 40303, 108 Stat. 1796 (1994); Religious Freedom Restoration Act of 1993, Pub. L. No. 103–141, § 4(a), 107 Stat. 1488 (1993) ; Civil Rights Act of 1991, Pub. L. No. 102–166, Title I, §§ 103, 113(a), 105 Stat. 1071 (1991); Act of Oct. 21, 1980, Pub. L. No. 96–481, Title II, § 205(c), 94 Stat. 2321 (1980); Civil Rights Attorney's Fees Awards Act of 1976, Pub. L. No. 94–559, § 2, 90 Stat. 2641 (1976). Second, the editorial notes, which accompany each version of the statute since 1940, consistently refer back to the Revised Statutes.

> Changes "made by a codifier without the approval of Congress" are "given no weight." *United States v. Welden*, 377 U.S. 95, 98 n.4, 84 S.Ct. 1082, 12 L.Ed.2d 152 (1964). However, the changes do shed light on a prior decision of this Court. In *Miller v. Apartments & Homes of New Jersey, Inc.*, we applied Section 1988, as the editors published it in 1970. 646 F.2d 101, 105 (3d Cir. 1981). At that time, the published version of Section 1988 purported to apply to claims under "this chapter." *Id.* at 105 (quoting 42 U.S.C. § 1988 ); *see also* 42 U.S.C. § 1988 (1970). This Court applied Section 1988(a) to housing discrimination claims, but without considering the textual issue addressed here—that the Fair Housing Act does not fall within the Revised Statutes, Titles 13, 24 and 70. We give *Miller* little weight as to the applicability of Section 1988(a) to the Fair Housing Act.

Congress' inaction with regard to Section 1988(a) stands in contrast to its frequent amendment of Section 1988(b), which relates to attorney's fees. Congress enacted Section 1988(b) in 1976 and then amended it repeatedly to provide for attorney's fees in cases under " sections 1981,

1981a, 1982, 1983, 1985, and 1986 of this title, title IX ..., the Religious Freedom Restoration Act of 1993 ..., the Religious Land Use and Institutionalized Persons Act of 2000 ..., title VI of the Civil Rights Act of 1964 ..., or section 13981 of this title...." 42 U.S.C. § 1988(b) (2016). *See, e.g.* , Religious Land Use and Institutionalized Persons Act of 2000, Pub. L. No. 106–274, § 4(d), 114 Stat. 803 (2000) ; Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103– 322, Title IV, § 40303, 108 Stat. 1796 (1994); Religious Freedom Restoration Act of 1993, Pub. L. No. 103–141, § 4(a), 107 Stat. 1488 (1993) ; Civil Rights Attorneys Fees Awards Act of 1976, Pub. L. No. 94–559, § 2, 90 Stat. 2641 (1976). In short, Congress has repeatedly amended Section 1988(b), but not Section 1988(a). This supports our holding that Congress intentionally applied Section 1988(a) only to Titles 13, 24 and 70 of the 108 Revised Statutes. *Cf.* *108 *Lewis v. United States* , 523 U.S. 155, 169–70, 118 S.Ct. 1135, 140 L.Ed.2d 271 (1998) (considering repeated amendments as evidence of Congressional intent).

### 3

Our decision is consistent with prior decisions interpreting Section 1988(a). The Supreme Court has applied Section 1988 to determine survival of a claim under Section 1983, a Reconstruction-era law. *Robertson v. Wegman n* , 436 U.S. 584, 589, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978) (citing *Moor* , 411 U.S. at 702 n.14, 93 S.Ct. 1785 ). It does *not* follow that Section 1988 also applies to the Fair Housing Act. The Supreme Court has, in general, "rejected linkage" between the Reconstruction-era Civil Rights Acts, e.g. 42 U.S.C. §§ 1981, 1983, 1985 and 1986, and "other federal statutes, emphasizing the independence of the remedial scheme established by the Reconstruction–Era Acts." *Burnett v. Grattan* , 468 U.S. 42, 49, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984) (citations omitted). For example, there are "vast differences" between Section 1982 and the

Fair Housing Act. *Jones v. Alfred H. Mayer Co.* , 392 U.S. 409, 416–17, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). *See also Fleming v. U.S. Postal Serv.* , 27 F.3d 259, 262 (7th Cir. 1994) (holding Section 1988 inapplicable to claims under Title VII of the Civil Rights Act of 1964 or the Rehabilitation Act of 1973); *Smith v. No. 2 Galesburg Crown Fin. Corp.* , 615 F.2d 407, 414 (7th Cir. 1980) (holding Section 1988 inapplicable to a claim under the Truth in Lending Act), *overruled on other grounds by Pridegon v. Gates Credit Union* , 683 F.2d 182, 194 (7th Cir. 1982) ; *but see Slade v. U.S. Postal Serv.* , 952 F.2d 357, 360 (10th Cir. 1991) (holding in a cursory decision that Section 1988 applies to Title VII claim).

For all of these reasons, we will follow the plain text of Section 1988(a), under which Section 1988(a) does not apply to the Fair Housing Act. We must turn elsewhere to determine whether a Fair Housing Act claim survives the death of a party.

## B

A Fair Housing Act claim is a federal statute, and therefore whether a claim survives the death of a party "is a question of federal law." *Carlson* , 446 U.S. at 23, 100 S.Ct. 1468 ; *see also United States v. Kimbell Foods, Inc.* , 440 U.S. 715, 726, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). As Congress has not provided statutory guidance, we resolve the survival issue according to federal common law. 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1954 (3d ed. 2016) ; 6–25 Jerry E. Smith, *Moore's Federal Practice* § 25.11 (2016). However, this does not resolve the matter. The "more difficult" question is not whether federal common law applies, but what its "content" should be. *Kimbell Foods* , 440 U.S. at 727, 99 S.Ct. 1448. Specifically, we must determine whether to apply a uniform rule of federal common law or adopt state law. *Id.* at 728, 99 S.Ct. 1448.

"Developing a federal common law rule is the exception rather than the rule." *In re Columbia*

*Gas Sys. Inc.* , 997 F.2d 1039, 1055 (3d Cir. 1993). In general, "[a]bsent a demonstrated need for a federal rule of decision, the Court has taken 'the prudent course' of 'adopt[ing] the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation.' " *Am. Elec. Power Co., Inc. v. Connecticut* , 564 U.S. 410, 422, 131 S.Ct. 2527, 180 L.Ed.2d 435 (2011) (quoting *Kimbell Foods* , 440 U.S. at 740, 99 S.Ct. 1448 ).

But while "the term and concept of 'federal common law' may strike some as anathema to 109 federal court jurisprudence in the wake of *109

Erie Railroad Co. v. Tompkins , 304 U.S. 64 [ ] (1938), ... in some areas of the law ... so-called 'federal common law' still exists to provide direction." *Wallach v. Eaton Corp.* , 837 F.3d 356, 365 n.11 (3d Cir. 2016) (citations omitted). One area where courts consistently apply a uniform rule of federal common law is survival of a federal claim. *See* 7C *Federal Practice and Procedure* , *supra* § 1954 ; 19 *Federal Practice and Procedure* , *supra* § 4516; *Moore's Federal Practice* , *supra* § 25.11. Indeed, numerous cases have applied a uniform federal rule to the issue of survival. *See Figueroa v. Sec'y of Health & Human Servs.* , 715 F.3d 1314, 1318 (Fed. Cir. 2013) (survival of claim under the Vaccine Act); *Harrow v.*

*Prudential Ins. Co. of Am.* , 279 F.3d 244, 248 (3d Cir. 2002) (survival of an ERISA claim); *United States v. Land, Winston Cty.* , 221 F.3d 1194, 1197 (11th Cir. 2000) (survival of forfeiture claim under 18 U.S.C. § 1955 ); *Sinito v. U.S. Dep't of Justice* , 176 F.3d 512, 513 (D.C. Cir. 1999) (survival of claim under the Freedom of Information Act); *United States v. NEC Corp.* , 11 F.3d 136, 137 (11th Cir. 1993), *as amended* , 11 F.3d 136 (1994) (survival of *qui tam* action under the False Claims Act); *Smith v. Dep't of Human Servs.* , 876 F.2d 832, 834 (10th Cir. 1989) (survival of claim under the Age Discrimination in Employment Act); *Mallick v. Int'l Bhd. of Elec. Workers* , 814 F.2d 674, 677 (D.C. Cir. 1987) (survival of a claim under the Labor–Management Reporting and Disclosure Act of

1959); *James v. Home Constr. Co. of Mobile, Inc.* , 621 F.2d 727, 729 (5th Cir. 1980) (survival of claim under Truth in Lending Act).

We find these decisions persuasive. Whether a Fair Housing Act claim survives the death of a party is an issue where a uniform federal common law rule is appropriate to fulfill the "overall purposes" of the statute. *Wallach* , 837 F.3d at 366 (quoting *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.* , 995 F.2d 425, 438 (3d Cir. 1993) (Greenberg, J., concurring and speaking for the majority)). The federal interest at stake in the Fair Housing Act, "to provide ... for fair housing throughout the United States," 42 U.S.C. § 3601, "warrants displacement of state law" on the "confined" issue of survival. *Empire Healthchoice Assurance, Inc. v. McVeigh* , 547 U.S. 677, 692, 126 S.Ct. 2121, 165 L.Ed.2d 131 (2006). Thus, we will apply a uniform rule.

As to the content of a uniform federal rule, we are cognizant that we lack the "creative power akin to that vested in Congress." *Am. Elec. Power Co.* , 564 U.S. at 422, 131 S.Ct. 2527 ; *see also Wallach* , 837 F.3d at 369 (adopting as uniform common law rule set forth in the Restatement of Contracts). For this reason, we will follow the weight of authority, which applies the pre-*Erie Railroad Co.*

*v. Tompkins* common law rule of survival, under which remedial claims survive, but penal claims do not. *See Moore's Federal Practice* , *supra* § 25.11; *Ex parte Schreiber* , 110 U.S. 76, 80, 3 S.Ct. 423, 28 L.Ed. 65 (1884) (penal claims do not survive). We are persuaded by the numerous cases that have applied this rule. *See, e.g.* , *Harrow* , 279 F.3d at 248 (ERISA claim remedial) ; *Land, Winston Cty.* , 221 F.3d at 1198 (forfeiture claim under 18 U.S.C. § 1955 remedial); *NEC Corp.* , 11 F.3d at 137 (*qui tam* action under the False Claims Act remedial); *Kilgo v. Bowman*

*Transp., Inc.* , 789 F.2d 859, 876 (11th Cir. 1986) (holding that if federal law applies, Title VII is remedial, but declining to decide whether federal law applies); *James* , 621 F.2d at 730 (Truth in Lending Act remedial). [5] *110 A Fair Housing Act claim is remedial. As we have stated, "[t]he Fair Housing Act was intended by Congress to have 'broad remedial intent.' " *Alexander v. Riga* , 208 F.3d 419, 425 (3d Cir. 2000) (quoting *Havens Realty v. Coleman* , 455 U.S. 363, 380, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) ); *see also Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly* , 658 F.3d 375, 385 (3d Cir. 2011) ("The FHA is a broadly remedial statute...."), *cert. dismissed* , —— U.S. ——, 134 S.Ct. 636, 187 L.Ed.2d 415 (2013). Thus, under the common law rule, Fair Housing Act claims survive the death of a party.

We now reach the merits of the first of two Fair Housing Act claims—whether Cowpet refused to provide a reasonable accommodation for Walters and Kromenhoek's disabilities, in violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B). We find that there are genuine issues of material fact. Therefore, we will reverse the grant of summary judgment for Cowpet.

## A

The Fair Housing Act makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2). " [D]iscrimination includes ... a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

---

[5] Our decision today applies only to survival under the Fair Housing Act. We do not consider whether a pre-*Erie* rule of

survival would be appropriate as to any other statute.

## V



To determine whether an accommodation is "reasonable," we consider "whether the requested accommodation is '(1) reasonable and (2) necessary to (3) afford handicapped persons an equal opportunity to use and enjoy housing.' " *Lapid–Laurel, L.L.C. v. Zoning Bd. of Adjustment of the Twp. of Scotch Plains* , 284 F.3d 442, 457 (3d Cir. 2002) (citation omitted).

A reasonable accommodation under the Fair Housing Act may include the use of an emotional support animal in one's own home, despite the existence of a rule, policy or law prohibiting such an animal. *See, e.g.* , *Castillo Condo. Ass'n v. U.S. Dep't of Hous. & Urban Dev.* , 821 F.3d 92, 100 (1st Cir. 2016) ; *Anderson v. City of Blue Ash* , 798 F.3d 338, 363 (6th Cir. 2015) ; *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.* , 765 F.3d 1277, 1289 (11th Cir. 2014). In emotional support animal cases, a housing provider may contest whether the accommodation is reasonable. Cowpet does not. There is no dispute that Walters and Kromenhoek are disabled and that the use of an emotional support animal was reasonable and necessary for their enjoyment of their homes.

Rather, what Cowpet does dispute is the additional statutory requirement that there be a "refusal" to provide the reasonable accommodation. 42 U.S.C. § 3604(f)(3)(B). To this requirement, we now turn.

Whether there has been a "refusal" to provide a reasonable accommodation under the Fair Housing Act depends on the circumstances. As several of our sister Circuits have held, a refusal may be "actual or constructive." *Groome Res. Ltd. v. Par. of Jefferson* , 234 F.3d 192, 199 (5th Cir. 2000) ; *accord Austin v. Town of Farmington* , 826 F.3d 622, 629 (2d Cir. 2016) ; *Bhogaita* , 765 F.3d at 1286. An undue delay in granting a reasonable accommodation may amount to a refusal.

111 *Bhogaita* , 765 F.3d at 1286 ; *111 Astralis Condo. Ass'n v. Sec'y, U.S. Dep't Hous. & Urban Dev.* ,

620 F.3d 62, 69 (1st Cir. 2010) ; *Groome Res. Ltd.* , 234 F.3d at 199. Moreover, a refusal "occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings." *Groome Res. Ltd.* , 234 F.3d at 199 (quoting *Bryant Woods Inn, Inc. v. Howard Cty.* , 124 F.3d 597, 602 (4th Cir. 1997) ).

However, we note that the same action, e.g. a denial, may sometimes amount to a "refusal" and, at other times, mere enforcement of a housing rule. For a housing provider's action to be considered a "refusal" under the Fair Housing Act, the provider must have had a prior "opportunity to accommodate." *Taylor v. Harbour Pointe Homeowners Ass'n* , 690 F.3d 44, 49 (2d Cir. 2012) (citing *Tsombanidis v. W. Haven Fire Dep't* , 352 F.3d 565, 578 (2d Cir. 2003), *superseded by regulation on other grounds* , 24 C.F.R. § 100.500(c) (2016), *as recognized in Mhany Mgmt., Inc. v. Cty. of Nassau* , 819 F.3d 581, 617 (2d Cir. 2016) ). "The defendants must have had an idea of what accommodation [the plaintiff] sought prior to their incurring liability for" refusing it. *Id.* (citing *Tsombanidis* , 352 F.3d at 579 ). For example, a housing provider may have an opportunity to accommodate because a plaintiff petitions for an accommodation or declares that she is entitled to it. *See, e.g.* , *Castillo* , 821 F.3d at 95, 98 (resident requested an accommodation by providing a doctor's note and advising housing provider "that he planned to keep his emotional support dog in his condominium unit and that he was entitled to do so under federal law"). In other circumstances, the disability and need for accommodation may be known or obvious to the provider. *Cf. Brady v. Wal–Mart Stores, Inc.* , 531 F.3d 127, 135 (2d Cir. 2008) (considering such a situation in the context of the ADA). These examples are non-exhaustive.[14]

[14] Herein, we describe the "refusal" element of a Fair Housing Act claim under 42 U.S.C. §

3604(f)(3)(B). We do not adopt the position of the Eleventh Circuit, which recognizes a freestanding "request" element. *See Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1225 (11th Cir. 2016) ; *Bhogaita*, 765 F.3d at 1285 ; *but see Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218 (11th Cir. 2008) (failing to list "request" as an element). We decline to follow the Eleventh Circuit's approach because it is a "refusal," not a "request" that is required by the text of Section 3604(f)(3)(B).

Even so, the substantive result may be the same. This is because the Eleventh Circuit has defined "request" to include any circumstances "sufficient to cause a reasonable [housing provider] to make appropriate inquiries about the possible need for an accommodation." *Hunt*, 814 F.3d at 1226 (alteration in original) (citation omitted). We agree with this broad interpretation, but do not take the same route to get there.

## B

Cowpet contends that it did not "refuse" a reasonable accommodation because Walters and Kromenhoek were never deprived of their emotional support animals. This argument fails. Cowpet did not have to deny Walters and Kromenhoek their emotional support animals in order to "refuse" a reasonable accommodation. As a matter of law, Cowpet may have refused a reasonable accommodation by declaring Walters and Kromenhoek in violation of the "no dogs" rule, by fining them fifty dollars a day or through undue delay. *Cf. Astralis* , 620 F.3d at 69 (refusal occurred where condominium association cited residents for parking infractions).

Whether Cowpet's actions constituted a "refusal," however, depends upon whether Cowpet was given an opportunity to accommodate. On this issue, the parties dispute material issues of fact. There are two *112 disputes of fact that preclude summary judgment.

First, the parties dispute whether Walters and Kromenhoek barred Cowpet from reviewing their paperwork. The basis for the dispute is a series of emails sent by Walters and Kromenhoek.

Although the content of the emails is undisputed, "there is a disagreement over the inferences that can be reasonably drawn from the facts...." *Windsor Sec., Inc. v. Hartford Life Ins. Co.* , 986 F.2d 655, 659 (3d Cir. 1993). Viewing the emails in the light most favorable to Walters and Kromenhoek, they are susceptible to two inferences. On one hand, Walters and/or Kromenhoek may have barred Cowpet from reviewing their paperwork. On the other hand, Walters and/or Kromenhoek may have only asked Cowpet to respect the privacy of their medical information. If the factfinder concludes that the latter inference prevails—that Cowpet was *not* barred from reviewing the paperwork— then Cowpet had an opportunity to accommodate, which it "refused."

Second, the parties dispute whether the Cowpet Board president, Harcourt, actually reviewed their paperwork on file in the Cowpet office. The office manager, Schechter, avers that Harcourt did so; the Board treasurer, Koehler, avers that he did not. If Harcourt reviewed the paperwork, then Cowpet had an opportunity to accommodate, which it refused. For both of these reasons, we will reverse the grant of summary judgment for Cowpet on Walters and Kromenhoek's Fair Housing Act reasonable accommodation claims.

## VI

Walters and Kromenhoek also allege interference with the exercise of their fair housing rights, in violation of 42 U.S.C. § 3617. The District Court granted summary judgment for Appellees. We will reverse in part and vacate in part.

## A

Under the Fair Housing Act, "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account

Case 1:22-cv-00448-TFM-N    Doc# 320-5    Filed 08/11/25    Page 15 of 19    PageID# 11918

Revock v. Cowpet Bay W. Condo. Ass'n    853 F.3d 96 (3d Cir. 2017)

of his having exercised or enjoyed ... any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617.

A Section 3617 claim does not require a substantive violation of Sections 3603 –3606. *Hidden Village, LLC v. City of Lakewood* , 734 F.3d 519, 528 (6th Cir. 2013) ; *Bloch v. Frischholz* , 587 F.3d 771, 782 (7th Cir. 2009) (en banc); *United States v. City of Hayward* , 36 F.3d 832, 836 (9th Cir. 1994). A claim may arise before or, as here, after a plaintiff acquires housing. *Bloch* , 587 F.3d at 782 ; *see also Hidden Village* , 734 F.3d at 529 (permitting post-acquisition Section 3617 claim to proceed to trial).

Walters and Kromenhoek's cases involve one type of Section 3617 claim—alleged "interfere[nce]" with fair housing rights. 42 U.S.C. § 3617 ; *see also* 24 C.F.R. § 100.400(c)(2) (2016) (setting forth examples of unlawful conduct, including interference with "enjoyment of a dwelling"). A Section 3617 interference claim requires proof of three elements: (1) that the plaintiff exercised or enjoyed[15] "any right granted or protected by"

Sections 3603 –3606 ; (2) that the defendant's conduct constituted interference; and (3) a causal connection existed between the exercise or *113 enjoyment of the right and the defendant's conduct. 42 U.S.C. § 3617 ; *see also* Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act, 81 Fed. Reg. 63054, 63059 (Sept. 14, 2016).

[15] In the alternative, Section 3617 prohibits discrimination on account of one "having aided or encouraged any other person in the exercise or enjoyment of" fair housing rights. 42 U.S.C. § 3617.

The term "interference" is not defined by the Fair Housing Act or the implementing regulation, 24 C.F.R. § 100.400 (2016). Therefore, the word must be "understood by its ordinary meaning." *United States v. Piekarsky* , 687 F.3d 134, 145 (3d Cir. 2012). The Ninth Circuit has construed

"interference" for the purposes of Section 3617 according to a dictionary definition as, "the act of meddling in or hampering an activity or process." *Walker v. City of Lakewood* , 272 F.3d 1114, 1129 (9th Cir. 2001) (quoting *Webster's Third New Int'l Dict.* 1178 (14th ed. 1961)); *see also Brown v. City of Tucson* , 336 F.3d 1181, 1192 (9th Cir. 2003) (observing that *Walker* involved alleged retaliation). Interference is "broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws." *Walker* , 272 F.3d at 1129 (citation omitted). Interference does not require force or threat of force. *Id.* at 1128 (citing 42 U.S.C. § 3631 ). Yet the prohibition on interference "cannot be so broad as to prohibit 'any action whatsoever tha[t] in any way hinders a member of a protected class.' " *Brown* , 336 F.3d at 1192 (quoting *Michigan Prot. & Advocacy Serv., Inc. v. Babin* , 18 F.3d 337, 347 (6th Cir. 1994) ).

Interference under Section 3617 may consist of harassment, provided that it is "sufficiently severe or pervasive" as to create a hostile environment. *Quigley v. Winter* , 598 F.3d 938, 947 (8th Cir. 2010) ; *see also Honce v. Vigil* , 1 F.3d 1085, 1090 (10th Cir. 1993) (same). Numerous decisions of our sister Circuits have recognized such a cause of action in the housing context. *See Neudecker v. Boisclair Corp.* , 351 F.3d 361, 364 (8th Cir. 2003) ; *Bloch* , 587 F.3d at 783 ; *Quigley* , 598 F.3d at 946 ; *Krueger v. Cuomo* , 115 F.3d 487, 491 (7th Cir. 1997) ; *DiCenso v. Cisneros* , 96 F.3d 1004, 1008 (7th Cir. 1996) ; *Honce* , 1 F.3d at 1090. Harassment that intrudes upon the "well-being, tranquility, and privacy of the home" is considered particularly invasive. *Frisby v. Schultz* , 487 U.S. 474, 485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (citation omitted).[16] *114 **B**

[16] Our interpretation is based upon the text of Section 3617 and the decisions of our sister

Case 1:22-cv-00448-TFM-N    Doc# 320-5    Filed 08/11/25    Page 16 of 19    PageID# 11919

Revock v. Cowpet Bay W. Condo. Ass'n    853 F.3d 96 (3d Cir. 2017)

Circuits. After we heard oral argument, the

Department of Housing and Urban Development issued a regulation, providing that Section 3617 (Section 818 of the Fair Housing Act) may be violated by "hostile environmental harassment because of ... handicap." 24 C.F.R. § 100.600(a) (2016). No party brought this regulation to our attention or asked this Court to rely upon it. Although this regulation is not necessary to our holding, it is fully consistent with our interpretation of Section 3617. The regulation provides, in relevant part, as follows:

> Hostile environment harassment refers to unwelcome conduct that is sufficiently severe or pervasive as to interfere with: The availability, sale, rental, or use or enjoyment of a dwelling; the terms, conditions, or privileges of the sale or rental, or the provision or enjoyment of services or facilities in connection therewith; or the availability, terms, or conditions of a residential real estate-related transaction. Hostile environment harassment does not require a change in the economic benefits, terms, or conditions of the dwelling or housing-related services or facilities, or of the residential real-estate transaction.
>
> (i) Totality of the circumstances. Whether hostile environment harassment exists depends upon the totality of the circumstances.
>
> (A)        Factors to be considered to determine whether hostile environment harassment exists include, but are not limited to, the nature of the conduct, the context in which the incident(s) occurred, the severity, scope, frequency, duration, and location of the conduct, and the relationships of the persons involved.
>
> (B)        Neither psychological nor physical harm must be demonstrated to prove that a hostile environment exists. Evidence of psychological or physical harm may, however, be relevant in determining whether a hostile environment existed and, if so, the amount of damages to which an aggrieved person may be entitled.
>
> (C)        Whether unwelcome conduct is sufficiently severe or pervasive as to create a hostile environment is evaluated from the perspective of a reasonable person in the aggrieved person's position....

24 C.F.R. § 100.600(a)(2) (2016). The regulation further provides that " [h]arassment can be written, verbal, or other conduct, and does not require physical contact." 24 C.F.R. § 100.600(b) (2016). In addition, "[a] single incident of harassment because of race, color, religion, sex, familial status, national origin, or handicap may constitute a discriminatory housing practice, where the incident is sufficiently severe to create a hostile environment, or evidences a quid pro quo." 24 C.F.R. § 100.600(c) (2016).

Walters and Kromenhoek raised Section 3617 claims against four Appellees: Cowpet, Felice, Talkington and Harcourt. We address each Appellee in turn.

1

As to Cowpet, we previously explained that there is a material dispute as to whether Walters and Kromenhoek barred it from reviewing their accommodation requests. We addressed this factual dispute in the context of Section 3604(f)(3) (B). We now address the same facts under an entirely different legal standard. We conclude that the factual dispute is material to the Section 3617 interference claim. If Walters and Kromenhoek barred Cowpet from reviewing their accommodation requests, then

Cowpet did not "interfere" with their rights. But if there was not such a ban, then Cowpet did "interfere" with their rights by failing to review their requests for a reasonable accommodation of their disabilities. Thus, we will reverse the District Court's grant of summary judgment in favor of Cowpet on the Section 3617 claim.

### 2

Walters and Kromenhoek allege that Felice, their neighbor, violated Section 3617 by posting derogatory, harassing and, at times, threatening comments on Talkington's blog. Felice wrote that dog owners might be "happier in another community rather than ostracized at [Cowpet], which would be another fine recourse, besides a significant $ $ fine, with progressive amounts." App. 1905. He wrote that someone who needed an emotional support animal "might go off his/her gourd" in a "violent reaction. We don't even know we need protection![ ] Bad Law![ ]" App. 1906–ª 07. He wrote "[i]f you can't remove the guilty, you can certainly ostracize them." App. 1920. He called dog owners "miscreants" and "totally selfish, spoiled, brats, willing to flaunt their illegality in every one[']s face." App. 1939. He wrote that dog owners' "gall and nerve require full responce [sic], with ostracizing the offenders in every manner at our disposal," including " [i]solat[ing] them completely to their little 'dog patch' on the beach and ignor[ing] them at every venue or occasion! [ ]" *Id.* He wrote that "failure to comply [with the no dogs rule] must lead to liens and even foreclosure, if needed, for compliance to be effective." *Id.*

Felice posted at least nine harassing messages, over a period of more than five months, from October 2011 through March 2012.[6] All of these

115 writings were made *115 public on the Internet. Felice continued his postings even after Walters responded, on the blog, that she was "mortified, that my personal business has been laid out over the internet without my permission or forewarning." App. 1912.

We conclude that there are genuine disputes of material fact "over the inferences that can be reasonably drawn from" Felice's blog posts. *Windsor* , 986 F.2d at 659. A reasonable jury could find that Felice's harassment was sufficiently severe or pervasive as to "interfere" with Walters and Kromenhoek's fair housing rights under 42 U.S.C. § 3617. A reasonable jury could also infer that there was a causal connection—that Felice engaged in harassing conduct "on account of" Walters and Kromenhoek's exercise of their fair housing rights. *Id.* Accordingly, we will reverse the grant of summary judgment for Felice.

### 3

Walters and Kromenhoek allege that Talkington, their neighbor, interfered with their fair housing rights by writing on his blog.[18] Talkington named

Walters and Kromenhoek and made public and derided their requests for accommodation of their disabilities. He posted that "Barbara [ ] [Walters] has a dog and claims to have 'papers' that allow her to have it." App. 1904. He wrote that Walters "has a pet and should be fined." App. 1910. Talkington posted an email from Harcourt to both Walters and Kromenhoek stating that they were in violation of the "no dogs" rule. Talkington wrote that Walters and Kromenhoek were "known violators" and that their emotional support animals were "illegal neighborhood puppy dogs." App. 1924. He wrote that Walters and Kromenhoek's certifications for their emotional support animals were issued by disreputable websites without "verify[ing] either the

---

6 Although Felice engaged in multiple instances of harassment, this is not necessary to a hostile environmental harassment claim under Section 3617. A

single act may be sufficient, provided that the conduct is "sufficiently severe or pervasive." *Quigley*, 598 F.3d at 946 ; *see also Honce*, 1 F.3d at 1090 (same).

animal's credentials or the purported disability." App. 1930. He suggested that Walters and Kromenhoek obtained their emotional support animal certifications from "diploma mill[s]" that would accept "stress" as a disability. App. 1935. Talkington wrote that Cowpet should "go on the offensive" and sue Walters and Kromenhoek. App. 1938. He explained that this would force them to "spend [ ] their own cash," and "the rubber will meet the road on how far everyone is willing to go on this issue." App. 1941.

18 Walters and Kromenhoek do not seek to hold Talkington liable for the posts of others, as they conceded in the District Court.

--------

Overall, Talkington posted numerous harassing blog posts and comments over more than five months. He posted these comments publicly on the Internet. He continued to do so after Walters expressed her "mortifi[cation]" that her need for an emotional support animal was made public. App. 1912.

We hold that there are genuine disputes of fact over the inferences that can be drawn from Talkington's blog posts. *Windsor* , 986 F.2d at 659. A reasonable jury could find that his conduct constituted harassment that was sufficiently severe or pervasive as to "interfere" with Walters and Kromenhoek's fair housing rights. 42 U.S.C. § 3617. A reasonable jury could also find that there was a causal connection between Talkington's conduct and Walters and Kromenhoek's exercise of their fair housing rights. As such, we will reverse the grant of summary judgment for Talkington.

### 4

Walters and Kromenhoek also alleged a Section 3617 claim against Harcourt. The *116 District Court did not analyze this claim, but rather dismissed it on the ground that the claim was purportedly identical to the claim against Cowpet. As we reverse the Section 3617 claim against Cowpet, we will vacate the grant of summary judgment in favor of Harcourt. On remand, the District Court must determine whether or not to substitute a party for Harcourt. *See infra* Section

VII. If the District Court grants substitution, the Court may be called upon to readdress the Section 3617 claim in light of this opinion.

## VII

The final issue before us is whether to permit substitution for the deceased Appellees Felice and Harcourt. The issues pertaining to substitution were raised below but were not resolved due to the District Court's rulings on the merits. Thus, while we deny the pending motions to substitute filed on our docket, we ask the District Court to decide the matter of substitution on remand, in light of our ultimate disposition.

## VIII

For the forgoing reasons, we will reverse in part and vacate in part the judgment of the District Court. We will reverse the grant of summary judgment in favor of Cowpet on both the Fair Housing Act reasonable accommodation and interference claims, 42 U.S.C. §§ 3604(f)(3)(B) and 3617. We will reverse the grant of summary judgment in favor of Felice and Talkington on the interference claims, 42 U.S.C. § 3617. We will vacate the grant of summary judgment in favor of Harcourt on the interference claim, 42 U.S.C. § 3617, and remand to the District Court for further proceedings consistent with this opinion. On remand, the District Court shall determine in the first instance whether to permit substitution for Appellees Felice and Harcourt. Since the federal claims are restored, the District Court's Section 1367(c) rationale for dismissing the territorial claims no longer applies; thus, we will reinstate the supplemental territorial claims against all Appellees. Each of these rulings shall apply to both Walters and Kromenhoek.

 casetext