Case No. 12-60691-Civ-SCOLA

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

# Sabal Palm Condos. of Pine Island Ridge Ass'n, Inc. v. Fischer

Decided Mar 13, 2014

Case No. 12-60691-Civ-SCOLA

03-13-2014

Sabal Palm Condominiums of Pine Island Ridge Association, Inc., Plaintiff, v. Laurence M. Fischer and Deborah G. Fischer, et al., Defendants.

Robert N. Scola

## Omnibus Order

The underlying dispute in this case is whether Laurence and Deborah Fischer, who are residents of Sabal Palm Condominiums of Pine Island Ridge Association, Inc., may keep a service dog, Sorenson, in their condominium as a reasonable accommodation under the Fair Housing Act (FHA), 42 U.S.C. § 3601 et seq., to assist Deborah, who has multiple sclerosis and is confined to a wheelchair. Deborah requested an accommodation in October 2011 because Sabal Palm has a no-pets policy.[1] On Sabal Palm's request, Deborah provided Sabal Palm with medical records substantiating that she has multiple sclerosis, is disabled within the meaning of the FHA, and suffers from various symptoms including severe difficulty in grabbing and manipulating items. She also provided records substantiating that Sorenson is a certified service dog trained to help her by retrieving items, opening and closing doors, and turning light switches on and off. Though that information should have been enough for Sabal Palm to grant Deborah's accommodation request, Sabal Palm (unwisely) decided that it wasn't. So in April 2012, it authorized its attorney, Christopher Trapani, to bring a declaratory-judgment action to have the Court decide (1) whether Sabal Palm

was required under the FHA to grant Deborah an exemption from its no-pets policy and allow it to keep her dog, and (2) the *2 extent of the records that Sabal Palm was entitled to under the FHA in order to evaluate Deborah's requested accommodation. In the declaratory-judgment action, Sabal Palm is the Plaintiff and the Fischers, the Defendants.

[1] The policy actually provides that no resident may have a pet without the consent of Sabal Palm's Board of Directors, other than one cat or fish. (ECF No. 82-10 at 5.) But no pet will be permitted that weighs more han 20 pounds at maturity. (*Id*.) For ease of reference and because the pets allowed by the policy do not matter for the issues in this case, the Court refers to the policy as the no-pets policy.

The Fischers then brought three counterclaims against Sabal Palm and three identical third-party claims against Trapani, the attorney, and Marvin Silvergold, who was (and possibly still is) the President of Sabal Palm's Board of Directors. (ECF No. 82.) For ease of reference the Court refers to this action as the Amended Counterclaim and to Sabal Palm, Trapani, and Silvergold collectively as Counter Defendants. The three claims asserted against Counter Defendants all allege violations of the FHA. They are: (1) that Counter Defendants violated 42 U.S.C. § 3604(f)(3)(B) by refusing the Fischers' request for an accommodation (refusal-to-accommodate claim); (2) that Counter Defendants violated 42 U.S.C. §3604(c) by promulgating rules in December 2011 for residents to keep pets and for disabled persons to obtain exemptions to the no-pets policy as an accommodation for their disability; and (3) that Counter Defendants violated 42 U.S.C. § 3617 by instituting the declaratory-judgment action in order to retaliate against the Fischers for asserting their right

to an accommodation under the FHA. (ECF No. 82.) For these alleged violations of the FHA, the Fischers seek injunctive relief, compensatory and punitive damages, and their attorney fees and costs. (*Id.*)

Each Counter Defendant filed a motion to dismiss all of these claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure and to strike the Fischers' claim for punitive damages. (ECF Nos. 89, 90, 95, 96.) For the reasons set forth below, the motions to dismiss (ECF Nos. 89, 95, 96) are **granted in part and denied in part** and the request to strike punitive damages (ECF No. 90) is **denied.** More specifically, the Court **grants** the motions to dismiss with respect to the Fischers' § 3604(c) and § 3617 claims. These claims are **dismissed with prejudice.** But the Court denies the motions to dismiss with respect to the Fischers' refusal-to-accommodate claim. The Court also **denies** the Fischers' motion (ECF No. 214) seeking leave to amend their Amended Counterclaim.

Before proceeding, the Court pauses to note that, according to the Background Paper prepared for a United States Senate Informational Hearing on the subject of fake service dogs (hereafter, the "Background Paper"),[2] there is a growing problem of people using fake service dogs, which has a "profound" *3 and negative effect "on the disabled, business and medical communities, and the airline industry." Background Paper at 11; *accord* Background Paper at 12, 11, 13. And after the court in *Auburn Woods I Homeowners Association v. Fair Employment and Housing Commission,* 121 Cal. App. 4th 1578[, 1582, 1584-85, 1599 (2004), held that "a homeowner's association had discriminated against condominium residents, a married couple who suffered from depression and other disorders, in failing to reasonably accommodate their disabilities by permitting them to keep a small companion dog . . . the number of housing disability cases involving companion or comfort animals as a reasonable accommodation has soared." Background Paper at 10-11.

[2] The Background Paper can be found online at the following website: http://sbp.senate.ca.gov/sites/sbp.senate.ca.gov/files/Background%20Paper%20for%20Fake%20Service%20Dog%20Hearing%20%282-14-14%29.pdf (last accessed on March 12, 2014).

So the Court realizes that there is some reason to be skeptical of requests to keep a dog as an accommodation for a disability in certain cases, particularly cases where the dog assists the disabled person by rendering emotional support. But this is not such a case. It is undisputed that Deborah has a bona fide physical disability that has severe physical symptoms. And her *specially trained* service dog does not assist her by providing emotional support: it assists her by helping her complete physical tasks that her physical disability makes difficult. That Counter Defendants turned to the courts to resolve what should have been an easy decision is a sad commentary on the litigious nature of our society. And it does a disservice to people like Deborah who actually are disabled and have a legitimate need for a service dog as an accommodation under the FHA.

## Background

Because a detailed fact section is unnecessary, the Court primarily recounts the relevant facts in the analysis section below. But since the heart of the Fischers' Amended Counterclaim is the refusal-to-accommodate claim, familiarity with the FHA provisions undergirding this claim is helpful. The FHA forbids discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap."[3] 42 U.S.C. § 3604(f)(2).

Prohibited discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such *4 accommodations may be necessary to afford [a disabled person an] equal opportunity to use and enjoy a dwelling." 42 U.S.C. §3604(f)(3)(B).

casetext

[3] Although the FHA uses the term *handicap* rather than *disability,* both terms have the same legal meaning: the definition of *disability* in the Americans with Disabilities Act "is drawn almost verbatim" from the definition of *handicap* "contained in the Fair Housing Amendments Act of 1988. Congress' repetition of a wellestablished term [implies] that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations." *Bragdon v. Abbott,* 524 U.S. 624, 631 (1998).

Two other helpful anchors are (1) knowing precisely what records Sabal Palm asked for and (2) Sabal Palm's belief about the validity of the Fischers' accommodation request at the time Sabal Palm brought the declaratory-judgment action. Sabal Palm requested that Deborah produce copies of her medical records from *all* of her healthcare providers who diagnosed or treated the disability that she claimed made a service dog necessary. (ECF No. 82-2 at 2.) In addition, Sabal Palm requested that she provide *"all* documents relating to the nature, size and species of dog, as well as all documents regarding any training it received." (*Id.* (emphasis added).) Though Deborah provided Sabal Palm with medical records substantiating her disability and its impact on her life, and with a record of Sorenson's training and certification, she did not provide *all* of her medical records relating to her disability nor *all* records relating to Sorenson's characteristics and his training. Because Sabal Palm believed that it was entitled to *all* of these records and that the records Deborah provided were insufficient to entitle her to keep Sorenson as an accommodation under the FHA, Sabal Palm had Trapani institute the declaratoryjudgment action. (ECF No. 129; ECF No. 82-9.)

Sabal Palm's precise posture concerning Deborah's ability to keep Sorenson at the time it sued is nuanced. In a letter sent to the Fischers by Trapani on behalf of Sabal Palm just a few days after Sabal Palm brought the declaratory-judgment action, Sabal Palm relayed, in relevant part, the following: that it is undisputed that Deborah is disabled; that it is undisputed that her request to keep Sorenson "would not involve an extraordinary expense on the part of [Sabal Palm]"; that Sabal Palm believed the records provided thus far were insufficient to entitle Deborah to a dog as an accommodation under the FHA; that Sabal Palm believed that it was within its legal rights to deny the accommodation and require Deborah to remove Sorenson; that Sabal Palm "recognize[d] that whether, and under what circumstances, accommodations to disabled persons are required is an evolving issue under the law"; that Sabal Palm therefore instructed Trapani to bring the declaratory-judgment action; and that while the lawsuit is pending, Deborah could "temporarily keep" Sorenson. (ECF No. 82-9 at 2-3.)

## Analysis

## A. Motion-to-dismiss standard

When considering a motion to dismiss under Rule 12(b)(6), the Court must accept all of a complaint's well-pled factual allegations as true, *\*5 construing them in the light most favorable to the plaintiff. *Pielage v. McConnell,* 516 F.3d 1282, 1284 (11th Cir. 2008). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Though the Rule does not require detailed factual allegations, it does require "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (brackets, internal citation, and internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* So a pleading that offers mere "labels and conclusions" or "a formulaic

recitation of the elements of a cause of action" will be dismissed. *Id.*

Faced with a motion to dismiss, a court should therefore "(1) eliminate any allegations in the complaint that are merely legal conclusions; and (2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *American Dental Association v. Cigna Corp.,* 605 F.3d 1283, 1290 (11th Cir. 2010) (internal quotation marks omitted). Moreover, "courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Id.* (brackets and internal quotation marks omitted). "This is a stricter standard than the Supreme Court described in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), which held that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Mukamal v. Bakes,* 378 F. App'x 890, 896 (11th Cir. 2010) (internal quotation marks omitted). These precepts apply to all civil actions, regardless of the cause of action alleged. *Kivisto v. Miller, Canfield, Paddock & Stone, PLC,* 413 F. App'x 136, 138 (11th Cir. 2011). **B. Silvergold's officer-immunity argument**

Silvergold argues that the Fischers' claims against him must be dismissed because he is immune as an officer of Sabal Palm under Florida Statute § 617.0834. (ECF No. 89 at 7-8.) This argument is unpersuasive. In relevant part, § 617.0834 provides that an officer of a nonprofit organization is generally "not personally liable for any

statement, vote, decision, or failure to *6 take an action, regarding organizational management or policy by an officer." But § 617.0834, a state statute, cannot bar a claim under the FHA, a federal cause of action. *Housing Opportunities Project for Excellence, Inc. v. Key Colony No. 4*

*Condominum Association, Inc.,* 510 F. Supp. 2d 1003, 1014 (S.D. Fla. 2007) (Martinez, J.). And even if that weren't true, immunity under § 617.0834 is not absolute: an officer is personally liable when that officer breaches his or her duties as an officer and the breach constitutes " [r]ecklessness or an act or omission that was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights." Fla. Stat. § 617.0834(1)(b)(3). The Fischers sufficiently allege that Silvergold falls within this exception to § 617.0834 immunity: they allege (1) that Silvergold "was personally involved in each and every discriminatory act mentioned [in the Amended Counterclaim] during his tenure as President of [Sabal Palm's] Board of Directors" and (2) that Silvergold discriminated against the Fischers "in total and reckless disregard of [the Fischers'] rights" under the FHA. (ECF No. 82 at 3, 15.)

Likely sensing that his argument lacks legal support, Silvergold adds a new argument in his reply brief: namely, that the Fischers failed to sufficiently allege that he was personally involved in the alleged discriminatory acts. (ECF No. 113 at 2-4.) But Silvergold forfeited this argument by failing to raise it in his opening brief. And even if

Silvergold had properly raised it, it would still fail. Individual board members or agents can be held liable when they "personally committed or contributed to a Fair Housing Act violation." *Falin v. Condominium Association of La Mer Estates, Inc.,* 2011 WL 5508654, at *3 (S.D. Fla. Nov. 9, 2011) (Cohn, J.); *accord Housing Opportunities,* 510 F. Supp. 2d at 1013-14. The Fischers allege

that Silvergold "was personally involved in each and every discriminatory act" and that he recklessly disregarded their rights under the FHA. (ECF No. 82 at 3, 15.) Similar factual allegations were found sufficient in *Housing Opportunities. Compare Housing Opportunities,* 510 F. Supp. 2d at 1013-14 (alleging that board members were personally involved in all discriminatory acts and that board members intentionally discriminated is sufficient to state a claim for discrimination against the board members under the FHA), *with* ECF No. 82 at 3, 12, 18, 20. In addition, other evidence allows one to

reasonably infer that Silvergold contributed to the alleged FHA violations. Silvergold was (and possibly still is) the President of Sabal Palm's Board of Directors when the Board demanded that Deborah provide extensive information to support her request, decided that the information that it had would justify it in denying the Fischers' accommodation request, decided to sue the Fischers, and promulgated rules requiring disabled persons to provide extensive information to support a request to keep a pet as an *7 accommodation—all actions that the Fischers allege were discriminatory. Moreover, Silvergold is carbon copied on all of Trapani's letters attached to the Amended Counterclaim and Trapani's email asserting that Sabal Palm is entitled to more information states that it is being forwarded to the Board. (ECF Nos. 82-2; 82-5; 82-7; 82-9.) The Fischers allege that these communications are evidence of the discrimination that she suffered and that Silvergold knew about them. And since the minutes of the December 14, 2011 board meeting show that Silvergold was present and that the rules passed unanimously, it follows that Silvergold affirmatively voted for allegedly discriminatory rules. These facts plausibly suggest that Silvergold contributed to the FHA violations alleged in the Amended Counterclaim.

## C. Silvergold's Rule 10(b) argument

Silvergold argues that the Fischers' Amended Counterclaim must be dismissed because it does not separately state the claims against Sabal Palm, Trapani, and Silvergold, thereby "making it unclear which alleged actions or inactions are being alleged against [him]." (ECF No. 89 at 6.) This extremely abbreviated argument—it consists of 3 paragraphs and just 5 sentences (two of which are from Rule 10(b) of the Federal Rules of Civil Procedure)—is unpersuasive. The Fischers allege that Silvergold was the President of Sabal Palm's Board during all the discriminatory acts of which they complain, that Silvergold was personally involved in each and every discriminatory act, and that "each reference

to Sabal Palm" therefore includes Silvergold. (*Id.* at 3.) So Silvergold is aware that the Fischers claim he is liable for all the discrimination and that his liability stems from his participation as the President in the Board's allegedly discriminatory decisions. This is more than enough to enable Silvergold to sufficiently respond to the allegations against him.

## D. The refusal-to-accommodate claim

The Fischers claim that Sabal Palm, Silvergold, and Trapani all failed to reasonably accommodate Deborah's disability by refusing her request to allow her service dog, Sorenson, to live with her. Sabal Palm, Silvergold, and Trapani all argue that this claim should be dismissed because they have allowed Sorenson to live with her during this litigation and therefore did not deny her accommodation request.

The FHA forbids discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2). "Such discrimination includes 'a refusal to make reasonable accommodations in rules, policies, practices, or services, when *8 such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Overlook Mutual Homes, Inc. v. Spencer,* 415 F. App'x 617, 620-21 (6th Cir. 2011) (quoting 42 U.S.C. § 3604(f)(3)(B)). "To prevail on a [§] 3604(f)(3)(B) claim"—that is, a claim that a housing provider refused to reasonably accommodate a disability—"a plaintiff must establish that (1) he is disabled or handicapped within the meaning of the FHA, (2) he requested a reasonable accommodation, (3) such accommodation was necessary to afford him an opportunity to use and enjoy his dwelling, and (4) the defendants refused to make the requested accommodation." *Hawn v. Shoreline Towers Phase 1 Condominium Assocation, Inc.,* 347 F. App'x 464, 467 (11th Cir. 2009).

The parties' dispute about the viability of the Fischers' refusal-to-accommodate claim turns on the last element: whether Counter Defendants in fact refused the Fischers' request to let Sorenson live with them.

casetext

The Sixth Circuit analyzed this precise issue thoroughly in *Overlook,* a case with a procedural posture similar to the present case. Although *Overlook* rejected the refusal-toaccommodate claim at issue in that case, the reasoning of *Overlook* demonstrates that the Fischers' claim survives scrutiny under Rule 12(b) (6) of the Federal Rules of Civil Procedure.

In *Overlook,* the Spencer family resided in Overlook, which had a no-pets policy. 415 F. App'x at 618. The Spencers adopted a dog, Scooby, in 2005, and though they admitted that Scooby was not originally prescribed by a medical professional, they maintained that Scooby had a calming effect on their daughter, Lynsey, who suffered from anxiety disorder. *Id.* In 2007, the Spencers formally requested that they be allowed to keep Scooby as an accommodation under the FHA. *Id.* Following this request, a series of letters was exchanged between Overlook and the Spencers,[1] in which Overlook asked for information documenting Lynsey's disability and her need for Scooby. The Spencers provided some of the information Overlook requested. *Id.* at 61819. More specifically, on the eve of the suit, the Spencers had provided the following information: "a letter from Lynsey's psychologist, stating that she had evaluated Lynsey and recommended a service dog"; a form providing the name of Lynsey's psychologist; an explanation that Scooby was not a specially trained service animal, but rather a companion animal that provided emotional *9 support and companionship; statements from the Spencers themselves or other nonmedical personnel that Lynsey suffers from

"anxiety disorder, neurological & emotional conditions" that affect "her ability to care for herself and learn, both of which are . . . recognized as major life activities"; and that Scooby "ameliorates the effects of Lynsey's condition through its presence and interaction with her." *Id.* (internal quotation marks omitted). By the time Overlook filed suit, it had requested but still not received the following information: "a diagnosis of Lynsey's medical condition"; contact information for Lynsey's medical providers; "a description of the treatment Lynsey was receiving"; and Lynsey's school and medical records by way of a signed release that would allow Overlook to obtain these records. *See id.* at 618-19. At various points, Overlook also requested a description of the dog's training and of the services it provided, but information responsive to this request was furnished when the Spencers informed Overlook that Scooby had received no special training and that he ameliorated the effects of Lynsey's condition by being present and interacting with her. *See id.* make the requested accommodation." *Id.* at 619. In response, the Spencers counterclaimed, alleging, among other things, that Overlook had refused to reasonably accommodate Lynsey's disability in violation of the FHA. *Id.* The case proceeded to trial and after the evidence had been presented, the district court entered judgment as a matter of law for Overlook on the Spencers' refusal-to-accommodate claim, reasoning that "they had presented insufficient proof that Overlook had actually denied their request for a reasonable accommodation." *Id.* at 620.

On appeal, the Sixth Circuit framed the question thus: "whether the district court erred in holding that, as a matter of law, Overlook did not constructively deny the request for a reasonable accommodation by

---

[1] The Spencers often acted through their attorney or the president of a local fairhousing center. For simplicity, references to the Spencers will also include communications made by these representatives. Significantly, neither the Spencers, their attorney, nor the president of the local fair-housing center, Jim McCarthy, were medical or dog-training professionals. *See id.* at 618-19.

Overlook did not make an official decision on the Spencers' accommodation request, nor did it begin eviction proceedings; it instead sued "for a declaratory judgment that it was not required to

delaying making a decision on the request, requesting school and medical records, and filing suit for a declaratory judgment." *Id.* at 620. Put more simply, the issue was "whether a reasonable jury could find that Overlook 'refused' to make the accommodation requested." *Id.* at 621.

The Court looked at three factors in analyzing the issue: (1) the extent to which the housing provider delayed and obstructed the process of negotiation over the requested accommodation by filing the lawsuit; (2) the state of the law at the time the suit was filed; and (3) whether the housing provider's delay in ruling on the accommodation request had the effect of depriving the disabled person of the accommodation. *See id.* at 621, 623. In setting forth the *10 principles relevant to the first factor, the Court relied heavily on the Joint Statement issued by the Department of Housing and Urban Development (HUD) and the Department of Justice (DOJ), entitled *Reasonable Accommodations Under The Fair Housing Act* (hereafter, the "Joint Statement").[5] *Id.* at 621-22.

Because those principles are directly relevant to the present case, the Court quotes the Sixth Circuit at length:

[5] The web site http://www.hud.gov/offices/fheo/library/huddojstatement.pdf (last accessed on March 12, 2014) contains the Joint Statement. Although the Joint Statement is a policy statement rather than "an authoritative interpretation of § 3604" that binds courts, the Joint Statement "may, of course, have the power to persuade." *Id.* at 621 n.3 (internal quotation marks omitted). The Sixth Circuit clearly found the Joint Statement highly persuasive because most of the principles it used to analyze the first factor came from the Joint Statement. The Joint Statement is written as a series of questions and answers. This Court also finds the Joint Statement highly persuasive.

casetext

[A] housing provider "has an obligation to provide prompt responses to reasonable accommodation requests. An undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation." Joint Statement at 11.

Moreover, the Joint Statement states that a "failure to reach an agreement on an accommodation request is in effect a decision by the provider not to grant the requested accommodation." *Id.* at 9. A housing provider, however, is entitled to seek information from an allegedly disabled person in order to establish the existence of the disability and the necessity of the accommodation. According to the Joint Statement,

> In response to a request for a reasonable accommodation, a housing provider may request *reliable* disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability, (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation.

*Id.* at 13. This inquiry need not be highly intrusive. "In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary . . . ." *Id.* at 13-14.

*Overlook,* 415 F. App'x at 621-22 (emphasis added). *11

With respect to the adequacy of the information that the Spencers provided to support their accommodation request, the Court's reasoning was nuanced: "Overlook was entitled to additional information," but "[a]t the same time, Overlook was probably not entitled to the broad

access to confidential medical and school records it demanded." *Id.* The additional, *reliable* information that Overlook was entitled to receive related to (a) verifying that Lynsey was disabled and (b) showing the relationship between Lynsey's disability and the need for the requested accommodation. *See id.* (For ease of reference, the Court will refer to information relating to these two categories as qualifying-disability information and nexus information, respectively.) Because Overlook had never received reliable information relating to either of these two categories, Overlook was not able "to verify that a qualifying disability existed or that the proposed accommodation was related to the disability." *Id.*

The letter from Lynsey's treating psychologist did not suffice because it "merely stated that Lynsey was receiving 'psychological counseling services' and required a 'service dog.'" *Id.* Information from a treating psychologist would ordinarily be reliable. *See* Joint Statement at 13-14 ("A doctor or other medical professional . . . who is in a position to know about the individual's disability may also provide verification of a disability."). But the psychologist's letter in *Overlook* did not state that Lynsey suffered from a disability—let alone identify what that disability was—and it did not show the relationship between the assistance the dog could provide and the unspecified problems for which Lynsey was receiving counseling. *See Overlook,* 415 F. App'x at 622. (Another way to express this last point is that the letter did not show how or explain why a service dog helped with Lynsey's unspecified problems.) So it did not provide any qualifying-disability and nexus information. *Id.*

The court also found insufficient the statements from the Spencers and McCarthy, the president of the local fair-housing center: "[e]ven after receiving [this information], Overlook was entitled to additional information." *Id.* at 622. Unlike the information from the treating psychologist, who provided no qualifying-disability and nexus information, the information provided by the Spencers and McCarthy was qualifying-disability and nexus information, and it was specific and detailed: they informed Overlook that Lynsey suffered from and was being treated for anxiety disorder, neurological conditions, and emotional conditions; that these ailments impacted Lynsey's ability to care for herself and learn;

8

that Scooby provided emotional support and companionship to Lynsey; and that Scooby ameliorated the effects of these conditions by being present and interacting with Lynsey. *See id.* at 618-19, 622. So the court did not find this information inadequate because it lacked detail or specificity. *See id.* at 622. Indeed, the court adopted the principles from the Joint Statement *12 that a housing provider's inquiry to obtain reliable qualifying-disability and nexus information "need not be highly intrusive" and that, "[i]n most cases, an individual's medical records or *detailed information* about the nature of a person's disability *is not necessary." Id.* (internal quotation marks omitted) (relying on Joint Statement at 13-14.) And since the information was manifestly qualifying-disability and nexus information, the Court could not have found that the Spencers failed to provide information on these subjects to Overlook. *See id.*

The only remaining basis on which the Court could reject this information as it did would be that the information was not sufficiently reliable. Neither the Spencers nor McCarthy were medical or dog-training professionals. That matters because Lynsey's alleged disability was an internal condition that would not be readily apparent to a lay observer. So the Spencers' and McCarthy's statements about the disability Lynsey allegedly suffered from and about how and why Scooby helped ameliorate this disability were unreliable in light of the facts. They were lay observers who were not qualified to diagnose Lynsey or pronounce how a dog helped her.

The nature of Lynsey's putative disability and the Joint Statement buttresses this conclusion. Lynsey's disability was not obvious. Unlike a person with a physical disability, such as someone confined to a wheelchair, Lynsey's disability was internal. Similarly, her need for the requested accommodation was not readily apparent. The Joint Statement provides that when a disability is readily apparent, the housing provider may not request additional information

about the requester's disability. Joint Statement at 12-13. So too with the requester's disability-related need for the accommodation. *Id.* That is, if it is readily apparent how the requested accommodation would help alleviate the difficulties posed by the disability, then the provider may not request additional information concerning the need for the requested accommodation. *Id.* It is only when either the requester's disability or the disabilityrelated need for the accommodation are not obvious that the provider may request reliable qualifying-disability or nexus information. *Id.* And even then, the provider's queries are limited to precisely what is not obvious. An example in the Joint Statement illustrates the point:

A rental applicant who uses a wheelchair advises a housing provider that he wishes to keep an assistance dog in his unit even though the provider has a "no pets" policy. The applicant's disability is readily apparent but the need for an assistance animal is not obvious to the provider. The housing provider may ask the applicant to provide information about the disabilityrelated need for the dog.

*13 *Id.* at 13. This example is contained in the Joint Statement's answer to the following question: "[w]hat kinds of information, if any, may a housing provider request from a person with an obvious or known disability who is requesting a reasonable accommodation?" Joint Statement at 12. Moreover, the rule *Overlook* borrowed from the Joint Statement providing that a housing provider may request reliable qualifying-disability and nexus information, as well as information "describ[ing] the needed accommodation," is predicated on the disability in question not being readily apparent, just as the disability in *Overlook* was. That is so because the rule is provided in the Joint Statement's answer to this question: "[i]f a disability *is not obvious,* what kinds of information may a housing provider request from the person with a disability in support of the requested accommodation?" Joint Statement at 13 (emphasis added). An accommodation can also be constructively denied due to delay in making the decision. *Overlook,* 415 F. App'x at 620; Joint Statement at 9, 11.

Since neither Lynsey's disability nor her need for a dog were readily apparent, Overlook was entitled to

seek reliable qualifying-disability and nexus information. But even then, the Sixth Circuit reasoned that "Overlook was probably not entitled to the broad access to confidential medical and school records it demanded." *Overlook,* 415 F. App'x at 622. Adding teeth to this conclusion, the Sixth Circuit recognized that "[i]n some circumstances, a housing provider that refuses to make a decision unless a requestor provides unreasonably excessive information could be found to have constructively denied the request by 'stonewalling' and short-circuiting the process." *Id.* Finding that a provider constructively denied a requested accommodation on this basis in turn flowed from the more general principle that "injury may result when a housing provider unreasonably delays responding to a request for an accommodation and that such delay may amount to a denial." *Id.* The court's discussion of this particular manner of concluding that a provider constructively denied a requested accommodation was not theoretical. The court concluded its analysis of the first factor—"the extent to which Overlook delayed and obstructed the process of negotiation over the requested accommodation by filing the lawsuit"—by noting that "were it not for additional factors that are present here, the Spencers would have presented a jury issue as to whether Overlook 'denied' their request." *Id.*

Moving onto the second factor—"the state of the law at the time Overlook filed its complaint"— the court concluded that this factor weighed in favor of concluding that Overlook had not constructively denied the Spencers' request to keep Scooby. *Id.* at 622-24. This factor analyzes whether the state of the law justified the housing provider in turning to the courts for clarification rather than simply responding to the request. *Id.* The court focused on the *14 legal issue that Overlook argued was in its favor: namely, whether a companion animal that lacks training could be a reasonable accommodation under the law. *Id.* at 619, 622-23. The district court concluded that because the law on this issue favored Overlook, "Overlook was well within its

rights to get a court ruling on whether a dog that is the subject of a reasonable accommodation can be any companion animal." *Id.* at 622 (brackets, ellipses, and internal quotation marks omitted). In reaching this conclusion, the district court had relied on a case that "held that 'evidence of individual training' is required to show that a 'service animal' is a reasonable accommodation under the FHA." *Id.* (quoting *Prindable v. Association of Apartment Owners of 2987 Kalakaua,* 304 F. Supp.2d 1245, 1256-57 (D. Haw. 2003), *aff'd on other grounds sub nom. DuBois v. Association of Apartment Owerns of 2987 Kalakaua,* 453 F.3d 1175, 1179 n.2 (9th Cir. 2005)). Other cases cut against this holding, but the Sixth Circuit did "agree with the district court that there was at least some dispute in the law as to whether a 'service animal' required training and whether it had to do more than provide comfort and companionship to qualify as an accommodation." *Id.* at 623.

But the "fact that the law is not entirely clear concerning a requested accommodation will not always justify a housing provider's filing suit rather than responding to a request." *Id.* Because "[a]ccommodations are often highly specific," there will often be "no case law that indicates a particular accommodation is required." *Id.* So merely "claiming that the law is 'unclear' should not entitle the provider to delay and obstruct the accommodation process." *Id.* But in *Overlook,* "Overlook could point to case law indicating that it was not required to treat Scooby"— a companion dog with no special training—"as an accommodation." *Id.* This "weigh[ed] against the reasonableness of a jury finding that its actions in seeking additional information and turning to the court for clarification constituted a denial of the Spencers' request." *Id.*

The third factor—whether the housing provider's delay in ruling on the accommodation request had the effect of depriving the disabled person of the accommodation—similarly weighed in favor of concluding that Overlook had not constructively denied the Spencers' request. *See id.* at 621, 623. Although Overlook did not grant the Spencers a temporary exemption from its no-pets policy, "the more important fact" was that Overlook allowed

Scooby to stay with the Spencers throughout the entire dispute. *Id.* at 623. And it never attempted to evict the Spencers or punish them for keeping Scooby. *Id.* So "Overlook's actions did not deny the Spencers the benefit of Scooby's company." *Id.*

\*15

In concluding, the court made another important point: "[a]s a general rule, housing providers should cooperate with residents to resolve disputes over reasonable accommodations rather than turning to the courts." *Id.* But because the second and third factors weighed against finding a constructive denial, the court held that Overlook's actions "did not constitute a denial of [the Spencers'] request for an accommodation." *Id.* at 624.

Now that the Court has explicated the three *Overlook* factors, the Court applies them to the present case. In analyzing the first factor— namely, the extent to which the housing provider delayed and obstructed the process of negotiation over the requested accommodation by filing the lawsuit— *Overlook* examined whether the information that the Spencers provided Overlook was sufficient for Overlook to make a decision about the requested accommodation. *Id.* at 622. The Fischers had certainly provided Sabal Palm enough information for it to rule on (and grant) their request. It bears emphasizing that unlike Lynsey, who had a mental and emotional disability that was not readily apparent, Deborah Fischer had a physical disability that was readily apparent because she was confined to a wheelchair. And the rule that *Overlook* adopted

from the Joint Statement about the reliable information a housing provider may request in response to an accommodation request was predicated on the requestor having a disability that was not readily apparent, as was the case in *Overlook. See id.* at 621; Joint Statement at 13. So it is doubtful, to say the least, that Sabal Palm was entitled to the detailed medical information it requested concerning Deborah's physical disability. (Sabal Palm requested that Deborah provide it with copies of her medical records from all of her healthcare providers who provided her with a diagnosis or treatment of the disability for which she claimed the need to keep Sorenson. (ECF No. 82-2 at 2.))

But even setting aside that problem with Sabal Palm's actions and assuming that Sabal Palm was entitled to this medical information, Deborah provided it before Sabal Palm sued. In December 2011, she gave Sabal Palm a medical history form completed by her primary-care doctor, Leslie Herzog. (ECF No. 82-6 at 82-6 at 2.) Herzog completed this form in January 2010 as part of Deborah's application for a service animal through Canine Companions for Independence (CCI). (*Id.* at 3-8.) The form provides copious information, including the following: that one purpose of the form is to determine the applicant's (i.e., Deborah's) suitability for having a service dog placed with her; that Herzog has been a physician to Deborah since October 2003; that Herzog last examined Deborah in January 2010 on the same day Herzog completed the form; that Deborah has multiple sclerosis; that she is confined to a wheelchair; that she suffers from a "loss of strength, balance, [and] coordination" in all of \*16 her extremities (including her hands); that she requires attendant care on a regular basis for "all

aspects of daily living"; and that she is a "good candidate" for a service dog through CCI. (ECF No. 82-6 at 3-8.) This information shows that "you have not provided the Board with any medical records substantiating your need for the "all aspects of daily living," and that she is a good dog." (ECF No. 82-7 at 2.) So later in February candidate for a service dog, which clearly implies 2012, Deborah gave them even more medical that a service dog would help with her disabilities. information substantiating her need for a dog.

(*See id.*)

more information. Sabal Palm contended that she had not substantiated her need for a service dog: No. 82-6 at 3-8.) This Deborah is disabled, that she needs assistance with

(ECF No. 82-8 at 2-11.)

Concluding that Sorenson would help with her disabilities is buttressed by a November 28, 2011 letter from a manager/instructor at CCI that Deborah provided to Sabal Palm on December 2, 2011. (ECF No. 82 at 4; ECF No. 82-3 at 2; ECF No. 82-4 at 2; ECF No. 129 at 4.) The letter reads thus: make it clear that a service dog trained to help

> This is *to certify* that Sorenson, tattoo number 2009218, is a Canine Companions for Independence assistance dog. He is placed with Deborah Fischer of Davie, FL. Sorenson *is trained to assist Deborah* by retrieving items, opening and closing doors and turning light switches on and off. Deborah and Sorenson graduated from our Southeast Regional Training Center on November 11, 2011. If you need further information, please do not hesitate to contact me at [phone number].

(ECF 82-8 at 11.) So the letter establishes that Sorenson is specially trained to assist Deborah, and the tasks it is designed to assist her with make sense given her disability of multiple sclerosis and the symptoms of that disability (e.g., loss of strength and coordination in all extremities, including her arms and hands). Based on this letter and the medical-history form that Herzog completed, one could not reasonably doubt that Deborah was disabled, that she needed an accommodation, and that having Sorenson as an accommodation would help ameliorate the effects of her disability.

Yet even after receiving information that should have been dispositive, Sabal Palm took the position in a February 2012 letter that it needed

A "home health certification and place of care" form signed by Herzog in July 2011 diagnoses Deborah with multiple sclerosis, wheelchair dependence, and debility (feebleness, weakness, or loss of strength). (*Id.* at 3.) It further states that "patient cannot safely leave home without assistance. Due to [patient's] health status, [patient] is homebound,

---

All of these additional medical records tell a consistent story: Deborah's multiple sclerosis renders her severely disabled and requires that she have the assistance of others to maximize her functional status. The descriptions of the symptoms of her disability in these documents make it clear that a service dog trained to help retrieve items, open doors, and turn light switches on and off would help ameliorate the effects of her disability. *17

A "treating source neurological questionnaire" completed by Herzog in July 2009 stated that Deborah had multiple sclerosis with the following symptoms: decreased grip strength; decreased ability to perform fine manipulation, decreased ability to perform gross manipulation; gait disturbance; sensory loss; motor loss; spasticity; severe fatigue; malaise; and substantial muscle weakness on repetitive activity. (ECF No. 82-3 at 2.)

Herzog elaborated: "Pt. [patient] with progressive exacerbations of condition—requires assistance of another with all ADLs [Activities of Daily Living] as well as with any transferring from wheelchair to another site[.] Pt. [patient] has significant loss of function of upper and lower extremities, muscle control, [and] strength. She suffers from fatigue." (*Id.*) The form also indicates that Deborah is wheelchair bound: "Pt [patient] is unable to ambulate or stand alone or with a handheld device. She requires the assistance of another individual to transfer from her wheelchair/scooter." (*Id.*) Deborah's grip strength was rated as 2/5, and her lower-extremity strength as 1/5. (*Id.*)

and therefore requires nursing care in the home. Home healthcare is medically necessary to maximize [patient's] functional status." (*Id.*)

The most recent medical record is a "group disability insurance attending physician's statement" completed by Herzog in August 2011. (*Id.* at 5-7.) Deborah is diagnosed with

multiple sclerosis, debility, and wheelchair dependence.[6]

(*Id.* at 5.) Deborah has "neurological deficits of extremities," cannot ambulate, cannot drive, "will not be able to *ever* return to [the] workforce," and "needs assistance [with] ADLs [activities of daily living]." (*Id.* at 6.) The job category that best describes Deborah's functional status is "sedentary," which means that she can lift, at best, "negligible weight."[2] (*Id.* at 7.)

[6] The form states that Deborah was first diagnosed with multiple sclerosis in 2001 and that the date she experienced a significant loss of function was July 2009. (*Id.* at 5-6.)

retrieve items, open doors, and turn light switches on and off—were severely impacted by her disability. Moreover, her being confined to a wheelchair would also sometimes prevent her from retrieving items (for example, items on the floor). And since she had provided evidence that Sorenson's training was specifically designed to help with these activities, she had amply established her disability-related need for Sorenson.

[8] Again, this analysis proceeds from the premise that Sabal Palm was entitled to obtain medical records substantiating Deborah's disability—a premise that is false because her disability was readily apparent. *See* Joint Statement at 1214. Sabal Palm's position that it needed records to verify that a service dog would help with her disability is plausible, *see id.* at 13, but the records it received before suing were more than

[2] Because there was no box below "sedentary" on the form, Deborah's limitations may exceed those described in the "sedentary" box. Hence the conclusion that she can lift negligible weight at best.

This information conclusively demonstrates that, contrary to Sabal Palm's contention, Deborah had

sufficient for it to verify that Deborah needed Sorenson.

Given the dispositive nature of the information that it had received, Sabal Palm's demands for even more information were unreasonable. As *Overlook* concluded, an inquiry seeking qualifying-disability information, nexus information, or information describing the needed accommodation, "need not be highly intrusive." Sabal Palm had already received detailed—and in the case of the medical records, confidential— information addressing these three points. Asking for even more medical records providing nexus information was clearly "highly intrusive," and the intrusion was not necessary. So the circumstances of the present case place it squarely within the following principle formulated by *Overlook:* "[i]n some circumstances, a housing provider that refuses to make a decision unless a requestor provides unreasonably excessive information could be found to have constructively denied the request by 'stonewalling' and short-circuiting the process." *Overlook,* 415 F. App'x at 622. In sum, the first factor strongly weighs in favor of concluding that the Fischers have plausibly alleged that Sabal Palm constructively denied their requested accommodation.

The second *Overlook* factor—the state of the law at the time the suit was filed—also weighs in favor of concluding that the Fischer's have alleged a plausible refusal-to-accommodate claim. This factor analyzes whether the state of the law justified the housing provider in turning to the courts for clarification rather than simply responding to the request. *Id.* at 622-24. Based

provided Sabal Palm with medical records substantiating her need for a dog that could retrieve items, open doors, and *18 turn light switches on and off.[8] She was disabled, needed assistance with all activities of daily living, and had specifically shown that her ability to grab and manipulate items—abilities that are necessary to

on Sabal Palm's Complaint and a letter from Trapani to the Fischers sent just five days after Sabal Palm sued, Sabal Palm believed at the time it filed suit that the law showed the following: that Sabal

Palm was entitled to all of the medical records it requested in order to properly evaluate the *19 accommodation; that it was within its rights to deny the accommodation because the Fischers failed to provide all the requested medical records; and that the records produced do not show that a dog in excess of 20 pounds is a reasonable or necessary accommodation. (*See* ECF No. 1 at ¶¶ 24-25, 28, 32, 36-37; ECF No. 82-9 at 2.[9])

Because Sabal Palm is mistaken about the law, this factor does not favor Sabal Palm. The Court analyzes each of Sabal Palm's beliefs about the law in turn.

> [9]  Although Sabal Palm's Amended Complaint (ECF No. 129) was filed well after it sued, the Amended Complaint advances the same beliefs about the state of the law. *(Compare* ECF No. 129 at ¶¶ 2122, 25, 29, 33-34, *with* ECF No. 1 at ¶¶ 24-25, 28, 32, 36-37.)

Sabal Palm's first two beliefs—that it was entitled to all of the medical records it requested and that it was within its rights to deny Deborah the dog because she failed to provide all the requested medical records—must be reframed to properly analyze them. Because Deborah had provided Sabal Palm with medical and dog-training records before Sabal Palm sued, the question becomes whether the law supports Sabal Palm's contention that it was entitled to additional records and that it could deny her request because she failed to provide these additional records. As discussed above, the records Deborah provided were more than sufficient to verify that she had a disability that lay observers could see with their own eyes,[10] that some of the symptoms associated with her disability would make it difficult for her to pick up and manipulate items, and that Sorenson's training (retrieving items, opening and closing doors, and turning light

switches on or off) would help alleviate some of the negative effects of her symptoms. Because Sabal Palm already had enough qualifying-disability and nexus information, Sabal Palm's request for additional records was excessive and unnecessary. The law is squarely against Sabal Palm on these beliefs.

> [10]  Because Deborah's disability was readily apparent, Sabal Palm was not entitled to ask for medical records verifying her disability. Joint Statement at 12-14. A contrary result would be absurd. For example, a housing provider should not be able to demand that a blind person or a person confined to a wheelchair produce medical records supporting their disability. *Id.* Because Deborah's disability-related need for a dog was not readily apparent Sabal Palm was entitled to ask for information substantiating her need. Joint Statement at 13-14. But as discussed above, Deborah provided enough information to show the relationship between her disability and the need for a dog with Sorenson's specific training.

So too with Sabal Palm's final belief—namely, that under the governing law, the records produced do not show that a dog in excess of 20 pounds is a *20 reasonable or necessary accommodation. The Court will analyze reasonableness and necessity in turn.

An accommodation is not reasonable "if [1] it would impose an undue financial and administrative burden on the housing provider or [2] it would fundamentally alter the nature of the provider's operations." Joint Statement at 7; *accord Schwarz v. City of Treasure Island,* 544 F.3d 1201, 1220 (11th Cir. 2008) (determining that an accommodation is unreasonable "if it either [1] imposes undue financial and administrative burdens on a grantee or [2]

requires a fundamental alteration in the nature of the program" (internal quotation marks omitted) (brackets in original)). Because Sabal Palm admits that it is "undisputed that [Deborah's] request for an accommodation would not involve an extraordinary expense on the part of [Sabal Palm]," the Court need consider only whether allowing Deborah to keep Sorenson would fundamentally alter the nature of Sabal Palm's program. (ECF No. 129 at 2.) "A fundamental alteration is a modification that alters the essential nature of a provider's operations." Joint Statement at 8 (internal quotation marks omitted); *accord Schwarz,* 544 at 1220 ("A proposed accommodation amounts to a 'fundamental alteration' if it would eliminate an essential aspect of the relevant activity." Sabal Palm is a condominium association. Its *raison d'être* is to provide housing. Allowing a disabled resident to keep a service dog would not fundamentally alter Sabal Palm because Sabal Palm would still be able to offer housing.

The governing regulation buttresses this conclusion. The companion regulation to 42 U.S.C. § 3604(f)(3)(B) is 24 C.F.R. § 100.24(a), and this regulation specifically provides that it is unlawful for a housing provider with a no-pets policy to refuse to permit a blind person to live in a dwelling unit with a seeing-eye dog. 24 C.F.R. § 100.24(b)(1). Because an essential element of both § 3604(f)(3)(B) and § 100.24(a) is that the accommodation be reasonable, it follows that allowing a disabled person to keep a dog in a housing unit with a no-pets policy is a reasonable accommodation.

Necessity cuts against Sabal Palm too. A housing provider is required to make a reasonable accommodation *"only* if it 'may be necessary to afford [a disabled resident of Sabal Palm an] equal opportunity to use and enjoy a dwelling.'" *Schwarz,* 544 F.3d at 1225 (quoting 42 U.S.C. § 3604(f)(3)(B)). "To show that a requested accommodation may be necessary, there must be an identifiable relationship, or nexus, between the requested accommodation and the individual's disability." Joint Statement at 6.

Deborah has sufficiently demonstrated that Sorenson may be necessary for her to have an equal opportunity to use and enjoy her dwelling.

The symptoms of her disability make it difficult for her to grab and manipulate *21 items and they require that she have assistance in all activities of her daily life. So it follows that a service dog trained to retrieve items, open and close doors, and turn light switches on and off would help alleviate some of the negative effects of her disability. Because Deborah provided medical and dogtraining records substantiating her need for a service dog with Sorenson's training, she has demonstrated necessity.

One additional argument under necessity deserves attention. In addition to arguing that a service dog is not a reasonable or necessary accommodation, Sabal Palm also appears to argue that even if a dog is reasonable or necessary for Deborah, a dog over 20 pounds is not reasonable or necessary. (*See* ECF No. 129 at 6-7; ECF 82-9 at 2.) This argument is unpersuasive. A dog under 20 pounds is a small dog. So given the height of the average door handle and light switch, a small dog will have a harder time opening and closing doors and turning light switches on or off. And there will be some items a small dog cannot retrieve because of the item's height that a bigger dog would be able to retrieve. Moreover, given the height of a person in a power wheelchair, a smaller dog will have a harder time retrieving items effectively for the disabled person.

This is not just commonsense—though it most certainly is that. Deborah also wrote in an email to Trapani that, "regarding the size of my dog— the dog is matched to the height of my chair, which enables him to assist me better with his jobs, i.e. picking up items I have dropped." (ECF No. 82-6 at 2.) She also attached a picture of her in her power wheelchair with Sorenson. (ECF No. 82-4 at 3.) In the picture, the dog's size fits well with the height of her in the wheelchair. (*See id.*)

==Deborah's statement regarding Sorenson being sized appropriately for her wheelchair is credible. It accords with common sense. And the picture Joint Statement at 8 (emphasis added). Since a dog over 20 poun==ds is a reasonable accommodation, Deborah's (commonsense) belief that a dog over 20 pounds—in particular, a dog of Sorenson's size — she provided to Sabal Palm supports her statement.

Sabal Palm's implied argument is that even if a dog is reasonable or necessary for Deborah, a dog 20 pounds or under would suffice is akin to an argument that an alternative accommodation (here, a dog under 20 pounds), would be equally effective in meeting Deborah's disability-related needs as a dog over 20 pounds. The Joint Statement's comments on alternative accommodations proposed by the housing provider is highly persuasive and useful in evaluating this argument.

> There may be instances where a provider believes that, while the accommodation requested by an individual is reasonable, there is an alternative accommodation that would be equally effective in meeting the individual's disability-related needs. In such a circumstance, the provider should discuss with the individual if she is willing to accept the altnerative accommodation. *However, providers should be aware that persons with disabilities typically have the most accurate knowledge about the functional limitations posed by their disability, and an individual is not obligated to accept an alternative accommodation suggested by the provider if she believes it will not meet her needs and her preferred accommodation is reasonable.*

In sum, the law at the time Sabal Palm sued is in her favor. The second *Overlook* factor strongly weighs in favor of concluding that Sabal Palm constructively denied the Fischers' requested accommodation.

The third *Overlook* factor—whether the housing provider's delay in ruling on the accommodation request had the effect of depriving the disabled person of the accommodation—is the only factor that favors

is better able to assist her is entitled to weight. The letter from the dog-training professional at CCI supports this conclusion as well. (*See* ECF No. 82-3 at 2.) The letter shows that in that person's professional judgment, Sorenson will assist Deborah. (*Id.*)

Sabal Palm. In its first communication, Sabal Palm told the Fischers that they could temporarily keep Sorenson while Sabal Palm evaluated their accommodation request. (ECF No. 82-2 at 3.) Similarly, in the April 2012 letter just a few days after Sabal Palm brought the declaratoryjudgment action, Sabal Palm told the Fischers that they could temporarily keep Sorenson while the lawsuit is pending. (ECF No. 82-9 at 3.) But because the other two factors strongly weigh in favor of concluding that Counter Defendants constructively denied the Fischers' accommodation request, the Court holds that the Fischers have plausibly alleged a refusal-toaccommodate claim.

## E. The Fischers' § 3604(c) claim

The Fischers allege that that rules adopted by Sabal Palm in December 2011 discriminate against disabled persons and thus violate 42 U.S.C. § 3604(c). (ECF 82 at 17-19.) All Counter Defendants argue that this claim should be dismissed because § 3604(c) applies to notices or statements made in connection with the sale or rental of a dwelling, a condition that is not met in this case. Trapani and Sabal Palm also argue that the claim is moot. Because mootness is jurisdictional, the Court considers that argument first.

### 1. Is the § 3604(c) claim moot?

> Trapani and Sabal Palm argue that this claim is moot because in November 2012 Sabal Palm amended the rule setting forth the procedure for seeking an exemption to the no-pets policy so that this procedure now applies to anyone seeking an exemption, not just to disabled persons. Their argument is unpersuasive.[11]

[11] That was not the only change Sabal Palm made to its rules about pets. It also peppered the rules on the procedures for seeking an exemption from the no-pets policy, the procedures for processing requests for an exemption, and the procedures for keeping pets (including pets allowed based on an exemption) with phrases like "unless otherwise required by law" or an equivalent. For example, the rules governing keeping pets—which includes a rule prohibiting pets in Sabal Palm's common areas—apply "unless otherwise prohibited by law." (ECF No. 96-1 at 3-4.) As discussed in more detail below, the FHA clearly prohibits such a rule for a service animal that is a reasonable and necessary accommodation to a disabled person. Sabal Palm does not argue that these other changes contributed to mooting the Fischers' claim until their reply brief. That is too late for the Court to consider that argument.

"To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all states of review, not merely at the time the complaint is filed.'" *Arizonans for Official English v. Arizona,* 520 U.S. 43, 67 (1997) (quoting *Preiser v. Newkirk,* 422 U.S. 395, 401 (1975)). "Mootness is jurisdictional," and therefore must be decided as a threshold matter and requires dismissal if the court finds its jurisdiction lacking under this doctrine. *Al Najjar v. Ashcroft,* 273 F.3d 1330, 1336 (11th Cir. 2001). The burden of establishing mootness rests with the party seeking dismissal. *See County of L.A. v. Davis,* 440 U.S. 625, 631 (1979). "A case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Ethredge v. Hail,* 996 F.2d 1173, 1175 (11th Cir. 1993).

In their §3604(c) claim, the Fischers seek not just injunctive relief, but also their attorney fees and compensatory and punitive damages. The monetary relief they seek cannot be mooted by any change in policy by Sabal Palm, including a change in Sabal Palm's governing rules and regulations. *Housing*

*Opportunities Project for Excellence, Inc. v. Wedgewood Condominium Association, Inc.,* 2012 WL 4193969, at *6 (S.D. Fla. Sept. 19, 2012) (Scola, J.) (citing *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 371 (1982)). That's because amending the rules did not give the Fischers the monetary compensation they seek in their § 3604(c) claim. *Id.; cf. Jews for Jesus, Inc. v. Hillsborough County Aviation Authority,* 162 F.3d 627, 629 (11th Cir. 1998)("In this case, the airport's change of policy has already given Jews for Jesus the relief they seek—the ability to distribute literature at the airport—and there is *24 therefore no meaningful relief left for the court to give."). The 3604(c) claim is therefore not moot.

But what about the injunctive relief sought under this claim? Is that relief mooted by Sabal Palm's amending the rules? There is a threshold question: must a court separately analyze whether injunctive relief under a particular claim can become moot when the plaintiff seeks monetary relief under that same claim. Assuming without deciding that a court must, the injunctive relief sought is still not moot. The injunctive relief sought by the Fischers is much broader than simply ordering Sabal Palm to apply the procedure for a pet exemption to anyone, disabled or not, who asks for it. So the change in the rule does not give the Fischers all the injunctive relief they seek. Moreover, the Fischers challenge not just the procedure for seeking an exemption, but also the procedures for processing exemption requests and for keeping pets. (ECF No. 82 at 8-12, 17-19.) So the rule change Sabal Palm points to does not even embrace all the rules that the Fischers challenge.

Besides, the small change Sabal Palm points to does not even satisfy the the following three-factor test that the Eleventh Circuit uses to decide whether a defendant's voluntarily ceasing the challenged conduct moots a plaintiff's claim: "(1) whether the challenged

conduct was isolated or unintentional, as opposed to a continuing and deliberate practice; (2) whether the defendant's cessation of the offending conduct was motivated by a genuine change of heart or timed to anticipate suit; and (3) whether, in ceasing the conduct, the defendant has acknowledged liability." *Sheely v. MRI Radiology Network, P.A.,* 505 F.3d 1173, 1184 (11th Cir. 2007).

Analyzing Sabal's Palms December 2011 rules and the amended November 2012 rules on pets in common areas nicely illustrates why the three factors weigh against mootness. Under the December 2011 rules, pets are not allowed in any common areas and they are allowed in catwalks or in elevators only if they are carried. (ECF No. 8210 at 7.) That rule is plainly unlawful as applied to any pet that has been allowed to a disabled person as an accommodation under the FHA (hereafter, "an accommodation animal"). The governing regulation makes it "unlawful . . . to refuse to make reasonable accommodations in rules . . . when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, *including public and common use areas."* 24 C.F.R. § 100.24(a). The regulation defines public and common-use areas broadly in a manner that would include the common areas at Sabal Palm and the elevators and catwalks. *See* 24 C.F.R. § 100.21. The November 2012 rules have this same rule; the only difference is that Sabal Palm now provides that this rule must be followed "unless otherwise prohibited by law." 25 (ECF 96-1 at 3.) *25

But the terse phrase—*unless otherwise prohibited by law*—is not a meaningful change and cannot be used to insulate Sabal Palm from liability. A contrary conclusion leads to absurd results. For example, what if Sabal Palm had a rule about bathrooms in common areas providing that, *unless otherwise prohibited by law,* bathroom X was for whites only and bathroom Y, for nonwhites? Just as that rule would be foreclosed by governing law, Sabal Palm's November 2012 rule is foreclosed by the FHA. That Sabal Palm's amended rules still contain an unlawful rule weighs in favor of

concluding that the challenged conduct is a continuing and deliberate rather than isolated or unintentional. It also shows that Sabal Palm has not ceased the challenged conduct. Moreover, adding the phrase *unless otherwise prohibited by law* to this rule without making other changes evinces a desire to avoid liability rather than a genuine change of heart. Sabal Palm is keeping the gist of the rules the Fischers challenge, making changes that amount to no more than window dressing.[12] So the three *Sheely* factors show that the Fischers' injunctive relief is not moot.[13]

[12] Analyzing the December 2011 and November 2012 versions of many other rules leads to the same conclusion. For example, consider the 2011 and 2012 versions of the rule requiring that a resident who owns a pet—including a disabled resident who has an animal as an accommodation under the FHA—carry liability insurance to insure against the chance that the animal injures someone. (ECF Nos. 82-10 at 8; 95-1 at 4.) This rule violates the FHA with respect to an animal that a disabled person has as an accommodation. *See* Joint Statement at 9 (persuasively explaining that a housing provider cannot condition a disabled person's reasonable and necessary accommodation on obtaining liability insurance). That the 2012 version of the rule applies *unless otherwise prohibited by law* does not fix the illegality for the reasons already explained.

[13] In one sentence, Sabal Palm and Trapani argue that the injunctive relief sought by the Fischers is not provided for under § 3604(c). (ECF NO. 95 at 13; ECF No. 96 at 13.) The Court declines to accept such an unsupported argument. The relief available to

private litigants for violations of the FHA is outlined in 42 U.S.C. § 3613(c); § 3604 just specifies conduct that violates the FHA. And the relief authorized by § 3613(c) is phrased broadly.

## 2. Is the § 3604(c) claim valid?

The Fischers contend that the December 2011 rules promulgated by Sabal Palm relating to pets discriminated against disabled persons and thus violated 42 U.S.C. § 3604(c). That section provides in relevant part that it is unlawful to "make, print, or publish . . . any notice, statement, or advertisement with respect to the sale or rental of a dwelling that indicates any *26 preference, limitation, or discrimination based on . . . handicap." Counter Defendants contend that this claim is invalid because the December 2011 rules were not connected with a sale or rental of the Fischers' dwelling. The Court agrees and dismisses this claim with prejudice.

Numerous courts have held that a § 3604(c) claim requires that the allegedly discriminatory statement be made in connection with the sale or rental of a dwelling. *E.g. White v. United States Department of Housing and Urban Development,* 475 F.3d 898, 904 (7th Cir. 2007); *Matarese v. Archstone Pentagon City,* 795 F. Supp. 2d 402, 441 (E.D. Va. 2011) (holding that § 3604(c) "extends to all written or oral statements *made by a person engaged in the sale or rental of a dwelling"* (emphasis added)), *rev'd in part on other grounds sub nom. Matarese v. Archstone Communities, LLC,* 468 F. App'x 283 (4th Cir. 2012); *Michigan Protection and Advocacy Service, Inc. v. Babin,* 799 F. Supp. 695, 716 (E.D. Mich. 1992) (holding that § 3604(c) governs "only the discriminatory comments of a person selling/renting his dwelling, or an agent acting on behalf of that person"); *Gourlay v. Forest Lake Estates Civic Assocation of Part Richey, Inc.,* 276 F. Supp.2d 1222, 1234 (M.D. Fla. 2003) (holding that the § 3604(c)'s plain language "indicates that to create liability either a sale or rental of a dwelling needs to occur or at least be potentially occurring"), *vacated due to settlement,* 2003 WL 22149660, at *1 (M.D. Fla. September 16, 2003). Because this interpretation accords with the plain language of the statute and its accompanying regulation, the Court adopts it. *See* 42 U.S.C. § 3604(c); 24 C.F.R. § 100.75(b) ("The prohibition in this section shall apply to all written or oral notices or statements by a *person engaged in the sale or rental of a dwelling."* (Emphasis added.)).

There are no factual allegations in the Fischers' Amended Counterclaim that the December 2011 rules (or the November 2012 rules, for that matter) were made in connection with the sale or rental of a dwelling. (*See* ECF No. 82.) The Amended Counterclaim similarly fails to allege facts that the Fischers' 3604(c) claim arises from the sale or rental of a dwelling. (*Id.* at 8-12, 17-18.) Moreover, the Fischers' allege that they own and currently live in a Sabal Palm condominium, and Deborah's December 2011 email to Trapani states, "I have lived here for 10 years." (ECF No. 82-4 at 2; *accord* ECF No. 82 at 2.) There are no allegations that the Fischers are attempting to sell or rent their dwelling. (*See* ECF No. 82.) For these reasons, the 3604(c) claim is not plausible and is **dismissed with prejudice.**

The dismissal is with prejudice because it is clear that the Fischers cannot in good faith allege facts fixing the fatal defects noted above. Counter Defendants' motions to dismiss pointed out that the Fischers' allegations did not support a 3604(c) claim for the reasons discussed above, and these *27 motions cited case law supporting their argument. (*See* ECF Nos. 89, 95, 96.) Moreover,

the Fischers' responses to these motions cited no case law supporting their position that the 3604(c) claim was valid, nor did they explain how their 3604(c) claim was connected to the sale or rental of a dwelling. (*See* ECF Nos. 100, 107, 108.) The adverse case law cited by Counter Defendants and the statute's plain language, coupled with the Fischers' inability to

cite any case in support of their claim or to explain how their claim was connected to a sale or rental, should have made the Fischers aware that their claim as pled was invalid. And yet the Fischers waited for months to move to amend their Amended Counterclaim in order to try to fix these problems.[14] (ECF No.

214.) In fact, the Fischers' motion to amend came after the close of fact discovery, after both Sabal Palm and Trapani had moved for summary judgment, and just days before the dispositivemotion deadline. (*Compare* ECF Nos. 201, 202, *and* 214, *with* ECF No. 193.) And even then, the Fischers did not try to allege facts connecting their 3604(c) claim to a sale or rental; they instead switched legal theories all together, arguing that the December 2011 rules violated § 3604(f)(2) rather than § 3604(c). (ECF No. 214-1 at 17.) Because the Court **denies** their motion to amend the Amended Counterclaim (ECF No. 214), the Court also dismisses the 3604(c) claim with prejudice.

> [14] A motion for sanctions filed months before the Fischers moved to amend their Amended Counterclaim similarly notified that Fischers that the 3604(c) claim was invalid. (ECF No. 143.)

There are several reasons to deny the Fischers' motion to amend (ECF No. 214). Given the multiple times that the Fischers were notified that the 3604(c) claim was invalid, and given the long delay in the Fischers' moving to amend to fix this claim, the Fischers' asserted excuse—namely, that they simply mistakenly cited to the wrong section of 3604—beggars belief. If the Fischers merely made a scrivener's error as they claim, then they should have moved to amend much sooner than they did. The Court concludes that the proposed amendment is the result of undue delay or dilatory motive, and perhaps even bad faith. Moreover, since the motion to amend came after the close of fact discovery, if the Court were to grant the motion, it would have to reopen fact discovery out of fairness to Counter Defendants. That would further

delay a case that should not have been brought in the first place. Failing to reopen discovery would prejudice Counter Defendants because they would not be able to conduct discovery on this new legal theory. That the motion to amend came after two parties moved for summary judgment is just icing on the cake. For all these reasons, the Court is well within its discretion to deny the motion to amend. *28

Finally, the Court notes that dismissing the Fischers' 3604(c) claim with prejudice does not foreclose them from obtaining meaningful relief. Under the declaratory-judgment action, the Court is empowered to decide (1) whether the Fischers are entitled to keep Sorenson as an accommodation under the FHA and (2) whether Sabal Palm is entitled to all of the records it requested. This necessarily implies the power to decide the scope of both the accommodation and the records that may legitimately be requested. In other words, the Court can decide under the declaratory-judgment action the records that Sabal Palm can legitimately demand and the conditions under which the Fischers may keep Sorenson.

If the Fischers were to move for summary judgment on the declaratory-judgment action and argue, for example, that they are entitled to keep Sorenson, then the Court could decide based on clear law that Deborah is entitled to keep Sorenson so that she can enjoy not only her dwelling, but the public- and common-use areas. *See* 24 C.F.R. § 100.204(a) (rendering it unlawful to deny reasonable accommodations that are necessary to enjoy the dwelling unit and public- and commonuse areas). Such a determination would similarly render void the rule that Deborah must carry Sorenson in catwalks and elevators because that rule would deprive her of equal enjoyment and use of these common-use areas. The same would go for the rule requiring that a resident carry liability insurance to insure against the chance that the service animal injures someone. *See* Joint Statement at 9 (persuasively explaining that a

housing provider cannot condition a disabled person's reasonable and necessary accommodation on obtaining liability insurance).

This principle generalizes. So the Court's conclusion that the Fischers provided more than enough information for Sabal Palm to grant their requested accommodation has obvious implications for the rules establishing the procedures for seeking and processing accommodations to the no-pet policy based on disability. So too, the Court's conclusions that in some cases, a housing provider is not entitled to any information about the person's disability or need for an accommodation, and that even when the provider is entitled to seek information, the inquiry need not be highly intrusive.

## F. The § 3617 retaliation claim

The Fischers allege that Counter Defendants violated 42 U.S.C. § 3617,[3] the FHA's retaliation provision, by instituting the declaratory-judgment action: *29 Counter Defendants "decided to use litigation in this court to coerce, intimidate, threaten, or interfere with the [Fischers'] enjoyment of their fair housing rights." (ECF No. 82 at 21.) Sabal Palm argues that its First Amendment right to petition the government renders it immune from liability for suing the Fischers. (ECF No. 96 at 17-18.) Because Sabal Palm is correct, the Court dismisses this claim *with prejudice.*

The First Amendment to the United States Constitution guarantees the right to "petition the Government for a redress of grievances." To give this principle life in the antitrust context, the Supreme Court developed the *Noerr-Pennington* doctrine, under which those who petition the executive or legislative branches of government for redress "are generally immune from antitrust liability." *Professional Real Estate Investors, Inc.*

---

*v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 56-57 (1993); *accord Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136 (1961) ("The Sherman Act does not prohibit . . . persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly."); *Mine Workers v. Pennington,* 381 U.S. 657, 670 (1965) ("Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition."). "The Court has further established that the right to petition extends to all departments of the government, including . . . the courts." *White v. Lee,* 227 F.3d 1214, 1231 (9th Cir. 2000) (citing *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972)).

Because the immunity under the *NoerrPennington* doctrine is based on the First Amendment right to petition—a right that is not limited to petitions involving antitrust issues—and because this right extends to petitions filed in the courts (i.e., lawsuits), this immunity also applies in other contexts, including to lawsuits that allegedly violate § 3617 of the FHA. *Id.* at 122932, 1237. But this immunity is not absolute: if a lawsuit is a "sham," then it is not protected by the First Amendment. *Id.* at 1231-32. The party challenging immunity bears the burden to show that the lawsuit is a sham. *Atico International USA, Inc. v. Luv N' Care, Ltd.,* 2009 WL 2589148, at *3 (S.D. Fla. August 19, 2009) (Cohn, J.) (internal quotation marks omitted).

The Supreme Court developed a two-part test to determine if a lawsuit is a sham. The first part is objective: "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Professional Real Estate,* 508 U.S. at 60. The second part, subjective: did the party

---

[3] This section makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . .

any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617.

bring the suit based on the party's belief that the process of the suit itself would further an illegal objective (for example, its belief that the costs of litigation would harm a competitor) rather than its belief that the potential *30 outcome of the suit (i.e., judicial relief) made suing worthwhile. *See id.* at 56-57, 60-61; *White,* 227 F.3d at 1232. In the context of the Fischers' claim that Sabal Palm's lawsuit violated § 3617, the lawsuit is not a sham unless "(1) no reasonable litigant could have realistically expected success on the merits, and (2) [Sabal Palm] filed the suit for the purpose of coercing, intimidating, threatening, or interfering with [the Fischers'] exercise of rights protected by the FHA." *White,* 227 F.3d at 1232.

Demonstrating that a lawsuit is objectively baseless is difficult. "The fact that a litigant loses his case does not show that his lawsuit was objectively baseless for purposes of *NoerrPennington* immunity." *White,* 227 F.3d at 1232 (italics added). A "court must resist the understandable temptation to engage in post hoc reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation. The court must remember that even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." *Professional Real Estate,* 508 U.S. at 60 n.5 (brackets, internal citations, and internal quotation marks omitted). *Professional Real Estate* itself concluded that a copyright suit defeated on summary judgment was not a sham. *Id.* at 64-65. In concluding that a losing copyright suit was not a sham, the Court drew from Rule 11 of the Federal Rules of Civil Procedure: "at the very least," the losing copyright suit "was based on an 'objectively good faith argument for the extension, modification, or reversal of existing law. . . . Even in the absence of supporting authority, [the losing party] would have been entitled to press a novel copyright claim so long as a similarly situated reasonable litigant could have perceived some likelihood of success.'" *Id.* at 65 (quoting Fed. R. Civ. P. 11). As the Ninth Circuit cautioned, "We do not lightly conclude in any *Noerr-Pennington* case

that the litigation in question is objectively baseless, as doing so would leave that action without the ordinary protections of the First Amendment, a result we would reach only with great reluctance." *White,* 227 F.3d at 1232.

Because the Fischers cannot make the difficult showing that Sabal Palm's suit is objectively baseless, the lawsuit is not a sham and Sabal Palm is immune from liability. To be sure, the Court's reasoning analyzing the refusal-to-accommodate claim shows that, based on the information it had before it sued, Sabal Palm should have allowed Deborah to have Sorenson. But losing is not enough for a suit to be objectively baseless.

Because Sabal Palm had not been presented with a statement from a medical professional expressly stating that Deborah needed a service dog as an accommodation to live in her apartment, Sabal Palm at least had a glimmer of hope that it could succeed. To be sure, the Joint Statement counsels against *31 such an express statement being necessary. And the records Sabal Palm had all but screamed that Deborah would benefit from a service dog with Sorenson's training. Moreover, the Court is unaware of a case holding that for a person with a readily apparent disability, there needs to be such an express statement when the evidence matches the obvious effects of the disabled person's symptoms with the dog's training. (For example, it is obvious that someone with severe fatigue, anemic grip strength and extremely poor motor coordination whose functional abilities include lift negligible weight may need help retrieving items.) But in some cases, there were such express statements and the courts held that the service dog was needed based on such express statements. For example, in *Bhogaita v. Altamonte Heights Condominium Assocation, Inc.*, Bhogaita had letters from his doctor stating that he suffered from Post Traumatic Stress Disorder, that he had a therapeutic relationship with his dog, and that

without his dog, he would be unable to work. 2012 WL 10511 at 4 (M.D. Fla. January 3, 2012). Sabal Palm could at least argue with a straight face that what was sufficient in this case was actually required in other cases and that the information it had did not sufficiently substantiate Deborah's need for Sorenson.

The Fischers' retaliation claim under § 3617 thus fails as a matter of law. The First Amendment renders Counter Defendants immune to this claim. The Court dismisses this claim *with prejudice* because the declaratory-judgment lawsuit cannot support a retaliation claim, no matter what facts the Fischers allege.[16]

[16] Silvergold did not advance an immunity argument based on the First Amendment. Only Sabal Palm and Trapani did. But because Silvergold has the same rights as they do under the First Amendment, the Fischers' retaliation claim must be dismissed against him as well.

--------

## G. Punitive Damages

Because the refusal-to-accommodate claim is the only surviving claim of the Amended Counterclaim, the Court restricts its analysis to the request for punitive damages under that claim. Counter Defendants contend that the Fischers' allegations are insufficient to support an award of punitive damages and therefore move to strike this relief. (ECF Nos. 90; 95 at 19; 96 at 18-19.) Counter Defendants' argument is unpersuasive.

Punitive damages are available under the FHA for a refusal-to-accommodate claim. 42 U.S.C. § 3613(c) (providing that punitive damages may be awarded if a court "finds that a discriminatory housing practice has occurred or is about to occur); 42 U.S.C. § 3602(f) (providing that an act that *32 violates § 3604(f)(3)(B) is a discriminatory housing practice). "The Eleventh Circuit has not discussed when punitive damages become available in Fair Housing Act cases." *United States v. Gumbaytay,* 757 F. Supp. 2d 1142, 1150 (M.D. Ala.

2011). But many other circuits have, and they use the standard set forth in *Kolstad v. American Dental Association,* 527 U.S. 526, 533-39 (1999), which analyzed when punitive damages are available in a Title VII of the Civil Rights Act case under 42 U.S.C. § 1981a(b) (1). *Id.* at 1151 (collecting circuit cases applying the *Kolstad* standard to punitive damages under the FHA). The Court is convinced by these and other decisions that the *Kolstad* standard used to analyze punitive damages in civil-rights cases should also be used in FHA cases. *See id.* (being similarly convinced).

Under this standard, "[p]unitive damages are appropriate in a federal civil rights action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Quigley v. Winter,* 598 F.3d 938, 952-53 (8th Cir. 2010) (internal quotation marks omitted) (applying the *Kolstad* standard to analyze punitive damages under the FHA). *Kolstad* held that "the terms 'malice' and 'reckless [indifference]' ultimately focus on the actor's state of mind." *Id.* at 953 (quoting *Kolstad,* 527 U.S. at 535) (entire quotation drawn from *Kolstad* except for brackets). More specifically, they "pertain to the defendant's knowledge that he may be acting in violation of federal law, not his awareness that he is engaging in discrimination." *Id.* (quoting an Eighth Circuit cases quoting *Kolstad,* 527 U.S. at 535) (brackets omitted). So for punitive damages to be available, a defendant

"must at least discriminate in the face of a

Sabal Palm Condos. of Pine Island Ridge Ass'n, Inc. v....    Case No. 12-60691-Civ-SCOLA (S.D. Fla. Mar. 13, 2014)

perceived risk that [his or her] actions will violate federal law." *Kolstad,* 527 U.S. at 536; *accord Quigley,* 598 F.3d at 953.

Because the Fischers' factual allegations make it plausible that Counter Defendants perceived the risk that their actions may violate federal law, punitive damages are valid at this stage of the proceedings. As discussed above under the refusal-to-accommodate claim, the Fischers' Amended Counterclaim and the documents attached to it show that Counter Defendants had more than enough information to conclude that Deborah was entitled to her accommodation under the FHA. Yet they demanded still more information and sued rather than making the correct (and obvious) decision. So when the Fischers allege that Counter Defendants engaged in these action with "total and reckless disregard of [the Fischers"] rights and indifferen[ce] to the medical conditions or needs of [Deborah]," that allegation is plausible. (ECF No. 82 at 15.) Moreover, Deborah sent a link to the Joint Statement to Trapani, and in his reply, Trapani acknowledged that he was familiar with the Joint Statement and that the "Association [i.e., Sabal Palm] is aware of your apparent *33 disability." (ECF Nos. 82-4 at 2; 82-5 at 2.) Silvergold was the president of the Board and Trapani copied him on the various letters he sent, so it is plausible that Silvergold was aware of this legal authority as well. And the Joint Statement does not support Counter Defendants' conclusion that based on the information that they received, Sabal Palm was within its rights to deny Deborah the accommodation. So by even stronger force of logic, the Joint Statement does not support Sabal Palm's decision to sue rather than grant the accommodation. Moreover, the April 2012 letter written by Trapani on behalf of Sabal Palm and carbon copied to Silvergold states that the "Association recognizes that the issue relating to whether, and under what circumstances, accommodations to disabled persons are required is an evolving issue under the law." (ECF No. 82-9 at 3.) This more than plausibly establishes that

Counter Defendants perceived the risk that may be violating the FHA when they sued rather than grant Deborah's request even though they had more than enough information. Punitive damages remain viable at this point. The Court **denies** Counter Defendants' requests to strike the Fischers' claim to punitive damages.

## Conclusion

For the above reasons, the motions to dismiss (ECF Nos. 89, 95, 96) are **granted in part and denied in part** and the request to strike punitive damages (ECF No. 90) is **denied.** More specifically, the Court **grants** the motions to dismiss with respect to the Fischers' § 3604(c) and § 3617 claims. These claims are **dismissed with prejudice.** But the Court denies the motions to dismiss with respect to the Fischers' refusal-toaccommodate claim. This claim stands. The Court **denies** the Fischers' motion (ECF No. 214) seeking leave to amend their Amended Counterclaim.

**Done and ordered** in chambers, at Miami, Florida, on March 13, 2014.

_____

**Robert N. Scola, Jr.**

**United States District Judge**