## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**MARK HEIMKES, et al.,**

    **Plaintiffs,**

**v.**                                                 **1:22-cv-00448-TFM-N**

**FAIRHOPE MOTORCOACH
RESORT CONDOMINIUM
OWNERS ASSOCIATION, INC.,**

    **Defendant.**

### DECLARATION OF FRANKLIN H. EATON, JR.

I, Franklin H. Eaton, Jr., declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am counsel of record for Plaintiffs Mark Heimkes and Shearldine Marie Allfrey in the above-captioned matter and am admitted to practice before this Court.

2.    I have personally reviewed all legal authorities, statutes, regulations, and guidance cited in Plaintiffs' Response to the Supplemental Show Cause Order (Doc. 318), including but not limited to the cases, statutes, and the HUD/DOJ Joint Statement on Reasonable Accommodations Under the Fair Housing Act (May 17, 2004).

3.      The following authorities, attached and highlighted, directly address the issues raised by the Court's Supplemental Order to Show Cause:

A.      ***Unger v. Majorca at Via Verde Homeowners Ass'n*, No. 21-13134 (11th Cir. Sep. 29, 2022):**

The Eleventh Circuit held that a plaintiff need only demonstrate a facially reasonable request for accommodation under the FHA, and that the district court must first consider the reasonableness of the plaintiff's requested accommodation before considering the defendant's alternatives. (Slip op. at 8, quoting Schaw, 938 F.3d at 1269 and Barnett, 535 U.S. at 401.) This directly rebuts the notion that a formal written request is required or that a housing provider may ignore an obvious or communicated need for accommodation.

B.      ***Schaw v. Habitat for Humanity of Citrus Cnty., Inc.*, 938 F.3d 1259 (11th Cir. 2019):**

"A plaintiff need only demonstrate a facially reasonable request—or one that seems reasonable in 'the run of cases.' … Schaw—who is unable to work—asked Habitat to accept proof that he brings in the same amount of money as any other Habitat homeowner, but in a different form. This request strikes us as the type of accommodation that the Supreme Court has deemed at least facially reasonable." (1266)

2

The Eleventh Circuit's framework, as clarified in Unger, requires the court to first consider the reasonableness of the plaintiff's request before considering alternatives.

C.   ***Quigley v. Winter*, 598 F.3d 938 (8th Cir. 2010):**

This case affirms the principle of vicarious liability under the FHA, holding that a landlord (or principal) may be liable for the discriminatory acts of agents, including attorneys, and that punitive damages are appropriate where a defendant "discriminates in the face of a perceived risk that [his] actions will violate federal law." (p. 953, quoting Kolstad, 527 U.S. at 536.). The underlying principle of vicarious liability, though not the central issue in Quigley, would apply if the discriminatory actions had been perpetrated by a property manager or other agent of Winter. In that scenario, Winter, as the principal (landlord), would likely have been held liable for their agent's actions under the FHA, even if he had not directly participated in or approved of them. See also *Meyer v. Holley*, 537 U.S. 280, 285–86 (2003); 24 C.F.R. § 100.7(a)(1)(iii), (b).

D.   ***Francis v. Kings Park Manor, Inc.*, 992 F.3d 67 (2d Cir. 2021):** The Second Circuit explains that 24 C.F.R. § 100.7(a)(1)(iii) imposes liability on a landlord or association for failing to intervene in third-party discrimination only where a legal duty to do so exists, such as through a declaration or contract. (p. 81.) This is quoted and applied in *Higgins v. 120 Riverside Boulevard at Trump Place Condo.*, 2022 WL 196802, at *63 (S.D.N.Y. Aug. 31, 2022): "To plead a negligent infliction of emotional distress claim under New York law, a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." (citing Francis, 992 F.3d at 81 (2d Cir. 2021) (en banc)). *Higgins* further discusses the scope of association liability and the legal basis for requiring intervention.

E.   ***Sabal Palm Condos. of Pine Island Ridge Ass'n, Inc. v. Fischer*, No. 12-60691 (S.D. Fla. Mar. 13, 2014):**
This case holds that, "In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary for determining whether an accommodation is required," and that excessive demands for documentation or delay can constitute

4

constructive denial. The court further holds that a housing provider's refusal to act on sufficient information, or to demand more than is necessary, is a violation of the FHA.

F.   **HUD/DOJ Joint Statement on Reasonable Accommodations under the Fair Housing Act (May 17, 2004):**

Question 12: "An individual making a reasonable accommodation request does not need to mention the Act or use the words 'reasonable accommodation.' However, the requester must make the request in a manner that a reasonable person would understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability."

Question 17: "If a person's disability is obvious, or otherwise known to the provider, and if the need for the requested accommodation is also readily apparent or known, then the provider may not request any additional information about the requester's disability or the disabilityrelated need for the accommodation."

Question 18: "In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary for this inquiry."

4.    These authorities are attached and highlighted to show the precise language supporting Plaintiffs' arguments, demonstrating that Plaintiffs' positions are warranted by existing law and are not frivolous or misleading.

5.    Any inaccuracies or typographical errors in prior filings were inadvertent and not intended to mislead the Court or opposing counsel.

6.    Plaintiffs' legal arguments are made in good faith, are warranted by existing law or a non-frivolous argument for extension, modification, or reversal of existing law, and are supported by the factual record and controlling authority.

7.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 12th day of August, 2025.

_____
Franklin H. Eaton, Jr.
The Eaton Law Firm, LLC
Counsel for Plaintiffs

No. 21-13134
United States Court of Appeals, Eleventh Circuit

# Unger v. Majorca at Via Verde Homeowners Ass'n

Decided Sep 29, 2022

21-13134

09-29-2022

STEVEN UNGER, Plaintiff-Appellant, v. MAJORCA AT VIA VERDE HOMEOWNERS ASSOCIATION INC., Defendant-Appellee.

PER CURIAM:

DO NOT PUBLISH

Appeal from the United States District Court for the Southern District of Florida D.C. Docket No. 1 9:20-cv-81175-AHS *1

Before ROSENBAUM, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Steven Unger appeals from the district court's dismissal of his complaint against Majorca At Via Verde Homeowners Association, Inc. ("Majorca"). Unger asserted a claim against Majorca for failing to reasonably accommodate his disability in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(f).[1] The district court dismissed Unger's complaint for failure to state a claim. After careful review, we reverse the district court's order.

[1]    This provision of the FHA is sometime referred to as the "Fair Housing Amendments Act of 1988" to reflect the amendment to the FHA that included a provision concerning discrimination against handicap-persons. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 (11th Cir. 2008) ("The FHAA amended 42

U.S.C. § 3604, the primary substantive provision of the FHA, by adding a new subsection (f)

that applies only to discrimination against the handicapped."). **I.**

This is an appeal from an order dismissing Unger's complaint under Federal Rule of Civil Procedure 12(b)(6). We therefore accept the complaint's factual allegations "as true and constru[e] them in the light most favorable to" Unger. *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). [2]    *2

Unger and his wife live at Majorca At Via Verde. Because Unger is disabled-he suffers from severe ankylosing spondylitis- he cannot attend Majorca's homeowners' association meetings.

Before April 2019, the minutes from the homeowners' association meetings "were promptly posted online . . . immediately after the meeting was held." Beginning in April 2019, however, the minutes were no longer promptly published on Majorca's website. Without access to the meeting minutes, Unger could not access Majorca At Via Verde's "community happenings."

Unger and his wife reached out to members of Majorca's board, and to Majorca's property management company, to obtain access to the meeting minutes. When they did not receive access, Unger's wife informed Majorca's property manager that Unger's disability prevented him from attending homeowners' association meetings and requested an accommodation on his behalf. Unger's wife requested that Majorca accommodate Unger by either recording the board meetings or providing "a transcript of the monthly board meetings minutes . . . immediately after the meetings occur."

In response to Unger's request, Majorca's property manager stated that "the board of directors does not

record" their meetings and that "[t]he only transcripts which are available are the approved meeting minutes from the previous meeting," meaning the transcripts would not be made available until a month after the relevant meeting. But the property manager stated that Unger could designate "a set representative by power of attorney" to attend the *3 meetings in his place and that the representative "may record or take notes as necessary" at the meetings.

Unsatisfied with this response, Unger retained counsel who repeated Unger's requested accommodations and informed Majorca that they had to accommodate Unger's disability. Majorca responded that "[t]here is no 'immediate' transcribing of the minutes"-because the minutes must be approved by the board before publicationand that the board "does not tape or video record any association meetings." Majorca also noted that it "has provided and continues to provide reasonable accommodations" to Unger. Majorca stated that, because of COVID-19, association meetings were now being held by Zoom (a remote video conference platform) and that Unger could attend the meetings remotely via Zoom. And Majorca stated that Unger may designate a thirdparty to attend and record the meetings on his behalf when meetings are held in person.

Unger filed a complaint against Majorca and alleged that Majorca violated the FHA by failing to grant his reasonable accommodation requests. Unger alleged that Majorca failed to accommodate his disability "by providing him minutes or recordings of meetings . . . either immediately after the meetings, or at all."

Majorca moved to dismiss Unger's complaint for failure to state a claim. Among other arguments,

Majorca asserted that Unger was not entitled to the specific accommodations he requested and that Majorca offered Unger two reasonable alternative accommodations: (1) the ability to attend association meetings via Zoom; *4 and (2) the ability to designate a third-party to attend and record association meetings on Unger's behalf.

The district court granted Majorca's motion to dismiss without prejudice. The district court found that Unger sufficiently alleged that he was disabled, that he requested an accommodation, and that an accommodation was necessary because of his disability. But the district court did not address whether the accommodations Unger requested were reasonable. Instead, the district court noted that Unger is not entitled to the accommodations he requested and found that Majorca did not refuse to reasonably accommodate Unger. In so doing, the district court relied on the alternative accommodations Majorca offered to Unger.

Unger moved to amend his complaint. In his proposed amended complaint, Unger alleged that the alternative accommodations Majorca proposed were not reasonable and that the accommodations he requested do not impose an undue burden on Majorca.

The district court denied Unger's motion for leave to amend and determined that Unger's proposed amended complaint conceded that Majorca "did not refuse the request" to accommodate Unger and that Majorca "proffered several reasonable accommodations." Accordingly, the district court found that the proposed amended complaint "suffer[ed] from the same deficiency as *5 the original [c]omplaint" and directed the clerk to close Unger's case. This appeal followed.[1]

---

[1] Unger appealed both the order dismissing his original complaint and the order denying his motion for leave to file an amended complaint. Because we find that the district court erred in dismissing Unger's original complaint, and the district

"suffer[ed] from the same deficiency as the original [c]om-plaint," we do not separately address the district court's order denying Unger's motion for leave to amend.

## II.

"We review the district court's grant of a motion to dismiss for failure to state a claim *de novo*, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Hunt*, 814 F.3d at 1221.

## III.

The FHA prohibits discriminating "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2). Under the FHA, discrimination "on the basis of a 'handicap,' or a disability," includes "refusing to make reasonable accommodations when necessary to afford the person equal opportunity to use and enjoy a dwelling." *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014) (footnote omitted). *6

To state a claim for failure to accommodate under the FHA, a plaintiff must plead:

> (1) the plaintiff is a person with a disability within the meaning of the FHA or a person associated with that individual; (2) the plaintiff requested a reasonable accommodation for the disability; (3) the requested accommodation was necessary to afford the plaintiff an opportunity to use and enjoy the dwelling; and (4) the defendant refused to make the [requested] accommodation.

*Hunt*, 814 F.3d at 1225. "At the pleading stage, the relevant question is whether the complaint provides

'a short and plain statement of the claim' that 'give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.* at 1221 (alteration in original) (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002)). And the complaint must "present[] a plausible set of facts from which we can infer that" Unger has "sufficiently pled [his] claim." *Id.* at 1225.

Here, the district court dismissed Unger's complaint, and then denied his motion to amend, because the court found that Unger failed to plausibly allege the fourth element of his failure to-accommodate claim, i.e., that Majorca refused to accommodate Unger. Unger argues that the district court erred because the district court should have determined whether the accommodations Unger requested, which Majorca refused to provide, were reasonable and should not have relied on the alternative accommodations 7 Majorca proposed in dismissing his claim. *7

> This appeal asks us to determine whether the district court properly relied on the alternative accommodations Majorca offered to Unger, before considering the reasonableness of the accommodations Unger requested. Our analysis is divided into two parts. First, we discuss this Court's framework for failure-to-ac-commodate claims under the FHA. Then, we discuss whether the district court correctly applied that framework.

### A. Framework for Failure-to-Accommodate Claims

In *Schaw v. Habitat for Humanity of Citrus County, Inc.*, 938 F.3d 1259 (11th Cir. 2019), this Court addressed the framework for failure-toaccommodate claims under the FHA and reversed a district court's decision that a defendant "was entitled to summary judgment because it had provided a sufficient '*alternative* accommodation.'" *Id.* at 1269 (emphasis in original). While we

court denied Unger's motion to amend because the proposed amended complaint

acknowledged that a plaintiff is not entitled to his requested accommodation, we concluded that so long as the plaintiff's request "is facially reasonable, the burden shifts to the defendant, who must prove that the accommodation would nonetheless impose an 'undue burden' or result in a 'fundamental alteration' of its program." *Id.* at 1266 (quoting *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1220 (11th Cir. 2008)). We concluded that the district court erred in its "alternative accommodation" finding because the district court should have "consider[ed] first whether the plaintiff's own requested accommodation 'seems reasonable on its face' before turning to consider a defendant's objections and *8 counterproposals." *Id.* at 1269 (quoting *U.S. Airways v. Barnett*, 535 U.S. 391, 401 (2002)).

Majorca argues that the *Schaw* framework does not apply here because *Schaw* was decided at a different procedural stage- an order granting summary judgment. We disagree. At the motion to dismiss stage, the plaintiff also bears the initial burden of showing that the plaintiff's requested accommodation is reasonable on its face. *Cf id.* at 1265-66 ("A plaintiff carries the initial burden of showing that his proposed accommodation is [facially] reasonable."). Indeed, "[t]o withstand a motion to dismiss under Rule 12(b)(6), a complaint must include 'enough facts to state a claim to relief that is plausible on its face,'" and a request for a reasonable accommodation is an element of Unger's FHA claim. *Hunt*, 814 at 1221, 1225 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). But arguments that a plaintiff's requested accommodation "impose[s] an 'undue burden' or result[s] in a 'fundamental alteration' of its program," *Schaw*, 938 F.3d at 1266, are affirmative defenses for which a defendant bears the burden of proof at both the motion to dismiss and the summary judgment stages of litigation, *see Willis v. Conopco, Inc.*, 108 F.3d 282, 286 (11th Cir. 1997) (describing "undue hardship" as "an affirmative defense to be pled and proven by an [American with

Disabilities Act] defendant"); *Haddad v. Dudek*, 784 F.Supp.2d 1308, 1330 (M.D. Fla. 2011) (explaining that, at the motion to dismiss stage, a defendant must establish its *9 "fundamental alteration defense" based "on the face of [the] [p]laintiff's [c]omplaint").[3]

> [3] While these cases involved the American with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"), "we look to case law under the RA and the ADA for guidance on what is reasonable under the FHA." *Schwarz*, 544 F.3d at 1220.

Therefore, *Schaw*'s general framework for failure-to-accom-modate claims under the FHA also applies at the motion to dismiss stage.[4] Accordingly, at the motion to dismiss stage, courts "must consider first whether the plaintiff's own requested accommodation 'seems reasonable on its face' before turning to consider a defendant's objections and counterproposals." *Schaw*, 938 F.3d at 1269 (quoting *Barnett*, 535 U.S. at 401).

> [4] We recognize that not every aspect of *Schaw* applies here because of the procedural posture of this case. For example, in *Schaw*, the district court was able to consider "outside evidence" in connection with the defendant's objections and counterproposals. 938 F.3d at 1269. But at the motion to dismiss stage, a court's consideration of a defendant's objections and counterproposals is limited to "the four corners of the complaint." *St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002) (explaining that, at the motion to dismiss stage, "[t]he scope of review must be limited to the four corners of the complaint"); *see, e.g., Haddad*, 784 F.Supp.2d at 1330 (denying defendants' motion to dismiss because "[d]efendants' fundamental alteration defense [was] not established . . . on the face of" the complaint).

## B. Whether the District Court Applied the *Schaw*-Framework



Unger v. Majorca at Via Verde Homeowners Ass'n    No. 21-13134 (11th Cir. Sep. 29, 2022)

Turning to Unger's complaint, Unger alleged that he requested Majorca either to record the association's meetings or to provide him with a



transcript of the meeting minutes immediately *10 after the meetings. Unger further alleged that, in response to his requests, Majorca stated that it would neither record its meetings nor provide Unger with a transcript of the meeting minutes immediately after the meetings. Therefore, Unger plausibly alleged that Majorca refused to provide either of his requested accommodations.

The district court's contrary conclusion-that Unger failed to allege that Majorca refused to accommodate him-was premised on the alternative accommodations Majorca offered to Unger. But the district court did not assess whether the accommodations Unger requested were facially reasonable before turning to Majorca's counterproposals. In so doing, we conclude that the district court erred.

casetext

In accordance with *Schaw*, the district court should have first considered whether Unger's "requested accommodation[s] 'seem[ed] reasonable on [their] face' before turning to consider" Majorca's "objections and counterproposals." 938 F.3d at 1269 (quoting *Barnett*, 535 U.S. at 401). Because the district court failed to follow this framework, remand is appropriate to allow the district court to do so in the first instance. *See Maldonado v. Baker Cnty. Sheriff's Off.*, 23 F.4th 1299, 1308 (11th Cir. 2022).

**IV.**

For the reasons stated, we reverse the district court's order dismissing Unger's claim and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.** *11

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 13 of 275
PageID# 11996
Unger v. Majorca at Via Verde Homeowners Ass'n, No. 21-13134 (11th Cir. Sep. 29, 2022)

**Find a**          **Legal**          **Learn**          **Legal**

FindLaw.    **Lawyer**    **Forms &**    **About**    **Professionals**    **Blogs**    **Services** the

**Law**

FINDLAW  /  CASE LAW  /  UNITED STATES  /  US 11TH CIR.  /  SCHAW V. HABITAT FOR HUMANITY OF CITRUS COUNTY INC

# SCHAW v. HABITAT FOR HUMANITY OF CITRUS COUNTY INC (2019)

## United States Court of Appeals, Eleventh Circuit.

Albert SCHAW, Plaintiff - Appellant, v. HABITAT FOR HUMANITY OF CITRUS COUNTY, INC., Defendant - Appellee.

## No. 17-13960

## Decided: September 18, 2019

## Before TJOFLAT, MARCUS, and NEWSOM, Circuit Judges.

## Lisa Charli Goodman, Hickey Law Firm, PA, MIAMI, FL, Matthew W. Dietz, Disability Independence Group, MIAMI, FL, for Plaintiff-Appellant. Robert Houston McLean, Bice Cole Law Firm, PL, OCALA, FL, Edwin C. Cluster, Ayres Cluster Law Firm, THE VILLAGES, FL, for Defendant-Appellee.

Albert Schaw, a quadriplegic, applied for a home with Habitat for Humanity of Citrus County. Because his annual social-security-disability income didn't meet Habitat's minimum-income threshold, Schaw requested an accommodation that would allow him to supplement those funds with either food stamps or a notarized letter memorializing the Rnancial support that he received from his family. When Habitat refused, Schaw sued under the Fair Housing Amendments Act, 42

U.S.C. § 3601 et. seq., which prohibits an entity from discriminating against a disabled individual by failing to make "reasonable accommodations" in policies and practices that are "necessary to afford" the individual an "equal opportunity to use and enjoy a dwelling." Id. § 3604(f)(3)(B). Schaw separately alleged that Habitat's minimum-income requirement has a disparate impact on disabled individuals receiving social-security-disability income.

The district court granted Habitat summary judgment on the basis that Schaw's requested accommodation wasn't "necessary" within the meaning of the Act, reasoning that it would alleviate only his "Rnancial condition—not his disability." The court also concluded that Schaw had failed to state a disparate-impact claim. After careful review, we conclude that while the district court correctly rejected Schaw's disparate-impact claim, it failed to properly analyze his failure-to-accommodate claim. Accordingly, we vacate and remand for further proceedings consistent with this opinion as to Schaw's failure-to-accommodate claim.

I

A

Shortly after he graduated from high school, Albert Schaw was in a wrestling accident that left him completely paralyzed. Schaw is now wheelchair-bound, and his current abode is ill-suited to accommodate his quadriplegia—it isn't wheelchair accessible, and there's no way for him to close the bathroom door for privacy. After seeing a television advertisement for Habitat for Humanity, a nonproRt that builds new homes for low-income individuals, Schaw decided to apply.

When Schaw met to discuss the application process with Habitat's Family Services Director, Rose Strawn, he learned that Habitat imposes a minimum-gross-annual-income requirement of $10,170, presumably to ensure that potential homeowners will be able to pay their mortgages. According to Schaw, his disability prevents him from working, so his main source of income is a Social Security Disability Insurance stipend of $778 per month, which equates to a gross annual income of $9,336. Given the Rxed nature of his SSDI, Schaw asked Habitat to consider one of two other sources of income toward its requirement. First, Schaw receives $194 per month in food stamps. With the food stamps, Schaw's gross annual income would be $11,664—enough to qualify. Second, Schaw receives $100 per month in familial support from his father. With that gift, his gross annual income (even excluding the food stamps) would be $10,536—also enough to qualify. On Strawn's

recommendation, Schaw provided a notarized letter from his father conRrming that he gives Schaw $100 each month.

Habitat's Board of Directors reviewed Schaw's application and determined that it couldn't accept either of the two additional sources of income. It wouldn't consider the food stamps because Habitat follows HUD guidelines, which provide that food stamps don't count as income. And it wouldn't accept the notarized letter from Schaw's father because the letter wasn't a legally enforceable guarantee that the monthly support would continue. The Board therefore rejected Schaw's application. It did, however, indicate that it would reconsider if the familial support took the form of a trust or an annuity.

Shortly thereafter, Schaw's attorney, Rebecca Bell, contacted Strawn to explain that a trust wouldn't work because it could jeopardize Schaw's ability to receive government beneRts. When Strawn then suggested an annuity, Bell explained that she didn't handle annuities but knew Rnancial advisors who did, and Strawn took that to mean that Bell would discuss the annuity option with Schaw. Strawn then sent Schaw a "Letter of Intent" explaining the conditions he needed to meet in order to qualify. One of those requirements was that he "[p]rovide documentation for [an] Annuity Plan, (for minimum of Rve years), as veriRcation of monthly support provided by [his] Father." Later, Schaw (through his aunt, Susan Hale) sent an email to Habitat inquiring as to the status of his application. George Rusaw, Habitat's president and CEO, responded that Schaw needed to provide "legally codiRed" evidence of the familial support and that "the notarized letter from [Schaw's] father [was] legally insujcient."

B

Schaw sued Habitat under the Fair Housing Amendments Act, 42 U.S.C. § 3604(f), bringing two separate claims. First, he asserted that Habitat violated § 3604(f)(3)(B), which requires "reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." Habitat failed to provide a reasonable accommodation for his disability, Schaw asserted, by refusing to consider his food stamps or familial support as income in lieu of wages earned. Second, Schaw alleged that Habitat's minimum-income requirement has a disparate impact on applicants receiving SSDI.

After discovery, the parties Rled cross-motions for summary judgment on both claims. Habitat accepted the facts alleged by Schaw and conceded (1) that Schaw is disabled within the meaning of the Act, (2) that Schaw asked Habitat to consider his food stamps and familial support as supplemental income, and (3) that Habitat refused to consider the food stamps and the familial support—other than in the form of a trust or annuity—as income for purposes of his application.

Habitat disputed, however, that the accommodation that Schaw requested was "reasonable" within the meaning of the Act.

Shortly after the parties Rled their motions, Schaw moved for leave to amend his complaint, seeking to clarify the effect that a trust or annuity would have on his government beneRts. At the time he Rled the complaint, Schaw believed that a trust or annuity would render him ineligible for SSDI beneRts. He then learned that while a trust or annuity wouldn't affect his SSDI, it could risk his eligibility for other needs-based assistance, such as Medicare. Because the district court didn't believe that these changes would affect its analysis as to the relevant questions of law, it declined to address the motion for leave to amend before ruling on the summary-judgment motions.

The district court granted Habitat's motion for summary judgment. The court didn't address the "reasonable[ness]" of Schaw's request, concluding instead that the accommodation wasn't "necessary" within the meaning of the Act because it "went solely to his Rnancial condition—not his disability." The court also concluded that summary judgment was appropriate because Schaw had failed to attempt in good faith to take advantage of Habitat's proposed "alternative accommodation"— namely, to have his father set up familial support in the form of a trust or annuity. As to Schaw's second claim, the court determined that he had failed to provide any evidence that Habitat's requirements had a disparate impact on SSDI recipients. This appeal followed.

II

The Fair Housing Amendments Act of 1988 exists "to prohibit discrimination based on handicap and familial status." Schwarz v. City of Treasure Island, 544 F.3d 1201, 1212 (11th Cir. 2008). As relevant here, discrimination includes refusing "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a disabled] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

To prevail on a failure-to-accommodate claim, a plaintiff must prove (1) that he is disabled, (2) that he requested a "reasonable accommodation[ ]," (3) that the requested accommodation was "necessary to afford [him an] equal opportunity to use and enjoy a dwelling," and (4) that the defendant refused to make the requested accommodation. Id.; see also Hunt v. Aimco Props., L.P., 814 F.3d 1213, 1225–26

(11th Cir. 2016). The Rrst and last elements are undisputed in this case—no one here disputes that Schaw is disabled or that Habitat refused to accommodate his request that it consider his supplemental sources of income. Accordingly, we focus on the middle two elements—whether the accommodation that Schaw requested was "reasonable" and whether it was "necessary to afford [him an] equal opportunity to use and enjoy a dwelling." The district court skipped the Rrst question and decided the case solely on the basis of the second. But because we Rnd that a genuine issue of material fact exists as to both, we will address each in turn.[1]

A

1

First, what do we mean when we talk about a "reasonable accommodation" under the Act? The reasonableness inquiry considers "whether the requested accommodation 'is both ejcacious and proportional to the costs to implement it.' " Bhogaita v. Altamonte Heights Condo. Ass'n, Inc., 765 F.3d

1277, 1289 (11th Cir. 2014) (quoting Oconomowoc Residential Programs v. City of Milwaukee, 300

F.3d 775, 784 (7th Cir. 2002)).[2] Assessing reasonableness "require[s] a balancing of the parties' needs." Id. An accommodation isn't reasonable if it requires "a fundamental alteration in the nature of a program" or imposes "undue Rnancial and administrative burdens." Se. Cmty. Coll. v. Davis, 442 U.S.

397, 410, 412, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) (interpreting the term "reasonable accommodation" in the analogous Rehabilitation Act context); see also Schwarz, 544 F.3d at 1220. This Court has explained—in imaginative terms—that "[t]he difference between [an] accommodation that is required and [a] transformation that is not is the difference between saddling a camel and removing its hump." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1260 (11th Cir. 2001) (interpreting the term "reasonable accommodation" in the analogous Americans with Disabilities Act context).

A plaintiff carries the initial burden of showing that his proposed accommodation is reasonable; however, on a showing of a facially reasonable request, it's up to the defendant to demonstrate why the requested accommodation would cause undue hardship. U.S. Airways v. Barnett, 535 U.S. 391, 401–02, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002).[3] The Supreme Court has explained that "a plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an 'accommodation' seems reasonable on its face, i.e., ordinarily or in the run of cases." Id. at 401, 122 S.Ct. 1516 (citation omitted). This doesn't necessarily mean that a defendant is required "to accommodate a [plaintiff] in any manner in which that [plaintiff] desires." Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir. 1997) (quotation omitted). It does mean, though, that the initial threshold presents a relatively low bar. See Willis, 108 F.3d at 286 & n.2 (11th Cir. 1997) ("As a general matter, a reasonable accommodation is one employing a method of accommodation that is reasonable in the run of cases . ") (quoting Barth v. Gelb, 2 F.3d 1180, 1187 (D.C. Cir. 1993)); see also Hunt, 814 F.3d at 1226 (assuming that a mother's request for accommodation was reasonable when she sought an exception to an apartment complex's lease-nonrenewal policy while making arrangements for her disabled son to be placed in offsite care).

If a plaintiff's request is facially reasonable, the burden shifts to the defendant, who must prove that the accommodation would nonetheless impose an "undue burden" or result in a "fundamental alteration" of its program. Schwarz, 544 F.3d at 1220. An accommodation requires a "fundamental alteration" if it would "eliminate an 'essential' aspect of the relevant activity," id. at 1220–21—or, if you prefer, would "remov[e] [the camel's] hump," Lucas, 257 F.3d at 1260. Whether a particular aspect of an activity is "essential" will turn on the facts of each case. Schwarz, 544 F.3d at 1221; see also Staron v. McDonald's Corp., 51 F.3d 353, 356 (2d Cir. 1995) ("[T]he determination of whether a particular modiRcation is 'reasonable' involves a fact-speciRc, case-by-case inquiry that considers, among other factors, the effectiveness of the modiRcation . and the cost to the organization that would implement it.").

While that may sound a little squishy, we aren't without guidance in this area. In Schwarz v. City of Treasure Island, we acknowledged that the Supreme Court had determined that the analogous ADA required the PGA Tour to allow a contestant to use a golf cart rather than walk during a tournament. 544 F.3d at 1221 (discussing PGA Tour, Inc. v. Martin, 532 U.S. 661, 689, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001)). While riding in a golf cart arguably provides an advantage of sorts, the Court explained

that the Tour's walking rule was not "an essential rule of competition" but was "at best peripheral to the nature of [its] athletic events." See Martin, 532 U.S. at 689, 121 S.Ct. 1879.

Another way to look at the "essential"-ness (or "fundamental"-ness) issue might be to ask, "What is the basic purpose of the rule or policy at issue?" In Schwarz, we considered a request for a variance to allow several halfway houses—which are classiRed as tourist-dwellings because of their high turnover rates—to operate, some in a designated single-family residential zone and others in a zone that allowed multi-family dwellings. 544 F.3d at 1205–06. In the process of evaluating the City's defense, we examined the basic purpose of zoning—"to bring complementary land uses together, while separating incompatible ones." Id. at 1221. We held that the low-turnover rule embodied in the prohibition on tourist dwellings went to the basic purpose of the single-family zoning restrictions—to provide quiet, safety, and permanence in single-family residential neighborhoods. Id. at 1223. We also concluded, however, that the same rule was not an "essential" aspect of multi-family zones. Id. at 1223–24. Despite the City's arguments about trajc congestion, noise, and other potential problems, we determined that allowing short-term recovery homes to operate in multi-family zones didn't effect the same kind of "fundamental alteration" that it would in single-family zones. Id. at 1225. Compare also, e.g., Se. Cmty. Coll., 442 U.S. at 410, 99 S.Ct. 2361 (requiring a nursing school to waive all clinical requirements for a deaf applicant would fundamentally alter the nature of the nursing program), with, e.g., Anderson v. City of Blue Ash, 798 F.3d 338, 363 (6th Cir. 2015) (allowing a miniature therapy horse to reside in disabled girl's backyard wouldn't necessarily fundamentally alter the nature of single-family neighborhoods).

When evaluating whether an accommodation would impose an undue burden, courts also weigh the respective costs and beneRts of the accommodation to the parties, performing a "balancing of the parties' needs." Bhogaita, 765 F.3d at 1288 (citation omitted). In Oconomowoc Residential Programs
v. City of Milwaukee, the Seventh Circuit evaluated a plaintiff's request for a variance from a municipal ordinance restricting community living facilities from operating within 2,500 feet of similar facilities. 300 F.3d at 777. The plaintiff demonstrated the reasonableness of the accommodation by pointing to a shortage of area residential facilities for brain-injured individuals and to court orders requiring two individuals to be transferred to a group home as soon as possible. Id. at 779. Although the City pointed to a slew of potential issues in return, including increased trajc

and adverse effects on neighborhood parking, the Court found that none of those inconveniences could be construed as an undue administrative or financial burden. Id. at 785–87.

Salute v. Stratford Greens Garden Apartments, 136 F.3d 293 (2d Cir. 1998), is an illustrative decision to the contrary. There, two disabled individuals who qualified for low-income housing assistance under the federal government's "Section 8" program applied for apartments at Stratford Greens. Id. at 296. Both were turned away, however, because the apartment manager "d[id] not want to get involved with the federal government and its rules and regulations." Id. In response, the applicants filed a complaint under the Fair Housing Amendments Act, alleging that Stratford Greens had discriminated against them by "refusing to make 'reasonable accommodations' to facilitate the rental." Id. The Second Circuit determined, though, that "the burden of participating in the Section 8 program" could not be viewed as imposing "only reasonable costs or insubstantial burdens." Id. at 301. Requiring an apartment complex to accept Section 8 applicants, the court explained, would impose an undue burden because participation in a federal program "will or may entail" a number of encumbrances, including "financial audits, maintenance requirements, inspection of the premises, reporting requirements, [and] an increased risk of litigation." Id. Having to rework its leasing program to accommodate these numerous requirements, the court concluded, would effect "a fundamental alteration" of the complex's rental policies. Id.

So, what's the upshot? From these decisions, we glean the following principles. First, a plaintiff need only demonstrate a facially reasonable request—or one that seems reasonable in "the run of cases." Willis, 108 F.3d at 286; Barth, 2 F.3d at 1187. Second, a defendant may then proffer evidence that the plaintiff's request would nonetheless cause an undue burden or a fundamental alteration of its policy or program. Third, in evaluating the evidence, a court may consider whether the plaintiff's requested accommodation would eliminate an "essential aspect" of the defendant's policy or program or simply inconvenience it, keeping in mind the "basic purpose" of the policy or program at issue, and weighing the benefits to the plaintiff against the burdens on the defendant.

2

Back to Schaw. The district court didn't address whether Schaw's requested accommodation was of a type likely to be reasonable in the "run of cases," preferring to grant judgment primarily on the ground that any accommodation was not, within the meaning of the Act, "necessary to afford [him an] equal opportunity to use and enjoy a dwelling." (Much more on necessity below—but

reasonableness Rrst.) Let's begin, then, by looking at the nature of Schaw's request: to submit food stamps or familial support in lieu of W-2 income for the purpose of meeting Habitat's minimum-income requirement. Recall that Habitat requires its program applicants to demonstrate a minimum gross annual income of $10,170, or $847.50 per month. Schaw receives a gross annual income of $9,336, or $778 in SSDI per month. He also receives $100 per month in familial support, increasing his gross annual income to $10,536. Factoring in his $194 in food stamps, he brings in a total of $12,864. If Habitat credited either the food stamps or the familial support, Schaw would meet the minimum-income requirement.

Is Schaw's request that Habitat accept food stamps or familial support toward its minimum-income requirement in lieu of ordinary wages facially "reasonable"? Seems so to us. To be clear, Schaw didn't ask Habitat to lower its minimum-income requirement or to accept any less than usual in terms of payment or interest. Instead, Schaw—who is unable to work—asked Habitat to accept proof that he brings in the same amount of money as any other Habitat homeowner, but in a different form. This request strikes us as the type of accommodation that the Supreme Court has deemed at least facially reasonable. It is more akin, we think, to allowing a golfer to use a cart—completing the essential aspects of the game in a different way—than requiring a nursing program to waive all clinical requirements—removing the essential aspects of a program. Compare PGA Tour, 532 U.S. at 689, 121 S.Ct. 1879, with Se. Cmty. Coll., 442 U.S. at 410, 99 S.Ct. 2361. Rather than seeking a waiver of a basic requirement of Habitat's housing program, Schaw asks to meet those basic requirements in his own way. That seems to us sujcient to meet the relatively low facial-reasonableness bar adopted in Barnett. See 535 U.S. at 401–02, 122 S.Ct. 1516.

It's a separate question, though—one that we decline to decide in the Rrst instance—whether Habitat can nonetheless demonstrate "special .  circumstances that demonstrate undue hardship." Id. at 401– 02, 122 S.Ct. 1516. Would Schaw's requested accommodation modify a core aspect of Habitat's program (i.e., remove the camel's hump) or merely inconvenience (i.e., saddle) it? The answer depends on the basic purpose of the income requirement and the relative beneRts and burdens to the parties of implementing Schaw's request. The record indicates that Habitat's requirements exist to ensure an applicant's ability to pay the mortgage. At least as matters currently stand, we can't say that Schaw's proposal would meaningfully thwart Habitat's minimum-income threshold. (Consider that the typical at-will employee can't guarantee an ongoing ability to pay, either.) It's possible, of course, that on closer inspection it will become clear that the

accommodation would constitute "a fundamental alteration in the nature" of Habitat's program in another way or impose "undue Rnancial or administrative burdens." Schwarz, 544 F.3d at 1218, 1220. And it's also possible that it won't. Because the record is silent as to the likely effect of Schaw's request, we think it prudent to remand to allow the district court to determine, in the Rrst instance, whether the accommodation constitutes an undue burden on or fundamental alteration of Habitat's program.

We should clarify one thing before we move on to the "necessity" prong of Schaw's claim. Although the record is devoid of evidence pertaining to whether Schaw's requested accommodation would impose "undue Rnancial or administrative burdens," the district court held that Habitat was entitled to summary judgment because it had provided a sujcient "alternative accommodation" in suggesting that Schaw's father set up a trust or an annuity to disburse the familial-support funds.[4] The district court suggested, per Walden v. Centers for Disease Control & Prevention, 669 F.3d 1277, 1294 (11th Cir. 2012), that "[o]nce Habitat offered a reasonable accommodation to Mr. Schaw, the burden shifted to him to make a good faith attempt to accommodate his needs through the proffered accommodation." In so holding, the district court erred. In particular, it transposed the proper burden of proof, seemingly confusing the Fair Housing Amendments Act's reasonable-accommodation inquiry with a religious-accommodation inquiry. Whereas Walden suggests that in the religiousaccommodation context "[a]ny reasonable accommodation by the employer is sujcient to meet its accommodation obligation," 669 F.3d at 1294 (citation omitted), Barnett makes clear—as we've explained—that when it comes to reasonable accommodation of a disability, a court at the summaryjudgment stage must consider Rrst whether the plaintiff's own requested accommodation "seems reasonable on its face" before turning to consider a defendant's objections and counterproposals, see
535 U.S. at 401–02, 122 S.Ct. 1516. Accordingly, the district court's alternative holding, shifting to Schaw the burden of proving a good-faith effort to make use of Habitat's proffered alternative accommodation, was premature. The court should have looked Rrst to the reasonableness of Schaw's own proposed accommodation before considering any outside evidence.

B

In addition to showing that he sought a "reasonable accommodation," a plaintiff attempting to prove a failure-to-accommodate claim under the Fair Housing Amendments Act must demonstrate that

the requested accommodation was "necessary to afford [him an] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). For clarity's sake, we'll assess the separate-but-related elements of necessity and equality—and how they apply here—one at a time.

1

According to our precedent, a " 'necessary' accommodation is one that alleviates the effects of a disability." Bhogaita, 765 F.3d at 1288 (citation omitted). The Fair Housing Amendments Act deRnes "handicap" (which our caselaw uses interchangeably with the term "disability") as an impairment that "substantially limits one or more of a person's major life activities," 42 U.S.C. § 3602(h), which, according to the implementing regulations, include "walking, seeing, hearing, speaking, breathing, learning and working," 24 C.F.R. § 100.201(b). So, linking these ideas together, an accommodation is "necessary" if it "alleviates the effects" of an impairment that limits a person's ability to, among other things, walk, see, hear, or work. The district court here granted summary judgment in Habitat's favor based primarily on this prong, concluding that, because the requested accommodation "went solely to [Schaw's] Rnancial condition—not his disability," it wasn't "necessary" within the meaning of the Act. We Rnd this too simplistic an explanation.

Schaw asserts that the "effect[ ] of [his] disability" relevant to this case, Bhogaita, 765 F.3d at 1288, is his inability to work. Because of this limitation, Schaw says, his income consists largely of SSDI—a Rxed monthly amount. Schaw contends that because he is unable to work and therefore unable to supplement his SSDI himself, he should be granted an accommodation allowing him to demonstrate additional income in another form: either his food stamps or a notarized letter indicating familial support. The district court, however, strictly separated Schaw's "Rnancial condition" from his "disability," holding that Rnancially oriented accommodations could not, as a rule, be necessary to alleviate the effect of a disability. We will address this issue in two parts: (1) whether an accommodation can be necessary, within the meaning of the Act, to alleviate the economic effects of a disability; and (2) whether Schaw has shown that the particular accommodation that he has requested is in fact necessary to alleviate the effect of his disability.

In concluding that Schaw's requested accommodation "went solely to his Rnancial condition—not his disability," and thus wasn't "necessary" for purposes of the Act, the district court relied on the Second Circuit's pronouncement in Salute v. Stratford Greens Garden Apartments that the Act "addresses the accommodation of handicaps, not the alleviation of economic disadvantages that

may be correlated with having handicaps." 136 F.3d at 301. Not in this Circuit. As we explained in Bhogaita v. Altamonte Heights Condominium Association, a "necessary" accommodation is one that alleviates not "handicaps" per se, but rather "the effects of" those handicaps. 765 F.3d at 1288. This distinction is important here. Consider, for example, the HUD Guidelines, which list as an illustrative accommodation an exception to a "no pets" rule for a seeing-eye dog. See 24 C.F.R. § 100.204(b). In such a case, it's not the handicap itself, but rather the effect of the handicap, that is being accommodated. Blindness (the handicap) creates an inability to walk around safely (the effect on a major life activity) and thus a need for a waiver of the prohibition on pets (the accommodation). Likewise, we might say, Schaw's quadriplegia (the handicap) creates an inability to work (the effect on a major life activity) and thus a need for a waiver of the usual type-of-income requirement (the accommodation). In both instances an accommodation is being provided to alleviate the effects of a disability on a major life activity.

Given the speciRcs of this case, we think it signiRcant that federal law lists "working" as a major life activity alongside "seeing, hearing, speaking, and walking." 42 U.S.C. § 3602(h); 24 C.F.R. § 100.201(b). It would be odd, then, if the Act deemed "necessary" those accommodations that "alleviate[] the effects of" an inability to see, hear, speak, or walk, but not those that alleviate the effects of an inability to work. As even the Salute court recognized, "the duty to make reasonable accommodations is framed by the nature of the particular handicap." 136 F.3d at 301 (emphasis added). In Schwarz, for instance, we recognized that "the 'need' created by a substance addiction"— the handicap—was "help with breaking that addiction and maintaining sobriety." 544 F.3d at 1227. With that in mind, we proceeded to examine whether short stays in halfway houses were an accommodation necessary to address that need. Id.

Turning to the case before us, the proper question is whether Schaw's inability to meet the minimumincome requirement through wages earned is an "effect" of his quadriplegia—whether there is some causal relationship between the two. Habitat argues that it isn't—that there's no causal connection— and that even under the Ninth Circuit's somewhat similar decision in Giebeler v. M&B Associates, 343 F.3d 1143 (9th Cir. 2003), Schaw would lose. We're not so sure. To briesy explain, in Giebeler, the plaintiff worked for Rve years as a psychiatric technician before being diagnosed with AIDS. Id. at 1145. After his diagnosis, he sought to rent an apartment for $875 per month, but was refused because he received only around $1200 per month in disability beneRts— much less than the requisite three times the rent. Id. When the plaintiff's mother—who made

plenty—attempted to sign a lease on her son's behalf, the apartment management rejected her on the basis that it didn't allow co-signors. Id. The plaintiff sued, and the Ninth Circuit agreed that the request—that his financially qualified mother be allowed to rent the apartment on his behalf—was clearly an accommodation within the meaning of the Act: "Barnett indicates that accommodations may adjust for the practical impact of a disability," the court explained, and "not only for the immediate manifestations of the physical or mental impairment giving rise to the disability." Id. at 1150, 1154–55. The court then remanded to the district court for factual findings as to whether the request was reasonable and would provide him an equal opportunity to use and enjoy a dwelling.

To be sure, Giebeler is an easier case. The court there had definitive evidence that the plaintiff was a well-established working professional at the time he contracted HIV, providing a direct causal link between the impairment and the inability to meet the minimum-income requirement. See id. at 1145. The record here isn't so clear concerning whether Schaw would have been able to meet Habitat's income requirement via wages earned prior to becoming paralyzed—it doesn't tell us his pre-accident salary, or whether he lived independently or paid rent anywhere before the accident. Complicating the inquiry, Schaw is classified for SSDI purposes as an "adult disabled child"—a designation indicating that, as a recent high-school graduate at the time of his injury, he hadn't yet reached full earning potential. Accordingly, we're lacking evidence here of the clear causal connection present in Giebeler.

We just don't know.[5]

That said, Schaw's complaint alleges that his inability to meet Habitat's minimum-income threshold through W-2 income is a result of his quadriplegia. The district court didn't explicitly consider whether that was so; instead, it summarily determined that the requested accommodation "went solely to [Schaw's] financial condition—not his disability." Under our precedent, however, it's clear that an accommodation addressing an inability to demonstrate wages earned could in some cases be "necessary"—that is, could "alleviate the effects of a disability." Bhogaita, 765 F.3d at 1288. Accordingly, the district court should have considered here whether Schaw's inability to demonstrate the minimum required income through W-2 wages was an effect of his disability.

2

Of course, it's not enough that an accommodation be "necessary" in the abstract—the Act pairs the word with the object of providing a disabled person an "equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Equal, according to one dictionary, means "receiving or entitled to the same treatment or privileges any other individual has or is entitled to." Webster's Third New International Dictionary 766 (2002). According to another, it denotes "having the same status, rights, or opportunities" and "uniform in application or effect; without discrimination on any grounds." Oxford Dictionary of English 591 (3d ed. 2010).

The Supreme Court has clariRed that, in this context, our focus should be (in Oxford-speak) on uniformity of "effect" rather than "application," with the end goal of ensuring that disabled individuals receive the same opportunities as other individuals. In U.S. Airways v. Barnett, the Court explained that "[t]he simple fact that an accommodation would provide a 'preference'—in the sense that it would permit the worker with a disability to violate a rule that others must obey—cannot, in and of itself, automatically show that the accommodation is not 'reasonable.'" 535 U.S. at 398, 122 S.Ct. 1516 (discussing accommodations under the analogous ADA standard). Indeed, the Court explained that accommodations are themselves a type of preference, and that such "preferences will sometimes prove necessary to achieve the Act's basic equal opportunity goal." Id. at 397, 122 S.Ct. 1516; see also id. ("By deRnition any special 'accommodation' requires .  different[], i.e., preferential[]" treatment.). As now-Justice Gorsuch explained during his time on the Tenth Circuit, "under the FHA it is sometimes necessary to dispense with formal equality of treatment in order to advance a more substantial equality of opportunity." Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City, 685 F.3d 917, 923 (10th Cir. 2012) (emphasis added).

This doesn't mean, of course, that under the Act a person with a disability is entitled to an accommodation that would place him in a better position to enjoy a dwelling than a member of the general public. See id. ("[W]hile the FHA requires accommodations necessary to ensure the disabled receive the same housing opportunities as everybody else, it does not require more or better opportunities."). As we explained in Schwarz, when accommodations "start addressing problems not caused by a person's handicap," a handicapped person receives not "an 'equal,' but rather a better opportunity to use and enjoy a dwelling,"—"a preference that the plain language of this statute cannot support." 544 F.3d at 1226 (emphasis added).

The district court here determined that "Schaw's requested accommodation[] went solely to his

Rnancial condition—not his disability," and, accordingly, that it would've given him "a better opportunity —as opposed to equal opportunity—to use and enjoy one of Habitat's dwellings." But again, we're not so sure. For one thing, the district court rested its conclusion that the accommodation would provide a "better" opportunity on the sawed premise that it would remedy only Schaw's Rnancial status— which, for reasons already explained, may or may not be true. Moreover, the district court neglected to acknowledge an important nuance—that the "Rnancial" aspect of the accommodation here concerns only the form of funding and not the amount. Schaw didn't request, for example, that Habitat lower its minimum-income standards or allow him to get away with doing or paying any less than other applicants. He stood ready to pay the monthly mortgage in full and to demonstrate a gross annual income exceeding the minimum required level. He requested only that he—an individual allegedly limited to a Rxed income as a result, he says, of his disability—be allowed to prove that income in part through familial support or food stamps, putting him in the same position as an able-bodied person who could (theoretically) increase his income through W-2 wages. This request—to show an equal income from a different source—could be construed as an invitation to "dispense with formal equality of treatment in order to advance a more substantial equality of opportunity." Cinnamon Hills, 685 F.3d at 923.

Of course, as Habitat points out, we could look at this another way: that Schaw seeks an advantage that other applicants don't enjoy. For instance, if an able-bodied comparator happened to bring in $778 monthly from his job and $100 in familial support, he too would have been denied a home. But nothing in the statute indicates that the fact that a theoretical non-disabled person also could potentially beneRt from an accommodation renders that accommodation improper. Again, "[t]he simple fact that an accommodation would provide a 'preference'—in the sense that it would permit the worker with a disability to violate a rule that others must obey—cannot, in and of itself, automatically show that the accommodation is not 'reasonable.' " Barnett, 535 U.S. at 398, 122 S.Ct. 1516. The inquiry is whether the requested accommodation would provide a disabled person an opportunity to enjoy a dwelling that would otherwise—due to his disability—elude him.

\* \* \*

Having (hopefully) provided some clariRcation regarding failure-to-accommodate claims under the Fair Housing Amendments Act, we think it prudent to remand for the district court to consider whether, in light of this opinion, Schaw has stated a failure-to-accommodate claim—speciRcally (1)

whether Habitat has shown that Schaw's facially reasonable request would nonetheless result in an undue burden on or fundamental alteration to its program and (2) whether the requested accommodation is necessary to afford Schaw an equal opportunity to use and enjoy a dwelling. See 42 U.S.C. § 3604(f)(3)(B).

III

Schaw separately claims that Habitat's minimum-income requirement has a disparate impact on SSDI recipients. Here, we agree with the district court—Schaw fails to state a claim.

In contrast to a disparate-treatment case in which a plaintiff seeks to establish that a defendant had "a discriminatory intent or motive," a plaintiff bringing a disparate-impact claim challenges practices that have a "disproportionately adverse effect" and are otherwise unjustiRed by a legitimate rationale. Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc., ––– U.S. ––––, 135 S. Ct. 2507, 2513, 192 L.Ed.2d 514 (2015) (quotation omitted). A plaintiff can demonstrate a discriminatory effect by showing that a policy "makes housing options signiRcantly more restrictive for members of a protected group than for persons outside that group." Hallmark Developers, Inc. v. Fulton Cty., 466 F.3d 1276, 1286 (11th Cir. 2006) (quotations omitted). Evidence demonstrating a "signiRcant discriminatory effect sujces to demonstrate a [prima facie] violation of the Fair Housing Act." Jackson v. Okaloosa Cty., 21 F.3d 1531, 1543 (11th Cir. 1994). That said, it's not enough to show that a few people are affected by a policy—rather, the disparity must be substantial enough to raise an inference of causation. Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308, 1314 (11th Cir. 1994); see Schwarz, 544 F.3d at 1218 (holding that a district court correctly rejected a disparate-impact claim because the plaintiff failed to present any relevant comparative evidence).

We needn't go any farther here, because Schaw failed to provide any evidence of discriminatory effect in the district court. Schaw alleged that Habitat's minimum-impact requirement has a disparate impact on persons with disabilities because the requirements make it impossible for a person receiving SSDI to qualify for a home. In response, Habitat provided evidence of numerous applicants receiving SSDI who'd been approved for a Habitat home. Rather than provide any evidence to the contrary, Schaw sought to amend his complaint to clarify that the minimum-income requirement has a disparate impact on "SSDI applicants who receive $847.50 or less in SSDI per month." Still, though, he offered no evidence. This reverse-engineered claim—tailored speciRcally to Schaw's particular circumstances—still fails. Schaw didn't submit any evidence to prove that

Habitat's requirements disproportionately exclude those receiving SSDI (no matter the amount) as compared with ablebodied individuals making the same amount of money from non-SSDI sources. Accordingly, the district court properly found that Schaw failed to state a disparate-impact claim.

IV

In sum, we hold (1) that a court must Rrst consider whether a plaintiff has shown that a requested accommodation is facially reasonable and then whether a defendant has demonstrated that the accommodation would result in an undue burden or fundamental alteration to its program or policy; (2) that a plaintiff's Rnancial state in any particular case could be unrelated, correlated, or causally related to his disability and that, in some cases, an accommodation with a Rnancial aspect—even one that appears to provide a preference—could be "necessary to afford [an] equal opportunity to use or enjoy a dwelling" within the meaning of the Act; and (3) that Schaw failed to create a genuine issue of material fact as to whether Habitat's minimum-income requirement disproportionately excludes SSDI recipients.

Accordingly, we ajrm the district court as to Schaw's disparate-impact claim and vacate and remand the district court's order for further proceedings consistent with this opinion as to Schaw's failure-toaccommodate claim—to determine, perhaps among other issues, whether Habitat has shown that Schaw's facially reasonable accommodation would result in an undue burden or a fundamental alteration to its program and whether Schaw's Rnancial state is a result of his disability such that the requested accommodation is "necessary to afford [him an] equal opportunity to use or enjoy a dwelling."

AFFIRMED IN PART AND VACATED AND REMANDED IN PART.

FOOTNOTES

1.    We review de novo the district court's grant of summary judgment. Loren v. Sasser, 309 F.3d 1296, 1301 (11th Cir. 2002) (per curiam) (citation omitted). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

2.    Although our case law addressing reasonable accommodations under the Fair Housing Amendments Act is rather thin, "Congress imported the reasonable-accommodation concept"

from case law interpreting the Americans with Disabilities Act and the Rehabilitation Act. Schwarz, 544 F.3d at 1220. Because "we have applied [these] reasonable-accommodation requirements on numerous occasions," we can "look to case law" under the ADA and RA for "guidance on what is reasonable under the [Fair Housing Amendments Act]." Id.

3. There is, of course, some overlap between these inquiries. But "[t]hat the evidence probative of the issue of whether an accommodation for the [plaintiff] is reasonable will often be similar (or identical) to the evidence probative of the issue whether a resulting hardship for the [defendant] is undue, does not change the fact that establishing that a reasonable accommodation exists is a part of a [FHAA] plaintiff's case, whereas undue hardship is an ajrmative defense to be pled and proven by a [FHAA] defendant." Willis v. Conopco, Inc., 108 F.3d 282, 286 (11th Cir. 1997).

4. What Habitat asks for is essentially a guarantee that Schaw's income will continue. That's understandable enough—Habitat wants assurance that if it risks accepting an alternate form of income, it will continue to be paid. But providing "insurance" in the form of a trust or annuity costs money and takes time, and the record does not resect that Habitat requires the same level of assurance from non-disabled applicants. We also know—or are told—that trust or annuity payments could negatively affect Schaw's other government-based assistance— speciRcally, Medicare costs and premiums from which he is currently exempted. These are facts of the sort that a court might take into consideration when weighing the beneRts and burdens to the parties.

5. For a bit of context, though, a person could exceed Habitat's minimum-income requirement by working 40 hours per week at $5.00 per hour, or 20 hours per week at $10.00 per hour.

NEWSOM, Circuit Judge:

**Was this helpful?**      Yes      No

# Welcome to FindLaw's Cases & Codes

A free source of state and federal court opinions, state laws, and the United States Code. For more information about the legal concepts addressed by these cases and statutes visit FindLaw's Learn About the Law.

**Go to Learn About the Law**



## United States Court of Appeals,Eighth Circuit.

Jaymie QUIGLEY, Appellant/Cross-Appellee, v. Dale WINTER, Appellee/Cross-Appellant.

## Nos.  08-3630, 08-3752.

## Decided: March 16, 2010

## Before RILEY, HANSEN, and GRUENDER, Circuit Judges.

## Scott P. Moore, argued, Christopher R. Hedican, Allison D. Balus, on the brief, Omaha, NE, for appellant/cross-appellee. Robert B. Deck, Tod J. Deck, on the brief, Sioux City, IA, for appellee/cross-appellant.

Jaymie Quigley brought claims against her landlord, Dale Winter, pursuant to the Fair Housing Act (FHA), 42 U.S.C. §  3601 et seq., and the Iowa Civil Rights Act (ICRA), Iowa Code ch. 216, alleging (1) sexual harassment;  (2) sex discrimination;  and (3) coercion, intimidation, threat, and interference with Quigley's enjoyment of her housing rights.    A jury found in favor of Quigley on all claims and awarded her $13,685.00 in compensatory damages and $250,000.00 in punitive damages.[1]    Quigley sought attorney fees and costs in the amount of $118,654.38.    The district court reduced the punitive damages award to $20,527.50 and awarded Quigley $20,000.00 in attorney fees and $1,587.88 in costs.

Quigley appeals the district court's judgment, contending the district court erred in (1) reducing her punitive damages award, and (2) awarding her a reduced amount of attorney fees without conducting the proper analysis.    Winter cross-appeals and asserts the district court committed various trial errors and erred in awarding any punitive damages to Quigley.    We abrm the district court's judgment with respect to Winter's claims on cross-appeal, and we reverse with respect to Quigley's claims on appeal.

I.    BACKGROUND

A.    Factual Background2

Winter owned more than twenty rental homes in Sioux City, Iowa. Many of Winter's tenants were lowincome women who received Section 8 housing vouchers (housing vouchers) from the Sioux City Housing Authority (SCHA) to help pay their rent.    In 2000, Quigley, along with her then-husband and her four children, rented a home from Winter.    Quigley used a housing voucher to pay her rent.

In 2002, Quigley informed Winter she was eligible to move into a larger home.    Winter drove Quigley in his car to one of Winter's other properties.    Quigley inspected the property, and when she returned to the car, Winter rubbed his hand down Quigley's arm and said, "[W]ell, how do you like it?"    Quigley recalled this incident made her feel "[s]cared" and "yucky."    Quigley, her boyfriend, and her children moved into a different rental property owned by Winter, using a housing voucher to pay the rent.

In 2004, Quigley's boyfriend moved to Louisiana to visit his ill father.    After Quigley's boyfriend moved out of the house, Winter behaved inappropriately toward Quigley on several other occasions. First, Quigley learned from a neighbor that Winter had been inside Quigley's house without prior notice when Quigley was not at home.    When Quigley went to her bedroom, she noticed her housecoat, which had been hanging on the back of the bedroom door when she left, was now lying on her bed.   Quigley confronted Winter about entering the home without giving prior notice, and Winter claimed he had to replace the screen on Quigley's bedroom window.    Quigley's screen was not damaged and had not been replaced.

One evening, Winter came to inspect Quigley's house while she was making dinner for her children. On that occasion, Winter stood very close to Quigley and rubbed his genital area.    Another time,

Winter came to Quigley's house for an inspection at 9:30 or 10:00 in the evening without giving Quigley prior notice.    Quigley's fourteen year-old sister was staying the night with her, and they were in their pajamas getting ready for bed.    While conducting his inspection, Winter followed Quigley and her sister into a bedroom and then a bathroom, which made them feel uncomfortable.    Quigley and her sister were watching television, and Winter lay down on Quigley's sectional couch after he

completed the inspection.    Winter stayed on the couch for ove or ten minutes until Quigley said, "Hey, Dale, we're going to bed."    Quigley had to tell Winter to leave "at least three times" before he left.

Quigley also reported receiving phone calls from Winter at inappropriate times, sometimes as late as 2:30 or 3:00 in the morning.    Winter sounded intoxicated when he called, and the phone calls made Quigley feel scared and worried about protecting her children and younger sister.

Quigley wanted to move out of the house because of Winter's conduct, but she would have lost her housing voucher if she broke the lease.    Quigley met with her SCHA worker and reported Winter's inappropriate actions.    Quigley asked if she could change the locks on her rental home, but the housing worker told her she could not change the locks unless she gave Winter a key.    The housing worker told Quigley she could get out of the lease without losing her housing voucher if Winter agreed to rescind the lease.    When Quigley asked Winter to release her from the lease, Winter refused.    Thereafter, Quigley changed the locks on her door without giving Winter a key.

About a month and a half before Quigley's lease ended, Winter showed up at her house while Quigley, her sister, and Quigley's friend were outside lying in the sun.    Quigley approached Winter's vehicle and inquired whether she would be getting her deposit back.    Winter puttered his hand against Quigley's stomach and said, "My eagle eyes have not seen everything yet."    Winter followed Quigley to the porch.    Quigley observed Winter staring at Quigley's sister's chest.    Quigley's sister was wearing shorts and a sport bra, so Quigley told her sister to "go get something on."    Winter said to Quigley's sister, "You're really mature.    How old are you?"    When Quigley said her sister was "only 14," Winter said, "Well, she looks a lot more mature than you."    Quigley's friend went to her car to get a cigarette, and Winter noticed the friend had a scar on her back.    Winter traced the scar with his onger, without consent, pulling the friend's pants downward to see where the scar ended.    Quigley moved out of the rental home, and Winter did not return her deposit.

Quigley oled a complaint with the Sioux City Human Rights Commission (SCHRC).    The investigator who handled Quigley's complaint testioed other single, female tenants of Winter's who were receiving housing assistance, corroborated Quigley's claims.

B.    Procedural Background

In June 2006, Quigley oled a complaint against Winter in the district court, alleging sexual harassment;  sex discrimination;  and coercion, intimidation, threats, and interference with Quigley's rights, in violation of the FHA and the ICRA. Quigley also asserted a breach of contract claim against Winter based upon Winter's failure to return Quigley's deposit.    Winter brought a breach of contract counterclaim against Quigley, insisting Quigley owed him unpaid rent and failed to leave the rental home "in a clean and satisfactory condition."

A ove-day jury trial began in April 2008.    At the end of the trial, the district court instructed the jury to consider whether:  (1) Winter discriminated against Quigley on the basis of her sex;  (2) Winter sexually harassed Quigley;  (3) Winter coerced, intimidated, or interfered with Quigley's exercise or enjoyment of her housing rights;  (4) Winter breached his contract with Quigley by failing to return her deposit;  and (5) Quigley breached her contract with Winter by failing to leave the rental property in a clean and satisfactory condition.    The jury found in favor of Quigley, and against Winter, on Winter's counterclaim and each of Quigley's claims, and awarded Quigley $13,685.00 in compensatory damages for the housing claims, $400.00 for Quigley's breach of contract claim, and $250,000.00 in punitive damages.

After the district court entered judgment, Winter oled a renewed motion for judgment as a matter of law, a motion for a new trial, and a motion to alter or amend the judgment, in part objecting to the award of punitive damages.    Quigley moved for an award of attorney fees and costs in the amount of $118,654.38.    Following a hearing on the motions, the district court entered an order (1) denying Winter's motions for a new trial and judgment as a matter of law, (2) reducing the award of punitive damages from $250,000.00 to $20,527.50, and (3) awarding Quigley $20,000.00 in attorney fees and $1,587.88 in costs.    Quigley appeals the district court's judgment with respect to the amount of punitive damages and attorney fees.    Winter cross-appeals, asserting various errors at trial and objecting to any award of punitive damages.

II.    DISCUSSION

## A.    Winter's Claims on Cross-Appeal

We orst address Winter's claims on cross-appeal.    Winter maintains the district court erred in submitting to the jury, and in denying Winter's post-trial motions related to, the following claims:  (1) hostile housing environment caused by sexual harassment;  (2) "quid pro quo" sexual harassment;  (3) sex discrimination;  and (4) coercion, intimidation, and interference with housing rights.    Winter next insists the district court made the following evidentiary errors:  (1) admitting "me too" testimony from three of Winter's former female tenants;  (2) admitting the SCHRC's probable cause determination and testimony from a SCHRC investigator;  and (3) excluding medical records and testimony from a physician's assistant at Siouxland Mental Health related to Quigley's mental health.[3]

### 1.   Standards of Review

"We review a district court's denial of a motion for judgment as a matter of law de novo."   Heaton v. The Weitz Co., 534 F.3d 882, 887 (8th Cir.2008) (citation omitted).   "We 'must abrm the jury's verdict unless, after viewing the evidence in the light most favorable to [Quigley], we conclude that no reasonable jury could have found in [her] favor.' " Id. (quoting Moysis v. DTG Datanet, 278 F.3d 819, 824 (8th Cir.2002)).   "We 'will not set aside a jury verdict unless there is a complete absence of probative facts to support the verdict.' " Id. (quoting Wilson v. Brinker Int'l, Inc., 382 F.3d 765, 769 (8th Cir.2004)).

A district court's decision to admit or exclude testimony is reviewed for an abuse of discretion. See, e.g., U.S. Salt, Inc. v. Broken Arrow, Inc., 563 F.3d 687, 689 (8th Cir.2009).   "A district court enjoys wide discretion in ruling on the admissibility of proffered evidence, and evidentiary rulings should only be overturned if there was a clear and prejudicial abuse of discretion."   Id. at 689-90 (internal marks and quotations omitted).

### 2.   Hostile Housing Environment Created by Sexual Harassment

As a preliminary matter, Winter questions whether a claim for hostile housing environment created by sexual harassment is actionable under the FHA. We conclude it is.    See Neudecker v. Boisclair Corp., 351 F.3d 361, 364 (8th Cir.2003) (recognizing a cause of action under the FHA for hostile housing environment created by disability harassment and citing, with approval, cases from other jurisdictions recognizing an FHA claim for hostile housing environment created by sexual

harassment);  see also DiCenso v. Cisneros, 96 F.3d 1004, 1008 (7th Cir.1996) (recognizing an FHA claim for hostile housing environment created by sexual harassment);  Honce v. Vigil, 1 F.3d 1085, 1089-90 (10th Cir.1993) (same).[4]

   Next, Winter insists there was insubcient evidence to support the jury's verdict in favor of Quigley on her hostile housing environment created by sexual harassment claim.    In this case, there was subcient evidence to support a hostile housing environment claim if a reasonable jury could ond Quigley proved by a preponderance of the evidence Winter subjected her to unwelcome sexual harassment, and the harassment was subciently severe or pervasive so as to interfere with or deprive Quigley of her right to use or enjoy her home.    See DiCenso, 96 F.3d at 1008 ("Applied to the housing context, a claim [of hostile housing environment caused by sexual harassment] is actionable 'when the offensive behavior unreasonably interferes with use and enjoyment of the premises.' " (quoting Honce, 1 F.3d at 1090) ("The harassment must be subciently severe or pervasive to alter the conditions of the housing arrangement.")).    Cf. Neudecker, 351 F.3d at 364-65 (setting forth the elements of a hostile housing environment disability harassment claim).

Winter denies he subjected Quigley to sexual advances or requests for sexual favors, and, alternatively, any sexual harassment Quigley experienced was not subciently severe or pervasive to support the jury's verdict.    Viewing the evidence in the light most favorable to Quigley, we conclude Quigley presented subcient evidence of numerous unwanted interactions of a sexual nature that interfered with Quigley's use and enjoyment of her home.    Quigley testioed Winter subjected her to unwanted touching on two occasions, made sexually suggestive comments, rubbed his genitals in front of her, placed several middle of the night phone calls to her home, made repeated unannounced visits, and, on one occasion, while Winter lay on Quigley's couch, had to be told to leave her home at least three times before he complied.    We emphasize that Winter subjected Quigley to these unwanted interactions in her own home, a place where Quigley was entitled to feel safe and secure and need not pee, which makes Winter's conduct even more egregious.

In order to set aside the jury's verdict in favor of Quigley, Winter must show "a complete absence of probative facts" support the jury's verdict and no reasonable jury could have found in Quigley's favor. Heaton, 534 F.3d at 887.    Winter simply cannot meet this high threshold for setting aside the jury's verdict.

3.   "Quid Pro Quo" Sexual Harassment

Winter next contends the district court erred in denying his motion for judgment as a matter of law on Quigley's "quid pro quo" sexual harassment claim.    " 'Quid pro quo' harassment occurs when housing beneots are explicitly or implicitly conditioned on sexual favors."    Honce, 1 F.3d at 1089; cf.

Ogden v. Wax Works, Inc., 214 F.3d 999, 1006 n. 8 (8th Cir.2000) ("To prevail on her [employment discrimination] quid pro quo claim, [plaintiff] needed to prove (1) she was a member of a protected class;  (2) she was subjected to unwelcome harassment in the form of sexual advances or requests for sexual favors;  (3) the harassment was based on sex;  and (4) her submission to the unwelcome advances was an express or implied condition for receiving job beneots or her refusal to submit resulted in a tangible job detriment." (citation omitted)).

In reviewing the district court's denial of Winter's motion for judgment as a matter of law, we must view all facts in the light most favorable to Quigley and afford her all reasonable inferences.    See HOK Sport, Inc. v. FC Des Moines, L.C., 495 F.3d 927, 934 (8th Cir.2007).    " '[W]here conpicting inferences reasonably can be drawn from evidence, it is the function of the jury to determine what inference shall be drawn.' " Id. (quoting Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc., 439 F.3d 894, 900 (8th Cir.2006)).

While the evidence of "quid pro quo" harassment was not overwhelming, after viewing the evidence in the light most favorable to Quigley, we conclude there was subcient evidence to support the jury's verdict.    Speciocally, when Quigley inquired about the likelihood of receiving her deposit back from Winter, Winter puttered his hand against Quigley's stomach and said, "My eagle eyes have not seen everything yet."    The jury could reasonably infer Winter was telling Quigley the return of her deposit was conditioned upon Winter seeing more of Quigley's body or even receiving a sexual favor, which would amount to "quid pro quo" sexual harassment.    We will not disturb the jury's verdict.

4.    Coercion, Intimidation, or Interference with Housing Rights

Winter maintains the district court should not have denied Winter's post-trial motion on Quigley's coercion, intimidation, and interference claim under 42 U.S.C. § 3617.    Winter contends Quigley's claim was "essentially a retaliation claim" and Quigley failed to prove retaliation.

Section 3617 states:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

In addition, 24 C.F.R. § 100.400 gives the following examples of conduct prohibited by 42 U.S.C. § 3617:

(1)    Coercing a person, either orally, in writing, or by other means, to deny or limit the beneots providedthat person in connection with the sale or rental of a dwelling . because of . sex.

(2)    Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because ofthe . sex . of such persons, or of visitors or associates of such persons.

.

(5)  Retaliating against any person because that person has made a complaint, testioed, assisted, or participated in any manner in a proceeding under the Fair Housing Act.

   In arguing there was insubcient evidence to support the jury's verdict, Winter focuses solely on the retaliation aspect of 42 U.S.C. § 3617.   As Quigley points out, retaliation is only one form of conduct prohibited under § 3617.   Viewing the evidence in the light most favorable to Quigley, we conclude there was more than subcient evidence of coercion, intimidation, and interference with Quigley's enjoyment of her housing rights, other than retaliation, to support the jury's verdict.

5.   Discriminatory Housing Practices

Winter also takes issue with the district court's denial of his motion for judgment as a matter of law on Quigley's discriminatory housing practices claim.   Winter complains the district court erred in instructing the jury and the jury's verdict was not supported by subcient evidence.

With respect to discriminatory housing practices, the district court instructed the jury as follows in Instruction No. 8A:

The plaintiff must prove by the preponderance of the evidence that the defendant engaged in a discriminatory housing practice.    The following are considered discriminatory housing practices prohibited by the present laws:

First, it is unlawful under the Fair Housing Act for a landlord to refuse to rent, or otherwise make unavailable houses or apartments or dwellings because of the tenant or applicant's sex.

Second, it is unlawful under the Fair Housing Act for a landlord to impose different terms, conditions or privileges related to the rental of a house or apartment or dwelling, or to deny or limit the terms, conditions, or privileges of the rental of an apartment or house or dwelling because of sex.

Third, it is unlawful under the Fair Housing Act to make statements with respect to the rental of a house, apartment or dwelling that indicate any preference, limitation, or discrimination based on sex, or that indicate any intention to make such a preference, limitation or discrimination.

Fourth, it is unlawful under the Fair Housing Act to coerce, intimidate, or interfere with any person in the exercise and enjoyment of rights granted and protected by the Fair Housing Act.

If you ond that the plaintiff has shown one or more of these acts or practices by the preponderance of the evidence, you must ond that the plaintiff has shown that the defendant committed a discriminatory housing practice.

If the plaintiff has failed to prove by a preponderance of the evidence that the defendant has committed one of the above listed acts, then your verdict must be for the defendant.

The next jury instruction provided,

The plaintiff must prove by a preponderance of the evidence that sex was a motivating factor in defendant's commission of any discriminatory housing practice.

The plaintiff is not required to show that her sex was the sole reason for the defendant's action;  the plaintiff is only required to show that sex was one motivating factor behind the challenged conduct.

The corresponding question on the verdict form, Question No. 2, asked the jury, "Do you ond by a preponderance of the evidence that defendant discriminated against plaintiff on the basis of sex in violation of the present laws?" [5]

Winter maintains Instruction No. 8A was erroneous because Quigley presented no evidence (1) Winter "refused to rent or otherwise made unavailable dwellings to her because of her sex";  (2) Quigley's "rental agreement was any different than those of [Winter's] other tenants, .  her rent was raised or lowered, [or] any act was taken with respect to the above matters at all, let alone because of [Quigley's] sex";  or (3) Winter "made a statement with respect to rental of his property that indicated a preference, limitation, or discrimination based on sex."    Winter also protests Instruction No. 8A's inclusion of the following language:  "[I]t is unlawful under the [FHA] to coerce, intimidate, or interfere with any person in the exercise and enjoyment of rights granted and protected by the [FHA]," because another jury instruction and question on the verdict form addressed Quigley's claim of coercion, intimidation, and interference with housing rights.    Because there was only one blank on the verdict form for the jury to oll in the amount of compensatory damages for all three of Quigley's FHA claims,
Winter raises the possibility Quigley recovered damages twice under the same theory of recovery. Winter claims these alleged errors in the jury instructions and verdict form entitle him to a new trial.

Before trial, Winter submitted proposed jury instructions and a proposed verdict form to the district court.    Winter's proposed jury instructions included an instruction on unlawful discriminatory practices under the FHA which was similar to Instruction No. 8A. Winter's proposed instruction stated it was unlawful under the FHA to "[t]hreaten, intimidate or interfere with persons in their enjoyment of a dwelling because of the sex of such persons, or of visitors or associates of such persons."   Winter's proposed verdict form also included only one blank for the jury to award compensatory damages for Quigley's FHA and ICRA claims.    Later, during the jury instruction conference, Winter made a general objection to the inclusion of Instruction No. 8A, and he made some specioc objections to the initial version of Instruction No. 8A. Winter did not dispute the statement of the law, only contesting whether any evidence existed for each violation and preferring a simple instruction on sexual harassment.    Winter did not object to the portion of the instruction concerning coercion, intimidation and interference with FHA rights, nor did Winter object to the onal form of Instruction No.
8A. Winter likewise did not object to having only one line on the verdict form for compensatory damages.

In order to preserve for appeal an objection to a jury instruction or verdict form, "appellants must raise specioc objections to the form or content of" the instruction or verdict form before the district

court.   Horstmyer v. Black & Decker, (U.S.), Inc., 151 F.3d 765, 770 (8th Cir.1998) (citation omitted);  see also Fed.R.Civ.P. 51(c)(1) ("A party who objects to an instruction .  must do so on the record, stating distinctly the matter objected to and the grounds for the objection.").    Absent a specioc objection, we will review only for plain error.    See Horstmyer, 151 F.3d at 770.    Winter did not properly preserve the objections he now makes to Instruction No. 8A and the verdict form.    We thus review his claims for plain error.

   " 'Plain error is a stringently limited standard of review,' especially in the civil context, and must result in a miscarriage of justice in order to compel reversal."    Id. at 771 (quoting Rush v. Smith, 56 F.3d 918, 925 (8th Cir.1995) (en banc)).    Jury instructions must fairly and adequately state the law, but "we will not ond error in instructions simply because they are technically imperfect or are not a model of clarity."    Hastings v. Boston Mut. Life Ins. Co., 975 F.2d 506, 510 (8th Cir.1992) (citation omitted).    Having reviewed the jury instructions in their entirety, we conclude Winter has not shown there was plain error in either the form or content of the instructions and verdict form.

Moreover, viewing the evidence in the light most favorable to Quigley, we conclude there was subcient evidence to support the jury's verdict in favor of Quigley on her sex discrimination claim. Winter's contention that he had a legitimate, non-discriminatory reason for any discriminatory behavior fails because the jury's verdict demonstrates the jury did not believe Winter.    Because we ond the district court subciently submitted each claim to the jury, we ond no error in the district court's use of only one space for compensatory damages on the verdict form.

6.   Evidentiary Issues

We now turn to Winter's claim that the district court made improper evidentiary rulings regarding the admission of testimony at trial.   "A district court enjoys wide discretion in ruling on the admissibility of proffered evidence, and evidentiary rulings should only be overturned if there was a clear and prejudicial abuse of discretion."   US Salt, 563 F.3d at 689-90 (internal marks and quotations omitted).   "The reason for [our] extremely deferential standard of review is obvious:  A Rule 403 ruling-as much as any type of determination made by a district court-depends on factors that are uniquely accessible to the trial judge who is present in the courtroom and uniquely inaccessible to an appellate judge who must take the case on a cold record."   Olson v. Ford Motor Co., 481 F.3d 619, 623 (8th Cir.2007).

Winter orst claims the district court erred in admitting the testimony of Winter's former tenants, Lisa Scooeld, Kayla Mobley, and Holly Cook. These three women testioed Winter also subjected them to sexual harassment while they were Winter's tenants.    Winter claims the testimony of these three women was irrelevant because there was no evidence Quigley knew the women or observed any of the events to which they testioed.

In Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 128 S.Ct. 1140, 170 L.Ed.2d 1 (2008), the Supreme Court considered the admissibility of so-called "me too" evidence in an employment discrimination case.    The Court determined such evidence was neither per se admissible nor per se inadmissible.    See id. at 386-88, 128 S.Ct. 1140.    Rather, "[t]he question whether evidence of discrimination [against other employees] by other supervisors is relevant in an individual ADEA case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case."    Id. at 388, 128 S.Ct. 1140.    The Court also observed, "In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings."    Id. at 384, 128 S.Ct. 1140.

    Our review of the trial transcript reveals the district court carefully analyzed the admissibility of each witness's testimony.    The district court refused to permit Mary Davis, another former tenant of Winter, to testify after hearing her proposed testimony outside the presence of the jury.    The district court excluded this testimony because Davis had last rented from Winter in 1994, and the district court found her testimony was too remote.    Affording the district court broad discretion, we hold the district court properly performed its gatekeeping function and did not abuse its discretion in admitting the evidence of Winter's three former tenants.

    Winter next takes issue with the district court's decision to admit the testimony of Patricia Johnson
(Johnson), a SCHRC investigator, and the SCHRC's probable cause determination.    Winter suggests
"Johnson's testimony regarding the [SCHRC probable cause] determination and how it was made was .  prejudicial and usurped the role of the jury."    Winter also maintains "Johnson's testimony as a whole was littered with hearsay and irrelevant evidence that was unfairly prejudicial to [Winter] and should have been excluded in its entirety."

"In an employment discrimination case, the decision whether to admit or exclude administrative ondings, such as EEOC investigation matters, is properly left to the sound discretion of the trial court." Doss v. Frontenac, 14 F.3d 1313, 1318 (8th Cir.1994) (citations omitted).    In this case, the district court instructed the jury regarding the probable cause determination and the testimony concerning the probable cause determination.    The instruction stated:

You have heard evidence about an investigation performed by the [SCHRC] and that organization's onding of "probable cause" regarding the issues in this case.    You may consider this onding by the [SCHRC] as evidence as set out in Exhibit 4. The "probable cause" onding by the [SCHRC] is not a onding you are bound by.    It is just a step in procedure and is not a onding by a preponderance of the evidence.    You, as a jury, not the [SCHRC], are the ones to decide whether or not the issues presented for your consideration have been proved or not.

Even if the admission were indeed an error, any possible prejudice was cured by the above instruction. See Johnson v. Yellow Freight Sys., Inc., 734 F.2d 1304, 1309 (8th Cir.1984) ("To admit the report under these circumstances would amount to admitting the opinion of an expert witness as to what conclusions the jury should draw[.]").    With regard to Johnson's testimony as a whole, Winter makes only general accusations of irrelevancy and prejudice, but he fails to cite any specioc examples. Under the circumstances, we ond no abuse of discretion in the district court's admission of Johnson's testimony.

Finally, Winter argues the district court improperly excluded Quigley's records from Siouxland Mental Health (Siouxland) and the testimony of Siouxland physician's assistant Dawn Nolan (Nolan).

Before trial, Quigley moved in limine to exclude "any evidence, comment or argument" related to Quigley's Siouxland mental health records and her history of, and treatment for, mental health conditions.    The district court granted the motion, excluding admission of Quigley's records, except for a portion to which the parties stipulated.    The parties stipulated to the following jury instruction: "The plaintiff has a history of depression and anxiety prior to January, 2004."

During her trial testimony, Johnson of the SCHRC reported Quigley had received counseling services at Siouxland for depression caused by the sexual harassment.    This testimony was elicited by Winter's attorney during cross-examination.    Winter then sought to introduce Nolan's testimony to prove Quigley did not report sexual harassment to Nolan and lied to Johnson when she said she

had.    Quigley objected to Nolan testifying, arguing Nolan's testimony would violate the psychiatrist-patient or physician-client privilege.    The district court heard Nolan's proposed testimony outside the presence of the jury.    The district court determined Nolan's testimony was inadmissible because Winter failed to prove Quigley did not tell anyone at Siouxland about the sexual harassment.    We ond no abuse of discretion in the district court's exclusion of Quigley's medical records and Nolan's testimony.

## B.   Quigley's Claims on Appeal

Having found no reversible trial error, we turn to Quigley's claims on appeal.    Quigley claims the district court (1) improperly reduced the jury's punitive damage award from $250,000.00 to $20,527.50, and (2) failed to conduct a proper analysis of Quigley's entitlement to attorney fees and awarded an insubcient amount of attorney fees to Quigley.    Conversely, Winter claims the district court erred in submitting punitive damages to the jury and in awarding any amount of punitive damages or attorney fees to Quigley.

## 1.   Punitive Damages

## a.   Punitive Damages Jury Instruction

We orst address Winter's contention that the district court erred in allowing the jury to consider punitive damages.    "The [FHA] provides for the recovery of punitive damages by victims of discriminatory housing practices."    Badami v. Flood, 214 F.3d 994, 997 (8th Cir.2000) (citing 42 U.S.C. § 3613(c)(1) (1994)).    We apply the same standard for punitive damages in [FHA] cases as we do in employment discrimination and 42 U.S.C. § 1983 civil rights cases. Id. at 997 (referencing Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)).    "Punitive damages are appropriate in a federal civil rights action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.' " Id. at 997 (quoting Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)).    In Kolstad, a gender discrimination case, the Supreme Court held "[t]he terms 'malice' and 'reckless [indifference]' ultimately focus on the actor's state of mind."    Kolstad, 527 U.S. at 535, 119 S.Ct. 2118 (citations omitted).    They "pertain to the [defendant's] knowledge that [he] may be

acting in violation of federal law, not [his] awareness that [he] is engaging in discrimination."
Badami, 214

F.3d at 997 (quoting Kolstad, 527 U.S. at 535, 119 S.Ct. 2118).    Thus, "it is subcient that a defendant 'discriminate in the face of a perceived risk that [his] actions will violate federal law to be liable in punitive damages.' " Id. (quoting Kolstad, 527 U.S. at 536, 119 S.Ct. 2118).

   The district court determined Quigley had presented subcient evidence to justify instructing the jury on punitive damages, because Winter admitted at trial he knew sexual harassment was unlawful, he had been a landlord for many years and managed many properties, he had worked with various governmental agencies to provide subsidized housing, and his lease agreement with Quigley stated he, as the landlord, was not to discriminate on the basis of sex.    We agree with the district court.   The district court did not err in submitting punitive damages for the jury's consideration.

b.    Reasonableness of the Punitive Damages Award

   The jury found Quigley was entitled to punitive damages in the amount of $250,000.00, and the district court entered judgment.    Winter then oled a motion to amend the judgment to reduce the punitive damages award.    The district court noted the punitive damages award was more than eighteen times the compensatory damages award ($13,685.00) and found the award was excessive and did not comport with due process.    The district court reduced the award to $20,527.50, which amounted to one and a half times the compensatory damages award, "for the simple reason that [Winter's] conduct .  can be considered only as to what he said and did directly to [Quigley]."

   Quigley challenges the district court's analysis, arguing the jury's punitive damages award complied with due process and the original award should be reinstated.   "We review a district court's legal conclusions regarding punitive damages de novo."   Henderson v. Simmons Foods, Inc., 217 F.3d 612, 618 (8th Cir.2000) (citation omitted).    We also review the proportionality determination de novo.   See Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 435, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (citation omitted).

The factual ondings made by the district courts in conducting the excessiveness inquiry, of course, must be accepted unless clearly erroneous.  But the question whether a [punitive damages award] is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context de novo review of that question is appropriate.

Id. (internal marks and citation omitted).

To assess the reasonableness or excessiveness of a punitive damages award, we consider:  (1) "the degree of reprehensibility of the defendant's conduct," (2) the ratio between punitive damages and actual harm (compensatory damages), and (3) "the civil or criminal penalties that could be imposed for comparable misconduct."   BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575, 580-81, 583, 116 S.Ct.
1589, 134 L.Ed.2d 809 (1996).

i.   Reprehensibility

In Gore, the Supreme Court declared the degree of reprehensibility was "[p]erhaps the most important indicium of the reasonableness of a punitive damages award."   Id. at 575, 116 S.Ct. 1589.   In assessing the degree of reprehensibility, we must consider whether

the harm caused was physical as opposed to economic;  the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;  the target of the conduct had onancial vulnerability;  the conduct involved repeated actions or was an isolated incident;  and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (citing Gore, 517 U.S. at 576-77, 116 S.Ct. 1589).

The district court determined Winter's conduct was not subciently reprehensible to justify the jury's punitive damages award.    The district court may have based this onding on an assumption the jury considered Winter's conduct toward other tenants, and not just the conduct directed toward Quigley, in arriving at the punitive damages amount.    However, as Quigley notes, the jury instruction on punitive damages clearly stated the jury was to consider "[Winter]'s conduct only as against [Quigley]" in assessing punitive damages.    We have no reason to believe the jury disregarded the district court's instructions.

Winter's conduct was reprehensible.    Quigley lived alone with small children at the time of Winter's harassment, and she had few, if any, alternative housing options.    Quigley's onancial vulnerability was evidenced by her need for Section 8 housing vouchers.    Winter held a certain level of power over

Quigley and her family.    Winter repeatedly subjected Quigley to inappropriate conduct during Quigley's tenancy, and Winter's conduct was unquestionably intentional and more than churlish. Most signiocant, Winter's conduct intruded upon Quigley's sense of security in her own home. However, as we explain below, we do not believe the degree of reprehensibility of Winter's conduct justioes the jury's large punitive damages award.

ii.    Ratio Between Punitive Damages and Actual Harm

The second Gore factor, the ratio between punitive and compensatory damages, is the "most commonly cited indicium of an unreasonable or excessive punitive damages award."   Gore, 517 U.S. at 580, 116 S.Ct. 1589.    Punitive "damages must bear a 'reasonable relationship' to compensatory damages."   Id. What constitutes a "reasonable relationship" varies from case to case.    The Supreme Court "ha[s] consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award."

Id. at 582, 116 S.Ct. 1589 (citation omitted).    The Court explained,

low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages.    A higher ratio may also be justioed in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been dibcult to determine.

Id.

Yet, later, in Campbell, the Court declared, "Our jurisprudence and the principles it has now established demonstrate .  few awards exceeding a single-digit ratio between punitive and compensatory damages, to a signiocant degree, will satisfy due process."   Campbell, 538 U.S. at 425, 123 S.Ct. 1513.    The Court continued, "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution."   Id. The Court reiterated there was "a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish."   Id. (citing Gore, 517 U.S. at 581 n. 33, 116 S.Ct. 1589).    The district court then declared, "While these ratios are not binding, they are instructive."   Id.

In Wallace v. DTG Operations, Inc., 563 F.3d 357, 359, 362 (8th Cir.2009), a retaliation case, our court found a punitive damages award, which was "approximately sixteen times greater than all of the actual damages combined" was excessive.    Citing Campbell, we reasoned, because the jury's award of $30,000 in actual damages was not a nominal amount, "a single-digit multiple should be the outer limit on [the punitive damages] award."    Id. at 362.    We observed, the Supreme Court found a punitive damages award " 'more than 4 times the amount of compensatory damages . close to the line' " of constitutionality.    Id. at 363 (quoting Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23-4, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)).    Based on the Court's guidance in Campbell and Haslip, we found "a four-to-one ratio" was an appropriate ratio.    Id.

Recognizing we are not bound by a rigid mathematical formula, we nevertheless, are persuaded a single digit multiplier is appropriate in the present case.    We take our guidance from the Supreme Court's assessment of single-digit multipliers.    Quigley was awarded $13,685.00 in compensatory damages, which is not a nominal amount.    We ond the circumstances of this case and due process do not justify a punitive damages award eighteen times greater than the compensatory damages and, agreeing with the district court, conclude the jury's punitive damage award was excessive.

iii.   Sanctions for Comparable Misconduct

We turn then to the onal Gore factor, a comparison between the punitive damages award and the civil and criminal penalties available for comparable misconduct.    "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.' " Gore, 517 U.S. at 583, 116 S.Ct. 1589 (quoting Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492

U.S. 257, 282, 301, 109 S.Ct. 2909, 106 L.Ed.2d 219(1989) (O'Connor, J., concurring in part and dissenting in part)).

Quigley points out 42 U.S.C. § 3614 permits the Attorney General to commence a civil action against "any person . engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by the [FHA]." Section 3614(d)(1)(C), as adjusted by the Inpation Adjustment Act

of 1990, Pub.L. No. 101-410, § 5(a)(4), 104 Stat. 891, and 29 C.F.R. § 85.3(b)(3), states a court may grant relief for a orst violation in an amount not exceeding $55,000.

While we agree with the district court that the jury's punitive damage award was excessive, we disagree with the district court's assessment that $20,527.50, which is one and a half times the compensatory award, subciently repects the reprehensibility of Winter's conduct.    We conclude an appropriate punitive damages award in this case is $54,750.    This amount is four times greater than Quigley's compensatory damages ($13,685.00), which we ond is an appropriate ratio under the circumstances of this case.    This amount comports with due process, while achieving the statutory and regulatory goals of retribution and deterrence.    See Campbell, 538 U.S. at 425, 123 S.Ct. 1513.

2.    Attorney Fees

Finally, Quigley contests the district court's judgment with respect to the attorney fee award. The district court granted Quigley's motion for attorney fees, but only awarded her $20,000.00 of the $117,066.50 Quigley requested.    " 'We review the district court's award of attorney fees for abuse of discretion.' " Heaton, 534 F.3d at 887 (quoting Ollis v. HearthStone Homes, Inc., 495 F.3d 570, 576 (8th Cir.2007)).

a.    Entitlement to Attorney Fees

"The prevailing party in FHA litigation may be awarded costs and a reasonable attorney's fee." Oxford House-A v. City of Univ. City, 87 F.3d 1022, 1024 (8th Cir.1996) (citing 42 U.S.C. § 3613(c)(2)).    Winter does not contest Quigley was a prevailing party;  however, Winter suggests Quigley may not be entitled to attorney fees because she had a contingency fee agreement with her attorneys.    Quigley's attorney stated, "[W]e have agreed with [Quigley] . that we would take a contingency fee amount, which is 33 1/3 [%], or what the court would grant us in statutorily granted attorney fees.
That's an either/or.    We don't get both."

Winter cites two 1986 cases from outside our circuit in support of his proposition that the existence of a contingency agreement bars an award of attorney fees.    See Tolliver v. Amici, 800 F.2d 149, 152 (7th Cir.1986);  Keith v. Volpe, 644 F.Supp. 1317, 1319 (C.D.Cal.1986), aff'd, 858 F.2d 467 (9th

Cir.1988).    We consider Tolliver and Keith inapplicable and not contrary to our decision.    As Quigley notes, these two cases were decided before the 1988 amendments to the FHA. Before the amendments, an award of attorney fees under the FHA was only available to "a prevailing plaintiff [who was] not onancially able to assume said attorney fees."    See Tolliver, 800 F.2d at 152 (citing 42 U.S.C. § 3612(c) (1986)).    The current version of the FHA does not limit attorney fees to plaintiffs or to those who are not onancially able to assume the fees;  rather, "the prevailing party, other than the

United States, [may recover] a reasonable attorney's fee."    42 U.S.C. § 3613(c)(2) (emphasis added).    "The attorney's fees provided for in a contingent-fee agreement is not a ceiling upon the fees recoverable."    Blanchard v. Bergeron, 489 U.S. 87, 96, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) (addressing attorney fees under 42 U.S.C. § 1988).    The district court did not err in onding Quigley was entitled to attorney fees.

b.    Amount of Attorney Fees

We now consider whether the district court erred in its manner of calculation or in the amount of attorney fees awarded to Quigley.    The Supreme Court has stated,

The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.    This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services.    The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed.    Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

The district court also should exclude from this initial fee calculation hours that were not "reasonably expended."    Cases may be overstaffed, and the skill and experience of lawyers vary widely.    Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission.

Hensley v. Eckerhart, 461 U.S. 424, 433-34, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (internal citations omitted).[6]    See also Hanig v. Lee, 415 F.3d 822, 825 (8th Cir.2005) ("The starting point in determining attorney fees is the lodestar, which is calculated by multiplying the number of hours

reasonably expended by the reasonable hourly rates.") (quoting Fish v. St. Cloud State Univ., 295 F.3d 849, 851 (8th Cir.2002)).

The district court's explanation for its award of attorney fees is puzzling.    The court stated, "There is no need to discuss the lodestar calculations or the skill and experience of the plaintiff's lawyers." Instead, the district court relied upon the "Kloberdanz theory."    This Kloberdanz theory apparently came from an unpublished district court case, United States v. Kloberdanz, No. CR 76-2013 (N.D.Iowa Nov. 30, 1976) (McManus, J.), which did not address the issue of attorney fees. According to the district court, Kloberdanz involved the criminal prosecution of a postal employee for theft, and the

Kloberdanz court found there was no need for an excessive one because, in the district court's words,

"it was a two bit case and he was going to receive a two bit one."    The district court then noted Quigley's case "is not a two bit case .  [but] there is still a matter of justice, there is still a matter of basic fairness, there is still a matter of equity."    The district court declared its belief that it was "appropriate to determine or consider the effect on [Winter], whether he can pay [the attorney fees] or not."    The district court concluded, "[W]hile they certainly are good lawyers and they certainly did a good job, .  attorney fees in the sum of $20,000.00 are appropriate."

The district court's failure, under the circumstances here, to analyze Quigley's entitlement to attorney fees under the lodestar approach was an abuse of discretion.    See De Jesús Nazario v. Morris Rodríguez, 554 F.3d 196, 207 (1st Cir.2009) ("Normally, a district court begins with a lodestar analysis, because failure to conduct such an undertaking 'creates a substantial burden upon the district court to account for its actions.' " (quoting Coutin v. Young & Rubicam P.R., Inc., 124 F.3d 331,

338 (1st Cir.1997)));  Moton v. Nathan & Nathan, P.C., 297 Fed.Appx. 930, 932 (11th Cir.2008) ( "Although the district court admittedly has wide discretion in this arena, we nonetheless are constrained to hold that the district court abused its discretion by failing to perform any 'lodestar' calculation at all." (citation omitted));  Pa. Envt'l. Defense Found. v. Canon-McMillan Sch. Dist., 152 F.3d 228, 232-33, 235 (3d Cir.1998) (reversing and remanding based on the district court's failure to use the lodestar method in awarding attorney fees);  Morales v. City of San Rafael, 96 F.3d 359, 36364, 365 (9th Cir.1996) (same).

Furthermore, we ond the district court erred in its consideration of Winter's ability to pay.    Even if a defendant's ability to pay could be an appropriate consideration in awarding attorney fees, the record in this case adequately supports Winter is a substantial owner of real estate, and Winter did not submit any evidence of his onancial situation or his net worth to address any issue of his inability to pay a substantial fee award.

In lieu of remanding the case to the district court, Quigley requests us to conduct a lodestar calculation and award the appropriate amount of attorney fees.    Quigley insists a remand to the district court would create a "serious risk of substantial continued litigation," because, based on the district court's previous decision, Quigley believes "another appeal to [our court] may be necessary if the issue is remanded."

"A request for attorney's fees should not result in a second major litigation."   Hensley, 461 U.S. at 437, 103 S.Ct. 1933.    The Eleventh Circuit has interpreted this command to authorize circuit courts to "determine for ourselves, once we conclude that the district court has abused its discretion, how many hours were reasonably spent in litigation."   Dillard v. City of Greensboro, 213 F.3d 1347, 1355 (11th Cir.2000) (citation omitted).    See also 28 U.S.C. §  2106 (providing circuit courts of appeals the power to "direct the entry of such appropriate judgment .  as may be just.");  Gay Obcers Action League v. Puerto Rico, 247 F.3d 288, 299 (1st Cir.2001) (foregoing a remand and imposing an award of punitive damages where the district court erred in its attorney fees calculation).    We have not located any cases from our circuit where we have foregone a remand under these circumstances. Cf. In re Kujawa, 270 F.3d 578, (8th Cir.2001);  Thomlison v. City of Omaha, 63 F.3d 786 (8th Cir.1995);  Rydder v. Rydder, 49 F.3d 369 (8th Cir.1995);  Allen v. Higgins, 902 F.2d 682 (8th Cir.1990). However, like the First and Eleventh Circuits, we believe the record before us is clear, remand would be inebcient, and it is necessary for us to determine an appropriate attorney fees award in this case in order to comply with the Supreme Court's command that "[a] request for attorney's fees should not result in a second major litigation," Hensley, 461 U.S. at 437, 103 S.Ct. 1933.[7]

While we agree with Quigley that the district court abused its discretion in signiocantly reducing Quigley's requested attorney fees without conducting the proper analysis and in basing its decision on unsupported considerations, we do agree with the district court's determination that Quigley's attorney fees request was excessive.    We have reviewed in depth Quigley's supporting documentation.    According to one of Quigley's attorneys, Scott Moore, the preparation of Quigley's

case involved 437.7 hours of work performed by six attorneys and two paralegals from Baird Holm, LLP, an Omaha, Nebraska, law orm.    These lawyers and their orm are deservedly highly respected, and their success in this case is commendable.    Although we do not question the ethics or abilities of these attorneys, in our view, the complexity of the issues in this case simply did not warrant the requested amount of "lawyering."    We also conclude there was a signiocant amount of duplicative work, in part caused by transitions in the attorneys of record.    For those reasons, we determine it is reasonable and appropriate to reduce the hours expended by each of the attorneys and paralegals by one-third, while leaving their hourly rates undisturbed.    See Hensley, 461 U.S. at 434, 103 S.Ct. 1933 ("Cases may be overstaffed.").

Using the adjusted number of hours, and multiplying by the respective hourly rates, we arrive at the following lodestar calculation.

"The product of reasonable hours times a reasonable rate does not end the inquiry.    There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.' " Hensley, 461 at 434, 103 S.Ct. 1933. Quigley obtained excellent results, as the jury found in her favor on all claims.    We conclude no other upward or downward adjustments are mandated in this case.    We thus conclude a reasonable attorney fee award in this case is $78,044.33.

## III.    CONCLUSION

For the reasons stated in this opinion, we abrm the district court's judgment with respect to Winter's claims on cross-appeal.    With respect to Quigley's claims on appeal, we reverse and remand the case to the district court with instructions to award Quigley $54,750.00 in punitive damages and $78,044.33 in attorney fees, together with $1,587.88 in non-taxable costs.[8]

I join all of the Court's opinion with the exception of the decision to forego a remand to the district court for a proper calculation of the attorneys' fee award.    I do not interpret the Supreme Court's statement in Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), about avoiding a "second major litigation" to encourage courts of appeals to usurp the traditional role of district courts in determining the proper fee award.    Rather, I read Hensley to suggest that it is the deferential standard of review, not our ability to calculate a fee award de novo, that alleviates the Supreme Court's ebciency concerns, including "avoiding frequent appellate review of what

essentially are factual matters."    See Hensley, 461 U.S. at 437, 103 S.Ct. 1933;  see also id. at 430 n. 3, 103 S.Ct. 1933 (listing twelve factors to consider in calculating a fee award).    We review the amount of an award using the deferential abuse of discretion standard precisely because "of the district court's superior understanding of the litigation."    See id. at 437, 103 S.Ct. 1933.

The Court today declares that because "the record before us is clear" and "remand would be inebcient," it is "necessary" for us to determine the appropriate attorneys' fee award.    Ante, at 958. Because the same can be said for most, if not all, attorneys' fee disputes that are appealed, it will henceforth become necessary for us to calculate the proper attorneys' fee award as a matter of course, whenever we ond an abuse of discretion.    District courts are in a far better position to perform this time-consuming and fact-intensive task.    As a result, I would adhere to our previous cases in which we have uniformly remanded for the district court to re-calculate the proper attorneys' fee award.    See, e.g., Lash v. Hollis, 525 F.3d 636, 643 (8th Cir.2008);  ante, at 957-58 (collecting cases);  see also Gisbrecht v. Barnhart, 535 U.S. 789, 809, 122 S.Ct. 1817, 152 L.Ed.2d 996 (2002) (similarly remanding for a new award calculation);  Hensley, 461 U.S. at 440, 103 S.Ct. 1933 (same).    On this issue alone, I respectfully dissent.

FOOTNOTES

1.    Quigley also asserted a breach of contract claim against Winter, for which she was awarded $400.00 by the jury.

2.    We recite the relevant facts in the light most favorable to the jury's verdict.

3.    We address Winter's claims concerning punitive damages and attorney fees in conjunction with our discussion of Quigley's claims on appeal.

4.    Winter all but conceded this issue at oral argument.

5.    Quigley suggests Question No. 2 on the verdict form was not directly tied to Instruction No. 8A. We reject Quigley's position.    While Question No. 2 may not have explicitly referenced Instruction No. 8A, there was no other instruction explaining what would constitute discriminatory housing practices or sex discrimination.

6.    While Hensley involved an award of attorney fees under 42 U.S.C. §  1988, the Hensley Court made clear "[t]he standards set forth in [the] opinion are generally applicable in all cases in

which Congress has authorized an award of fees to a 'prevailing party.' " Hensley, 461 U.S. at 433 n. 7, 103

S.Ct. 1933.

7. We do not argue with the dissent that the usual procedure is to remand any further consideration of an attorney fee award to the district court because the district court typically is "in a better position to perform this time-consuming and fact-intensive task."    However, based on the circumstances and record of this case, we believe it is more ebcient and appropriate for our court to decide the attorney fee award now.

8. Winter does not contest Quigley's costs.

RILEY, Circuit Judge.

**Was this helpful?**    Yes 👍    No 👎

15-1823
Francis v. Kings Park Manor, Inc.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2015

(Argued: April 7, 2016

Final Submission: November 22, 2016

Decided: March 4, 2019)

Docket No. 15‑1823‑cv

_____

DONAHUE FRANCIS,

*Plaintiff‑Appellant,*

v.

KINGS PARK MANOR, INC., CORRINE DOWNING,

*Defendants‑Appellees,*

RAYMOND ENDRES,

*Defendant.*

_____

Before:

POOLER, LIVINGSTON, and LOHIER, *Circuit Judges*.

In this appeal, we consider whether a landlord may be liable under §§ 3604 and 3617 of the Fair Housing Act of 1968 ("FHA"), 42 U.S.C. §§ 3604, 3617, and analogous provisions of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, for failing to take prompt action to address a racially hostile housing environment created by one tenant targeting another, where the landlord knew of the discriminatory conduct and had the power to correct it. The United States District Court for the Eastern District of New York (Spatt, *J.*)

2

dismissedŏtheŏclaimsŏofŏplaintiffŏDonahueŏFrancisŏunderŏtheŏFHA,ŏ42ŏU.S.C.ŏ §§ŏ1981ŏandŏ1982,ŏandŏtheŏNYSHRL,ŏasŏwellŏasŏFrancis'sŏotherŏclaimsŏunderŏNewŏYorkŏStateŏlaw.ŏŏWeŏ**VACATE**ŏtheŏDistrictŏCourt'sŏdismissalŏofŏtheŏfederalŏclaimsŏ

andŏtheŏNYSHRLŏclaimsŏandŏ**REMAND**ŏforŏfurtherŏproceedings.ŏŏWeŏ**AFFIRM**ŏtheŏDistrictŏCourt'sŏjudgmentŏinŏallŏotherŏrespects.ŏ

ŏ

JudgeŏLivingstonŏdissentsŏbyŏseparateŏopinion.ŏ

ŏ

SASHAŏSAMBERGŎCHAMPIONŏ(YiyangŏWu,ŏ JohnŏP.ŏRelman,ŏ*onŏtheŏbrief*),ŏRelman,ŏDaneŏ&ŏColfaxŏPLLC,ŏWashington,ŏDC,ŏ*for*ŏ*PlaintiffŎAppellant*.ŏ

ŏ

MELISSAŏCORWINŏ(StanleyŏJ.ŏSomer,ŏ*onŏtheŏbrief*),ŏSomer,ŏHellerŏ&ŏCorwinŏLLP,ŏCommack,ŏNY,ŏ*forŏDefendantsŎAppellees*.ŏ

ŏ

VanitaŏGupta,ŏPrincipalŏDeputyŏAssistantŏ

Attorney General, Jennifer Levin Eichhorn,
Sharon McGowan, Thomas Chandler,
United States Department of Justice, Civil
Rights Division, Washington, DC; Tonya T.
Robinson, Acting General Counsel,
Michelle Aronowitz, Deputy General
Counsel for Enforcement and Fair Housing,
Kathleen Pennington, M. Casey Weissman
Vermeulen, Alexandria Lippincott, U.S.
Department of Housing and Urban
Development, Office of General Counsel,
Washington, DC, *for Amicus Curiae* United
States of America.

Susan Ann Silverstein, AARP Foundation
Litigation, Washington, DC, *for Amicus
Curiae* AARP.

LOHIER, *Circuit Judge*:

Just over fifty years ago, spurred by the assassination of Dr. Martin Luther

King, Jr., Congress enacted Title VIII of the Civil Rights Act of 1968, commonly

referred to as the Fair Housing Act of 1968 ("FHA" or "Act"), 42 U.S.C. § 3601 et

seq., a landmark piece of civil rights legislation that accompanied the Civil Rights

Act of 1964 and the Voting Rights Act of 1965.  The main question before us is

whether a landlord may be liable under the FHA for failing to take prompt action

to address a racially hostile housing environment created by one tenant targeting

another, where the landlord knew of the discriminatory conduct and had the

power to correct it.  In holding that a landlord may be liable in those limited

circumstances, we adhere to the FHA's broad language and remedial scope and

agree with the views of the United States Department of Housing and Urban

Development ("HUD"), the agency tasked with administering the FHA.  We

therefore vacate the judgment of the United States District Court for the Eastern

District of New York (Spatt, J.) dismissing Donahue Francis's claims under the

FHA and analogous New York State law, as well as his claims under 42 U.S.C.

6

§§ 1981 and 1982, and remand for further proceedings.  As for Francis's

challenges to the District Court's dismissal of his other claims, we affirm.

BACKGROUND

1. Facts

The allegations in Francis's complaint, which we assume to be true, see

Morales v. City of New York, 752 F.3d 234, 236 (2d Cir. 2014), tell a story that

remains too common today.  "Having lived in inner city urban communities

during earlier parts of his life," and "in search of a better housing situation," in

2010 Francis signed a rental lease agreement with defendant Kings Park Manor

7

Inc. ("KPM").[2]  He soon moved into an apartment unit of a complex owned by

KPM and managed by co‑defendant Corrine Downing (together with KPM, the

"KPM Defendants").  After several uneventful months, Francis's next door

neighbor, Raymond Endres, began to subject Francis to what can only be

described as a brazen and relentless campaign of racial harassment, abuse, and

threats.  The specific allegations are as follows.  See Joint App'x 11–17.  In February 2012 Francis heard Endres say "Jews, fucking Jews," while standing in front of

---

[2]  Francis entered the lease agreement pursuant to the Housing Choice Voucher Program, 42 U.S.C. § 1437f(o), commonly known as the "Section 8" public housing program.

their apartments.[3]  Endres then called Francis, who is black, a "fucking nigger."[4]

On March 3, Endres approached Francis's open front door and said "damn fucking Jews," then looked at Francis and said "fucking asshole." On March 10, Francis overheard Endres and another tenant discussing Francis "in derogatory terms." The following day, Endres approached Francis's open front door and repeatedly called him a "nigger," then stated, "fucking nigger, close your god darn door, fucking lazy, god damn fucking nigger." On March 20, Francis

---

[3] Although Francis is apparently not Jewish, he alleges that some of his neighbors complained about Endres's anti‑Semitic rants in the KPM complex.

[4] For a brief history of this odious word, see Randall Kennedy, Nigger: The Strange Career of a Troublesome Word (2002).

9

repeatedly called Francis a "nigger" in the parking lot of the apartment complex.

By this point, Francis understandably "felt afraid, anxious, and unwelcome." On May 14, Endres yelled "fuck you" in front of Francis's front door; the following day, Endres approached Francis, who was leaving his apartment, and said, "keep your door closed you fucking nigger." On May 22, Endres told Francis, "I oughta kill you, you fucking nigger." On August 10, Endres called Francis a "fucking nigger" and a "black bastard." Finally, on September 2, 2012, Endres stood at Francis's open front door and photographed the interior of Francis's apartment.

From the start of Endres's several-month campaign of harassment, Francis,

"fear[ing] for his personal safety," contacted the police and the KPM Defendants

to complain.  His first call to the police on March 11 prompted Suffolk County

Police Hate Crimes Unit officers to visit the KPM apartment complex, interview

witnesses, and warn Endres to stop threatening Francis with racial epithets.  That

day Francis also filed a police report, and a police officer told the KPM

Defendants about Endres's conduct.  The KPM Defendants did nothing.

In May 2012 Francis called the police again and filed another police report.

This time, by letter dated May 23, 2012, Francis notified the KPM Defendants

directly about Endres's racist conduct between March and May 2012.  The letter

"report[ed] . . . . Endres for racial harassment, [and] for making racial slurs

directly to [Francis]." It also provided contact information for the Suffolk

County police officers responsible for investigating Endres. Again, the KPM

Defendants failed to do anything at all, even as little as respond to Francis's

letter.

Endres' conduct persisted. His escalating racial threats to Francis finally

prodded the Suffolk County Police Department to arrest Endres for aggravated

harassment in violation of New York Penal Law § 240.30. On August 10,

2012,

Francis sent a second letter. It informed the KPM Defendants that Endres

continued to direct racial slurs at Francis and "anti-semitic, derogatory slurs

12

against Jewish people." It also disclosed that Endres had recently been arrested

for harassment.

Endres's attempt to photograph Francis's apartment on September 2 was

apparently the last straw. Francis contacted the police and the following day

sent the KPM Defendants a third and final letter complaining about Endres's

continued harassment. After receiving the letter, KPM advised Downing "not to

get involved," and the KPM Defendants declined to respond or follow up. As a

result, Endres remained a tenant at the apartment complex.

The complaint alleges that the KPM Defendants not only failed to

investigate or attempt to resolve Francis's complaints of racial abuse but, to the

contrary, allowed Endres to live at the complex through January 2013 without

13

reprisal.  That month, Endres' lease expired and he moved out of his apartment.

A few months later, in April 2013, Endres pleaded guilty to harassment in violation of New York Penal Law § 240.26(1).  That same month, the State court entered an order of protection prohibiting him from contacting Francis.

2. Procedural History

In June 2014 Francis sued the KPM Defendants and Endres, claiming primarily that they violated §§ 3604 and 3617 of the FHA,[5] the Civil Rights Act of

---

[5] Because Francis's complaint, the briefing presented to this Court, and the majority of the cases relied on in this opinion do so, we cite to the current codified version of the FHA contained in Title 42 of the United States Code, see 42 U.S.C. § 3601 et seq., rather

14

1866, 42 U.S.C. §§ 1981, 1982, and that the KPM Defendants violated § 296(5) of

the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296(5),

which bars housing discrimination in New York. Francis also sued the KPM

Defendants and Endres for negligent infliction of emotional distress and for

violating NYSHRL § 296(6) by aiding and abetting a violation of NYSHRL

§ 296(5), the KPM Defendants for breach of contract and breach of the implied

warranty of habitability under New York State law, and Endres for intentional

infliction of emotional distress. The District Court entered a default judgment

against Endres, who never appeared. The KPM Defendants moved under Rule

---

than the numbered sections of the FHA itself as originally passed (§§ 804 and 818).

15

12(b)(6) to dismiss the claims against them for failure to state a claim.  The District Court granted that motion except as to Francis's implied warranty of habitability claim, which Francis voluntarily withdrew and the District Court dismissed.  The District Court then granted partial final judgment in favor of the KPM Defendants so that Francis could pursue this appeal, even though damages against Endres remained to be determined.  See Fed. R. Civ. P. 54(b).

Following oral argument, we solicited HUD's views relating to a landlord's potential liability for a tenant's racial harassment of another tenant under its regulations.  In response, HUD, as amicus curiae, points us to its rules

designed to clarify the law in this area and urges us to recognize certain limited claims against landlords arising out of tenant‐on‐tenant racial harassment.

DISCUSSION

We focus on Francis's federal claims arising under §§ 3604 and 3617 of the FHA and under the Civil Rights Act of 1866, as well as his New York claims arising under NYSHRL § 296 and for negligent infliction of emotional distress.

We review the District Court's dismissal of these claims de novo, accepting the factual allegations in the complaint as true.  See Biro v. Condé Nast, 807 F.3d 541, 544 (2d Cir. 2015).

17

### 1. Post Acquisition Claims Under the Fair Housing Act

We start with the statutory text.  As relevant to this appeal, § 3604(b) of the Act makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b).  Section 3617 of the Act also makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed" any right protected by the Act.  42 U.S.C. § 3617.  The language of the

18

FHA has a "broad and inclusive compass," City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 731 (1995) (quotation marks omitted), and we therefore give it a "generous construction," Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 212 (1972).  Together, the Act's provisions are designed "to eliminate all traces of discrimination within the housing field."  Cabrera v. Jakabovitz, 24 F.3d 372, 390 (2d Cir. 1994) (quotation marks omitted).

We first address Francis's claims under §§ 3604(b) and 3617 with the text and those principles in mind.  As a threshold matter, we consider whether § 3604 prohibits discrimination occurring after a plaintiff buys or rents housing.  We

19

hold that so‑called "post‑acquisition" claims are cognizable under § 3604.[6]

> Our view is rooted first in the language of the provision itself, which

prohibits discrimination in the "terms, conditions, or privileges of sale or rental

of a dwelling, or in the provision of services or facilities in connection therewith."

42 U.S.C. § 3604(b). As we describe somewhat more fully below, a number of our

sister circuits have located in that text some degree of post‑acquisition protection.

We agree with the Seventh Circuit, for example, that the FHA's use of the terms

---

[6] Our dissenting colleague agrees that the FHA has "some post‑acquisition application." Dissenting Op., post, at 8.

"privileges" and "conditions" refers not just to the sale or rental itself, but to

certain benefits or protections flowing from and following the sale or rental.  See

Bloch v. Frischholz, 587 F.3d 771, 779–80 (7th Cir. 2009) (en banc).  And we agree

with the analysis of the Ninth Circuit, for example, that "[t]he inclusion of the

word 'privileges' implicates continuing rights," indicating that the "natural

reading" of the statute "encompasses claims regarding services or facilities

perceived to be wanting after the owner or tenant has acquired possession of the

dwelling."  Comm. Concerning Cmty. Improvement v. City of Modesto, 583 F.3d

690, 713 (9th Cir. 2009).  In other words, we rely not only on the Supreme

Court's

21

directiveŏthatŏweŏreadŏtheŏstatuteŏbroadly,ŏbutŏalsoŏandŏmoreŏfundamentall

yŏonŏ theŏstatutoryŏtextŏitself.ŏŏ

Inŏarrivingŏatŏthisŏinterpretation,ŏweŏnoteŏhowŏcloselyŏ§ŏ3604(b)'sŏbro
adŏ

languageŏtracksŏtheŏlanguageŏofŏTitleŏVII,ŏwhich,ŏtogetherŏwithŏtheŏFHA,ŏfo
rmsŏ

partŏofŏtheŏbackboneŏofŏtheŏcoordinatedŏcongressionalŏ"schemeŏofŏfederalŏci
vilŏ

rightsŏlawsŏenactedŏtoŏendŏdiscrimination."ŏŏ<u>HuntingtonŏBranch,ŏN.A.A.C.P.
ŏv.</u>ŏ

<u>TownŏofŏHuntington,</u>ŏ844ŏF.2dŏ926,ŏ935ŏ(2dŏCir.ŏ1988)ŏ("Theŏ[FHAŏandŏTitl
eŏVII]ŏ

areŏpartŏofŏaŏcoordinatedŏschemeŏofŏfederalŏcivilŏrightsŏlawsŏenactedŏtoŏen
dŏ

discriminationŏ.ŏ.ŏ.ŏ."),ŏ<u>supersededŏbyŏregulationŏonŏotherŏgrounds,</u>ŏ24ŏC.F.
R.ŏ

22

§ 100.500(c).  Section 3604(b) of the FHA provides that "it shall be <u>unlawful</u> . . . .

[t]o <u>discriminate against</u> any person in the <u>terms, conditions, or privileges</u> of sale

or rental of a dwelling, or in the provision of services or facilities in connection

therewith, <u>because of race, color, religion, sex, familial status, or national origin</u>."

42 U.S.C. § 3604(b) (emphasis added).  Title VII, enacted four years before the

FHA, similarly provides that "[i]t shall be an <u>unlawful</u> employment practice for

an employer . . . to <u>discriminate against</u> any individual with respect to his

compensation, <u>terms, conditions, or privileges</u> of employment, <u>because of</u> such

individual's race, color, religion, sex, or or national origin." 42 U.S.C. § 2000e‐2(a)(1)

(emphasis added). Of course, the language in Title VII bans both pre- and post-hiring discrimination (including on-the-job racial harassment). See, e.g., Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014).

Understanding that the analogy between the employer‑employee relationship and the landlord‑tenant relationship is imperfect and goes only so far, it nevertheless would be strange indeed if the nearly identical language of the FHA did not also impose liability for post‑acquisition discrimination on landlords under certain circumstances. See Texas Dep't of Hous. & Cmty. Affairs v.

25

Inclusiveŏ Cmtys.ŏ Project,ŏ Inc.,ŏ 135ŏ S.ŏ Ct.ŏ 2507,ŏ 2516–19ŏ (2015)ŏ (relyingŏ onŏ

interpretationsŏ ofŏ Titleŏ VIIŏ toŏ interpretŏ theŏ FHA).ŏ

Inŏ recognizingŏ postŌacquisitionŏ hostileŏ housingŏ environmentŏ claimsŏ underŏ

theŏ FHA,ŏ twoŏ ofŏ ourŏ sisterŏ circuitsŏ haveŏ likewiseŏ citedŏ theŏ linguisticŏ overlapŏ

betweenŏ Titleŏ VIIŏ andŏ §ŏ 3604(b).ŏŏ Seeŏ DiCensoŏ v.ŏ Cisneros,ŏ 96ŏ F.3dŏ 1004,ŏ 1008ŏ (7thŏ

Cir.ŏ 1996)ŏ ("[W]eŏ recognizeŏ aŏ hostileŏ housingŏ environmentŏ causeŏ ofŏ action,ŏ andŏ

beginŏ ourŏ analysisŏ withŏ theŏ moreŏ familiarŏ Titleŏ VIIŏ standard.");ŏ Honceŏ v.ŏ Vigil,ŏ 1ŏ

F.3dŏ 1085,ŏ 1088–90ŏ (10thŏ Cir.ŏ 1993)ŏ (citingŏ Titleŏ VIIŏ caselawŏ toŏ concludeŏ thatŏ aŏ

hostileŏ housingŏ environmentŏ claimŏ isŏ actionableŏ "whenŏ theŏ offensiveŏ

26

behavior unreasonably interferes with use and enjoyment of the premises" and is "sufficiently severe or pervasive to alter the conditions of the housing arrangement" (quotation marks omitted)).  Similarly, in <u>Neudecker v. Boisclair Corp.,</u> the Eighth Circuit relied on analogous language in the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 <u>et seq.,</u> to conclude that post-acquisition "disability harassment" against a disabled tenant by other tenants "is actionable under the FHA."  351 F.3d 361, 364 (8th Cir. 2003).  There the tenant's

suit against a property management company was permitted to proceed under

the FHA after the tenant alleged that he was subjected to repeated disability

based harassment by fellow tenants, that he reported the harassment to the

company "to no avail," and that the harassment interfered with his right to enjoy

his home. Id. at 365.

It is telling that on the issue of whether the FHA prohibits any type of

post-acquisition discrimination, every other circuit faced with the issue has

acknowledged that § 3604(b) at least prohibits "discrimination relating to. . . .

28

actual or constructive eviction," which is <u>necessarily</u> post‑acquisition. <u>Cox v.</u>

<u>City of Dallas</u>, 430 F.3d 734, 746 (5th Cir. 2005); <u>see</u> <u>Modesto</u>, 583 F.3d at 714; <u>Woodard v. Fanboy, L.L.C.</u>, 298 F.3d 1261, 1263–64, 1268 (11th Cir. 2002); <u>Betsey v. Turtle Creek Assocs.</u>, 736 F.2d 983, 985–86 (4th Cir. 1984); <u>see also</u> <u>Michigan Prot. & Advocacy Serv., Inc. v. Babin</u>, 18 F.3d 337, 347 (6th Cir. 1994). As the Seventh Circuit concluded, "in some circumstances homeowners have an FHA cause of action for discrimination that occurred after they moved in." <u>Bloch</u>, 587

F.3d at 772.  In short, there is no circuit split on whether § 3604 reaches post

acquisition conduct.  It does.

The only division, if one exists, relates to the scope or degree of the

provision's reach.  To answer that question we turn to § 3617, which, again,

makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in

the exercise or enjoyment of, or on account of his having exercised or enjoyed, or

on account of his having aided or encouraged any other person in the exercise or

enjoyment of, any right granted or protected by section . . . 3604." 42 U.S.C.

§ 3617.  Section 3617 more comprehensively prohibits discriminatory conduct

barred by § 3604(b) and creates an independent cause of action.  Based on our

reading of the text of that provision, we agree with the Seventh Circuit that

"[c]oercion, intimidation, threats, or interference with or on account of a person's

exercise of his or her [§ 3604(b)] rights can be distinct from outright violations of

[§ 3604(b)]."  <u>Bloch</u>, 587 F.3d at 782.  "For instance, if a landlord rents to a white

tenant but then threatens to evict him upon learning that he is married to a black

woman, the landlord has plainly violated § 3617, whether he actually evicts the tenant or not."  <u>Id.</u>

We also note that HUD's regulations have for thirty years clearly

31

contemplated claims based on post‐acquisition conduct, consistent with our

interpretation of §§ 3604 and 3617.  In 1989, for example, HUD promulgated

regulations that prohibited "[f]ailing or delaying maintenance or repairs of sale

or rental dwellings because of race," 24 C.F.R. § 100.65(b)(2), or "[l]imiting the

use of privileges, services or facilities associated with a dwelling because of

race . . . of an owner [or] tenant," *id.* § 100.65(b)(4); *see* *Bloch*, 587 F.3d at 780–81;

*Modesto*, 583 F.3d at 713–14; Implementation of the Fair Housing Amendments

Act of 1988, 54 Fed. Reg. 3232, 3285 (Jan. 23, 1989).  The director reference to

"tenants" in § 100.65(b)(4) provides particularly strong evidence that HUD has

long considered the services provision of § 3604 to apply throughout a person's

tenancy.

Finally, in our view, contrary interpretations of §§ 3604(b) and 3617 would

contravene Congress's intent to root out discrimination in housing and to

"replace the ghettos [with] truly integrated and balanced living patterns."

Trafficante, 409 U.S. at 211 (quotation marks omitted).  With the objective of

building a racially integrated society in mind, it would make no sense for Congress to require landlords to rent homes without regard to race but then permit them to harass tenants or turn a blind eye when tenants are harassed in

their homes because of race. See Babin, 18 F.3d at 347 (The FHA "encompasses

such overt acts as racially motivated firebombings . . . [or] sending threatening

notes.").

For these reasons, we conclude that the FHA reaches conduct that, as here,

"would constitute discrimination in the enjoyment of residence in a dwelling or

in the provision of services associated with that dwelling" after acquisition.[6]

Modesto, 583 F.3d at 714; see Wetzel v. Glen St. Andrew Living Cmty., LLC, 901

F.3d 856, 866–67 (7th Cir. 2018).

---

[6] Some scholarship on the subject confirms that § 3604(b) and § 3617 encompass post‑

acquisition claims.  See generally Robert G. Schwemm, Neighbor on Neighbor Harassment:  Does the Fair Housing Act Make a Federal Case out of It?, 61 Case W. Res.

L. Rev. 865 (2011); Mary Pennisi, A Herculean Leap for the Hard Case of Post‑Acquisition Claims:  Interpreting Fair Housing Act Section 3604(b) After Modesto, 37

Fordham Urb. L.J. 1083 (2010); Rigel C. Oliveri, Is Acquisition Everything?  Protecting

the Rights of Occupants Under the Fair Housing Act, 43 Harv. C.R.‑C.L. L. Rev. 1 (2008);

Robert G. Schwemm, Cox, Halprin, and Discriminatory Municipal Services Under the  Fair Housing Act, 41 Ind. L. Rev. 717 (2008).

    2. The HUD Regulations and Tenant‑on‑Tenant Racial Harassment

Having concluded that the FHA encompasses post-acquisition claims, we next consider whether a landlord may ever be liable under the FHA for intentionally failing to address tenant-on-tenant racial discrimination. As our dissenting colleague accepts, Dissenting Op., post, at 18–19, the only other Circuit to grapple with the issue recently concluded that the FHA "creates liability against a landlord that has actual notice of tenant-on-tenant harassment based on a protected status, yet chooses not to take any reasonable steps within its control to stop that harassment." Wetzel, 901 F.3d at 859. The KPM Defendants appear to argue that landlords are not liable under

36

the FHA even for such intentional failures.  But as the Seventh Circuit has recognized, the text of § 3617, which forbids "interfer[ence]" with a person's "exercise or enjoyment of" his or her rights under the FHA, encompasses landlord liability for a tenant's racially hostile conduct in some circumstances.  See Wetzel, 901 F.3d at 859, 862–63.

Our dissenting colleague observes, see Dissenting Op., post, at 20, 29–30, that the text of the FHA nowhere explicitly endorses landlord liability for tenant-on-tenant harassment.  True, but we have never required every last detail of a legislative scheme to be spelled out in a statute itself—especially a civil rights statute.  After all, the FHA also makes no explicit reference to liability for actual

or constructive eviction, or for landlord-on-tenant intentional harassment, even though both forms of liability are widely recognized. See Wetzel, 901 F.3d at 862–63, 866–67. In any event, we have more than statutory text, legislative history, and a pattern of expansive readings of the FHA on which to draw in determining whether the statute prescribes landlord liability for tenant-on-tenant harassment. We also have HUD's interpretation of the FHA on the precise issue before us: In 2016 HUD published a final rule (the "Rule") amending its rules for discriminatory conduct under the FHA. See Quid Pro Quo and Hostile

38

Environment Harassment and Liability for Discriminatory Housing Practices

Under the Fair Housing Act, 81 Fed. Reg. 63,054 (Sept. 14, 2016) (codified at 24 C.F.R. pt. 100). The Rule, to which we accord "great" but by no means definitive weight, Trafficante, 409 U.S. at 210,[7] defines hostile environment harassment in violation of the FHA as referring to "unwelcome conduct that is sufficiently

_____

[7] Under the scheme described in Skidmore v. Swift & Co., 323 U.S. 134 (1944), we also accord deference to agency litigation interpretations when the agency, as here, appears as amicus. Serrichio v. Wachovia Sec. LLC, 658 F.3d 169, 178 (2d. Cir. 2011); Simsbury Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 207 (2d Cir. 2009) ("[W]e will generally defer to an agency's interpretation of its own regulations, including one presented in an amicus brief, so long as the interpretation is not plainly erroneous or inconsistent with law."). We find HUD's interpretation here helpful and persuasive regardless of the level of deference.

severeŏorŏpervasiveŏasŏtoŏinterfereŏwith:ŏŏTheŏavailability,ŏsale,ŏrental,ŏorŏu

seŏorŏ

enjoymentŏofŏaŏdwelling;ŏtheŏterms,ŏconditions,ŏorŏprivilegesŏofŏtheŏsaleŏor

ŏrental,ŏ

orŏtheŏprovisionŏorŏenjoymentŏofŏservicesŏorŏfacilitiesŏinŏconnectionŏt
herewith;ŏorŏ

theŏavailability,ŏterms,ŏorŏconditionsŏofŏaŏresidentialŏrealŏestateȎrelate
dŏ

transaction."ŏŏ24ŏC.F.R.ŏ§ŏ100.600(a)(2).ŏŏAsŏHUDŏexplainsŏinŏitsŏami
cusŏbriefŏinŏ

thisŏappeal,ŏtheŏRuleŏmerelyŏ"formalizesŏHUD'sŏlongstandingŏviewŏt
hat,ŏunderŏ

theŏFHA,ŏaŏhousingŏproviderȎmayŏbeŏheldŏliableŏinŏcertainŏcircumsta
ncesŏforŏ

failingŏtoŏaddressŏtenantȎonȎtenantŏharassment."ŏŏHUDŏAmicusŏBr.ŏ
2.ŏŏŏ

40

The͞Rule,͞HUD's͞other͞implementing͞regulations͞for͞§§͞3604(b)͞and͞3617,͞

and͞the͞views͞expressed͞in͞its͞amicus͞brief͞only͞reinforce͞our͞textual͞

interpretation,͞reflect͞the͞Act's͞broad͞scope͞and͞purpose,͞comport͞with͞the͞

holdings͞of͞several͞of͞our͞sister͞circuits,͞and͞further͞persuade͞us͞that͞a͞landlord͞

may͞be͞liable͞under͞the͞FHA͞for͞failing͞to͞intervene͞in͞tenant͞on͞tenant͞racial͞

harassment͞of͞which͞it͞knew͞or͞reasonably͞should͞have͞known͞and͞had͞the͞ 16 power͞to͞address.͞

HUD's͞regulations,͞as͞clarified͞by͞the͞Rule,͞specifically͞provide͞that͞a͞

landlord͞may͞be͞liable͞under͞the͞FHA͞for͞"[f]ailing͞to͞take͞prompt͞action͞to͞

correct͞and͞end͞a͞discriminatory͞housing͞practice͞by͞a͞third͞party"͞tenant͞where͞

41

the landlord "knew or should have known of the discriminatory conduct and

had the power to correct it." [8]  24 C.F.R. § 100.7(a)(1)(iii).  We distill from

the Rule,

---

[8]  The standard is also consistent with the Equal Employment Opportunity Commission's regulations under Title VII, which state that an employer may be liable for failing to address a hostile work environment that is created by a non employee.  See 29 C.F.R § 1604.11(e) ("An employer may also be responsible for the acts of non employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action."); see also Inclusive Cmtys. Project, 135 S. Ct. at 2516–19 (turning to Title VII and the Age Discrimination in Employment Act of 1967 for "essential background and instruction" in an FHA case).

42

andȭfromȭHUD'sȭownȭreadingȭofȭit,ȭthreeȭelementsȭthatȭaȭplaintiffȭ"mustȭ proveȭ

.ȭ.ȭ.ȭtoȭestablishȭaȭhousingȭprovider'sȭliabilityȭforȭthirdȮpartyȭharassment:ȭ ȭ(1)ȭ[t]heȭ

thirdȮpartyȭcreatedȭaȭhostileȭenvironmentȭforȭtheȭplaintiffȭ.ȭ.ȭ.ȭ;ȭ(2)ȭtheȭh ousingȭ

providerȭknewȭorȭshouldȭhaveȭknownȭaboutȭtheȭconductȭcreatingȭtheȭhost ileȭ

environment;"ȭandȭ(3)ȭnotwithstandingȭitsȭobligationȭunderȭtheȭFHAȭtoȭdo ȭso,ȭ

"theȭhousingȭproviderȭfailedȭtoȭtakeȭpromptȭactionȭtoȭcorrectȭandȭendȭthe ȭ

harassmentȭwhileȭhavingȭtheȭpowerȭtoȭdoȭso."ȭȭQuidȭProȭQuoȭandȭHostil eȭ

EnvironmentȭHarassment,ȭ81ȭFed.ȭReg.ȭatȭ63,069.ȭ

ȭ
        TheȭKPMȭDefendantsȭconjureȭaȭparadeȭofȭhorriblesȭthatȭwillȭresultȭf romȭ

theȭRule,ȭmostȭprominentlyȭthatȭtheȭFHAȭwillȭbecomeȭaȭ"vehicleȭforȭtheȭ

resolution of neighborhood disputes." Appellee's Br. 6. Their description is overblown. As mentioned above, and as relevant here, the Rule governs a landlord's obligation only in a discrete subset of disputes that involve discrimination "sufficiently severe or pervasive as to interfere with," among other things, the "use or enjoyment of a dwelling." 24 C.F.R. § 100.600(a)(2).

The KPM Defendants also argue that HUD's regulations rest on a fundamental misunderstanding of the landlord–tenant relationship. Unlike employer–employee relationships, they contend, no agency relationship exists between landlords and tenants, and landlords exert far less control over tenants than do employers over employees. We disagree with their argument. In devising 24 C.F.R. § 100.7(a), HUD demonstrated that it clearly understood the

44

agencyõprinciplesõatõissueõinõtheseõrelationships.õõAõlandlordõmayõbeõliableõunderõ

§õ100.7(a)(1)(ii)õonlyõwhenõitõknowsõorõshouldõhaveõknownõaboutõtheõmisconductõ

ofõanõemployeeõorõagentõbutõfailedõtoõintervene.õõSectionõ100.7(a)(1)(iii),õonõtheõ

otherõhand,õimposesõliabilityõonõaõlandlordõforõfailingõtoõinterveneõinõtheõconductõ

ofõaõthirdõpartyõonlyõwhereõanõobligationõtoõdoõsoõexistsõunderõtheõFHA,[9]õ

consistentõwithõtheõstatute'sõbroadõobjectiveõofõeliminatingõdiscriminationõinõ housing.õõõ õ

TheõKPMõDefendantsõalsoõargueõthatõHUD'sõregulationsõfailõtoõconsiderõaõ

---

[9]õWeõviewõitõasõuncontroversialõthatõunderõsomeõcircumstancesõaõlandlordõmayõbeõliableõ
toõaõtenantõforõconditionsõoccasionedõbyõaõthirdõpartyõthatõrenderõtheõhomeõ uninhabitableõorõotherwiseõinterfereõwithõtheõtenant'sõpermissibleõuseõofõtheõleasedõ

landlord's variable levels of control over tenants.  But 24 C.F.R. § 100.7(a)(1)(iii)

contemplates degrees of landlord control, by providing that "[t]he power [of the

landlord] to take prompt action to correct and end a discriminatory housing

practice by a third party depends upon the extent of the [landlord's] control or

any other legal responsibility the [landlord] may have with respect to the

conduct of such third party."  The Rule, in other words, clarifies that a landlord's

ability to control a given tenant is relevant to determining the landlord's liability.

This will be a fact dependent inquiry.  In some cases, a landlord may not have

enough control over its tenants to be held liable for failing to intervene.  In other

cases, it will.  Under the Rule, the landlord can be held liable only in

46

circumstances where the landlord had the power to take corrective action yet

---

property.  See Wetzel, 901 F.3d at 865 (noting that the obligation of a landlord to

provide its tenants a residence free from "'interfer[ence] with a permissible use of the

leased property by the tenant' . . . is breached even if a third party causes the interference, so long as the disturbance was 'performed on property in which the

landlord has an interest' and the 'conduct could be legally controlled by [the landlord]'"

(quoting Restatement (Second) of Property: Landlord & Tenant § 6.1 & cmt. d (Am. Law

Inst. 1977))).

failed to do so.  81 Fed. Reg. at 63,070–

71.  But the landlord escapes liability

under the FHA if the appropriate corrective action is "beyond the scope of

its power to act."[10]  Id. at 63,071.

---

[10]
 Whether the KPM Defendants had the "power to act" to take corrective action in this

case (arising from, say, their authority to evict or some other authority) as a matter of

federal common law or of State law is a question we leave to the District Court to

47

In determining the scope of a landlord's power, courts will of course

consider that housing providers ordinarily have a range of mechanisms at their

disposal to correct discriminatory tenant‑on‑tenant harassment, such as "issuing

and enforcing notices to quit, issuing threats of eviction and, if necessary,

enforcing evictions," all of which are "powerful tools" that may be "available to a

---

consider on remand.  But two further observations are appropriate.  First, New York

law appears to allow that a landlord may have a duty to prevent tenant‑on‑tenant

attacks if "the landlord had ability or a reasonable opportunity to control [the

aggressor]" and "the harm complained of was foreseeable."  Firpi v. NYCHA, 573

N.Y.S.2d 704, 705 (2d Dep't 1991) (quotation marks omitted).  Second, Francis's lease

appears to authorize the KPM Defendants to bar a tenant's access to common areas,

Joint App'x 51, as well as to evict a tenant who engages in criminal activity, "disturb[s]

. . . neighbors," or represents "an actual and imminent threat to other tenants," Joint App'x 55–56.

housing provider to control or remedy a tenant's illegal [discriminatory]

conduct." Id.; see Wetzel, 901 F.3d at 865 ("Control in the absolute sense . . . is

not required for liability. Liability attaches because a party has an arsenal of

incentives and sanctions . . . that can be applied to affect conduct but fails to use

them." (quotation marks omitted)). In acknowledging that landlords have these

remedial tools, we also recognize that the "duty . . . to furnish housing services in

a nondiscriminatory manner to the tenants" "resides primarily with [the]

landlord" and its agents—that is, "the owner or manager of the property."

Clifton Terrace Assocs., Ltd. v. United Techs. Corp., 929 F.2d 714, 719–20 (D.C.

49

Cir. 1991). But before even addressing the landlord's power to act, we "ask[]

whether [the management defendants] had actual knowledge of the severe

harassment [the tenant] was enduring and whether they were deliberately

indifferent to it." Wetzel, 901 F.3d at 864.

The KPM Defendants and our dissenting colleague further submit that the

Rule, as applied to this case, is impermissibly retroactive. See Dissenting Op.,

post, at 36–37. Although we would hold that Francis alleged a cognizable claim

under the FHA even in the absence of the Rule,[11] we nevertheless conclude that

---

[11] In other words, even if the Rule were retroactive, that would not present a problem here because we are applying the FHA itself (using the Rule as an aid in interpreting the FHA), not the Rule, to assess Francis's allegations in this case.

50

theõRuleõisõnotõretroactiveõbutõinterpretive.õõAnõinterpretiveõrule,õevenõone õthatõ

grapplesõwithõaõhardõissue,õ"merelyõclarif[ies]õanõexistingõstatuteõorõregulat ion,"õ

andõcreatesõnoõnewõrights.õõSweetõv.õSheahan,õ235õF.3dõ80,õ91õ(2dõCir.õ200

0)õ

(quotationõmarksõomitted).õõItõ"doesõnotõchangeõtheõlaw,õbutõ[only]õrestate

sõwhatõ

theõlawõaccordingõtoõtheõagencyõisõandõhasõalwaysõbeen:õõItõisõnoõmoreõre

troactiveõ

inõitsõoperationõthanõisõaõjudicialõdeterminationõconstruingõandõapplyingõaõ

statuteõ

toõaõcaseõinõhand."õõOrrõv.õHawk,õ156õF.3dõ651,õ654õ(6thõCir.õ1998)õ (quotationõ

marksõomitted).õõByõcontrast,õaõlegislativeõruleõ"change[s]õtheõlaw"õa ndõ

"impose[s]õaõnewõduty,õcreate[s]õaõnewõobligation,õtake[s]õawayõaõrig htõorõ

51

attache[s] a new disability to a past occurrence." *Blake v. Carbone*, 489 F.3d 88,

98 (2d Cir. 2007). As such, legislative rules are potentially retroactive but apply

retroactively only in limited circumstances. *See Sweet*, 235 F.3d at 88–90.

In this case, the Rule promulgated by HUD purports on its face to be an

interpretive rule. It "codifies HUD's longstanding view that a property owner

. . . may be held liable for failing to take corrective action within its power in

response to tenant̄on̄tenant harassment of which the owner knew or should

have known." 81 Fed. Reg. at 63,070. The Rule "does not add any new forms of

liability under the [FHA] or create obligations that do not otherwise exist." *Id.* at

63,068. HUD's amicus brief reinforces the interpretive nature of the Rule. For

example, it asserts that the Rule merely "formalizes HUD's longstanding view

that, under the FHA, a housing provider may be held liable in certain

circumstances for failing to address tenant‑on‑tenant harassment."

HUD Amicus

Br. 2. HUD also explains that the Rule "does not identify any new

forms of

liability under the FHA." Id. at 4. Having flatly rejected any notion of FHA

liability premised on tenant‑on‑tenant harassment, the dissent understandably

contests this explanation. But we see no compelling reason to doubt HUD's

assertion that the Rule reflects a longstanding view held by the agency.

We accept, too, HUD's characterization of its own regulation as

53

interpretive, as the Rule expresses the agency's view that the claim at issue in this

case has long been cognizable under the FHA.  See Huberman v. Perales, 884

F.2d 62, 68 (2d Cir. 1989) ("By declaring the implementing regulations

interpretive, the [agency] expressed [its] judgment that . . . [its] regulations did

not make . . . a change, retroactive or otherwise.").  As discussed, federal courts

have consistently considered hostile housing environments a violation of the

FHA on its own terms.  Because there was an adequate legislative basis for

hostile housing environment claims under the FHA independently of the Rule,

see Sweet, 235 F.3d at 91, and because HUD has never suggested a contrary

position, we "afford more weight to the agency's . . . description" of it as

54

interpretive.  *Mejia‑Ruiz v. INS*, 51 F.3d 358, 365 (2d Cir. 1995).

Lastly, in urging that we affirm the District Court's dismissal of Francis's FHA claims, the KPM Defendants argue that even if a hostile housing environment claim were cognizable under the FHA, Francis failed to allege that

they intentionally discriminated against him.  We have several problems with this argument.  First, although both our dissenting colleague, *see* Dissenting Op.,

*post*, at 11–12, and the KPM Defendants contend that intentional discrimination

is an element of an FHA violation, we have never gone quite that far.  To the

contrary, we have held that, "[t]o establish a violation of the FHA, a plaintiff

need not show discriminatory intent but need only prove that the challenged

55

practice has a discriminatory effect." Davis v. New York City Hous. Auth., 278

F.3d 64, 81 (2d Cir. 2002). This discriminatory "effects test" extends to "suits

brought to redress discrimination against individual plaintiffs," Robinson v. 12

Lofts Realty, Inc., 610 F.2d 1032, 1038 (2d Cir. 1979); see id. at 1036, including

suits filed under § 3604(b), see United States v. Starrett City Assocs., 840 F.2d

1096, 1099–1101 (2d Cir. 1988). In recognizing such a test, we are joined by the

Fifth Circuit, which has long held that a violation of § 3604(b) "may be

established not only by proof of discriminatory intent, but also by a showing of significant discriminatory effect." Simms v. First Gibraltar Bank, 83 F.3d 1546,

1555 (5th Cir. 1996).

Second, the KPM Defendants' argument misunderstands the difference between the harassing acts of a landlord or its agent and the harassing acts of a third party over which the landlord has a real measure of control. Take, for example, the somewhat analogous context involving a hostile work environment claim under Title VII. Faced with such a claim, we have not required a showing of direct intentional discrimination by the employer before imposing liability. Instead, we have premised an employer's liability on the employer's actual or constructive knowledge of the non-supervisory employee's harassment and the employer's subsequent failure to act. See Duch v. Jakubek, 588 F.3d 757, 765–66 (2d Cir. 2009). Insofar as the District Court required Francis to allege that the

57

KPM Defendants' conduct was the result of direct, intentional racial discrimination, we conclude that this was error.

Finally, even assuming that such a requirement exists, we think that Francis's complaint, viewed in the light most favorable to Francis, plausibly and adequately alleges that the KPM Defendants engaged in intentional racial discrimination. Specifically, it alleges that the KPM Defendants "discriminat[ed] against [Francis] by tolerating and/or facilitating a hostile environment," even though the defendants had authority to "counsel, discipline, or evict [Endres] due to his continued harassment of [Francis]," and also had "intervened against other tenants at Kings Park Manor regarding non‑race‑related violations of their leases or of the law." Joint App'x 19–20. In other words, Francis has alleged that the KPM Defendants had actual knowledge of Endres's criminal racial

58

harassmentőofőFrancisőbut,őbecauseőitőinvolvedőrace,őintentionallyőallowedőit
őtoő

continueőevenőthoughőtheyőhadőtheőpowerőtoőendőit.őőSeeőWetzel,ő901őF.3d
őatő864.őő

Acceptingőtheseőallegationsőasőtrue,őtheőKPMőDefendantső"subjectedő[Franci
s]őtoő

conductőthatőtheőFHAőforbids."őőId.őőItőmayőturnőoutőthatőtheőKPMőDefen
dantső

triedőbutőfailedőtoőrespond.őőOrőitőmayőunfoldőthatőtheyőwereőpowerlessőt
oőevictőorő

otherwiseődealőwithőEndres—
inőwhichőcaseőnotőevenőaődiscriminatoryőeffectsőtestő

couldősaveőFrancis'sőcase.[12]őőButőFrancisőisőentitledőtoődiscoveryőregardingő
atőleastő

---

[12] őTheőKPMőDefendantsőalsoőargueőthatőevenőifőtheőRuleőappliesőhere,őFrancisőhaső
failedő
toőestablishőthatőtheőallegedőincidentsőbetweenőhimőandőEndresőwereőbecauseőofő
hisőrace.őő
ViewingőtheőallegationsőinőtheőcomplaintőinőtheőlightőmostőfavorableőtoőFrancis,őit
őisőhardő
forőusőtoőseeőhowőthisőcouldőbeőso,őbutőinőanyőeventőweőleaveőthatőquestionőtoő
beőresolvedő

theŏlevelŏofŏcontrolŏtheŏKPMŏDefendantsŏactuallyŏexercisedŏoverŏtenantsŏandŏ

whetherŏtheyŏhadŏtheŏpowerŏtoŏactŏtoŏredressŏEndres'sŏabuse.ŏŏŏ Forŏtheseŏreasons,ŏweŏvacateŏtheŏDistrictŏCourt'sŏdismissalŏofŏFrancis'sŏ

FHAŏclaimsŏandŏremandŏforŏfurtherŏproceedingsŏrelatingŏtoŏthoseŏclaims.ŏ

3. TheŏCivilŏRightsŏActŏofŏ1866ŏ

ŏ

TheŏDistrictŏCourtŏdismissedŏFrancis'sŏclaimsŏunderŏtheŏCivilŏRightsŏ Actŏofŏ

1866,ŏ42ŏU.S.C.ŏ§§ŏ1981ŏandŏ1982,ŏbecauseŏheŏfailedŏtoŏallegeŏthatŏtheŏKPMŏ

Defendantsŏactedŏwithŏracialŏanimus,ŏratherŏthanŏdeliberateŏindifference.ŏŏInŏanŏ

actionŏunderŏ§§ŏ1981ŏorŏ1982,ŏaŏplaintiffŏmustŏallegeŏthreeŏelements:ŏŏFirst,ŏthatŏtheŏ

plaintiffŏisŏaŏmemberŏofŏaŏracialŏminority;ŏsecond,ŏthatŏtheŏdefendantŏintendedŏtoŏ

byŏtheŏDistrictŏCourtŏonŏremandŏwithŏtheŏbenefitŏofŏbothŏHUD'sŏRuleŏandŏthisŏopinion.ŏŏŏ

discriminate based on the plaintiff's race; and third, that the discrimination

concerned one of the enumerated statutory activities (here, to make and enforce

contracts (§ 1981) and to lease property (§ 1982)).  Mian v. Donaldson, Lufkin &

Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993).  In this case, only the second

factor is in dispute.  The KPM Defendants maintain that Francis needed to allege

that they intended to discriminate on the basis of race, while Francis claims that

it is enough to allege their deliberate indifference to Endres's discri

minatory

conduct.  We agree with Francis.  A defendant's deliberate indifference to racial

discrimination can violate § 1981,[13] so long as the indifference "was such that the defendant intended the discrimination to occur." Gant ex rel. Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 141 (2d Cir. 1999). As we explained in

connection with Francis's FHA claim, Francis has plausibly and adequately

alleged that the KPM Defendants acted with at least deliberate indifference that

facilitated Endres's racial harassment. We therefore vacate the District Court's

dismissal of Francis's §§ 1981 and 1982 claims and remand for further

proceedings relating to those claims.

4. State Law Claims

---

[13] Although we have not previously addressed the issue, we see no reason to distinguish § 1981 from § 1982 in this regard. We therefore hold that a defendant's deliberate indifference to racial discrimination can also violate § 1982 under similar circumstances.

Finally, Francis challenges the District Court's dismissal of his claims

under NYSHRL §§ 296(5) and 296(6), as well as its dismissal of his claim for

negligent infliction of emotional distress under New York State law.  We address

each challenge in turn.

a. New York Executive Law

Section 296(5) of the NYSHRL, like the FHA, prohibits housing

discrimination and provides in relevant part:  "It shall be an unlawful

discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing

agent . . . [t]o discriminate against any person because of race . . . in the terms,

conditionsŏorŏprivilegesŏofŏtheŏsale,ŏrentalŏorŏleaseŏofŏanyŏsuch

ŏhousingŏ

accommodationŏorŏinŏtheŏfurnishingŏofŏfacilitiesŏorŏservicesŏinŏconnectionŏ

therewith."ŏŏN.Y.ŏExec.ŏLawŏ§ŏ296(5)(a)(2);ŏseeŏalsoŏid.ŏ§ŏ296(6)ŏ(prohibiting ŏaidingŏ

andŏabettingŏ"anyŏofŏtheŏactsŏforbiddenŏunderŏthisŏarticle").ŏŏStatingŏaŏhousingŏ

discriminationŏclaimŏunderŏNewŏYorkŏStateŏlawŏisŏsubstantiallyŏsimilarŏtoŏstatingŏ

aŏhousingŏdiscriminationŏclaimŏunderŏtheŏFHA.ŏŏSeeŏStalkerŏv.ŏStewartŏTenantsŏ

Corp.,ŏ940ŏN.Y.S.2dŏ600,ŏ602–03ŏ(1stŏDep'tŏ2012)ŏ(notingŏtheŏ"substantialŏidentityŏ

betweenŏtheŏlanguageŏandŏpurposesŏofŏExecutiveŏLawŏ§ŏ296(5)ŏandŏthoseŏofŏtheŏ

federalŏFairŏHousingŏAct").ŏŏIndeed,ŏ"[c]laimsŏunderŏtheŏFHAŏandŏ[§]ŏ296ŏareŏ

evaluatedŏunderŏtheŏsameŏframework."ŏŏOlsenŏv.ŏStarkŏHomes,ŏInc.,ŏ759ŏF.3dŏ140,ŏ

153 (2d Cir. 2014) (quotation marks omitted).  The District Court understood this

point, concluding that Francis's "claim under [§] 296(6) fail[ed] as a matter of

law" for the same reasons that his FHA claims failed.  <u>Francis v. Kings Park</u>

<u>Manor, Inc.,</u> 91 F. Supp. 3d 420, 434 (E.D.N.Y. 2015).

Because we conclude that the FHA must proceed rather than fail, we

vacate the District Court's dismissal of Francis's claims under § 296 and re

mand  for further proceedings.

b. <u>Negligent Infliction of Emotional Distress</u>

The District Court dismissed Francis's claim on the ground that a landlord

owes no common law duty of care to prevent one tenant from

harassing another 7

tenant.  But as we explained above, the KPM Defendants may

have had a duty

65

arising from the FHA itself.  Nevertheless, we affirm for the separate reason that

any injury for negligent infliction of emotional distress "is compensable only

when [it is] a direct, rather than a consequential, result of the breach" of a duty

that a defendant owes to a plaintiff.[14]  Kennedy v. McKesson Co., 58 N.Y.2d 500,

506 (1983).  Here, as alleged in the complaint and when viewed in the light most

favorable to Francis, the KPM Defendants' breach of the duty they may have

owed Francis did not directly result in Francis's emotional distress, which Endres

directly caused with his continued campaign of racial harassment.

---

[14]  Under New York law, a claim for negligent infliction of emotional distress requires at

least a causal connection between the conduct and the injury.  See Mortise v. United

States, 102 F.3d 693, 696 (2d Cir. 1996); Jason v. Krey, 875 N.Y.S.2d 194, 195 (2d

Dep't 2009)

CONCLUSION

We have considered the parties' remaining arguments and conclude that they are either without merit or, as with the KPM Defendants' arguments based on the First, Fourth, and Fourteenth Amendments, forfeited. For the reasons set forth above, we **VACATE** the District Court's dismissal of Francis's claims under the FHA, §§ 1981 and 1982, and NYSHRL § 296, and **REMAND** for further proceedings consistent with this opinion. We **AFFIRM** the District Court's judgment in all other respects.

67

DEBRA ANN LIVINGSTON, *Circuit Judge*, dissenting:

This complaint involves the resident of a New York apartment complex who allegedly subjected his neighbor to racially motivated harassment on about a dozen occasions before moving away when the landlord declined to renew his lease. But the case is not about the heinous conduct of horrible neighbors, nor whether to condone it. Instead, the question here is whether this Court properly construes Title VIII of the Civil Rights Act of 1968, referred to as the Fair Housing Act (the "FHA"), to impose a duty on *landlords* to monitor and remediate the behavior of one's neighbors, on pain of incurring liability for damages and litigation costs, including attorney's fees. The majority does not properly construe the FHA to impose such third‑party liability for the conduct of neighbors. Instead,

1

it steers the FHA into "unchartered territory," *see Wetzel v. Glen St. Andrew Living Cmty., LLC,* 901 F.3d 856, 864 (7th Cir. 2018), where courts improbably discover new causes of action in half-century-old provisions, and heedless of the deleterious consequences for parties, courts, and the housing market.

The majority justifies its novel and expansive theory of landlord liability for tenant-on-tenant harassment by invoking the "broad language" of the FHA. But I can find no support for the majority's decision in the FHA's text, our precedent, or the background tort principles that informed Congress at the time the FHA was enacted. Accordingly, I respectfully dissent.

## I

1. *Textual Analysis*

Although the trajectory of its analysis somewhat obscures the breadth of its

2

holding, the majority today tackles the question whether the FHA imposes liability on landlords for "failing to take prompt action to address a racially hostile housing environment created by one tenant targeting another," regardless of the landlord's lack of discriminatory intent.  Maj. Op. at 3.  In concluding that the FHA *does* impose such liability, the majority purports to "start with the statutory text."  Maj. Op. at 10.  But make no mistake.  This is textual analysis in name only, performed en route to fashioning a new cause of action from a fundamentally flawed analogy to Title VII and from "great," Maj. Op. at 19, if unjustified, deference to pronouncements by the Department of Housing and Urban Development ("HUD") in connection with a rule that HUD promulgated *after* this litigation

3

began. [15] The majority acknowledges that the FHA "nowhere explicitly endorses

landlord liability for tenant‑on‑tenant harassment," but is unconcerned by this

lack of statutory support because "we have never required every last detail

of a legislative scheme to be spelled out in a statute itself." Maj.

Op. at 18–19.

Respectfully, however, the FHA specifies *nothing* as to the elements of the cause of

action recognized today. And the provisions on which the majority *does* rely are most reasonably read to exclude it.

_____

[15] Notably, HUD's new rule, *Quid Pro Quo and Hostile Environment Harassment and
Liability for Discriminatory Housing Practices Under the Fair Housing Act*, 81 Fed. Reg. 63,054, 63,069 (Sept. 14, 2016) ("HUD Rule"), which is discussed herein, has been

Two provisions of the FHA are at issue here.  Section 3604(b) makes it unlawful "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).  Section 3617 makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by [§ 3604]."  *Id.* at § 3617.  At the start, and on the face of each provision, the statutory language requires a plaintiff to prove discrimination or related conduct *by the defendant* and would not appear to impose

an ongoing duty to *prevent* discrimination by others.  Thus, typical violations of

considered by only one other circuit court, which deemed it insufficiently supported by reasoned analysis to permit any reliance on it.  *See Wetzel*, 901 F.3d at 866.  § 3604(b) by landlords have included such matters as "showing a member of a protected class fewer apartments, quoting higher rents," and "requiring [unnecessary] applications and credit checks."  *Francis v. Kings Park Manor, Inc.*, 91 F. Supp. 3d 420, 432 (E.D.N.Y. 2015) (quoting *Fair Hous. Justice Ctr. v. Broadway Crescent Realty, Inc.*, No. 10 Civ. 34 (CM), 2011 WL 856095, at *6 (S.D.N.Y. Mar. 9, 2011)).  A recent claim brought under § 3617 in this Circuit included allegations that a defendant landlord refused to offer basic services to his tenants and locked them out of their apartment because of their race.  *See Khodeir v. Sayyed*, N

6

o. 15 cv 8763 (DAB), 2016 WL 5817003, at *1–2, 4 (S.D.N.Y. Sept. 28, 2016). As the majority concedes, neither provision facially contemplates liability for failing to redress tenant‑on‑tenant harassment. *See* Maj. Op. at 18.

Indeed, even to reach the question before us today, the majority must first resolve an antecedent question long left unanswered in this Circuit: namely, whether § 3604(b) reaches *any* conduct occurring after the initial sale or rental of a residence, let alone a landlord's alleged failure to prevent or remediate the conduct of tenants commencing years after a plaintiff's lease was signed. *See Francis*, 91 F. Supp. 3d at 424 (noting that the plaintiff first heard his neighbor using racial and ethnic slurs almost two years into the leasehold).

Again at the start, and as Judge Posner noted some years ago when analyzing the provisions at issue here, "[t]he Fair Housing Act contains no

7

hint

either in its language or its legislative history of a concern with anything but *access*

to housing." *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n,* 3

88 F.3d

327, 329 (7th Cir. 2004). Because the FHA's central focus was "the widespr

ead

practice" in 1968 "of refusing to sell or rent homes in desirable residential

areas to

members of minority groups," post‑acquisition problems including "*harassin*

*g . . .*

*neighbors*" would "tend not to arise until the Act was enacted and enforced

." *Id.* at 328–

29 (emphasis added). Unsurprisingly, then, nothing in the FHA "suggest[s]

that Congress was trying to solve that future problem, an endeavor that w

ould have required careful drafting in order to make sure that

quarrels between

8

neighbors did not become a routine basis for federal litigation." *Id.* at 329.

The majority reassures that "there is no circuit split on whether § 3604 reaches post‑acquisition conduct." Maj. Op. at 15. In doing so, however, the majority obfuscates the deep division that *does* exist as to "the *scope or degree* of the provision's [post‑acquisition] reach." Maj. Op. at 15 (emphasis added). Judge Posner himself allowed that § 3604(b) "might be stretched far enough [in the post‑acquisition context] to reach a case of 'constructive eviction.'" *Halprin*, 388 F. 3d at 329.[16]  The majority, however, goes much further, aligning itself with the N

---

[16]
The Fifth Circuit cited the example of one such claim in *Cox v. City of Dallas*, 430 F.3d 734 (5th Cir. 2005), noting that if a landlord "refused to continue renting to a tenant because the tenant entertained black guests," such conduct, amounting to a constructive eviction, would constitute discrimination in the "terms, conditions, or privileges of . . . ren

in th

Circuit's position that the FHA reaches any "conduct," including a defendant's

*failure* to act, "that . . . 'constitute[s] discrimination in the enjoyment of residence

in a dwelling or in the provision of services associated with that dwelling' after

acquisition." Maj. Op. at 17 (quoting *Comm. Concerning Cmty. Improvement*

*v. City*

*of Modesto*, 583 F.3d 690, 714 (9th Cir. 2009)). In other words,

§ 3604(b), in the majority's articulation, provides "a blanket 'privilege' to be

free from all discrimination from any source" when such

discrimination affects

residential enjoyment. *Bloch v. Frischholz*, 587 F.3d 771, 780 (7th Cir. 2009)

(rejecting

any such "blanket privilege"). But on analysis, this is simply not a reason

---

tal," cognizable under § 3604(b), *id.* at 746–
47 (discussing *Woods Drake v. Lundy*, 667 F.2d 1198 (5th Cir. 1982)).

10

able interpretation of the provision's reach.

By way of reminder, § 3604(b) makes it unlawful to discriminate "in the terms, conditions, or privileges of sale or rental of a dwelling." As the majority notes, this language partially "tracks the language of Title VII." Maj. Op. at 12.

But unlike Title VII, which provides a cause of action against specified *employers* who discriminate, the FHA does not identify a class of potential defendants who can be charged— so that not only landlords, but also public housing authorities, cooperative boards, block associations, real estate agents, or, indeed, *anyone*, is potentially liable.

With this limitless list of potential defendants in mind, the full import of the majority's approach becomes clear. Agreeing with the Ninth Circuit, the majority

11

construes the phrase "privileges of sale or rental" in § 3604(b) to encompass claims

regarding *any* "'services or facilities perceived to be wanting after the owner or tenant has acquired possession of the dwelling'"—regardless whether such services or facilities have any connection with the rental or sale.  Maj. Op. at 11 (quoting *Modesto*, 583 F.3d at 713).  In *Modesto*, on which the majority relies, this approach produced the holding that a plaintiff may pursue a § 3604(b) claim alleging discrimination by a local government in the provision of law enforcement protection to homeowners or renters, notwithstanding the lack of any connection to a residence's sale or lease.  *See Modesto*, 583 F.3d at 713–15.

But § 3604(b) simply does not have the vague and expansive scope that the majority's (and the Ninth Circuit's) interpretation affords it.  The FHA expressly defines "to rent" as "to lease, to sublease, to let and otherwise

12

to grant for a consideration the right to occupy the premises not owned by the occupant." 42 U.S.C. § 3602(e). Section 3604(b)'s prohibition on discrimination in the "terms, conditions, or privileges of . . . rental" is thus most reasonably read to refer to discrimination in the terms, conditions, and privileges of the *rental arrangement* — a construction that has *some* post‑acquisition application, but that still ties potential liability to discrimination regarding the commitments made and benefits afforded in connection with the rental itself.

To be clear, § 3604(b) prohibits discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling, *or* in the provision of services or facilities in connection therewith . . . ." (emphasis added). But this doesn't change

13

the

analysis.  The Fifth Circuit has recognized as much, holding that the prohibition on discrimination in "the provision of services or facilities in connection therewith" applies specifically to "*the sale or rental* of [the] dwelling," rather than to the dwelling generally.  *Cox v. City of Dallas,* 430 F.3d 734, 745 (5th Cir. 2005) (emphasis added) (holding that municipality's alleged failure to prevent dumping near the plaintiffs' homes was *not* actionable under § 3604(b) because the allegedly discriminatory enforcement of zoning laws was not "connected" to the sale or rental of the dwelling).  The Fifth Circuit directly addressed § 3604(b)'s text, noting that its interpretation of the language was "grammatically superior" in requiring

14

a relationship between the services or facilities at issue and a sale or rental

. *Id.*

The majority fails to recognize that the same limiting principle holds true

for the word "privileges" in § 3604(b)'s prohibition against discrimination in the

"terms, conditions, or privileges of sale or rental." The majority "agree[s] with the

analysis of the Ninth Circuit" that "privileges" connotes "continuing rights," so as

to encompass post‑acquisition claims "regarding services or facilities perceived to

be wanting after the owner or tenant has acquired possession of the dwelling."

Maj. Op. at 11 (quoting *Modesto*, 583 F.3d at 713). But "privileges of sale or rental,"

like "terms and conditions," requires a connection with the sale or rental, so

that not *all* impairments of a person's post‑acquisition enjoyment of

15

residence are

sufficiently connected to the sale or rental to trigger § 3604(b).  As the Fifth Circuit

explained in requiring such a connection, the argument to the contrary, based

solely on reading the word "privileges" in isolation from the statute as a

whole, is notably "unconvincing."  *Cox*, 430 F.3d at 745 n.32.[17]

The majority evades this textually required connection for a simple reason:

the complaint here contains not a word to suggest that Kings Park Manor,

Inc., the landlord in this case, undertook any obligation in its rental

arrangement with Donahue Francis, the tenant, for monitoring the

---

[17] Judge Higginbotham, the author of *Cox*, also noted that the approach to § 3604(b)'s

interpretation endorsed by the majority today would appear to have the unlikely effect

of affording a § 3604(b) cause of action for alleged discrimination by any party, so long as it could be said to "impact[ ] property values."  *Cox*, 430 F.3d at 746.  But as he suggested, that broad reach cannot reasonably be ascribed to this provision.

16

conduct of other tenants and remediating their behavior. This is not a usual "term, condition, or privilege" of a lease. But after today, that no longer matters. The majority joins the Ninth Circuit in eliminating any required connection between the "terms, conditions, or privileges of sale or rental" and the sale or rental itself, placing this Court on the wrong side of the significant circuit split as to § 3604's post-acquisition reach.

Nor do the majority's textual problems end with § 3604(b). Turning our attention to § 3617, I gather that it is the majority's position that a landlord's failure to redress tenant-on-tenant harassment qualifies as an "interference" with the enjoyment of a "right . . . protected by" § 3604(b). [18] Even assuming that

---

[18] By way of reminder, § 3617 provides in relevant part that it is unlawful "to coerce,

§ 3604(b)

were otherwise applicable (and it is not), the majority's position constitutes

an untenable interpretation of the word "interfere," which

contemporaneous

dictionaries define as "to check, hamper; hinder; disturb; intervene; intermeddle; interpose; to enter into or take part in, the concerns of others."

*Black's Law*

*Dictionary* 951 (4th ed. 1968); *see also Revock v. Cowpet Bay W. Condo. Ass'n,*

853 F.3d

96, 113 (3d Cir. 2017) (defining "interfering" for the purposes of § 3617 as

"the act

of meddling in or hampering an activity or process" (quoting *Walker v. City of*

---

intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604."

18

*Lakewood,* 272 F.3d 1114, 1129 (9th Cir. 2001) (quoting *Webster's Third New Int'l Dictionary* 1178 (14th ed. 1961)))).  Indeed, one would think that § 3617's *prohibition* on intimidation, coercion, and other inappropriate intermeddling in others' enjoyment of rights protected by § 3604 is a particularly unlikely place to look for a *duty to intervene* to address one tenant's harassment by another.

Finally, I disagree with the majority's evisceration of any discriminatory intent requirement from these provisions of the FHA.  *See* Maj. Op. at 29 ("Insofar as the District Court required Francis to allege that the KPM Defendants' conduct was the result of direct, intentional racial discrimination, we conclude that that his was error.").  As the court below noted, "fairly read, the text of both Section 3604(b)

19

and Section 3617 of the FHA . . . require intentional discrimination on the part of a Defendant." *Francis*, 91 F. Supp. 3d at 433. Section 3604(b) prohibits "discriminat[ion] . . . *because of*" a protected characteristic. (emphasis added). As the Supreme Court has consistently reminded us, a person acts "because of" something if that something "was the 'reason' that the [person] decided to act."

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013); *see also Alexander v. Sandoval*, 532 U.S. 275, 278–80 (2001) (holding that it was ''beyond dispute'' that statute banning discrimination "on the ground of race" prohibited "only intentional discrimination''). Similarly, § 3617, making it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of,

or on account of his having exercised or enjoyed . . . any right granted [under the FHA]," demands a showing that "the defendant[] coerced, threatened,

20

intimidated, or interfered with the plaintiff *on account* of her protected activity under the FHA." *Bloch,* 587 F.3d at 783 (emphasis added).

The majority decides to the contrary, but it can do so only by ignoring this clear statutory text and all or part of past decisions of this Court and others. *See, e.g., Austin v. Town of Farmington,* 826 F.3d 622, 630 (2d Cir. 2016) (noting that a retaliation claim brought under § 3617 requires "a showing of a particular state of mind, *i.e.,* a retaliatory motive"); *Wetzel,* 901 F.3d at 868 (reaffirming that an interference claim brought under § 3617 requires a showing of intentional discrimination); *HDC, LLC v. City of Ann Arbor,* 675 F.3d 608, 613 (6th Cir. 2012) ("In this Circuit, a plaintiff is required to demonstrate 'discriminatory animus' to prevail on an interference claim under [§ 3617 of] the Act."); *Sofarelli v. Pinellas*

21

*Cty.,* 931 F.2d 718, 723 (11th Cir. 1991) (holding that to recover under §§ 3604(b) and 3617 a plaintiff "must establish that" the defendant "acted with racial animus").[5]    Moreover, the smattering of Second Circuit cases on which the majority *does* rely predates the Supreme Court's recent and significant decision on this subject in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.,* 135 S. Ct. 2507 (2015) ("*ICP*"), and is accordingly of limited precedential value (to whatever degree it can even be said to support the majority's position).[6]

---

[5] *See also Eureka V LLC v. Town of Ridgefield,* No. 3:02CV00356 (DJS), 2011 WL 13228231, at
*15 (D. Conn. Feb. 4, 2011) ("Eureka's § 3617 claim fails because Eureka is unable to show
one of the critical elements of such a claim: discriminatory intent."), *aff'd,* 535 F. App'x 41
(2d Cir. 2013).

[6] HUD purports to rely on *ICP* itself to support its argument that "[a] plaintiff does not
need to prove a landlord's discriminatory intent or motive to establish liability under the
FHA for failing to intervene in tenant‐on‐tenant racial harassment." HUD Amicus Br. 14–

22

ŏ

15.ŏŏButŏtheŏmajorityŏwiselyŏavoidsŏHUD'sŏargumentŏtoŏthisŏeffectŏbecauseŏ*ICP*ŏinstead

demandsŏthatŏcircuitsŏ*reevaluate*ŏtheirŏjurisprudenceŏcognizingŏdisparateŏimpactŏclaimsŏ underŏ theŏ FHA.ŏ ŏ *ICP*ŏ holdsŏ thatŏ §ŏ 3604*(a)*ŏ (notŏ (b))ŏ permitsŏ disparateŏ impactŏ claims.ŏŏ
Notably,ŏhowever,ŏtheŏCourtŏbasedŏthisŏconclusionŏonŏtheŏ"otherwiseŏmakeŏunavailable"ŏ
languageŏ ofŏ thatŏ subsection—languageŏ "ofŏ centralŏ importance"ŏ notŏ toŏ beŏ foundŏ inŏŏ §§ŏ3604(b)ŏandŏ3617.ŏŏ*ICP*,ŏ135ŏS.ŏCt.ŏatŏ2518.ŏŏŏŏ

Perhapsŏ recognizingŏ theŏ precariousnessŏ ofŏ thatŏ position,ŏ theŏ majorityŏ

asserts,ŏfinally,ŏthatŏevenŏassumingŏaŏrequirementŏofŏintentionalŏdiscriminati on,ŏ

Francisŏhas,ŏinŏanyŏevent,ŏadequatelyŏallegedŏthatŏtheŏKPMŏDefendantsŏeng agedŏinŏ

intentionalŏracialŏdiscrimination.ŏŏMaj.ŏOp.ŏatŏ29.ŏŏThisŏisŏaŏstartlingŏconclu sion,ŏforŏ

FrancisŏhimselfŏdoesŏnotŏargueŏthatŏtheŏKPMŏDefendantsŏareŏliableŏbecause ŏtheyŏ

actedŏwithŏracialŏanimus,ŏbutŏinsteadŏarguesŏprincipallyŏthatŏthisŏCourtŏsho uldŏ imposeŏ liabilityŏ underŏ theŏ FHAŏ forŏ theŏ "*negligent*ŏ failureŏ toŏ remedyŏ aŏ

23ŏ

discriminatory [housing] environment." Br. Pl Appellant at 14 (emphasis added).[19]

Left to its own devices to find in the complaint a plausible basis for inferring intentional discrimination, the majority latches onto Francis's conclusory statement that the KPM Defendants "have intervened against other tenants at Kings Park Manor regarding non race related violations of their leases or of the law." Joint App'x at 20. But this amounts to the claim that because the KPM Defendants did *something* with regard to *some* incident involving *some* tenant at *some* past point, the alleged failure to intervene here must have been based on

---

[19] Thus, as to the preceding paragraphs, even if the majority were correct that disparate impact claims are available under §§ 3604(b) and 3617, this would still not save Francis's suit because he brings a disparate treatment claim, not one of disparate impact. *See ICP*, 135 S. Ct. at 2513 (contrasting the two theories of liability).

racial animus.  Despite the majority's valiant efforts, this "naked assertion"
cannot

plausibly support an inference of discriminatory intent.  *See Ashcroft v. Iqbal*
, 556
U.S. 662, 676–
78 (2007) (noting that a complaint fails to state a claim "if it tenders
naked assertion[s] devoid of further factual enhancement," and that
pleading "purposeful discrimination requires more than . . . intent as
awareness of consequences" (internal quotation marks omitted)).

In essence, the majority's statutory analysis is not textual at all, but fl
oats on the statute's "broad and inclusive compass," Maj. Op. at 10
(quoting *City of*

*Edmonds v. Oxford House,* 514 U.S. 725, 731 (1995)), as supplemented by an
analogy

to Title VII and by deference to the aforementioned HUD Rule.  The Title
VII
analogy and the HUD Rule are dealt with below.  As for the FHA's broad
purpose,

recognition of a statute's purpose, however salutary, does not give us a "ro

25

ving

license . . . to disregard clear language simply on the view that . . . Congress must

have intended something broader." *Michigan v. Bay Mills Indian Cmty.*, 572

U.S.

782, 794 (2014) (internal quotation marks omitted). And this is particularly

true in

construing the FHA, given that the Supreme Court has already instructed t

hat the

FHA's "overriding societal priority" of eradicating discrimination in housing

does

not mean that Congress abandoned traditional tort liability rules to further

this goal. *Meyer v. Holley*, 537 U.S. 280, 290–

91 (2003). In sum, because "no legislation

pursues its purposes at all costs," *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*,

138 S.

Ct. 1061, 1073 (2018) (quoting *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 6

37 (2012)), the debate over the FHA's meaning must take place

26

primarily on the terrain of statutory text—

where the majority's expansive holding finds no support.  2. *Precedent*

Nor is support for the majority's newfound theory of liability to be found in

the precedent of our Circuit and our sister circuits.  If the claim at issue here were

really discernible from the statute's text, we would expect a substantial body of

decisions grappling with the question of landlord liability for tenant-on-tenant

harassment.  *See* Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 80–

81 (2012) ("New rights cannot be suddenly 'discovered' years later in a

document, unless everyone affected by the document had somehow

overlooked an applicable provision that was there all along.").  But as the court

below noted, the case law on this question is remarkably "sparse."  *Francis*,

91 F.

Supp. 3d at 429.  Surveying the first thirty years following Title VIII's enactment, I can find no case from any circuit or district court cognizing the claim recognized by the majority today; only a handful consider it in the following two decades.[20]

Even "sparse," it appears, is an understatement.

Previously, the closest cases on point recognized "hostile housing environment claims."  Under this theory of liability, plaintiffs have been pe

---

[20] While at least one district court decision, in more recent years, can be read to support such a claim, *see Fahnbulleh v. GFZ Realty, LLC*, 795 F. Supp. 2d 360, 364 (D. Md. 2011) ("[T]here is no categorical rule that prevents FHA recovery for hostile housing environment sexual harassment based on tenant on tenant harassment."), a number of courts have held to the contrary, *see, e.g., Lawrence v. Courtyards at Deerwood Ass'n, Inc.,* 318 F. Supp. 2d 1133, 1144–45 (S.D. Fla. 2004) (concluding that "[a] failure to act does not rise to the level of the egregious overt conduct that has been held sufficient to state a claim under section 3617"); *see also Ohio Civ. Rights Comm'n v. Akron Metro. Hous. Auth.,* 892 N.E.2d 415, 419 (Ohio 2008) (holding that a landlord's failure to intervene does not state a claim under Ohio's analogue to the FHA).

rmitted to move forward with claims under the FHA where a

*landlord's* "offensive behavior unreasonably interfere[d] with use and

enjoyment of the premises." *Honce v. Vigil*, 1 F.3d 1085, 1090 (10th

Cir. 1993). We have assumed without deciding (and without

publishing) that a plaintiff may state such a claim in

appropriate circumstances. *Khalil v. Farash Corp.*, 277 F. App'x 81, 84 (2d

Cir. 2008).

In all the cases from other circuits where these claims have been brought

against

landlords, however, the landlord *or one of his agents* was responsible for the

actual harassment. *See, e.g., Quigley v. Winter*, 598 F.3d 938, 946–47

(8th Cir. 2010)

(affirming jury's determination that landlord violated FHA where the eviden

ce

indicated that he sexually harassed a tenant when receiving rent payments).

29

As precedent for imposing an affirmative obligation on landlords to redress tenant‑on‑tenant harassment, the majority and HUD point us to *Neudecker v. Boisclair Corp.*, 351 F.3d 361 (8th Cir. 2003) (per curiam).  Even assuming that *Neudecker* has *any* persuasive value, *see Halprin*, 388 F.3d at 329 (noting that *Neudecker* was not a "considered holding"), the case is simply inapposite.  In *Neudecker*, the complaint alleged that the property manager's children had harassed the disabled plaintiff‑tenant, while the property managers themselves disseminated the tenant's private medical information to other tenants and engaged in acts of harassment.  *Neudecker*, 351 F.3d at 362–63.  As these allegations indicate, the landlord's agents and their children, for whom the landlord might reasonably be held vicariously liable, were thus charged with creating the hostile environment.

The majority also points to the Seventh Circuit's recent opinion in *Wetzel*,

30

but that case, involving the alleged harassment on protected grounds of a senior citizen living in a senior facility, is likewise distinguishable.  To be clear, *Wetzel* does hold that the FHA "creates liability against a landlord that has actual notice of tenant on tenant harassment based on a protected status, yet chooses not to take any reasonable steps within its control to stop that harassment."  *Wetzel*, 901 F.3d at 859.  In concluding that such control was adequately alleged, however, the court pointed to the "Tenant's Agreement" governing the defendant's "residential community for older adults."  *Id.*  This agreement guaranteed residents, *inter alia,* the provision of three meals daily served in a central location and access to a community room.  *Id.*  The defendant landlord there was alleged not only

31

to have failed to remediate harassment of the plaintiff by other residents, but also to have barred her from common spaces that she was entitled to frequent. *Id.* at 860.

Under these circumstances, the plaintiff may have sufficiently alleged that the landlord "discriminate[d] . . . in the provision of *services or facilities*," *see* 42 U.S.C. § 3604(b) (emphasis added), that had been guaranteed in the rental arrangement.

*Wetzel*, 901 F.3d at 867.

To the extent that *Wetzel* reads more broadly to align with the majority's opinion here, it is similarly unpersuasive. *Wetzel* acknowledges that the FHA "does not address" the question of landlord liability for third-party harassment, and that the statute "does not spell out a test" for liability under these circumstances. *Id.* at 863. These concessions support my view: the statute does

32

ŏ

notŏ"address"ŏaŏdistinctŏdutyŏonŏtheŏpartŏofŏtheŏlandlordŏtoŏredressŏharass

mentŏ

becauseŏtheŏstatuteŏdoesŏnotŏimposeŏone.ŏŏAndŏitŏwouldŏbeŏpeculiarŏforŏth

eŏstatuteŏ

toŏspellŏoutŏaŏ"test"ŏforŏaŏtheoryŏofŏliabilityŏfoundŏnowhereŏwithinŏitsŏtext.

ŏŏButŏevenŏ assumingŏ *arguendo*ŏ thatŏ *Wetzel*ŏ wasŏ correctlyŏ decided,ŏ itŏ isŏ

sufficientlyŏ

distinguishableŏfromŏtheŏpresentŏcaseŏasŏtoŏprovideŏlittle,ŏifŏany,ŏsupportŏfo

rŏtheŏ

majority'sŏconclusionŏthatŏanŏFHAŏclaimŏhasŏbeenŏadequatelyŏallegedŏhere.ŏ

ŏ *3.ŏŏTheŏTitleŏVIIŏAnalogyŏandŏtheŏHUDŏRuleŏ*

Atŏbottom,ŏtheŏmajority'sŏconclusionŏtodayŏrestsŏonŏneitherŏtheŏFHA'sŏ

ŏtextŏ

norŏitsŏprecedent,ŏbutŏonŏdrawingŏanŏanalogyŏtoŏTitleŏVIIŏandŏitsŏ"hostileŏ

workŏ

environment"ŏcases,ŏasŏrecentlyŏendorsedŏbyŏHUD.ŏŏToŏprevailŏonŏaŏhostile

ŏworkŏ environmentŏ claimŏ underŏ Titleŏ VII,ŏ aŏ plaintiffŏ needŏ notŏ

demonstrateŏ thatŏ theŏ employerŏ himselfŏ engagedŏ inŏ theŏ allegedŏ

33ŏ

harassment nor offer evidence of discriminatory intent on the employer's part. Instead, a negligent employer can

be liable "when a co‑worker harasses the plaintiff." *Vance v. Ball State Univ.*, 570

U.S. 421, 427 (2013). Relying heavily on the 2016 HUD Rule promulgated after this litigation began, the majority becomes the first court to import into the FHA a theory of liability lifted directly from Title VII case law.

The majority "distill[s] from the [HUD] Rule"—not, I will note, the FHA—three elements a plaintiff must prove to establish a housing provider's liability for third‑party harassment: "'(1) [t]he third‑party created a hostile environment for the plaintiff . . . ; (2) the housing provider knew or should have known about the conduct creating the hostile environment;' and (3) notwithstanding its obligation

34

under the FHA[,] . . . 'the housing provider failed to take prompt action to correct and end the harassment while having the power to do so.'" Maj. Op. at 21 (quoting HUD Rule, 81 Fed. Reg. 63,069). The majority affords "great" weight to the HUD Rule, Maj. Op. at 19, and asserts that while "the analogy between the employer–employee relationship and the landlord–tenant relationship is imperfect," it would nevertheless be "strange indeed" if the FHA did not mirror Title VII in imposing liability on landlords for tenant-on-tenant harassment, just as employers are responsible for the harassing conduct of their employees, Maj. Op. at 13.

Far from bolstering the majority's analysis, however, the analogy to Title VII highlights the glaring problems inherent in its theory of FHA liability. To

35

be sure,

Title VII can be *relevant* to the interpretation of Title VIII. But we do not

reflexively

superimpose one body of case law onto the other. At times, the Supreme

Court

has emphasized the similarities between the two statutes, *see ICP*, 135 S. Ct

. at 2516

(interpreting Title VIII with reference to Title VII), but at other moments it

has

focused on their differences, *see Curtis v. Loether*, 415 U.S. 189, 197 (1974) (r

ejecting

reasoning by analogy to Title VII in interpreting Title VIII). When making

the

interpretive choice whether to draw an analogy to Title VII, we must keep

in mind

that which HUD itself concedes: "[T]he home and the workplace are signifi

cantly

different environments such that strict reliance on Title VII case law is not

36

always appropriate [in the Title VIII context]." HUD Rule, 81 Fed. Reg. 63,055; *see also Wetzel*, 901 F.3d at 866 (acknowledging that "there are salient differences between Title VII and the FHA").

Given that "strict reliance on Title VII case law is not always appropriate," the majority would do well to consider why the analogy it draws between the employer–employee and landlord–tenant relationships makes no sense in the circumstances of this case. First, as the court below aptly noted, there are "well‐known legal distinctions between the employer–employee relationship and the landlord–tenant relationship—including, that an employee is considered an agent of the employer while the tenant is not considered an agent of the landlord." *Francis*, 91 F. Supp. 3d at 429; *see also Ohio Civ. Rights Comm'n v. Akron Metro Hous.*

37

*Auth.*, 892 N.E.2d 415, 420 (Ohio 2008) ("[T]he amount of control that a landlord exercises over his tenant is not comparable to that which an employer exercises over his employee.").  This difference alone urges caution in endorsing today's full-scale incorporation of the precise claim recognized in the employment context, given that the Supreme Court consistently looks to "agency principles                                        for guidance" in setting Title VII liability standards.  *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986).

Granted, the absence of a principal-agent relationship in the landlord-tenant context may not be dispositive on the issue whether a Title VII analogy can be drawn.  Though less common, an employer can sometimes be liable for failing to address a hostile work environment that is created by a non-agent                         (a                         non-

38

employee). *See, e.g., Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (noting that university employer could potentially be liable for failing to redress discrimination perpetrated by student athletes). Even in these Title VII cases, however, we consider whether "there is a 'specific basis for imputing the conduct creating the hostile work environment to the employer.'" *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Feingold v. New York*, 366 F.3d 138, 149–50 (2d Cir. 2004)). In doing so, we "consider *the extent of the employer's control* and any other legal responsibility which the employer may have with respect to the conduct of such non employees." *Summa*, 708 F.3d at 124 (emphasis added) (quoting 29 C.F.R. § 1604.11(e)). In other words, the degree of control enjoyed by the employer

remains critical in deducing whether that employer is properly held accountable, should the environment become "hostile."

Employers simply exert far more control over not only their employees, but also the entire workplace environment, than do landlords over their tenants and the residences those tenants quite literally call their own.[21] Taken collectively, an employer's ability to monitor, respond and enforce—all crucial aspects of our Title VII jurisprudence—differs substantially from the ability of a landlord to do the same. For example, in assessing whether an employer was negligent in permitting

_____

[21] This observation also applies to the Seventh Circuit's analogy between Title IX (governing discrimination in educational environments) and the FHA. *See Wetzel*, 901 F.3d at 863–64. Our Circuit has suggested that at least some school officials exercise similar control over their students as employers do over employees. *See Summa,* 708 F.3d at 124 (holding that football coach exercised sufficient control over players to impute liability, under Title VII, for harassment of graduate student manager). The same cannot be said for landlords and their tenants.

a hostile work environment to exist, we consider, among other factors, whether the employer adequately "monitor[ed] the workplace, . . . . respond[ed] to complaints, . . . . provide[d] a system for registering complaints," or, by contrast, "effectively discourage[d] complaints from being filed." *Vance,* 570 U.S. at 449.

But as a matter of societal reality, landlords have never monitored their tenants to the substantial degree that employers monitor employees, nor have they solicited and maintained information about tenants and their comings and goings in a similar fashion. Moreover, and significantly, Title VIII contains no evidence of a congressional intent to dramatically upend that reality.

Likewise, the remedial steps we call upon employers to take in the employment setting have no analogue in the housing setting. In the Title VII

context, we assess whether an employer "knew, or in the exercise of reaso

nable care should have known," about the harassment yet failed to

take                                                                    appropriate

remedial action." *Duch,* 588 F.3d at 762 (quoting *Howley v. Town of Stratfor

d,* 217    F.3d    141,    154    (2d    Cir.    2000)).    Such

"appropriate remedial action"                    can                    include

launching a "prompt investigation," *Russell v. New York Univ.,* No. 15‑cv‑

2185   (GHW),   2017   WL   3049534,   at   *29   (S.D.N.Y.   July   17,   2017),

ordering                         all                         staff

members to "undergo sexual harassment training," *Summa,* 708 F.3d at 125,

or

separating the victim from the harasser, *Ingram v. West,* 70 F. Supp. 2d 103

3, 1037

(W.D. Mo. 1999).   Investigations in this context are a substantial undertakin

g.   An

inquiry that amounts "to nothing more than the company's interview of Pl

aintiff,

42

and the union's telephone conversation with [the harasser]" will not suffice. *Holt v. Dynaserv Indus., Inc.*, No. 14-cv-8299 (LGS), 2016 WL 5108205, at *9 (S.D.N.Y. Sept. 19, 2016). But a thorough investigation that includes interviewing "twelve managers and staff" will. *Killis v. Cabela's Retail II, Inc.*, No. 13 C 6532, 2015 WL 128098, at *13 (N.D. Ill. Jan. 8, 2015).

As this laundry list of corrective actions indicates, just as landlords do not have the same capacity as employers to monitor their tenants, neither do they ordinarily have similar tools at their disposal to investigate and remediate misconduct. A landlord cannot temporarily evict a tenant or force all tenants to undergo harassment training and provide information about each other's behavior. And while an employer can transfer a problematic employee, a landlord cannot move tenants around different building units in

43

ŏ̄

similarŏ̄                                                                                      fashion.ŏ̄ŏ̄

Furthermore,ŏ̄evenŏ̄ifŏ̄landlordsŏ̄*could*ŏ̄developŏ̄aŏ̄rosterŏ̄ofŏ̄suchŏ̄intermediateŏ̄

stepsŏ̄ andŏ̄ penalties,ŏ̄ weŏ̄ mightŏ̄ questionŏ̄ whetherŏ̄ Congressŏ̄ soughtŏ̄ toŏ̄

importŏ̄                                        suchŏ̄                                        aŏ̄

systemŏ̄intoŏ̄theŏ̄housingŏ̄context,ŏ̄withoutŏ̄aŏ̄wordŏ̄asŏ̄toŏ̄theŏ̄dueŏ̄processŏ̄pri

nciplesŏ̄ thatŏ̄suchŏ̄aŏ̄systemŏ̄mightŏ̄implicate.ŏ̄

Theŏ̄ majorityŏ̄ ignoresŏ̄ theseŏ̄ concernsŏ̄ byŏ̄ assertingŏ̄ thatŏ̄ landlordsŏ̄

controlŏ̄

residentialŏ̄complexes,ŏ̄justŏ̄asŏ̄employersŏ̄controlŏ̄workplaces,ŏ̄becauseŏ̄landlor

dsŏ̄

retainŏ̄theŏ̄powerŏ̄toŏ̄evictŏ̄tenants.ŏ̄ŏ̄*See*ŏ̄Maj.ŏ̄Op.ŏ̄atŏ̄24.ŏ̄ŏ̄Granted,ŏ̄theŏ̄majori

tyŏ̄paysŏ̄

lipŏ̄serviceŏ̄toŏ̄theŏ̄notionŏ̄thatŏ̄determiningŏ̄whetherŏ̄anyŏ̄particularŏ̄landlordŏ̄h

asŏ̄

sufficientŏ̄controlŏ̄overŏ̄tenantŏ̄behaviorŏ̄toŏ̄imposeŏ̄liabilityŏ̄willŏ̄beŏ̄aŏ̄"factŌ̄de

pendentŏ̄

inquiry."ŏ̄Maj.ŏ̄Op.ŏ̄atŏ̄23.ŏ̄ŏ̄Butŏ̄itŏ̄concludesŏ̄byŏ̄suggesting,ŏ̄againŏ̄withŏ̄refere

nceŏ̄toŏ̄

44ŏ̄

the HUD Rule, that "housing providers ordinarily have a range of mechanisms at their disposal to correct discriminatory tenant‑on‑tenant harassment, such as

'issuing and enforcing notices to quit, *issuing threats of eviction and, if necessary enforcing evictions,*' all of which are 'powerful tools.'" Maj. Op. at 24 (quoting HUD Rule, 81 Fed. Reg. 63,071) (emphasis added). In other words, while the majority's liability rule may ostensibly require a "fact‑dependent inquiry," the landlord, by virtue of the power to evict, will "ordinarily" lose. But this result, upon analysis, only further underscores the inaptness of the Title VII analogy.

### 4.  *Background Tort Principles and the FHA*

The majority fundamentally errs in its assessment of the present cause of action by failing to consider the Supreme Court's instruction that "an                                    action brought for compensation by a victim of housing discrimination is, in effec

45

t, a tort

action." *Meyer*, 537 U.S. at 285.  Given that directive, it is appropriate to consider traditional "tort‑related . . . liability rules," as the Supreme Court does, in interpreting the FHA. *Id.*[10]  But the majority has a real problem in taking such rules into account.  Courts in general and New York courts in particular have been remarkably clear:  "'[A] reasonable opportunity or effective means to control a third person does not arise from the mere power to evict' that person as a tenant."

*Torre v. Paul A. Burke Constr., Inc.*, 661 N.Y.S.2d 145, 146 (4th Dep't 1997) (quoting *Siino v. Reices*, 628 N.Y.S.2d 757, 758 (2d Dep't 1995)).  Hence, a landlord has no duty to protect a tenant from even the criminal act of another "since it cannot be

46

said that the landlord had the ability or a reasonable opportunity to control [the offending tenant]." *Blatt v. N.Y.C. Hous. Auth.*, 506 N.Y.S.2d 877, 879 (2d Dep't 1986); *see also id.* ("The power to evict cannot be said to have furnished the [defendant] with a reasonable opportunity or effective means to prevent or remedy [the] unacceptable conduct, since the incident giving rise to the injuries

---

[10] There are other potential common law doctrines relevant to a landlord's responsibility for the behavior of third parties, but those sound in contract and property law rather than tort, and generally involve remedies like rent abatement rather than compensatory damages. *See, e.g., Park West Mgmt. Corp. v. Mitchell*, 47 N.Y.2d 316, 329 (1979) (concluding that a janitorial strike violated the implied warranty of habitability). They are thus less pertinent here, given the Supreme Court's conclusion that in the FHA, Congress "legislate[d] against a legal background of ordinary *tort-related* vicarious liability rules and consequently intends its legislation to incorporate *those rules.*" *Meyer*, 537 U.S. at 285 (emphases added).

sustained, and indeed, the pattern of harassment alleged by the plaintiff, ar

ose

from a purely personal dispute between the two individuals." (internal qu

otation marks omitted)).[22]

Acknowledging that "the text of the FHA nowhere explicitly

endorses

---

[22] To support its contrary position, the majority cites *Firpi v. N.Y.C. Hous. Auth.*, 573

N.Y.S.2d 704 (2d Dep't 1991), but *Firpi*, in fact, demonstrates that Francis's claim has no

basis in the common law of New York.  The *Firpi* plaintiffs brought a negligence suit against their landlord after one of them was attacked by a co-tenant with whom the

plaintiffs allegedly had a "history of disputes." *Id.* at 705.  The aggressor had allegedly

been the subject of several complaints brought to the landlord not only by the plaintiffs

but also by other tenants in the building.  *Id.*  The court there ordered the *dismissal* of the

plaintiffs' negligence claim because the landlord was "not in a position to control [the

tenant's] behavior." *Id.*  Moreover, the court cautioned that resorting to eviction in this

case would not have been "proper in a personal dispute between tenants." *Id.* (citing

*Blatt*, 506 N.Y.S.2d at 877).  There (as here), the "controversy was one for the police, and not for the [landlord]." *Id.* at 706.

landlord liability for tenant-on-tenant harassment," Maj. Op. at 18, the majority nonetheless interprets this text (just recognized to be silent on the issue) to alter rather than respect these traditional tort-liability rules. But this analytical move contravenes a cardinal tenet of statutory interpretation that "[i]n order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (citation omitted). We "assume Congress is familiar with the common-law rule and does not mean to displace it *sub silentio* in federal causes of action. A claim for damages under the FHA—which is akin to a 'tort action'— is no exception to this

49

traditional requirement." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017) (internal quotation marks and citation omitted).

Even if we were to import the Title VII "hostile work environment" standard into the context of the FHA in some circumstances, this common law background suggests the need for a far more careful delineation of the situations in which a landlord exercises sufficient control over tenant behavior to be directly liable for failing to redress that behavior. Perhaps the degree of control exercised by a landlord in cases such as *Wetzel*, where the landlord was responsible for the provision of daily meals and the maintenance of community spaces in a senior living facility, differs in kind from the typical case. Perhaps not. The allegations

in the present complaint, however, at least as they relate to the landlord-tenant relationship, are typical in all respects.  And as New York courts have confirmed, the power to evict is too blunt and unwieldy an instrument to support the conclusion that landlords are in a position to prevent one tenant's harassment of another, so that liability for the failure to do so may properly be imposed.

*    *    *    *    *

The instant complaint provides a good example of the difficult questions that go unaddressed in the majority's rush to recognize this new cause of action.

According to its allegations, the plaintiff, having already notified the police of his neighbor's outrageous conduct, did not notify the management company of the

51

harassment until almost three months after the first incident occurred an

d two

months after the plaintiff renewed his lease.  Moreover, he did not requ

est the

company's assistance even at that time.  Nor does the complaint sugges

t that the

police investigation had been discontinued or was ineffective.  So when,

precisely,

did the landlord stand in breach of a duty to act, even assuming such

a duty existed?  Notably, the management company declined to

renew the harassing

tenant's lease when it came up for renewal in the aftermath of his bad

behavior, which by that point had resulted in his arrest.  Does

failure to renew a lease constitute "prompt" remedial action?

Courts will be grappling with such questions for years to come.

The majority dismisses such concerns offhand as a "parade of horribl

es."

Maj. Op. at 21.  Make no mistake, however: these issues will be unavoidab

52

leŏforŏ thoseŏ whomŏ thisŏ decisionŏ affects.ŏ ŏ Judgeŏ Posnerŏ wasŏ correctŏ inŏ

notingŏ thatŏ

Congressŏdidŏnotŏcontemplateŏtheŏproblemŏofŏharassmentŏbyŏ"neighbors"ŏw

henŏitŏ enactedŏ theŏ FHAŏandŏ thatŏ ifŏ itŏ hadŏ addressedŏ thisŏ problem,ŏ

theŏmostŏ                                                               "carefulŏ

drafting"ŏwouldŏhaveŏbeenŏrequired.ŏŏ*Halprin,*ŏ388ŏF.3dŏatŏ329.ŏŏTheŏmajori

tyŏisŏnotŏ

inŏtheŏpositionŏtoŏundertakeŏsuchŏdrafting,ŏbutŏtheŏcostsŏofŏtheŏlegalŏuncert

aintyŏ

engenderedŏbyŏitsŏdecisionŏcannotŏbeŏwishedŏaway.ŏŏToday'sŏdecisionŏmay

ŏbenefitŏ

lawŏfirmsŏandŏinsuranceŏcompanies,ŏwhichŏsometimesŏprofitŏfromŏlegalŏano

malies.ŏŏ

*See*ŏ42ŏU.S.C.ŏ§ŏ3613(c)(2)ŏ(attorney'sŏfeesŏaccordedŏtoŏtheŏprevailingŏpartyŏa

tŏtheŏ

discretionŏofŏtheŏcourt).ŏŏDespiteŏtheŏmajority'sŏgoodŏintentions,ŏhowever,ŏt

heŏrealŏ

53ŏ

winners today will not include those in pursuit of fair housing, and certainly not the renters among them, who will likely be left to foot the bill.

II

Having applied the "ordinary tools of statutory construction," *City of Arlington v. F.C.C.*, 569 U.S. 290, 296 (2013), I conclude by considering more closely HUD's guidance on the question at issue here. As referenced above, after this litigation commenced, HUD promulgated a regulation through the notice and comment process that imports the scope of employer liability under Title VII for employee on employee harassment into the housing context and purports to cognize the precise claim the majority recognizes today. *See* HUD Rule, 81 Fed. Reg. 63,054.[12] HUD also submitted an *amicus* brief offering essentially the same argument as set forth in the preamble to and comments surrounding its new rule. *See generally* HUD Amicus Br.

54

ō

Theō Seventhō Circuitō declinedō toō relyō onō theō HUDō Ruleō inō *Wetzel*, ō noting ō thatō "thereō areō salientō differencesō betweenō Titleō VIIō andō theō FHA"ō andō thatō "moreō analysisō thanō HUDō wasō ableō toō offer"ō wasō neededō toō supportō HUD'sō position.ōō

*Wetzel*, ō 901ō F.3dō atō 866.ōō Theō majorityō evincesō noō suchō caution, ō purportingō toō useō theō Ruleō merelyō toō "reinforce"ō itsō view, ō Maj.ō Op.ō atō 20, ō butō atō theō sameō timeō

---

[12]ō 24ō C.F.R.ō §ō 100.7, ō "Liabilityō forō Discriminatoryō Housingō Practices,"ō reads:ō ō

(a) *Directō liability.*ō
ō
(1)ō Aō personō isō directlyō liableō for:ōō ō

    (i)    Theō person'sō ownō conductō thatō resultsō inō aō discriminatoryō housingō practice.ōō

    (ii)    Failingō toō takeō promptō actionō toō correctō andō endō aō discriminatoryō housingō practiceō byō thatō person'sō employeeō orō agent, ō whereō theō personō knewō orō shouldō haveō knownō ofō theō discriminatoryō conduct.ōō

    (iii)    Failingō toō takeō promptō actionō toō correctō andō endō aō discriminatoryō housingō practiceō byō aō thirdō party, ō whereō theō personō knewō orō shouldō

55ō

have known of the discriminatory conduct and had the power to correct it. The power to take prompt action to correct and end a discriminatory housing practice by a third party depends upon the extent of the person's control or any other legal responsibility the person may have with respect to the conduct of such third party.

according it to "great," albeit "by no means definitive" weight, Maj. Op. at 19, and

devoting the majority of its discussion to that Rule. I disagree with the majority's

effectively dispositive reliance on HUD's pronouncements, which fail adequately

to justify the agency's interpretation of the text and, in any event, raise retroactivity concerns if applied in this case.

First, even assuming *arguendo* the majority's erroneous premise that the HUD Rule is "interpretive," Maj. Op. at 25, the Rule carries little to no persuasive force. The "convenience [of interpretive rules] comes at a price: Interpretive rules

do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203–04 (2015) (internal quotation marks omitted).[23] The deference afforded to an interpretive rule "depends on, *inter alia*, 'the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements.'" *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846

---

[23] So, too, for HUD's *amicus* brief, even applying this Circuit's precedent, which extends *Skidmore* deference to an agency's interpretation of a statute set forth during litigation. *See SEC v. Rosenthal*, 650 F.3d 156, 160 (2d Cir. 2011). The Supreme Court has not yet addressed the propriety of deference in such circumstances, and "there is a well-defined circuit split on the question." *E.I. DuPont De Nemours & Co. v. Smiley*, 138 S. Ct. 2563 (2018) (Gorsuch, J., dissenting from the denial of *certiorari*).

F.3d 492, 509 (2d Cir. 2017) (quoting *Skidmore v. Swift,* 323 U.S. 134, 140 (1944)).

The HUD Rule scores poorly on all these metrics.  For the reasons already explained at length, the Rule misinterprets the FHA's text, finds no support in precedent, and relies on a flawed analogy to Title VII.  The Supreme Court has already rejected similarly superficial reasoning by analogy in the Title VII context, denying *Skidmore* deference to an interpretation by the Equal Employment Opportunity Commission that merely referenced the case law surrounding *other* antidiscrimination statutes and "fail[ed] to address the specific provisions of [Title VII's] statutory scheme."  *Nassar,* 570 U.S. at 361.  Furthermore, HUD's responses to the comments provided during the notice and comment period are circ

58

ular and conclusory.  For example, in response to commentator concerns that the Rule

"unduly burden[s] housing providers," HUD merely asserts that the regulation

"does not create new or enhanced liabilities." *See* HUD Rule, 81 Fed. Reg. 63,069.

Yet the Rule undeniably paves the way for a new category of FHA litigation, and

thus *some* analysis of its effects was warranted. *See Wetzel*, 901 F.3d at 866

(rejecting wholesale adoption of the HUD Rule as a theory of liability under the FHA

because "more analysis than HUD was able to offer is necessary before we can

take that step").  But the majority's reliance on the HUD Rule is also impermissible for an

entirely different reason: the Rule is *legislative*, and so cannot have the retroactive

effect on this case that the majority affords it.  Interpretive rules "do not create

rights, but merely clarify an existing statute or regulation," while "legislativ

e rules

are those that create new law, rights, or duties, in what amounts to a legis

lative

act." *Sweet v. Sheahan*, 235 F.3d 80, 91 (2d Cir. 2000) (internal quotation ma

rks omitted).   This Rule clearly does the latter.   HUD's claims to

the contrary

notwithstanding, the prior interpretations of the FHA canvassed throughout

this

dissent demonstrate that HUD's rule "significantly expand[s] the class of pe

rsons"

subject to a legal requirement, *id.* at 92, by creating a new form of liability

for an

entire class of housing providers.  Even within HUD's own proceedings, I

can find

no precedent for the interpretation advanced under the current iteration of

the

Rule.  *See, e.g., The Sec'y, United States Dep't of Hous. & Urban Dev., on Behal
f of*

*Christina L. Brown, Charging Party*, 1997 WL 358074, at *5 (H.U.D. June 26, 1997) ("[I]n order to establish a hostile environment in a case brought under the [FHA], *the actions of the landlord* must be pervasive and persistent." (emphasis added)). In other words, if the regulation represents HUD's own "longstanding view," Maj. Op. at 26, it is one that has, for just as long, been hidden from sight.

Giving retroactive effect to a legislative rule "presents problems of unfairness because it can deprive [parties] of legitimate expectations and upset settled transactions." *Sweet*, 235 F.3d at 88 (quoting *Eastern Enters. v. Apfel,* 524 U.S. 498, 501 (1998)). In the absence of a clear congressional signal, "[w]e are prohibited from applying a regulation to conduct that took place before its enactment

61

. . . . where the regulation would 'impose new duties with respect to transactions already completed.'" *Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 158 (2d Cir. 1999) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)). Given that the HUD Rule "create[s] new law, rights, or duties, in what amounts to a legislative act," *Sweet*, 235 F.3d at 91 (internal quotation marks omitted), it cannot apply to this case.

Lacking any persuasive agency guidance, "[i]t is instead our task to determine the correct reading" of the FHA. *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). I believe I have done so. For all of the reasons outlined above, I respectfully dissent from the majority's decision to vacate the dismissal of the plaintiff's FHA

62

claims, as well as his claims pursuant to the New York State Human Rights Law, which parallels the FHA.

*      *      *

Finally, I dissent as well from the vacatur of the district court's dismissal of Francis's claims pursuant to §§ 1981 and 1982. In a single paragraph, the majority contends that a plaintiff need only allege that a defendant was "deliberate[ly] indifferen[t]" to racial discrimination in order to state the intent element of claims pursuant to these provisions. Maj. Op. at 31. Even assuming *arguendo* the majority's questionable conclusion that a deliberate indifference standard governs Francis's §§ 1981 and 1982 claims, I would hold that Francis has failed plausibly to allege his landlord's deliberate indifference. *See Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999) ("[A] plaintiff must show t

63

hat the

defendant's indifference was such that the defendant *intended the discrimi*

*nation to*

*occur*." (emphasis added)).  But in any event, the problems with the maj

ority's *ipse dixit* indifference standard run deeper.

The Supreme Court has never held, as the majority purports to do to

day, that allegations of deliberate indifference are sufficient to make

out the intent element of §§ 1981 and 1982 claims.  Moreover,

before today, this Court had affirmed the propriety of the "deliberate

indifference" standard in the § 1981

context only, specifically in the school setting.  *See Gant*, 195 F.3d at 141.

Our

precedent in *Gant* relied on Supreme Court decisions construing Title IX.

*See id.* at 140 (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642–

43 (1999)).  The

Supreme Court, for its part, found the application of the "deliberate indiffer

ence" standard appropriate in the Title IX context only because of

school officials'

64

"substantial *control* over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645 (emphasis added). A Title IX funding recipient's liability for deliberate indifference to racial harassment therefore arises *only* where the official "at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf."

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

The majority here substantially broadens the scope of liability pursuant to §§ 1981 and 1982 by unmooring the less demanding "deliberate indifference" standard from the Supreme Court's "limit[ing]" factors, *Davis*, 526 U.S. at 645, thus exposing all manner of private actors to suit for the acts of third parties. Respectfully, however, the majority's conclusion here is no more the product of reasoned explication than is the analogy it draws between landlords and

65

employers.  Accordingly, I also dissent as to the majority's decision to rein

state

Francis's claims under §§ 1981 and 1982, and would affirm the judgment i

n all respects.

Case No. 12-60691-Civ-SCOLA

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

# Sabal Palm Condos. of Pine Island Ridge Ass'n, Inc. v. Fischer

Case No. 12-60691-Civ-SCOLA

03-13-2014

Sabal Palm Condominiums of Pine Island Ridge Association, Inc., Plaintiff, v. Laurence M. Fischer and Deborah G. Fischer, et al., Defendants.

Robert N. Scola

## Omnibus Order

The underlying dispute in this case is whether Laurence and Deborah Fischer, who are residents of Sabal Palm Condominiums of Pine Island Ridge Association, Inc., may keep a service dog, Sorenson, in their condominium as a reasonable accommodation under the Fair Housing Act (FHA), 42 U.S.C. § 3601 et seq., to assist Deborah, who has multiple sclerosis and is confined to a wheelchair. Deborah requested an accommodation in October 2011 because Sabal Palm has a no-pets policy.[1] On Sabal Palm's request, Deborah provided Sabal Palm with medical records substantiating that she has multiple sclerosis, is disabled within the meaning of the FHA, and suffers from various symptoms including severe difficulty in grabbing and manipulating items. She also provided records substantiating that Sorenson is a certified service dog trained to help her by retrieving items, opening and closing doors, and turning light switches on and off. Though that information should have been enough for Sabal Palm to grant Deborah's

Decided Mar 13, 2014

accommodation request, Sabal Palm (unwisely) decided that it wasn't. So in April 2012, it authorized its attorney, Christopher Trapani, to bring a declaratory-judgment action to have the Court decide (1) whether Sabal Palm was required under the FHA to grant Deborah an exemption from its no-pets policy and allow it to keep her dog, and (2) the *2 extent of the records that Sabal Palm was entitled to under the FHA in order to evaluate Deborah's requested accommodation. In the declaratory-judgment action, Sabal Palm is the Plaintiff and the Fischers, the Defendants.

[1] The policy actually provides that no resident may have a pet without the consent of Sabal Palm's Board of Directors, other than one cat or fish. (ECF No. 82-10 at 5.) But no pet will be permitted that weighs more han 20 pounds at maturity. (*Id*.) For ease of reference and because the pets allowed by the policy do not matter for the issues in this case, the Court refers to the policy as the no-pets policy.

The Fischers then brought three counterclaims against Sabal Palm and three identical third-party claims against Trapani, the attorney, and Marvin Silvergold, who was (and possibly still is) the President of Sabal Palm's Board of Directors. (ECF No. 82.) For ease of reference the Court refers to this action as the Amended Counterclaim and to Sabal Palm, Trapani, and Silvergold collectively as Counter Defendants. The three claims asserted against Counter Defendants all allege violations of the FHA. They are: (1) that Counter Defendants violated 42 U.S.C. § 3604(f) (3)(B) by refusing the Fischers' request for an accommodation (refusal-to-accommodate claim); (2) that Counter Defendants violated 42 U.S.C. §3604(c) by promulgating rules in December 2011 for residents to keep pets and for disabled persons to obtain exemptions

to the no-pets policy as an accommodation for their disability; and (3) that Counter Defendants violated 42 U.S.C. § 3617 by instituting the declaratory-judgment action in order to retaliate against the Fischers for asserting their right

to an accommodation under the FHA. (ECF No. 82.) For these alleged violations of the FHA, the Fischers seek injunctive relief, compensatory and punitive damages, and their attorney fees and costs. (*Id.*)

Each Counter Defendant filed a motion to dismiss all of these claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure and to strike the Fischers' claim for punitive damages. (ECF Nos. 89, 90, 95, 96.) For the reasons set forth below, the motions to dismiss (ECF Nos. 89, 95, 96) are **granted in part and denied in part** and the request to strike punitive damages (ECF No. 90) is **denied.** More specifically, the Court **grants** the motions to dismiss with respect to the Fischers' § 3604(c) and § 3617 claims. These claims are **dismissed with prejudice.** But the Court denies the motions to dismiss with respect to the Fischers' refusal-to-accommodate claim. The Court also **denies** the Fischers' motion (ECF No. 214) seeking leave to amend their Amended Counterclaim.

Before proceeding, the Court pauses to note that, according to the Background Paper prepared for a United States Senate Informational Hearing on the subject of fake service dogs (hereafter, the "Background Paper"),[2] there is a growing problem of people using fake service dogs, which has a "profound" *3 and negative effect "on the disabled, business and medical communities, and the airline industry." Background Paper at 11; *accord* Background Paper at 12, 11, 13. And after the court in *Auburn Woods I Homeowners Association v. Fair Employment*

*and Housing Commission,* 121 Cal. App. 4th 1578[, 1582, 1584-85, 1599 (2004), held that "a homeowner's association had discriminated against condominium residents, a married couple who suffered from depression and other disorders, in failing to reasonably accommodate their disabilities by permitting them to keep a small companion dog . . . the number of housing disability cases involving companion or comfort animals as a reasonable accommodation has soared." Background Paper at 10-11.

[2]    The Background Paper can be found online at the following  website: http://sbp.senate.ca.gov/sites/sbp.senate.ca.gov/files/Background%20Paper%20for%20Fake%20Service%20Dog%20Hearing%20%282-14-14%29.pdf  (last  accessed  on March 12, 2014).

So the Court realizes that there is some reason to be skeptical of requests to keep a dog as an accommodation for a disability in certain cases, particularly cases where the dog assists the disabled person by rendering emotional support. But this is not such a case. It is undisputed that Deborah has a bona fide physical disability that has severe physical symptoms. And her *specially trained* service dog does not assist her by providing emotional support: it assists her by helping her complete physical tasks that her physical disability makes difficult. That Counter Defendants turned to the courts to resolve what should have been an easy decision is a sad commentary on the litigious nature of our society. And it does a disservice to people like Deborah who actually are disabled and have a legitimate need for a service dog as an accommodation under the FHA.

## Background

Because a detailed fact section is unnecessary, the Court primarily recounts the relevant facts in the analysis section below. But since the heart of the Fischers' Amended Counterclaim is the refusal-toaccommodate claim, familiarity with the FHA provisions undergirding this claim is helpful. The FHA forbids discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap."[3] 42 U.S.C. § 3604(f)(2).

Prohibited discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such *4 accommodations may be necessary to afford [a disabled

person an] equal opportunity to use and enjoy a dwelling." 42 U.S.C. §3604(f)(3)(B).

[3] Although the FHA uses the term *handicap* rather than *disability,* both terms have the same legal meaning: the definition of *disability* in the Americans with Disabilities Act "is drawn almost verbatim" from the definition of *handicap* "contained in the Fair Housing Amendments Act of 1988. Congress' repetition of a wellestablished term [implies] that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations." *Bragdon v. Abbott,* 524 U.S. 624, 631 (1998).

Two other helpful anchors are (1) knowing precisely what records Sabal Palm asked for and (2) Sabal Palm's belief about the validity of the Fischers' accommodation request at the time Sabal Palm brought the declaratory-judgment action. Sabal Palm requested that Deborah produce copies of her medical records from *all* of her healthcare providers who diagnosed or treated the disability that she claimed made a service dog necessary. (ECF No. 82-2 at 2.) In addition, Sabal Palm requested that she provide *"all* documents relating to the nature, size and species of dog, as well as all documents regarding any training it received." (*Id.* (emphasis added).) Though Deborah provided Sabal Palm with medical records substantiating her disability and its impact on her life, and with a record of Sorenson's training and certification, she did not provide *all* of her medical records relating to her disability nor *all* records relating to Sorenson's characteristics and his training. Because Sabal Palm believed that it was entitled to *all* of these records and that the records Deborah provided were insufficient to entitle her to keep Sorenson as an accommodation under the FHA, Sabal Palm

had Trapani institute the declaratory judgment action. (ECF No. 129; ECF No. 82-9.)

Sabal Palm's precise posture concerning Deborah's ability to keep Sorenson at the time it sued is nuanced. In a letter sent to the Fischers by Trapani on behalf of Sabal Palm just a few days after Sabal Palm brought the declaratory-judgment action, Sabal Palm relayed, in relevant part, the following: that it is undisputed that Deborah is disabled; that it is undisputed that her request to keep Sorenson "would not involve an extraordinary expense on the part of [Sabal Palm]"; that Sabal Palm believed the records provided thus far were insufficient to entitle Deborah to a dog as an accommodation under the FHA; that Sabal Palm believed that it was within its legal rights to deny the accommodation and require Deborah to remove Sorenson; that Sabal Palm "recognize[d] that whether, and under what circumstances, accommodations to disabled persons are required is an evolving issue under the law"; that Sabal Palm therefore instructed Trapani to bring the declaratory-judgment action; and that while the lawsuit is pending, Deborah could "temporarily keep" Sorenson. (ECF No. 82-9 at 2-3.)

## Analysis

### A. Motion-to-dismiss standard

When considering a motion to dismiss under Rule 12(b)(6), the Court must accept all of a complaint's well-pled factual allegations as true, *5 construing them in the light most favorable to the plaintiff. *Pielage v. McConnell,* 516 F.3d 1282, 1284 (11th Cir. 2008). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Though the Rule does not require detailed factual allegations, it does require "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (brackets, internal citation, and internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."

*Id.* So a pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will be dismissed. *Id.*

Faced with a motion to dismiss, a court should therefore "(1) eliminate any allegations in the complaint that are merely legal conclusions; and (2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *American Dental Association v. Cigna Corp.,* 605 F.3d 1283, 1290 (11th Cir. 2010) (internal quotation marks omitted). Moreover, "courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Id.* (brackets and internal quotation marks omitted). "This is a stricter standard than the Supreme Court described in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), which held that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Mukamal v. Bakes,* 378 F. App'x 890, 896 (11th Cir. 2010) (internal quotation marks omitted). These precepts apply to all civil actions, regardless of the cause of action alleged. *Kivisto v. Miller, Canfield, Paddock & Stone, PLC,* 413 F. App'x 136, 138 (11th Cir. 2011). **B. *Silvergold's officer immunity argument***

Silvergold argues that the Fischers' claims against him must be dismissed because he is immune as an officer of Sabal Palm under Florida Statute § 617.0834. (ECF No. 89 at 7-8.) This argument is unpersuasive. In relevant part, § 617.0834 provides that an officer of a nonprofit organization is generally "not personally liable for any

statement, vote, decision, or failure to *6 take an action, regarding organizational management or policy by an officer." But § 617.0834, a state statute, cannot bar a claim

under the FHA, a federal cause of action. *Housing Opportunities Project for Excellence, Inc. v. Key Colony No. 4 Condominum Association, Inc.,* 510 F. Supp. 2d 1003, 1014 (S.D. Fla. 2007) (Martinez, J.). And even if that weren't true, immunity under § 617.0834 is not absolute: an officer is personally liable when that officer breaches his or her duties as an officer and the breach constitutes "[r]ecklessness or an act or omission that was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights." Fla. Stat. § 617.0834(1)(b)(3). The Fischers sufficiently allege that Silvergold falls within this exception to § 617.0834 immunity: they allege (1) that Silvergold "was personally involved in each and every discriminatory act mentioned [in the Amended Counterclaim] during his tenure as President of [Sabal Palm's] Board of Directors" and (2) that Silvergold discriminated against the Fischers "in total and reckless disregard of [the Fischers'] rights" under the FHA. (ECF No. 82 at 3, 15.)

Likely sensing that his argument lacks legal support, Silvergold adds a new argument in his reply brief: namely, that the Fischers failed to sufficiently allege that he was personally involved in the alleged discriminatory acts. (ECF No. 113 at 2-4.) But Silvergold forfeited this argument by failing to raise it in his opening brief. And even if Silvergold had properly raised it, it would still fail. Individual board members or agents can be held liable when they "personally committed or contributed to a Fair Housing Act violation." *Falin v. Condominium Association of La Mer Estates, Inc.,* 2011 WL 5508654, at *3 (S.D. Fla. Nov. 9, 2011) (Cohn, J.); *accord Housing Opportunities,* 510 F. Supp. 2d at 1013-14. The Fischers allege that Silvergold "was personally involved in each and every discriminatory act" and that he recklessly disregarded their rights under the FHA. (ECF No. 82 at 3, 15.) Similar factual allegations were found sufficient in *Housing Opportunities. Compare Housing Opportunities,* 510 F. Supp. 2d at 1013-14 (alleging that board members were personally involved in all discriminatory acts and that board members intentionally discriminated is sufficient to state a claim for discrimination against the board members under the FHA), *with* ECF No. 82 at 3, 12, 18, 20. In addition, other evidence allows one to

reasonably infer that Silvergold contributed to the alleged FHA violations. Silvergold was (and possibly still is) the President of Sabal Palm's Board of Directors when the Board demanded that Deborah provide extensive information to support her request, decided that the information that it had would justify it in denying the Fischers' accommodation request, decided to sue the Fischers, and promulgated rules requiring disabled persons to provide extensive information to support a request to keep a pet as an *7 accommodation—all actions that the Fischers allege were discriminatory. Moreover, Silvergold is carbon copied on all of Trapani's letters attached to the Amended Counterclaim and Trapani's email asserting that Sabal Palm is entitled to more information states that it is being forwarded to the Board. (ECF Nos. 82-2; 82-5; 82-7; 82-9.) The Fischers allege that these communications are evidence of the discrimination that she suffered and that Silvergold knew about them. And since the minutes of the December 14, 2011 board meeting show that Silvergold was present and that the rules passed unanimously, it follows that Silvergold affirmatively voted for allegedly discriminatory rules. These facts plausibly suggest that Silvergold contributed to the FHA violations alleged in the Amended Counterclaim.

## C. Silvergold's Rule 10(b) argument

Silvergold argues that the Fischers' Amended Counterclaim must be dismissed because it does not separately state the claims against Sabal Palm, Trapani, and Silvergold, thereby "making it unclear which alleged actions or inactions are being alleged against [him]." (ECF No. 89 at 6.) This extremely abbreviated argument—it consists of 3 paragraphs and just 5 sentences (two of which are from Rule 10(b) of the Federal Rules of Civil Procedure)—is unpersuasive. The Fischers allege that Silvergold was the President of Sabal Palm's Board during all the discriminatory acts of which they complain, that Silvergold was personally involved in each and

every discriminatory act, and that "each reference to Sabal Palm" therefore includes Silvergold. (*Id.* at 3.) So Silvergold is aware that the Fischers claim he is liable for all the discrimination and that his liability stems from his participation as the President in the Board's allegedly discriminatory decisions. This is more than enough to enable Silvergold to sufficiently respond to the allegations against him.

## D. The refusal-to-accommodate claim

The Fischers claim that Sabal Palm, Silvergold, and Trapani all failed to reasonably accommodate Deborah's disability by refusing her request to allow her service dog, Sorenson, to live with her. Sabal Palm, Silvergold, and Trapani all argue that this claim should be dismissed because they have allowed Sorenson to live with her during this litigation and therefore did not deny her accommodation request.

The FHA forbids discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2). "Such discrimination includes 'a refusal to make reasonable accommodations in rules, policies, practices, or services, when *8 such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Overlook Mutual Homes, Inc. v. Spencer,* 415 F. App'x 617, 620-21 (6th Cir. 2011) (quoting 42 U.S.C. § 3604(f)(3)(B)). "To prevail on a [§] 3604(f)(3)(B) claim"—that is, a claim that a housing provider refused to reasonably accommodate a disability—"a plaintiff must establish that (1) he is disabled or handicapped within the meaning of the FHA, (2) he requested a reasonable accommodation, (3) such accommodation was necessary to afford him an opportunity to use and enjoy his dwelling, and (4) the defendants refused to make the requested accommodation." *Hawn v. Shoreline Towers Phase 1 Condominium Assocation, Inc.,* 347 F. App'x 464, 467 (11th Cir. 2009).

The parties' dispute about the viability of the Fischers' refusal-to-accommodate claim turns on the last element: whether Counter Defendants in fact refused the Fischers' request to let Sorenson live with them.

The Sixth Circuit analyzed this precise issue thoroughly in *Overlook,* a case with a procedural posture similar to the present case. Although *Overlook* rejected the refusal-toaccommodate claim at issue in that case, the reasoning of *Overlook* demonstrates that the Fischers' claim survives scrutiny under Rule 12(b) (6) of the Federal Rules of Civil Procedure.

In *Overlook,* the Spencer family resided in Overlook, which had a no-pets policy. 415 F. App'x at 618. The Spencers adopted a dog, Scooby, in 2005, and though they admitted that Scooby was not originally prescribed by a medical professional, they maintained that Scooby had a calming effect on their daughter, Lynsey, who suffered from anxiety disorder. *Id.* In 2007, the Spencers formally requested that they be allowed to keep Scooby as an accommodation under the FHA. *Id.* Following this request, a series of letters was exchanged between Overlook and the Spencers,[1] in which Overlook asked for information documenting Lynsey's disability and her need for Scooby. The Spencers provided some of the information Overlook requested. *Id.* at 61819. More specifically, on the eve of the suit, the Spencers had provided the following information: "a letter from Lynsey's psychologist, stating that she had evaluated Lynsey and recommended a service dog"; a form providing the name of Lynsey's psychologist; an explanation that Scooby was not a specially trained service animal, but rather a companion animal that provided emotional *9 support and companionship; statements from the Spencers themselves or other nonmedical personnel that Lynsey suffers from


casetext

"anxiety disorder, neurological & emotional conditions" that affect "her ability to care for herself and learn, both of which are . . . recognized as major life activities"; and that Scooby "ameliorates the effects of Lynsey's condition through its presence and interaction with her." *Id.* (internal quotation marks omitted). By the time Overlook filed suit, it had requested but still not received the following information: "a diagnosis of Lynsey's medical condition"; contact information for Lynsey's medical providers; "a description of the treatment Lynsey was receiving"; and Lynsey's school and medical records by way of a signed release that would allow Overlook to obtain these records. *See id.* at 618-19. At various points, Overlook also requested a description of the dog's training and of the services it provided, but information responsive to this request was furnished when the Spencers informed Overlook that Scooby had received no special training and that he ameliorated the effects of Lynsey's condition by being present and interacting with her. *See id.*

make the requested accommodation." *Id.* at 619. In response, the Spencers counterclaimed, alleging, among other things, that Overlook had refused to reasonably accommodate Lynsey's disability in violation of the FHA. *Id.* The case proceeded to trial and after the evidence had been presented, the district court entered judgment as a matter of law for Overlook on the Spencers' refusal-to-accommodate claim, reasoning that "they had presented insufficient proof that Overlook had actually denied their request for a reasonable accommodation." *Id.* at 620.

On appeal, the Sixth Circuit framed the question thus: "whether the district court erred in holding that, as a matter of law, Overlook did not constructively deny the request for a reasonable accommodation by

---

[1] The Spencers often acted through their attorney or the president of a local fairhousing center. For simplicity, references to the Spencers will also include communications made by these representatives. Significantly, neither the Spencers, their attorney, nor the president of the local fair-housing center, Jim McCarthy, were medical or dog-training professionals. *See id.* at 618-19.

Overlook did not make an official decision on the Spencers' accommodation request, nor did it begin eviction proceedings; it instead sued "for a declaratory judgment that it was not required to

delaying making a decision on the request, requesting school and medical records, and filing suit for a declaratory judgment." *Id.* at 620. Put more simply, the issue was "whether a reasonable jury could find that Overlook 'refused' to make the accommodation requested." *Id.* at 621.

The Court looked at three factors in analyzing the issue: (1) the extent to which the housing provider delayed and obstructed the process of negotiation over the requested accommodation by filing the lawsuit; (2) the state of the law at the time the suit was filed; and (3) whether the housing provider's delay in ruling on the accommodation request had the effect of depriving the disabled person of the accommodation. *See id.* at 621, 623. In setting forth the *10 principles relevant to the first factor, the Court relied heavily on the Joint Statement issued by the Department of Housing and Urban Development (HUD) and the Department of Justice (DOJ), entitled *Reasonable Accommodations Under The Fair Housing Act* (hereafter, the "Joint Statement").[5] *Id.* at 621-22.

Because those principles are directly relevant to the present case, the Court quotes the Sixth Circuit at length:

[5] The web site http://www.hud.gov/offices/fheo/library/huddojstatement.pdf (last accessed on March 12, 2014) contains the Joint Statement. Although the Joint Statement is a policy statement rather than "an authoritative interpretation of § 3604" that binds courts, the Joint Statement "may, of course, have the power to persuade." *Id.* at 621 n.3 (internal quotation marks omitted). The Sixth Circuit clearly found the Joint Statement highly persuasive because most of the principles it used to analyze the first factor came from the Joint Statement. The Joint Statement is written as a series of questions and answers. This Court also finds the Joint Statement highly persuasive.

[A] housing provider "has an obligation to provide prompt responses to reasonable accommodation requests. An undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation." Joint Statement at 11.

Moreover, the Joint Statement states that a "failure to reach an agreement on an accommodation request is in effect a decision by the provider not to grant the requested accommodation." *Id.* at 9. A housing provider, however, is entitled to seek information from an allegedly disabled person in order to establish the existence of the disability and the necessity of the accommodation. According to the Joint Statement,

> In response to a request for a reasonable accommodation, a housing provider may request *reliable* disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability, (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation.

*Id.* at 13. This inquiry need not be highly intrusive. "In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary . . . ." *Id.* at 13-14.

*Overlook,* 415 F. App'x at 621-22 (emphasis added). *11

With respect to the adequacy of the information that the Spencers provided to support their accommodation request, the Court's reasoning

was nuanced: "Overlook was entitled to additional information," but "[a]t the same time, Overlook was probably not entitled to the broad access to confidential medical and school records it demanded." *Id.* The additional, *reliable* information that Overlook was entitled to receive related to (a) verifying that Lynsey was disabled and (b) showing the relationship between Lynsey's disability and the need for the requested accommodation. *See id.* (For ease of reference, the Court will refer to information relating to these two categories as qualifyingdisability information and nexus information, respectively.) Because Overlook had never received reliable information relating to either of these two categories, Overlook was not able "to verify that a qualifying disability existed or that the proposed accommodation was related to the disability." *Id.*

The letter from Lynsey's treating psychologist did not suffice because it "merely stated that Lynsey was receiving 'psychological counseling services' and required a 'service dog.'" *Id.* Information from a treating psychologist would ordinarily be reliable. *See* Joint Statement at 13-14 ("A doctor or other medical professional . . . who is in a position to know about the individual's disability may also provide verification of a disability."). But the psychologist's letter in *Overlook* did not state that Lynsey suffered from a disability—let alone identify what that disability was—and it did not show the relationship between the assistance the dog could provide and the unspecified problems for which Lynsey was receiving counseling. *See Overlook,* 415 F. App'x at 622. (Another way to express this last point is that the letter did not show how or explain why a service dog helped with Lynsey's unspecified problems.) So it did not provide any qualifying-disability and nexus information. *Id.*

The court also found insufficient the statements from the Spencers and McCarthy, the president of the local fairhousing center: "[e]ven after receiving [this information], Overlook was entitled to additional information." *Id.* at 622. Unlike the information from the treating psychologist, who provided no qualifying-disability and nexus information, the information provided by the Spencers and McCarthy was qualifying-disability and nexus information, and it was specific and detailed: they informed Overlook that Lynsey suffered from and was

8

being treated for anxiety disorder, neurological conditions, and emotional conditions; that these ailments impacted Lynsey's ability to care for herself and learn; that Scooby provided emotional support and companionship to Lynsey; and that Scooby ameliorated the effects of these conditions by being present and interacting with Lynsey. *See id.* at 61819, 622. So the court did not find this information inadequate because it lacked detail or specificity. *See id.* at 622. Indeed, the court adopted the principles from the Joint Statement *12 that a housing provider's inquiry to obtain reliable qualifying-disability and nexus information "need not be highly intrusive" and that, "[i]n most cases, an individual's medical records or *detailed information* about the nature of a person's disability *is not necessary." Id.* (internal quotation marks omitted) (relying on Joint Statement at 13-14.) And since the information was manifestly qualifying-disability and nexus information, the Court could not have found that the Spencers failed to provide information on these subjects to Overlook. *See id.*

The only remaining basis on which the Court could reject this information as it did would be that the information was not sufficiently reliable. Neither the Spencers nor McCarthy were medical or dog-training professionals. That matters because Lynsey's alleged disability was an internal condition that would not be readily apparent to a lay observer. So the Spencers' and McCarthy's statements about the disability Lynsey allegedly suffered from and about how and why Scooby helped ameliorate this disability were unreliable in light of the facts. They were lay observers who were not qualified to diagnose Lynsey or pronounce how a dog helped her.

The nature of Lynsey's putative disability and the Joint Statement buttresses this conclusion. Lynsey's disability was not obvious. Unlike a person with a physical disability, such as someone confined to a wheelchair, Lynsey's disability was internal. Similarly, her need for the requested accommodation was not readily

apparent. The Joint Statement provides that when a disability is readily apparent, the housing provider may not request additional information about the requester's disability. Joint Statement at 1213. So too with the requester's disability-related need for the accommodation. *Id.* That is, if it is readily apparent how the requested accommodation would help alleviate the difficulties posed by the disability, then the provider may not request additional information concerning the need for the requested accommodation. *Id.* It is only when either the requester's disability or the disabilityrelated need for the accommodation are not obvious that the provider may request reliable qualifying-disability or nexus information. *Id.* And even then, the provider's queries are limited to precisely what is not obvious. An example in the Joint Statement illustrates the point:

A rental applicant who uses a wheelchair advises a housing provider that he wishes to keep an assistance dog in his unit even though the provider has a "no pets" policy. The applicant's disability is readily apparent but the need for an assistance animal is not obvious to the provider. The housing provider may ask the applicant to provide information about the disabilityrelated need for the dog.

*13 *Id.* at 13. This example is contained in the Joint Statement's answer to the following question: "[w]hat kinds of information, if any, may a housing provider request from a person with an obvious or known disability who is requesting a reasonable accommodation?" Joint Statement at 12. Moreover, the rule *Overlook* borrowed from the Joint Statement providing that a housing provider may request reliable qualifying-disability and nexus information, as well as information "describ[ing] the needed accommodation," is predicated on the disability in question not being readily apparent, just as the disability in *Overlook* was. That is so because the rule is provided in the Joint Statement's answer to this question: "[i]f a disability *is not obvious,* what kinds of information may a housing provider request from the person with a disability in support of the requested accommodation?" Joint Statement at 13 (emphasis added). An accommodation can also be constructively denied due to delay in making the decision. *Overlook,* 415 F. App'x at 620; Joint Statement at 9, 11.

Since neither Lynsey's disability nor her need for a dog were readily apparent, Overlook was entitled to

9

seek reliable qualifying-disability and nexus information. But even then, the Sixth Circuit reasoned that "Overlook was probably not entitled to the broad access to confidential medical and school records it demanded." *Overlook,* 415 F. App'x at 622. Adding teeth to this conclusion, the Sixth Circuit recognized that "[i]n some circumstances, a housing provider that refuses to make a decision unless a requestor provides unreasonably excessive information could be found to have constructively denied the request by 'stonewalling' and short-circuiting the process." *Id.* Finding that a provider constructively denied a requested accommodation on this basis in turn flowed from the more general principle that "injury may result when a housing provider unreasonably delays responding to a request for an accommodation and that such delay may amount to a denial." *Id.* The court's discussion of this particular manner of concluding that a provider constructively denied a requested accommodation was not theoretical. The court concluded its analysis of the first factor—"the extent to which Overlook delayed and obstructed the process of negotiation over the requested accommodation by filing the lawsuit"—by noting that "were it not for additional factors that are present here, the Spencers would have presented a jury issue as to whether Overlook 'denied' their request." *Id.*

Moving onto the second factor—"the state of the law at the time Overlook filed its complaint"— the court concluded that this factor weighed in favor of concluding that Overlook had not constructively denied the Spencers' request to keep Scooby. *Id.* at 622-24. This factor analyzes whether the state of the law justified the housing provider in turning to the courts for clarification rather than simply responding to the request. *Id.* The court focused on the *14 legal issue that Overlook argued was in its favor: namely,

whether a companion animal that lacks training could be a reasonable accommodation under the law. *Id.* at 619, 622-23. The district court concluded that because the law on this issue favored Overlook, "Overlook was well within its rights to get a court ruling on whether a dog that is the subject of a reasonable accommodation can be any companion animal." *Id.* at 622 (brackets, ellipses, and internal quotation marks omitted). In reaching this conclusion, the district court had relied on a case that "held that 'evidence of individual training' is required to show that a 'service animal' is a reasonable accommodation under the FHA." *Id.* (quoting *Prindable v. Association of Apartment Owners of 2987 Kalakaua,* 304 F. Supp.2d 1245, 1256-57 (D. Haw. 2003), *aff'd on other grounds sub nom. DuBois v. Association of Apartment Owerns of 2987 Kalakaua,* 453 F.3d 1175, 1179 n.2 (9th Cir. 2005)). Other cases cut against this holding, but the Sixth Circuit did "agree with the district court that there was at least some dispute in the law as to whether a 'service animal' required training and whether it had to do more than provide comfort and companionship to qualify as an accommodation." *Id.* at 623.

But the "fact that the law is not entirely clear concerning a requested accommodation will not always justify a housing provider's filing suit rather than responding to a request." *Id.* Because " [a]ccommodations are often highly specific," there will often be "no case law that indicates a particular accommodation is required." *Id.* So merely "claiming that the law is 'unclear' should not entitle the provider to delay and obstruct the accommodation process." *Id.* But in *Overlook,* "Overlook could point to case law indicating that it was not required to treat Scooby"— a companion dog with no special training—"as an accommodation." *Id.* This "weigh[ed] against the reasonableness of a jury finding that its actions in seeking additional information and turning to the court for clarification constituted a denial of the Spencers' request." *Id.*

The third factor—whether the housing provider's delay in ruling on the accommodation request had the effect of depriving the disabled person of the accommodation— similarly weighed in favor of concluding that Overlook had not constructively denied the Spencers' request. *See id.* at 621, 623. Although Overlook did not grant the

casetext

Spencers a temporary exemption from its no-pets policy, "the more important fact" was that Overlook allowed

10

Scooby to stay with the Spencers throughout the entire dispute. *Id.* at 623. And it never attempted to evict the Spencers or punish them for keeping Scooby. *Id.* So "Overlook's actions did not deny the Spencers the benefit of Scooby's company."

*Id.*

In concluding, the court made another important point: "[a]s a general rule, housing providers should cooperate with residents to resolve disputes over reasonable accommodations rather than turning to the courts." *Id.* But because the second and third factors weighed against finding a constructive denial, the court held that Overlook's actions "did not constitute a denial of [the Spencers'] request for an accommodation."

*Id.* at 624.

Now that the Court has explicated the three *Overlook* factors, the Court applies them to the present case. In analyzing the first factor— namely, the extent to which the housing provider delayed and obstructed the process of negotiation over the requested accommodation by filing the lawsuit— *Overlook* examined whether the information that the Spencers provided Overlook was sufficient for Overlook to make a decision about the requested accommodation. *Id.* at 622.

The Fischers had certainly provided Sabal Palm enough information for it to rule on (and grant) their request. It bears emphasizing that unlike Lynsey, who had a mental and emotional disability that was not readily apparent, Deborah Fischer had a physical disability that was readily apparent because she was confined to a wheelchair. And the rule that *Overlook* adopted [...] more information. Sabal Palm contended that she had not substantiated her need for a service dog: [...] This [...] shows that "you have not provided the Board with any medical records substantiating your need for the [...]"

from the Joint Statement about the reliable information a housing provider may request in response to an accommodation request was predicated on the requestor having a disability that was not readily apparent, as was the case in *Overlook*. *See id.* at 621; Joint Statement at 13. So it is doubtful, *[*15]* to say the least, that Sabal Palm was entitled to the detailed medical information it requested concerning Deborah's physical disability. (Sabal Palm requested that Deborah provide it with copies of her medical records from all of her healthcare providers who provided her with a diagnosis or treatment of the disability for which she claimed the need to keep Sorenson. (ECF No. 82-2 at 2.)) But even setting aside that problem with Sabal Palm's actions and assuming that Sabal Palm was entitled to this medical information, Deborah provided it before Sabal Palm sued. In December 2011, she gave Sabal Palm a medical history form completed by her primary-care doctor, Leslie Herzog. (ECF No. 82-6 at 2.) Herzog completed this form in January 2010 as part of Deborah's application for a service animal through Canine Companions for Independence (CCI). (*Id.* at 3-8.) The form provides copious information, including the following: that one purpose of the form is to determine the applicant's (i.e., Deborah's) suitability for having a service dog placed with her; that Herzog has been a physician to Deborah since October 2003; that Herzog last examined Deborah in January 2010 on the same day Herzog completed the form; that Deborah has multiple sclerosis; that she is confined to a wheelchair; that she suffers from a "loss of *[*16]* strength, balance, [and] coordination" in all of her extremities (including her hands); that she requires attendant care on a regular basis for "all aspects of daily living"; and that she is a "good candidate" for a service dog through CCI. (ECF No. 82-6 at 3-8.) This information shows that Deborah is disabled, that she needs assistance with "all aspects of daily living," and that she is a good candidate for a service dog.

 casetext

(ECF No. 82-7 at 2.) So later in February 2012, Deborah gave them even more medical information substantiating her need for a dog.

(*See id.*)

Sabal Palm Condos. of Pine Island Ridge Ass'n, Inc. v....    Case No. 12-60691-Civ-SCOLA (S.D. Fla. Mar. 13, 2014)

candidate for a service dog, which clearly implies that a service dog would help with her disabilities.

(ECF No. 82-8 at 2-11.)

Concluding that Sorenson would help with her disabilities is buttressed by a November 28, 2011 letter from a manager/instructor at CCI. (ECF No. 82 at 4; ECF No. 82-3 at 2; ECF No. 82-4 at 2; ECF No. 129 at 4.) The letter reads thus:

> This is *to certify* that Sorenson, tattoo number 2009218, is a Canine Companions [17] for Independence assistance dog. He is placed with Deborah Fischer of Davie, FL. Sorenson *is trained to assist Deborah* by retrieving items, opening and closing doors and turning light switches on and off. Deborah and Sorenson graduated from our Southeast Regional Training Center on November 11, 2011. If you need further information, please do not hesitate to contact me at [phone number]. (ECF 82-8 at 11.)

(ECF No. 82-3 at 2.) So the letter establishes that Sorenson is specially trained to assist Deborah, and the tasks it is designed to assist her with make sense given her disability of multiple sclerosis and the symptoms of that disability (e.g., loss of strength and coordination in all extremities, including her arms and hands). Based on this letter and the medical-history form that Herzog completed, one could not reasonably doubt that Deborah was disabled, that she needed an accommodation, and that having Sorenson as an accommodation would help ameliorate the effects of her disability.

All of these additional medical records tell a consistent story: Deborah's multiple sclerosis renders her severely disabled and requires that she have the assistance of others to maximize her functional status. The descriptions of the symptoms of her disability in these documents make it clear that a service dog trained to help retrieve items, open doors, and turn light switches on and off would help ameliorate the effects of her disability. *17

A "treating source neurological questionnaire" completed by Herzog in July 2009 stated that Deborah had multiple sclerosis with the following symptoms: decreased grip strength; decreased ability to perform fine manipulation, decreased ability to perform gross manipulation; gait disturbance; sensory loss; motor loss; spasticity; severe fatigue; malaise; and substantial muscle weakness on repetitive activity. (ECF 82-8 at 11.)

Herzog elaborated: "Pt. [patient] with progressive exacerbations of condition—requires assistance of another with all ADLs [Activities of Daily Living] as well as with any transferring from wheelchair to another site[.] Pt. [patient] has significant loss of function of upper and lower extremities, muscle control, [and] strength. She suffers from fatigue." (*Id.*) The form also indicates that Deborah is wheelchair bound: "Pt [patient] is unable to ambulate or stand alone or with a handheld device. [...] transfer [...] lower-extremity strength as 1/5." (*Id.*)

Yet even after receiving information that should have been dispositive, Sabal Palm took the position in a February 2012 letter that it needed

A "home health certification and place of care" form signed by Herzog in July 2011 diagnoses Deborah with multiple sclerosis,

wheelchair dependence, and debility (feebleness, weakness, or loss of strength). (*Id.* at 3.) It further states that "patient cannot safely leave home without assistance. Due to [patient's] health status, [patient] is homebound, She requires the assistance of another individual to from  her wheelchair/scooter." (*Id.*)

Deborah's grip strength was rated as 2/5, and her and therefore requires nursing care in the home. Home healthcare is medically necessary to maximize [patient's] functional status." (*Id.*)

The most recent medical record is a "group disability insurance attending physician's statement" completed by Herzog in August 2011. (*Id.* at 5-7.) Deborah is diagnosed with

12

multiple     sclerosis,     debility,     and wheelchair dependence.[6]

(*Id.* at 5.) Deborah has "neurological deficits of extremities," cannot ambulate, cannot drive, "will not be able to *ever* return to [the] workforce," and "needs assistance [with] ADLs [activities of daily living]." (*Id.* at 6.) The job category that best describes Deborah's functional status is "sedentary," which means that she can lift, at best, "negligible weight."[2] (*Id.* at 7.)

6

The form states that Deborah was first diagnosed with multiple sclerosis in 2001 and that the date she experienced a significant loss of function was July 2009.

(*Id.* at 5-6.)

retrieve items, open doors, and turn light switches on and off—were severely impacted by her disability. Moreover, her being confined to a wheelchair would also sometimes prevent her from retrieving items (for example, items on the floor). And since she had provided evidence that Sorenson's

training was specifically designed to help with these activities, she had amply established her disability-related need for Sorenson.

8

Again, this analysis proceeds from the premise that Sabal Palm was entitled to obtain medical records substantiating Deborah's disability—a premise that is false because her disability was readily apparent. *See* Joint Statement at 1214. Sabal Palm's position that it needed records to verify that a service dog would help with her disability is plausible, *see id.* at 13, but the records it received before suing were more than

2

Because there was no box below "sedentary" on the form, Deborah's limitations may exceed those described in the "sedentary" box. Hence the conclusion that she can lift negligible weight at best.

This information conclusively demonstrates that, contrary to Sabal Palm's contention, Deborah had

sufficient for it to verify that Deborah needed Sorenson.

Given the dispositive nature of the information that it had received, Sabal Palm's demands for even more information were unreasonable. As *Overlook* concluded, an inquiry seeking qualifying-disability information, nexus information, or information describing the needed accommodation, "need not be highly intrusive." Sabal Palm had already received detailed—and in the case of the medical records, confidential— information addressing these three points. Asking for even more medical records providing nexus information was clearly "highly intrusive," and the intrusion was not necessary. So the circumstances of the present case place it squarely within the following principle formulated by *Overlook:* "[i]n some circumstances, a housing provider that refuses to make a decision unless a requestor     provides     unreasonably     excessive information could be found to have constructively denied     the     request     by     'stonewalling'     and

casetext

shortcircuiting the process." *Overlook,* 415 F. App'x at 622. In sum, the first factor strongly weighs in favor of concluding that the Fischers have plausibly alleged that Sabal Palm constructively denied their requested accommodation.

The second *Overlook* factor—the state of the law at the time the suit was filed—also weighs in favor of concluding that the Fischer's have alleged a plausible refusal-to-accommodate claim. This factor analyzes whether the state of the law justified the housing provider in turning to the courts for clarification rather than simply responding to the request. *Id.* at 622-24. Based

provided Sabal Palm with medical records substantiating her need for a dog that could retrieve items, open doors, and *18 turn light switches on and off.[8] She was disabled, needed assistance with all activities of daily living, and had specifically shown that her ability to grab and manipulate items—abilities that are necessary to

casetext

on Sabal Palm's Complaint and a letter from Trapani to the Fischers sent just five days after Sabal Palm sued, Sabal Palm believed at the time it filed suit that the law showed the following: that Sabal

Palm was entitled to all of the medical records it requested in order to properly evaluate the *19 accommodation; that it was within its rights to deny the accommodation because the Fischers failed to provide all the requested medical records; and that the records produced do not show that a dog in excess of 20 pounds is a reasonable or necessary accommodation. (*See* ECF No. 1 at ¶¶ 24-25, 28, 32, 36-37; ECF No. 82-9 at 2.[9])

Because Sabal Palm is mistaken about the law, this factor does not favor Sabal Palm. The Court analyzes each of Sabal Palm's beliefs about the law in turn.

[9] Although Sabal Palm's Amended Complaint (ECF No. 129) was filed well after it sued, the Amended Complaint advances the same beliefs about the state of the law. (*Compare* ECF No. 129 at ¶¶ 2122, 25, 29, 33-34, *with* ECF No. 1 at ¶¶ 24-25, 28, 32, 36-37.)

Sabal Palm's first two beliefs—that it was entitled to all of the medical records it requested and that it was within its rights to deny Deborah the dog because she failed to provide all the requested medical records—must be reframed to properly analyze them. Because Deborah had provided Sabal Palm with medical and dog-training records before Sabal Palm sued, the question becomes whether the law supports Sabal Palm's contention that it was entitled to additional records and that it could deny her request because she failed to provide these additional records. As discussed above, the records Deborah provided were more than sufficient to verify that she had a disability that lay observers could see with their own eyes,[10] that some of the symptoms associated with her disability would make it difficult for her to pick up and manipulate items, and that Sorenson's training (retrieving

items, opening and closing doors, and turning light switches on or off) would help alleviate some of the negative effects of her symptoms. Because Sabal Palm already had enough qualifying-disability and nexus information, Sabal Palm's request for additional records was excessive and unnecessary. The law is squarely against Sabal Palm on these beliefs.

[10] Because Deborah's disability was readily apparent, Sabal Palm was not entitled to ask for medical records verifying her disability. Joint Statement at 12-14. A contrary result would be absurd. For example, a housing provider should not be able to demand that a blind person or a person confined to a wheelchair produce medical records supporting their disability. *Id.* Because Deborah's disability-related need for a dog was not readily apparent Sabal Palm was entitled to ask for information substantiating her need. Joint Statement at 13-14. But as discussed above, Deborah provided enough information to show the relationship between her disability and the need for a dog with Sorenson's specific training.

So too with Sabal Palm's final belief—namely, that under the governing law, the records produced do not show that a dog in excess of 20 pounds is a *20 reasonable or necessary accommodation. The Court will analyze reasonableness and necessity in turn.

An accommodation is not reasonable "if [1] it would impose an undue financial and administrative burden on the housing provider or [2] it would fundamentally alter the nature of the provider's operations." Joint Statement at 7; *accord Schwarz v. City of Treasure Island,* 544 F.3d 1201, 1220 (11th Cir. 2008) (determining that an accommodation is unreasonable "if it

Sabal Palm Condos. of Pine Island Ridge Ass'n, Inc. v....    Case No. 12-60691-Civ-SCOLA (S.D. Fla. Mar. 13, 2014)

either [1] imposes undue financial and administrative burdens on a grantee or [2] requires a fundamental alteration in the nature of the program" (internal quotation marks omitted) (brackets in original)). Because Sabal Palm admits that it is "undisputed that [Deborah's] request for an accommodation would not involve an extraordinary expense on the part of [Sabal Palm]," the Court need consider only whether allowing Deborah to keep Sorenson would fundamentally alter the nature of Sabal Palm's program. (ECF No. 129 at 2.) "A fundamental alteration is a modification that alters the essential nature of a provider's operations." Joint Statement at 8 (internal quotation marks omitted); *accord Schwarz,* 544 at 1220 ("A proposed accommodation amounts to a 'fundamental alteration' if it would eliminate an essential aspect of the relevant activity." Sabal Palm is a condominium association. Its *raison d'être* is to provide housing. Allowing a disabled resident to keep a service dog would not fundamentally alter Sabal Palm because Sabal Palm would still be able to offer housing.

The governing regulation buttresses this conclusion. The companion regulation to 42 U.S.C. § 3604(f)(3)(B) is 24 C.F.R. § 100.24(a), and this regulation specifically provides that it is unlawful for a housing provider with a no-pets policy to refuse to permit a blind person to live in a dwelling unit with a seeing-eye dog. 24 C.F.R. § 100.24(b)(1). Because an essential element of both § 3604(f)(3)(B) and § 100.24(a) is that the accommodation be reasonable, it follows that allowing a disabled person to keep a dog in a housing unit with a no-pets policy is a reasonable accommodation.

Necessity cuts against Sabal Palm too. A housing provider is required to make a reasonable accommodation *"only* if it 'may be necessary to afford [a disabled resident of Sabal Palm an] equal opportunity to use and enjoy a dwelling.'" *Schwarz,* 544 F.3d at 1225 (quoting 42 U.S.C. § 3604(f)(3)(B)). "To show that a requested accommodation may be necessary, there must be an

identifiable relationship, or nexus, between the requested accommodation and the individual's disability." Joint Statement at 6.

Deborah has sufficiently demonstrated that Sorenson may be necessary for her to have an equal opportunity to use and enjoy her dwelling.

The symptoms of her disability make it difficult for her to grab and manipulate *21 items and they require that she have assistance in all activities of her daily life. So it follows that a service dog trained to retrieve items, open and close doors, and turn light switches on and off would help alleviate some of the negative effects of her disability. Because Deborah provided medical and dogtraining records substantiating her need for a service dog with Sorenson's training, she has demonstrated necessity.

One additional argument under necessity deserves attention. In addition to arguing that a service dog is not a reasonable or necessary accommodation, Sabal Palm also appears to argue that even if a dog is reasonable or necessary for Deborah, a dog over 20 pounds is not reasonable or necessary. (*See* ECF No. 129 at 6-7; ECF 82-9 at 2.) This argument is unpersuasive. A dog under 20 pounds is a small dog. So given the height of the average door handle and light switch, a small dog will have a harder time opening and closing doors and turning light switches on or off. And there will be some items a small dog cannot retrieve because of the item's height that a bigger dog would be able to retrieve. Moreover, given the height of a person in a power wheelchair, a smaller dog will have a harder time retrieving items effectively for the disabled person.

This is not just commonsense—though it most certainly is that. Deborah also wrote in an email to Trapani that, "regarding the size of my dog— the dog is matched to the height of my chair, which enables him to assist me better with his jobs, i.e. picking up items I have dropped."

(ECF No. 82-6 at 2.) She also attached a picture of her in her power wheelchair with Sorenson. (ECF No. 82-4 at 3.) In the picture, the dog's size fits well with the height of her in the wheelchair. (*See id.*)

Deborah's statement regarding Sorenson being sized appropriately for her wheelchair is credible. It accords with common sense. And the picture Joint Statement at 8 (emphasis added). Since a dog over 20 pounds is a reasonable accommodation, she provided to Sabal Palm supports her statement.

Sabal Palm's implied argument is that even if a dog is reasonable or necessary for Deborah, a dog 20 pounds or under would suffice is akin to an argument that an alternative accommodation (here, a dog under 20 pounds), would be equally effective in meeting Deborah's disability-related needs as a dog over 20 pounds. The Joint Statement's comments on alternative accommodations proposed by the housing provider is highly persuasive and useful in evaluating this argument.

> There may be instances where a provider believes that, while the accommodation requested by an individual is reasonable, there is an alternative accommodation that would be equally effective in meeting the individual's disability-related needs. In such a circumstance, the provider should discuss with the individual if she is willing to accept the altnerative accommodation. *However, providers should be aware that persons with disabilities typically have the most accurate knowledge about the functional limitations posed by their disability, and an individual is not obligated to accept an alternative accommodation suggested by the provider if she believes it will not meet her needs and her preferred accommodation is reasonable.*

In sum, the law at the time Sabal Palm sued is in her favor. The second *Overlook* factor strongly weighs in favor of concluding that Sabal Palm constructively denied the Fischers' requested accommodation.

Deborah's (commonsense) belief that a dog over 20 pounds—in particular, a dog of Sorenson's size — is better able to assist her is entitled to weight. The letter from the dog-training professional at CCI supports this conclusion as well. (*See* ECF No. 82-3 at 2.) The letter shows that in that person's professional judgment, Sorenson will assist Deborah. (*Id.*)

The third *Overlook* factor—whether the housing provider's delay in ruling on the accommodation request had the effect of depriving the disabled person of the accommodation—is the only factor that favors Sabal Palm. In its first communication, Sabal Palm told the Fischers that they could temporarily keep Sorenson while Sabal Palm evaluated their accommodation request. (ECF No. 82-2 at 3.) Similarly, in the April 2012 letter just a few days after Sabal Palm brought the declaratoryjudgment action, Sabal Palm told the Fischers that they could temporarily keep Sorenson while the lawsuit is pending. (ECF No. 82-9 at 3.) But because the other two factors strongly weigh in favor of concluding that Counter Defendants constructively denied the Fischers' accommodation request, the Court holds that the Fischers have plausibly alleged a refusaltoaccommodate claim.

## E. The Fischers' § 3604(c) claim

The Fischers allege that that rules adopted by Sabal Palm in December 2011 discriminate against disabled persons and thus violate 42 U.S.C. § 3604(c). (ECF 82 at 17-19.) All Counter Defendants argue that this claim should be dismissed because § 3604(c) applies to notices or statements made in connection with the sale or rental of a dwelling, a condition that is not met in this case. Trapani and Sabal Palm also argue that the claim is moot. Because mootness is jurisdictional, the Court considers that argument first.

### 1. Is the § 3604(c) claim moot?



Trapani and Sabal Palm argue that this claim is moot because in November 2012 Sabal Palm amended the rule setting forth the procedure for seeking an exemption to the no-pets policy so that this procedure now applies to anyone seeking an exemption, not just to disabled persons. Their argument is unpersuasive.[11]

> [11]
>
> That was not the only change Sabal Palm made to its rules about pets. It also peppered the rules on the procedures for seeking an exemption from the no-pets policy, the procedures for processing requests for an exemption, and the procedures for keeping pets (including pets allowed based on an exemption) with phrases like "unless otherwise required by law" or an equivalent. For example, the rules governing keeping pets—which includes a rule prohibiting pets in Sabal Palm's common areas—apply "unless otherwise prohibited by law." (ECF No. 96-1 at 3-4.) As discussed in more detail below, the FHA clearly prohibits such a rule for a service animal that is a reasonable and necessary accommodation to a disabled person. Sabal Palm does not argue that these other changes contributed to mooting the Fischers' claim until their reply brief. That is too late for the Court to consider that argument.

"To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all states of review, not merely at the time the complaint is filed.'" *Arizonans for Official English v. Arizona,* 520 U.S. 43, 67 (1997) (quoting *Preiser v. Newkirk,* 422 U.S. 395, 401 (1975)). "Mootness is jurisdictional," and therefore must be decided as a threshold matter and requires dismissal if the court finds its jurisdiction lacking under this doctrine. *Al Najjar v. Ashcroft,* 273 F.3d 1330, 1336 (11th Cir. 2001). The burden of establishing mootness rests with the party seeking dismissal. *See County of L.A. v. Davis,* 440 U.S. 625, 631 (1979). "A case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Ethredge v. Hail,* 996 F.2d 1173, 1175 (11th Cir. 1993).

In their §3604(c) claim, the Fischers seek not just injunctive relief, but also their attorney fees and compensatory and punitive damages. The monetary relief they seek cannot be mooted by any change in policy by Sabal Palm, including a change in Sabal Palm's governing rules and regulations. *Housing Opportunities Project for Excellence, Inc. v. Wedgewood Condominium Association, Inc.,* 2012 WL 4193969, at *6 (S.D. Fla. Sept. 19, 2012) (Scola, J.) (citing *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 371 (1982)). That's because amending the rules did not give the Fischers the monetary compensation they seek in their § 3604(c) claim. *Id.*; *cf. Jews for Jesus, Inc. v. Hillsborough County Aviation Authority,* 162 F.3d 627, 629 (11th Cir. 1998)("In this case, the airport's change of policy has already given Jews for Jesus the relief they seek—the ability to distribute literature at the airport— and there is *24 therefore no meaningful relief left for the court to give."). The 3604(c) claim is therefore not moot.

But what about the injunctive relief sought under this claim? Is that relief mooted by Sabal Palm's amending the rules? There is a threshold question: must a court separately analyze whether injunctive relief under a particular claim can become moot when the plaintiff seeks monetary relief under that same claim. Assuming without deciding that a court must, the injunctive relief sought is still not moot. The injunctive relief sought by the Fischers is much broader than simply ordering Sabal Palm to apply the procedure for a pet exemption to anyone, disabled or not, who asks for it. So the change in the rule does not give the Fischers all the injunctive relief they seek. Moreover, the Fischers challenge not just the procedure for seeking an exemption, but also the procedures

for processing exemption requests and for keeping pets. (ECF No. 82 at 8-12, 17-19.) So the rule change Sabal Palm points to does not even embrace all the rules that the Fischers challenge.

Besides, the small change Sabal Palm points to does not even satisfy the the following threefactor test that the Eleventh Circuit uses to decide whether a defendant's voluntarily ceasing the challenged conduct moots a plaintiff's claim: "(1) whether the challenged conduct was isolated or unintentional, as opposed to a continuing and deliberate practice; (2) whether the defendant's cessation of the offending conduct was motivated by a genuine change of heart or timed to anticipate suit; and (3) whether, in ceasing the conduct, the defendant has acknowledged liability." *Sheely v. MRI Radiology Network, P.A.,* 505 F.3d 1173, 1184 (11th Cir. 2007).

Analyzing Sabal's Palms December 2011 rules and the amended November 2012 rules on pets in common areas nicely illustrates why the three factors weigh against mootness. Under the December 2011 rules, pets are not allowed in any common areas and they are allowed in catwalks or in elevators only if they are carried. (ECF No. 8210 at 7.) That rule is plainly unlawful as applied to any pet that has been allowed to a disabled person as an accommodation under the FHA (hereafter, "an accommodation animal"). The governing regulation makes it "unlawful . . . to refuse to make reasonable accommodations in rules . . . when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, *including public and common use areas."* 24 C.F.R. § 100.24(a). The regulation defines public and common-use areas broadly in a manner that would include the common areas at Sabal Palm and the elevators and catwalks. *See* 24 C.F.R. § 100.21. The November 2012 rules have

this same rule; the only difference is that Sabal Palm now provides that this rule must be followed "unless otherwise prohibited by law." [25] (ECF 96-1 at 3.) *25

But the terse phrase—*unless otherwise prohibited by law*—is not a meaningful change and cannot be used to insulate Sabal Palm from liability. A contrary conclusion leads to absurd results. For example, what if Sabal Palm had a rule about bathrooms in common areas providing that, *unless otherwise prohibited by law,* bathroom X was for whites only and bathroom Y, for nonwhites? Just as that rule would be foreclosed by governing law, Sabal Palm's November 2012 rule is foreclosed by the FHA. That Sabal Palm's amended rules still contain an unlawful rule weighs in favor of concluding that the challenged conduct is a continuing and deliberate rather than isolated or unintentional. It also shows that Sabal Palm has not ceased the challenged conduct. Moreover, adding the phrase *unless otherwise prohibited by law* to this rule without making other changes evinces a desire to avoid liability rather than a genuine change of heart. Sabal Palm is keeping the gist of the rules the Fischers challenge, making changes that amount to no more than window dressing.[12] So the three *Sheely* factors show that the Fischers' injunctive relief is not moot.[24]

---

[12] Analyzing the December 2011 and November 2012 versions of many other rules leads to the same conclusion. For example, consider the 2011 and 2012 versions of the rule requiring that a resident who owns a pet—including a disabled resident who has an animal as an accommodation under the FHA— carry

[24] In one sentence, Sabal Palm and Trapani argue that the injunctive relief sought by the Fischers is not provided for under § 3604(c).

(ECF NO. 95 at 13; ECF No. 96 at 13.) The Court declines to accept such an unsupported argument. The relief available to



liability insurance to insure against the chance that the animal injures someone. (ECF Nos. 82-10 at 8; 95-1 at 4.) This rule violates the FHA with respect to an animal that a disabled person has as an accommodation. *See* Joint Statement at 9 (persuasively explaining that a housing provider cannot condition a disabled person's reasonable and necessary accommodation on obtaining liability insurance). That the 2012 version of the rule applies *unless otherwise prohibited by law* does not fix the illegality for the reasons already explained.

private litigants for violations of the FHA is outlined in 42 U.S.C. § 3613(c); § 3604 just specifies conduct that violates the FHA. And the relief authorized by § 3613(c) is phrased broadly.

## 2. Is the § 3604(c) claim valid?

The Fischers contend that the December 2011 rules promulgated by Sabal Palm relating to pets discriminated against disabled persons and thus violated 42 U.S.C. § 3604(c). That section provides in relevant part that it is unlawful to "make, print, or publish . . . any notice, statement, or advertisement with respect to the sale or rental of a dwelling that indicates any *26 preference, limitation, or discrimination based on . . . handicap." Counter Defendants contend that this claim is invalid because the December 2011 rules were not connected with a sale or rental of the Fischers' dwelling. The Court agrees and dismisses this claim with prejudice.

Numerous courts have held that a § 3604(c) claim requires that the allegedly discriminatory statement be made in connection with the sale or rental of a dwelling. *E.g. White v. United States Department of Housing and Urban Development,* 475 F.3d 898, 904 (7th Cir. 2007); *Matarese v. Archstone Pentagon City,* 795 F. Supp. 2d 402, 441 (E.D. Va. 2011) (holding that § 3604(c) "extends to all written or oral statements *made by a person engaged in the sale or rental of a dwelling"* (emphasis added)), *rev'd in part on other grounds sub nom. Matarese v. Archstone Communities, LLC,* 468 F. App'x 283

(4th Cir. 2012); *Michigan Protection and Advocacy Service, Inc. v. Babin,* 799 F. Supp. 695, 716 (E.D. Mich. 1992) (holding that § 3604(c) governs "only the discriminatory comments of a person selling/renting his dwelling, or an agent acting on behalf of that person"); *Gourlay v. Forest Lake Estates Civic Assocation of Part Richey, Inc.,* 276 F. Supp.2d 1222, 1234 (M.D. Fla. 2003) (holding that the § 3604(c)'s plain language "indicates that to create liability either a sale or rental of a dwelling needs to occur or at least be potentially occurring"), *vacated due to settlement,* 2003 WL 22149660, at *1 (M.D. Fla. September 16, 2003). Because this interpretation accords with the plain language of the statute and its accompanying regulation, the Court adopts it. *See* 42 U.S.C. § 3604(c); 24 C.F.R. § 100.75(b) ("The prohibition in this section shall apply to all written or oral notices or statements by a *person engaged in the sale or rental of a dwelling."* (Emphasis added.)).

There are no factual allegations in the Fischers' Amended Counterclaim that the December 2011 rules (or the November 2012 rules, for that matter) were made in connection with the sale or rental of a dwelling. (*See* ECF No. 82.) The Amended Counterclaim similarly fails to allege facts that the Fischers' 3604(c) claim arises from the sale or rental of a dwelling. (*Id.* at 8-12, 17-18.) Moreover, the Fischers' allege that they own and currently live in a Sabal Palm condominium, and Deborah's December 2011 email to Trapani states, "I have lived here for 10 years." (ECF No. 82-4 at 2; *accord* ECF No. 82 at 2.) There are no allegations that the Fischers are attempting to sell or rent their dwelling. (*See* ECF No. 82.) For these reasons, the 3604(c) claim is not plausible and is **dismissed with prejudice.**

The dismissal is with prejudice because it is clear that the Fischers cannot in good faith allege facts fixing the fatal defects noted above. Counter Defendants' motions to dismiss

pointed out that the Fischers' allegations did not support a 3604(c) claim for the reasons discussed above, and these *27 motions cited case law supporting their argument. (*See* ECF Nos. 89, 95, 96.) Moreover,

the Fischers' responses to these motions cited no case law supporting their position that the 3604(c) claim was valid, nor did they explain how their 3604(c) claim was connected to the sale or rental of a dwelling. (*See* ECF Nos. 100, 107, 108.) The adverse case law cited by Counter Defendants and the statute's plain language, coupled with the Fischers' inability to cite any case in support of their claim or to explain how their claim was connected to a sale or rental, should have made the Fischers aware that their claim as pled was invalid. And yet the Fischers waited for months to move to amend their Amended Counterclaim in order to try to fix these problems.[14] (ECF No. 214.) In fact, the Fischers' motion to amend came after the close of fact discovery, after both Sabal Palm and Trapani had moved for summary judgment, and just days before the dispositivemotion deadline. (*Compare* ECF Nos. 201, 202, *and* 214, *with* ECF No. 193.) And even then, the Fischers did not try to allege facts connecting their 3604(c) claim to a sale or rental; they instead switched legal theories all together, arguing that the December 2011 rules violated § 3604(f)(2) rather than § 3604(c). (ECF No. 214-1 at 17.) Because the Court **denies** their motion to amend the Amended Counterclaim (ECF No. 214), the Court also dismisses the 3604(c) claim with prejudice.

[14] A motion for sanctions filed months before the Fischers moved to amend their Amended Counterclaim similarly notified that Fischers that the 3604(c) claim was invalid. (ECF No. 143.)

There are several reasons to deny the Fischers' motion to amend (ECF No. 214). Given the multiple times that the Fischers were notified that the 3604(c) claim was invalid, and given the long delay in the Fischers' moving to amend to fix this claim, the Fischers' asserted excuse—namely, that they simply mistakenly cited to the wrong section of 3604—beggars belief. If the Fischers merely made a scrivener's error as they claim, then they should have moved to amend much sooner than they did. The Court concludes that the proposed amendment is the result of undue delay or dilatory motive, and perhaps even bad faith. Moreover, since the motion to amend came after the close of fact discovery, if the Court were to grant the motion, it would have to reopen fact discovery out of fairness to Counter Defendants. That would further delay a case that should not have been brought in the first place. Failing to reopen discovery would prejudice Counter Defendants because they would not be able to conduct discovery on this new legal theory. That the motion to amend came after two parties moved for summary judgment is just icing on the cake. For all these reasons, the Court is well within its discretion to deny the motion to amend. *28

Finally, the Court notes that dismissing the Fischers' 3604(c) claim with prejudice does not foreclose them from obtaining meaningful relief. Under the declaratory-judgment action, the Court is empowered to decide (1) whether the Fischers are entitled to keep Sorenson as an accommodation under the FHA and (2) whether Sabal Palm is entitled to all of the records it requested. This necessarily implies the power to decide the scope of both the accommodation and the records that may legitimately be requested. In other words, the Court can decide under the declaratory-judgment action the records that Sabal Palm can legitimately demand and the conditions under which the Fischers may keep Sorenson.

If the Fischers were to move for summary judgment on the declaratory-judgment action and argue, for example, that they are entitled to keep Sorenson, then the Court could decide based on clear law that Deborah is entitled to keep Sorenson so that she can

enjoy not only her dwelling, but the public- and common-use areas. *See* 24 C.F.R. § 100.204(a) (rendering it unlawful to deny reasonable accommodations that are necessary to enjoy the dwelling unit and public- and commonuse areas). Such a determination would similarly render void the rule that Deborah must carry Sorenson in catwalks and elevators because that rule would deprive her of equal enjoyment and use of these common-use areas. The same would go for the rule requiring that a resident carry liability insurance to insure against the chance that the service animal injures someone. *See* Joint Statement at 9 (persuasively explaining that a housing provider cannot condition a disabled person's reasonable and necessary accommodation on obtaining liability insurance).

This principle generalizes. So the Court's conclusion that the Fischers provided more than enough information for Sabal Palm to grant their requested accommodation has obvious implications for the rules establishing the procedures for seeking and processing accommodations to the no-pet policy based on disability. So too, the Court's conclusions that in some cases, a housing provider is not entitled to any information about the person's disability or need for an accommodation, and that even when the provider is entitled to seek information, the inquiry need not be highly intrusive.

## F. The § 3617 retaliation claim

The Fischers allege that Counter Defendants violated 42 U.S.C. § 3617,[3] the FHA's retaliation provision, by instituting the declaratory-judgment action: *29 Counter Defendants "decided to use litigation in this court to coerce, intimidate, threaten, or interfere with the [Fischers'] enjoyment of their fair housing rights." (ECF No. 82 at 21.) Sabal Palm argues that its First Amendment right to petition the government renders it immune from liability for suing the Fischers. (ECF No. 96 at 1718.) Because Sabal Palm is correct, the Court dismisses this claim *with prejudice.*

The First Amendment to the United States Constitution guarantees the right to "petition the Government for a redress of grievances." To give this principle life in the antitrust context, the Supreme Court developed the *Noerr-Pennington* doctrine, under which those who petition the executive or legislative branches of government for redress "are generally immune from antitrust liability." *Professional Real Estate Investors, Inc.*

---

[3] This section makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . .

*v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 56-57 (1993); *accord Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136 (1961) ("The Sherman Act does not prohibit . . . persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly."); *Mine Workers v. Pennington,* 381 U.S. 657, 670 (1965) ("Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition."). "The Court has further established that the right to petition extends to all departments of the government, including . . . the courts." *White v. Lee,* 227 F.3d 1214, 1231 (9th Cir. 2000) (citing *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972)).

Because the immunity under the *NoerrPennington* doctrine is based on the First Amendment right to petition—a right that is not limited to petitions involving antitrust issues—and because this right extends to petitions filed in the courts (i.e., lawsuits), this immunity also applies in other contexts, including to lawsuits that allegedly violate § 3617 of the FHA. *Id.* at 122932, 1237. But this immunity is not absolute: if a lawsuit is a "sham," then it is not protected by the First Amendment. *Id.* at 1231-32. The party challenging immunity bears the burden to show that the lawsuit



is a sham. *Atico International USA, Inc. v. Luv N' Care, Ltd.,* 2009 WL 2589148, at *3 (S.D. Fla. August 19, 2009) (Cohn, J.) (internal quotation marks omitted).

The Supreme Court developed a two-part test to determine if a lawsuit is a sham. The first part is objective: "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Professional Real Estate,* 508 U.S. at 60. The second part, subjective: did the party

any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617.

bring the suit based on the party's belief that the process of the suit itself would further an illegal objective (for example, its belief that the costs of litigation would harm a competitor) rather than its belief that the potential *30 outcome of the suit (i.e., judicial relief) made suing worthwhile. *See id.* at 56-57, 60-61; *White,* 227 F.3d at 1232. In the context of the Fischers' claim that Sabal Palm's lawsuit violated § 3617, the lawsuit is not a sham unless "(1) no reasonable litigant could have realistically expected success on the merits, and (2) [Sabal Palm] filed the suit for the purpose of coercing, intimidating, threatening, or interfering with [the Fischers'] exercise of rights protected by the FHA." *White,* 227 F.3d at 1232.

Demonstrating that a lawsuit is objectively baseless is difficult. "The fact that a litigant loses his case does not show that his lawsuit was objectively baseless for purposes of *NoerrPennington* immunity." *White,* 227 F.3d at 1232 (italics added). A "court must resist the understandable temptation to engage in post hoc reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation. The court must remember that even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." *Professional Real Estate,* 508 U.S. at

60 n.5 (brackets, internal citations, and internal quotation marks omitted). *Professional Real Estate* itself concluded that a copyright suit defeated on summary judgment was not a sham. *Id.* at 64-65. In concluding that a losing copyright suit was not a sham, the Court drew from Rule 11 of the Federal Rules of Civil Procedure: "at the very least," the losing copyright suit "was based on an 'objectively good faith argument for the extension, modification, or reversal of existing law. . . . Even in the absence of supporting authority, [the losing party] would have been entitled to press a novel copyright claim so long as a similarly situated reasonable litigant could have perceived some likelihood of success.'" *Id.* at 65 (quoting Fed. R. Civ. P. 11). As the Ninth Circuit cautioned, "We do not lightly conclude in any *Noerr-Pennington* case that the litigation in question is objectively baseless, as doing so would leave that action without the ordinary protections of the First Amendment, a result we would reach only with great reluctance." *White,* 227 F.3d at 1232.

Because the Fischers cannot make the difficult showing that Sabal Palm's suit is objectively baseless, the lawsuit is not a sham and Sabal Palm is immune from liability. To be sure, the Court's reasoning analyzing the refusal-toaccommodate claim shows that, based on the information it had before it sued, Sabal Palm should have allowed Deborah to have Sorenson. But losing is not enough for a suit to be objectively baseless.

Because Sabal Palm had not been presented with a statement from a medical professional expressly stating that Deborah needed a service dog as an accommodation to live in her apartment, Sabal Palm at least had a glimmer of hope that it could succeed. To be sure, the Joint Statement counsels against *31 such an express statement being necessary. And the records Sabal Palm had all but screamed that Deborah would benefit from

a service dog with Sorenson's training. Moreover, the Court is unaware of a case holding that for a person with a readily apparent disability, there needs to be such an express statement when the evidence matches the obvious effects of the disabled person's symptoms with the dog's training. (For example, it is obvious that someone with severe fatigue, anemic grip strength and extremely poor motor coordination whose functional abilities include lift negligible weight may need help retrieving items.) But in some cases, there were such express statements and the courts held that the service dog was needed based on such express statements. For example, in *Bhogaita v. Altamonte Heights Condominium Assocation, Inc.* , Bhogaita had letters from his doctor stating that he suffered from Post Traumatic Stress Disorder, that he had a therapeutic relationship with his dog, and that without his dog, he would be unable to work. 2012 WL 10511 at 4 (M.D. Fla. January 3, 2012). Sabal Palm could at least argue with a straight face that what was sufficient in this case was actually required in other cases and that the information it had did not sufficiently substantiate Deborah's need for Sorenson.

The Fischers' retaliation claim under § 3617 thus fails as a matter of law. The First Amendment renders Counter Defendants immune to this claim. The Court dismisses this claim *with prejudice* because the declaratory-judgment lawsuit cannot support a retaliation claim, no matter what facts the Fischers allege.[16]

[16]
Silvergold did not advance an immunity argument based on the First Amendment. Only Sabal Palm and Trapani did. But because Silvergold has the same rights as they do under the First Amendment, the Fischers' retaliation claim must be dismissed against him as well.

--------

## G. Punitive Damages
Because the refusal-to-accommodate claim is the only surviving claim of the Amended

Counterclaim, the Court restricts its analysis to the request for punitive damages under that claim. Counter Defendants contend that the Fischers' allegations are insufficient to support an award of punitive damages and therefore move to strike this relief. (ECF Nos. 90; 95 at 19; 96 at 18-19.) Counter Defendants' argument is unpersuasive.

Punitive damages are available under the FHA for a refusal-to-accommodate claim. 42 U.S.C. § 3613(c) (providing that punitive damages may be awarded if a court "finds that a discriminatory housing practice has occurred or is about to occur); 42 U.S.C. § 3602(f) (providing that an act that *32 violates § 3604(f)(3)(B) is a discriminatory housing practice). "The Eleventh Circuit has not discussed when punitive damages become available in Fair Housing Act cases." *United States v. Gumbaytay,* 757 F. Supp. 2d 1142, 1150 (M.D. Ala. 2011). But many other circuits have, and they use the standard set forth in

*Kolstad v. American Dental Association,* 527 U.S. 526, 533-39 (1999), which analyzed when punitive damages are available in a Title VII of the Civil Rights Act case under 42 U.S.C. § 1981a(b) (1). *Id.* at 1151 (collecting circuit cases applying the *Kolstad* standard to punitive damages under the FHA). The Court is convinced by these and other decisions that the *Kolstad* standard used to analyze punitive damages in civil-rights cases should also be used in FHA cases. *See id.* (being similarly convinced).

Under this standard, "[p]unitive damages are appropriate in a federal civil rights action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Quigley v. Winter,* 598 F.3d 938, 952-53 (8th Cir. 2010) (internal quotation marks omitted) (applying the *Kolstad* standard to analyze punitive damages under the FHA). *Kolstad* held that "the terms 'malice' and 'reckless [indifference]'

ultimately focus on the actor's state of mind." *Id.* at 953 (quoting *Kolstad,* 527 U.S. at 535) (entire quotation drawn from *Kolstad* except for brackets). More specifically, they "pertain to the defendant's knowledge that he may be acting in violation of federal law, not his awareness that he is engaging in discrimination." *Id.* (quoting an Eighth Circuit cases quoting *Kolstad,* 527 U.S. at 535) (brackets omitted). So for punitive damages to be available, a defendant

"must at least discriminate in the face of a



perceived risk that [his or her] actions will violate federal law." *Kolstad,* 527 U.S. at 536; *accord Quigley,* 598 F.3d at 953.

Because the Fischers' factual allegations make it plausible that Counter Defendants perceived the risk that their actions may violate federal law, punitive damages are valid at this stage of the proceedings. As discussed above under the refusal-to-accommodate claim, the Fischers' Amended Counterclaim and the documents attached to it show that Counter Defendants had more than enough information to conclude that Deborah was entitled to her accommodation under the FHA. Yet they demanded still more information and sued rather than making the correct (and obvious) decision. So when the Fischers allege that Counter Defendants engaged in these action with "total and reckless disregard of [the Fischers"] rights and indifferen[ce] to the medical conditions or needs of [Deborah]," that allegation is plausible. (ECF No. 82 at 15.) Moreover, Deborah sent a link to the Joint Statement to Trapani, and in his reply, Trapani acknowledged that he was familiar with the Joint

Statement and that the "Association [i.e., Sabal Palm] is aware of your apparent *33 disability." (ECF Nos. 82-4 at 2; 82-5 at 2.) Silvergold was the president of the Board and Trapani copied him on the various letters he sent, so it is plausible that Silvergold was aware of this legal authority as well. And the Joint Statement does not support Counter Defendants' conclusion that based on the information that they received, Sabal Palm was within its rights to deny Deborah the accommodation. So by even stronger force of logic, the Joint Statement does not support Sabal Palm's decision to sue rather than grant the accommodation. Moreover, the April 2012 letter written by Trapani on behalf of Sabal Palm and carbon copied to Silvergold states that the "Association recognizes that the issue relating to whether, and under what circumstances, accommodations to disabled persons are required is an evolving issue under the law." (ECF No. 82-9 at

3.) This more than plausibly establishes that Counter Defendants perceived the risk that may be violating the FHA when they sued rather than grant Deborah's request even though they had more than enough information. Punitive damages remain viable at this point. The Court **denies** Counter Defendants' requests to strike the Fischers' claim to punitive damages.

## Conclusion

For the above reasons, the motions to dismiss (ECF Nos. 89, 95, 96) are **granted in part and denied in part** and the request to strike punitive damages (ECF No. 90) is **denied.** More specifically, the Court **grants** the motions to dismiss with respect to the Fischers' § 3604(c) and § 3617 claims. These claims are **dismissed with prejudice.** But the Court denies the motions to dismiss with respect to the Fischers' refusal-to-accommodate claim. This claim stands. The Court **denies** the Fischers' motion (ECF No. 214) seeking leave to amend their Amended Counterclaim.

**Done and ordered** in chambers, at Miami, Florida, on March 13, 2014.

—————

**Robert N. Scola, Jr.**

**United States District Judge**

 casetext

24



**U.S. DEPARTMENT OF JUSTICE**
CIVIL RIGHTS DIVISION



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
OFFICE OF FAIR HOUSING AND EQUAL OPPORTUNITY

*Washington, D.C.*
*May 17, 2004*

**JOINT STATEMENT OF**
**THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
**AND THE DEPARTMENT OF JUSTICE**

***REASONABLE ACCOMMODATIONS UNDER THE***
***FAIR HOUSING ACT***

## Introduction

The Department of Justice ("DOJ") and the Department of Housing and Urban Development ("HUD") are jointly responsible for enforcing the federal Fair Housing Act[1] (the "Act"), which prohibits discrimination in housing on the basis of race, color, religion, sex, national origin, familial status, and disability.[2] One type of disability discrimination prohibited by the Act is the refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person with a disability the equal opportunity to use and enjoy a dwelling.[3] HUD and DOJ frequently respond to complaints alleging that housing providers have violated the Act by refusing reasonable accommodations to persons with disabilities. This Statement provides technical assistance regarding the rights and obligations of persons with disabilities and housing providers under the Act relating to

---

[1]

The Fair Housing Act is codified at 42 U.S.C. §§ 3601 - 3619. [2]

The Act uses the term "handicap" instead of the term "disability." Both terms have the same legal meaning. *See* <u>Bragdon</u> v. <u>Abbott</u>, 524 U.S. 624, 631 (1998) (noting that definition of "disability" in the Americans with Disabilities Act is drawn almost verbatim "from the definition

of 'handicap' contained in the Fair Housing Amendments Act of 1988"). This document uses the term "disability," which is more generally accepted. [3]

42 U.S.C. § 3604(f)(3)(B).

reasonable accommodations.[4]

## Questions and Answers

**1. What types of discrimination against persons with disabilities does the Act prohibit?**

The Act prohibits housing providers from discriminating against applicants or residents because of their disability or the disability of anyone associated with them[5] and from treating persons with disabilities less favorably than others because of their disability. The Act also makes it unlawful for any person to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford ... person(s) [with disabilities] equal opportunity to use and enjoy a dwelling."[6] The Act also prohibits housing providers from refusing residency to persons with disabilities, or placing conditions on their residency, because those persons may require reasonable accommodations. In addition, in certain circumstances, the Act requires that housing providers allow residents to

---

[4]

Housing providers that receive federal financial assistance are also subject to the requirements of Section 504 of the Rehabilitation Act of l973. 29 U.S.C. § 794. Section 504, and its implementing regulations at 24 C.F.R. Part 8, prohibit discrimination based on disability and require recipients of federal financial assistance to provide reasonable accommodations to applicants and residents with disabilities. Although Section 504 imposes greater obligations than the Fair Housing Act, (*e.g.*, providing and paying for reasonable accommodations that involve structural modifications to units or public and common areas), the principles discussed in this Statement regarding reasonable accommodation under the Fair Housing Act generally apply to requests for reasonable accommodations to rules, policies, practices, and services under Section 504. *See* U.S. Department of Housing and Urban Development, Office of Public and Indian Housing, Notice PIH 2002-01(HA) (www.hud.gov/offices/fheo/disabilities/PIH02-01.pdf) and

"Section 504: Frequently Asked Questions," (www.hud.gov/offices/fheo/disabilities/

sect504faq.cfm#anchor272118). [5]

The Fair Housing Act's protection against disability discrimination covers not only home seekers with disabilities but also buyers and renters without disabilities who live or are associated with individuals with disabilities 42 U.S.C. § 3604(f)(1)(B), 42 U.S.C. § 3604(f)(1)(C), 42 U.S.C. § 3604(f)(2)(B), 42 U.S.C. § (f)(2)(C). *See also* H.R. Rep. 100-711 – 24 (reprinted in 1988 U.S.C.A.N. 2173, 2184-85) ("The Committee intends these provisions to prohibit not only discrimination against the primary purchaser or named lessee, but also to

- 2 -

prohibit denials of housing opportunities to applicants because they have children, parents, friends, spouses, roommates, patients, subtenants or other associates who have disabilities."). *Accord*: Preamble to Proposed HUD Rules Implementing the Fair Housing Act, 53 Fed.

Reg. 45001 (Nov. 7, 1988) (citing House Report). 6

42 U.S.C. § 3604(f)(3)(B). HUD regulations pertaining to reasonable accommodations may be found at 24 C.F.R. § 100.204.

make reasonable structural modifications to units and public/common areas in a dwelling when those modifications may be necessary for a person with a disability to have full enjoyment of a dwelling.[25] With certain limited exceptions (*see* response to question 2 below), the Act applies to privately and publicly owned housing, including housing subsidized by the federal government or rented through the use of Section 8 voucher assistance.

## 2.   Who must comply with the Fair Housing Act's reasonable accommodation requirements?

Any person or entity engaging in prohibited conduct – *i.e.*, refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling – may be held liable unless they fall within an exception to the Act's coverage. Courts have applied the Act to individuals, corporations, associations and others involved in the provision of housing and residential lending, including property owners, housing managers, homeowners and condominium associations, lenders, real estate agents, and brokerage services. Courts have also applied the Act to state and local governments, most often in the context of exclusionary zoning or other land-use decisions. *See e.g.*, City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 729 (1995); Project Life v. Glendening, 139 F. Supp. 703, 710 (D. Md. 2001), aff'd 2002 WL 2012545 (4th Cir. 2002). Under specific exceptions to the Fair Housing Act, the reasonable accommodation requirements of the Act do not apply to a private individual owner who sells his own home so long as he (1) does not own more than three single-family homes; (2) does not use a real estate agent and does not employ any discriminatory advertising or notices; (3) has not engaged in a similar sale of a home within a 24-month period; and (4) is not in the business of selling or renting dwellings. The reasonable accommodation requirements of the Fair Housing Act also do not apply to owner-occupied buildings that have four or fewer dwelling units.

## 3.   Who qualifies as a person with a disability under the Act?

The Act defines a person with a disability to include (1) individuals with a physical or mental impairment that substantially limits one or more major life activities; (2) individuals who are regarded as having such an impairment; and (3) individuals with a record of such an impairment.

The term "physical or mental impairment" includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, Human

---

[25] This Statement does not address the principles relating to reasonable modifications. For further information see the HUD regulations at 24 C.F.R. § 100.203. This statement also does not address the additional requirements imposed on recipients of Federal financial assistance pursuant to Section 504, as explained in the Introduction.

Immunodeficiency Virus infection, mental retardation, emotional illness, drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism.

The term "substantially limits" suggests that the limitation is "significant" or "to a large degree."

The term "major life activity" means those activities that are of central importance to daily life, such as seeing, hearing, walking, breathing, performing manual tasks, caring for one's self, learning, and speaking.[26] This list of major life activities is not exhaustive. *See e.g.*, <u>Bragdon v. Abbott</u>, 524 U.S. 624, 691-92 (1998)(holding that for certain individuals reproduction is a major life activity).

      **4.     Does the Act protect juvenile offenders, sex offenders, persons who illegally use controlled substances, and persons with disabilities who pose a significant danger to others?**

No, juvenile offenders and sex offenders, by virtue of that status, are <u>not</u> persons with disabilities protected by the Act. Similarly, while the Act does protect persons who are recovering from substance abuse, it does <u>not</u> protect persons who are currently engaging in the current illegal use of controlled substances.[9] Additionally, the Act does not protect an individual with a disability whose tenancy would constitute a "direct threat" to the health or safety of other individuals or result in substantial physical damage to the property of others unless the threat can be eliminated or significantly reduced by reasonable accommodation.

      **5.     How can a housing provider determine if an individual poses a direct threat?**

The Act does not allow for exclusion of individuals based upon fear, speculation, or stereotype about a particular disability or persons with disabilities in general. A determination that an individual poses a direct threat must rely on an individualized assessment that is based on reliable objective evidence (*e.g.*, current conduct, or a recent history of overt acts). The assessment must consider: (1) the nature, duration, and severity of the risk of injury; (2) the probability that injury will actually occur; and (3) whether there are any reasonable

---

[26] The Supreme Court has questioned but has not yet ruled on whether "working" is to be considered a major life activity. <u>See</u> <u>Toyota Motor Mfg, Kentucky, Inc. v. Williams</u>, 122 S. Ct. 681, 692, 693 (2002). If it is a major activity, the Court has noted that a claimant would be required to show an inability to work in a "broad range of jobs" rather than a specific job. *See* <u>Sutton</u> v. <u>United Airlines, Inc</u>., 527 U.S. 470, 492 (1999). [9 th]

   *See*, *e.g.*, <u>United States</u> v. <u>Southern Management Corp</u>., 955 F.2d 914, 919 (4 Cir. 1992) (discussing exclusion in 42 U.S.C. § 3602(h) for "current, illegal use of or addiction to a controlled substance").

accommodations that will eliminate the direct threat. Consequently, in evaluating a recent history of overt acts, a provider must take into account whether the individual has received intervening treatment or medication that has eliminated the direct threat (*i.e.*, a significant risk of substantial harm). In such a situation, the provider may request that the individual document how the circumstances have changed so that he no longer poses a direct threat. A provider may also obtain satisfactory assurances that the individual will not pose a direct threat during the tenancy. The housing provider must have reliable, objective evidence that a person with a disability poses a direct threat before excluding him from housing on that basis.

**Example 1**: A housing provider requires all persons applying to rent an apartment to complete an application that includes information on the applicant's current place of residence. On her application to rent an apartment, a woman notes that she currently resides in Cambridge House. The manager of the apartment complex knows that Cambridge House is a group home for women receiving treatment for alcoholism. Based solely on that information and his personal belief that alcoholics are likely to cause disturbances and damage property, the manager rejects the applicant. The rejection is unlawful because it is based on a generalized stereotype related to a disability rather than an individualized assessment of any threat to other persons or the property of others based on reliable, objective evidence about the applicant's recent past conduct. The housing provider may not treat this applicant differently than other applicants based on his subjective perceptions of the potential problems posed by her alcoholism by requiring additional documents, imposing different lease terms, or requiring a higher security deposit. However, the manager could have checked this applicant's references to the same extent and in the same manner as he would have checked any other applicant's references. If such a reference check revealed objective evidence showing that this applicant had posed a direct threat to persons or property in the recent past and the direct threat had not been eliminated, the manager could then have rejected the applicant based on direct threat.

**Example 2**: James X, a tenant at the Shady Oaks apartment complex, is arrested for threatening his neighbor while brandishing a baseball bat. The Shady Oaks' lease agreement contains a term prohibiting tenants from threatening violence against other residents. Shady Oaks' rental manager investigates the incident and learns that James X threatened the other resident with physical violence and had to be physically restrained by other neighbors to keep him from acting on his threat. Following Shady Oaks' standard practice of strictly enforcing its "no threats" policy, the Shady Oaks rental manager issues James X a 30-day notice to quit, which is the first step in the eviction process. James X's attorney contacts Shady Oaks' rental manager and explains that James X has a psychiatric disability that causes him to be physically violent when he stops taking his prescribed medication. Suggesting that his client will not pose a direct threat to others if proper safeguards

are taken, the attorney requests that the rental manager grant James X an exception to the "no threats" policy as a reasonable accommodation based on James X's disability. The Shady Oaks rental manager need only grant the reasonable accommodation if James X's attorney can provide satisfactory assurance that James X will receive appropriate counseling and periodic medication monitoring so that he will no longer pose a direct threat during his tenancy. After consulting with James X, the attorney responds that James X is unwilling to receive counseling or submit to any type of periodic monitoring to ensure that he takes his prescribed medication. The rental manager may go forward with the eviction proceeding, since James X continues to pose a direct threat to the health or safety of other residents.

### 6.    What is a "reasonable accommodation" for purposes of the Act?

A "reasonable accommodation" is a change, exception, or adjustment to a rule, policy, practice, or service that may be necessary for a person with a disability to have an equal opportunity to use and enjoy a dwelling, including public and common use spaces. Since rules, policies, practices, and services may have a different effect on persons with disabilities than on other persons, treating persons with disabilities exactly the same as others will sometimes deny them an equal opportunity to use and enjoy a dwelling. The Act makes it unlawful to refuse to make reasonable accommodations to rules, policies, practices, or services when such accommodations may be necessary to afford persons with disabilities an equal opportunity to use and enjoy a dwelling.

To show that a requested accommodation may be necessary, there must be an identifiable relationship, or nexus, between the requested accommodation and the individual's disability.

**Example 1:** A housing provider has a policy of providing unassigned parking spaces to residents. A resident with a mobility impairment, who is substantially limited in her ability to walk, requests an assigned accessible parking space close to the entrance to her unit as a reasonable accommodation. There are available parking spaces near the entrance to her unit that are accessible, but those spaces are available to all residents on a first come, first served basis. The provider must make an exception to its policy of not providing assigned parking spaces to accommodate this resident.

**Example 2:** A housing provider has a policy of requiring tenants to come to the rental office in person to pay their rent. A tenant has a mental disability that makes her afraid to leave her unit. Because of her disability, she requests that she be permitted to have a friend mail her rent payment to the rental office as a reasonable accommodation. The provider must make an exception to its payment policy to accommodate this tenant.

**Example 3:** A housing provider has a "no pets" policy. A tenant who is deaf requests that the provider allow him to keep a dog in his unit as a reasonable accommodation. The tenant explains that the dog is an assistance animal that will alert him to several sounds, including knocks at the door, sounding of the smoke detector, the telephone ringing, and cars coming into the driveway. The housing provider must make an exception to its "no pets" policy to accommodate this tenant.

**7. Are there any instances when a provider can deny a request for a reasonable accommodation without violating the Act?**

Yes. A housing provider can deny a request for a reasonable accommodation if the request was not made by or on behalf of a person with a disability or if there is no disabilityrelated need for the accommodation. In addition, a request for a reasonable accommodation may be denied if providing the accommodation is not reasonable – *i.e.,* if it would impose an undue financial and administrative burden on the housing provider or it would fundamentally alter the nature of the provider's operations. The determination of undue financial and administrative burden must be made on a case-by-case basis involving various factors, such as the cost of the requested accommodation, the financial resources of the provider, the benefits that the accommodation would provide to the requester, and the availability of alternative accommodations that would effectively meet the requester's disability-related needs.

When a housing provider refuses a requested accommodation because it is not reasonable, the provider should discuss with the requester whether there is an alternative accommodation that would effectively address the requester's disability-related needs without a fundamental alteration to the provider's operations and without imposing an undue financial and administrative burden. If an alternative accommodation would effectively meet the requester's disability-related needs and is reasonable, the provider must grant it. An interactive process in which the housing provider and the requester discuss the requester's disability-related need for the requested accommodation and possible alternative accommodations is helpful to all concerned because it often results in an effective accommodation for the requester that does not pose an undue financial and administrative burden for the provider.

**Example:** As a result of a disability, a tenant is physically unable to open the dumpster placed in the parking lot by his housing provider for trash collection. The tenant requests that the housing provider send a maintenance staff person to his apartment on a daily basis to collect his trash and take it to the dumpster. Because the housing development is a small operation with limited financial resources and the maintenance staff are on site only twice per week, it may be an undue financial and administrative burden for the housing provider to grant the requested daily trash pick-up service. Accordingly, the requested accommodation may not be reasonable. If the housing provider denies the requested accommodation as unreasonable, the housing provider should discuss with the tenant whether reasonable accommodations could be provided to meet the tenant's

disability-related needs – for instance, placing an open trash collection can in a location that is readily accessible to the tenant so the tenant can dispose of his own trash and the provider's maintenance staff can then transfer the trash to the dumpster when they are on site. Such an accommodation would not involve a fundamental alteration of the provider's operations and would involve little financial and administrative burden for the provider while accommodating the tenant's disability-related needs.

There may be instances where a provider believes that, while the accommodation requested by an individual is reasonable, there is an alternative accommodation that would be equally effective in meeting the individual's disability-related needs. In such a circumstance, the provider should discuss with the individual if she is willing to accept the alternative accommodation. However, providers should be aware that persons with disabilities typically have the most accurate knowledge about the functional limitations posed by their disability, and an individual is not obligated to accept an alternative accommodation suggested by the provider if she believes it will not meet her needs and her preferred accommodation is reasonable.

## 8. What is a "fundamental alteration"?

A "fundamental alteration" is a modification that alters the essential nature of a provider's operations.

> **Example:** A tenant has a severe mobility impairment that substantially limits his ability to walk. He asks his housing provider to transport him to the grocery store and assist him with his grocery shopping as a reasonable accommodation to his disability. The provider does not provide any transportation or shopping services for its tenants, so granting this request would require a fundamental alteration in the nature of the provider's operations. The request can be denied, but the provider should discuss with the requester whether there is any alternative accommodation that would effectively meet the requester's disability-related needs without fundamentally altering the nature of its operations, such as reducing the tenant's need to walk long distances by altering its parking policy to allow a volunteer from a local community service organization to park her car close to the tenant's unit so she can transport the tenant to the grocery store and assist him with his shopping.

## 9.   What happens if providing a requested accommodation involves some costs on the part of the housing provider?

Courts have ruled that the Act may require a housing provider to grant a reasonable accommodation that involves costs, so long as the reasonable accommodation does not pose an undue financial and administrative burden and the requested accommodation does not constitute a fundamental alteration of the provider's operations. The financial resources of the provider, the

cost of the reasonable accommodation, the benefits to the requester of the requested accommodation, and the availability of other, less expensive alternative accommodations that would effectively meet the applicant or resident's disability-related needs must be considered in determining whether a requested accommodation poses an undue financial and administrative burden.

**10.      What happens if no agreement can be reached through the interactive process?**

A failure to reach an agreement on an accommodation request is in effect a decision by the provider not to grant the requested accommodation. If the individual who was denied an accommodation files a Fair Housing Act complaint to challenge that decision, then the agency or court receiving the complaint will review the evidence in light of applicable law and decide if the housing provider violated that law. For more information about the complaint process, see question 19 below.

**11. May a housing provider charge an extra fee or require an additional deposit from applicants or residents with disabilities as a condition of granting a reasonable accommodation?**

No. Housing providers may not require persons with disabilities to pay extra fees or deposits as a condition of receiving a reasonable accommodation.

> **Example 1**: A man who is substantially limited in his ability to walk uses a motorized scooter for mobility purposes. He applies to live in an assisted living facility that has a policy prohibiting the use of motorized vehicles in buildings and elsewhere on the premises. It would be a reasonable accommodation for the facility to make an exception to this policy to permit the man to use his motorized scooter on the premises for mobility purposes. Since allowing the man to use his scooter in the buildings and elsewhere on the premises is a reasonable accommodation, the facility may not condition his use of the scooter on payment of a fee or deposit or on a requirement that he obtain liability insurance relating to the use of the scooter. However, since the Fair Housing Act does not protect any person with a disability who poses a direct threat to the person or property of others, the man must operate his motorized scooter in a responsible manner that does not pose a significant risk to the safety of other persons and does not cause damage to other persons' property. If the individual's use of the scooter causes damage to his unit or the common areas, the housing provider may charge him for the cost of repairing the damage (or deduct it from the standard security deposit imposed on all tenants), if it is the provider's practice to assess tenants for any damage they cause to the premises.

**Example 2:** Because of his disability, an applicant with a hearing impairment needs to keep an assistance animal in his unit as a reasonable accommodation. The housing provider may not require the applicant to pay a fee or a security deposit as a condition of allowing the applicant to keep the assistance animal. However, if a tenant's assistance animal causes damage to the applicant's unit or the common areas of the dwelling, the housing provider may charge the tenant for the cost of repairing the damage (or deduct it from the standard security deposit imposed on all tenants), if it is the provider's practice to assess tenants for any damage they cause to the premises.

### 12. When and how should an individual request an accommodation?

Under the Act, a resident or an applicant for housing makes a reasonable accommodation request whenever she makes clear to the housing provider that she is requesting an exception, change, or adjustment to a rule, policy, practice, or service because of her disability. She should explain what type of accommodation she is requesting and, if the need for the accommodation is not readily apparent or not known to the provider, explain the relationship between the requested accommodation and her disability.

An applicant or resident is not entitled to receive a reasonable accommodation unless she requests one. However, the Fair Housing Act does not require that a request be made in a particular manner or at a particular time. A person with a disability need not personally make the reasonable accommodation request; the request can be made by a family member or someone else who is acting on her behalf. An individual making a reasonable accommodation request does not need to mention the Act or use the words "reasonable accommodation." However, the requester must make the request in a manner that a reasonable person would understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability.

Although a reasonable accommodation request can be made orally or in writing, it is usually helpful for both the resident and the housing provider if the request is made in writing. This will help prevent misunderstandings regarding what is being requested, or whether the request was made. To facilitate the processing and consideration of the request, residents or prospective residents may wish to check with a housing provider in advance to determine if the provider has a preference regarding the manner in which the request is made. However, housing providers must give appropriate consideration to reasonable accommodation requests even if the requester makes the request orally or does not use the provider's preferred forms or procedures for making such requests.

**Example:** A tenant in a large apartment building makes an oral request that she be assigned a mailbox in a location that she can easily access because of a physical disability that limits her ability to reach and bend. The provider would prefer that the tenant make the accommodation request on a pre-printed form, but the tenant

fails to complete the form. The provider must consider the reasonable accommodation request even though the tenant would not use the provider's designated form.

**13. Must a housing provider adopt formal procedures for processing requests for a reasonable accommodation?**

No. The Act does not require that a housing provider adopt any formal procedures for reasonable accommodation requests. However, having formal procedures may aid individuals with disabilities in making requests for reasonable accommodations and may aid housing providers in assessing those requests so that there are no misunderstandings as to the nature of the request, and, in the event of later disputes, provide records to show that the requests received proper consideration.

A provider may not refuse a request, however, because the individual making the request did not follow any formal procedures that the provider has adopted. If a provider adopts formal procedures for processing reasonable accommodation requests, the provider should ensure that the procedures, including any forms used, do not seek information that is not necessary to evaluate if a reasonable accommodation may be needed to afford a person with a disability equal opportunity to use and enjoy a dwelling. See Questions 16 - 18, which discuss the disabilityrelated information that a provider may and may not request for the purposes of evaluating a reasonable accommodation request.

**14.    Is a housing provider obligated to provide a reasonable accommodation to a resident or applicant if an accommodation has not been requested?**

No. A housing provider is only obligated to provide a reasonable accommodation to a resident or applicant if a request for the accommodation has been made. A provider has notice that a reasonable accommodation request has been made if a person, her family member, or someone acting on her behalf requests a change, exception, or adjustment to a rule, policy, practice, or service because of a disability, even if the words "reasonable accommodation" are not used as part of the request.

**15.    What if a housing provider fails to act promptly on a reasonable accommodation request?**

A provider has an obligation to provide prompt responses to reasonable accommodation requests. An undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation.

**16. What inquiries, if any, may a housing provider make of current or potential residents regarding the existence of a disability when they have not asked for an accommodation?**

- 12 -

Under the Fair Housing Act, it is usually unlawful for a housing provider to (1) ask if an applicant for a dwelling has a disability or if a person intending to reside in a dwelling or anyone associated with an applicant or resident has a disability, or (2) ask about the nature or severity of such persons' disabilities. Housing providers <u>may</u>, however, make the following inquiries, provided these inquiries are made of all applicants, including those with and without disabilities:

- An inquiry into an applicant's ability to meet the requirements of tenancy;

- An inquiry to determine if an applicant is a current illegal abuser or addict of a controlled substance;

- An inquiry to determine if an applicant qualifies for a dwelling legally available only to persons with a disability or to persons with a particular type of disability; and

- An inquiry to determine if an applicant qualifies for housing that is legally available on a priority basis to persons with disabilities or to persons with a particular disability.

**Example 1:** A housing provider offers accessible units to persons with disabilities needing the features of these units on a priority basis. The provider may ask applicants if they have a disability and if, in light of their disability, they will benefit from the features of the units. However, the provider may not ask applicants if they have other types of physical or mental impairments. If the applicant's disability and the need for the accessible features are not readily apparent, the provider may request reliable information/documentation of the disability-related need for an accessible unit.

**Example 2:** A housing provider operates housing that is legally limited to persons with chronic mental illness. The provider may ask applicants for information needed to determine if they have a mental disability that would qualify them for the housing. However, in this circumstance, the provider may not ask applicants if they have other types of physical or mental impairments. If it is not readily apparent that an applicant has a chronic mental disability, the provider may request reliable information/documentation of the mental disability needed to qualify for the housing.

In some instances, a provider may also request certain information about an applicant's or a resident's disability if the applicant or resident requests a reasonable accommodation. See Questions 17 and 18 below.

**17. What kinds of information, if any, may a housing provider request from a person with an obvious or known disability who is requesting a reasonable accommodation**?

A provider is entitled to obtain information that is necessary to evaluate if a requested reasonable accommodation may be necessary because of a disability. If a person's disability is obvious, or otherwise known to the provider, and if the need for the requested accommodation is also readily apparent or known, then the provider may not request any additional information about the requester's disability or the disability-related need for the accommodation.

If the requester's disability is known or readily apparent to the provider, but the need for the accommodation is not readily apparent or known, the provider may request only information that is necessary to evaluate the disability-related need for the accommodation.

> **Example 1:** An applicant with an obvious mobility impairment who regularly uses a walker to move around asks her housing provider to assign her a parking space near the entrance to the building instead of a space located in another part of the parking lot. Since the physical disability (*i.e.*, difficulty walking) and the disability-related need for the requested accommodation are both readily apparent, the provider may not require the applicant to provide any additional information about her disability or the need for the requested accommodation.

> **Example 2:** A rental applicant who uses a wheelchair advises a housing provider that he wishes to keep an assistance dog in his unit even though the provider has a "no pets" policy. The applicant's disability is readily apparent but the need for an assistance animal is not obvious to the provider. The housing provider may ask the applicant to provide information about the disability-related need for the dog.

> **Example 3:** An applicant with an obvious vision impairment requests that the leasing agent provide assistance to her in filling out the rental application form as a reasonable accommodation because of her disability. The housing provider may not require the applicant to document the existence of her vision impairment.

**18. If a disability is not obvious, what kinds of information may a housing provider request from the person with a disability in support of a requested accommodation?**

A housing provider may not ordinarily inquire as to the nature and severity of an individual's disability (*see* Answer 16, above). However, in response to a request for a reasonable accommodation, a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability (*i.e.*, has a physical or mental impairment that substantially limits one or more major life activities), (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation. Depending on the individual's

- 14 -

circumstances, information verifying that the person meets the Act's definition of disability can usually be provided by the individual himself or herself (*e.g.*, proof that an individual under 65 years of age receives Supplemental Security Income or Social Security Disability Insurance benefits[27] or a credible statement by the individual). A doctor or other medical professional, a peer support group, a non-medical service agency, or a reliable third party who is in a position to know about the individual's disability may also provide verification of a disability. In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary for this inquiry.

Once a housing provider has established that a person meets the Act's definition of disability, the provider's request for documentation should seek only the information that is necessary to evaluate if the reasonable accommodation is needed because of a disability. Such information must be kept confidential and must not be shared with other persons unless they need the information to make or assess a decision to grant or deny a reasonable accommodation request or unless disclosure is required by law (*e.g.*, a court-issued subpoena requiring disclosure).

**19. If a person believes she has been unlawfully denied a reasonable accommodation, what should that person do if she wishes to challenge that denial under the Act?**

When a person with a disability believes that she has been subjected to a discriminatory housing practice, including a provider's wrongful denial of a request for reasonable accommodation, she may file a complaint with HUD within one year after the alleged denial or may file a lawsuit in federal district court within two years of the alleged denial. If a complaint is filed with HUD, HUD will investigate the complaint at no cost to the person with a disability.

There are several ways that a person may file a complaint with HUD:

•       By placing a toll-free call to 1-800-669-9777 or TTY 1-800-927-9275;

•       By completing the "on-line" complaint form available on the HUD internet site: http://www.hud.gov; or

•       By mailing a completed complaint form or letter to:

        Office of Fair Housing and Equal Opportunity
        Department of Housing & Urban Development

---

[27] Persons who meet the definition of disability for purposes of receiving Supplemental Security Income ("SSI") or Social Security Disability Insurance ("SSDI") benefits in most cases meet the definition of disability under the Fair Housing Act, although the converse may not be true. *See e.g.*, Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 797 (1999)

- 15 -

451 Seventh Street, S.W., Room 5204 Washington,
DC 20410-2000

---

(noting that SSDI provides benefits to a person with a disability so severe that she is unable to do her previous work and cannot engage in any other kind of substantial gainful work whereas a person pursuing an action for disability discrimination under the Americans with Disabilities Act may state a claim that "with a reasonable accommodation" she could perform the essential functions of the job).

Upon request, HUD will provide printed materials in alternate formats (large print, audio tapes, or Braille) and provide complainants with assistance in reading and completing forms.

The Civil Rights Division of the Justice Department brings lawsuits in federal courts across the country to end discriminatory practices and to seek monetary and other relief for individuals whose rights under the Fair Housing Act have been violated. The Civil Rights Division initiates lawsuits when it has reason to believe that a person or entity is involved in a "pattern or practice" of discrimination or when there has been a denial of rights to a group of persons that raises an issue of general public importance. The Division also participates as *amicus curiae* in federal court cases that raise important legal questions involving the application and/or interpretation of the Act. To alert the Justice Department to matters involving a pattern or practice of discrimination, matters involving the denial of rights to groups of persons, or lawsuits raising issues that may be appropriate for *amicus* participation, contact:

U.S. Department of Justice
Civil Rights Division
Housing and Civil Enforcement Section – G St.
950 Pennsylvania Avenue, N.W. Washington,
DC 20530

For more information on the types of housing discrimination cases handled by the Civil Rights Division, please refer to the Housing and Civil Enforcement Section's website at http://www.usdoj.gov/crt/housing/hcehome.html.

A HUD or Department of Justice decision not to proceed with a Fair Housing Act matter does not foreclose private plaintiffs from pursuing a private lawsuit. However, litigation can be an expensive, time-consuming, and uncertain process for all parties. HUD and the Department of Justice encourage parties to Fair Housing Act disputes to explore all reasonable alternatives to litigation, including alternative dispute resolution procedures, such as mediation. HUD attempts to conciliate all Fair Housing Act complaints. In addition, it is the Department of Justice's policy to offer prospective defendants the opportunity to engage in pre-suit settlement negotiations, except in the most unusual circumstances.

Case 1:22-cv-00448-TFM-N   Doc# 321-1   Filed 08/12/25   Page 237 of 275
PageID# 12220
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 1 of 32

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 238 of 275
PageID# 12221
Case 2:11-cv-01143-RFB-CWH    Document 442    Filed 03/05/19    Page 2 of 32

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

|  |  |
|---|---|
| DEBORAH SANZARO and MICHAEL SANZARO, | Case No. 2:11-cv-01143-RFB-CWH |
| Plaintiffs, | <u>AMENDED</u> <u>ORDER</u> |
| v. | **Findings of Fact and Conclusions of Law After Court Trial** |
| ARDIENTE HOMEOWNERS ASSOCIATION, LLC *et al.*, |  |
| Defendants. |  |

## I.    INTRODUCTION

Plaintiffs in this case are Deborah Sanzaro ("Mrs. Sanzaro") and Michael Sanzaro ("Mr. Sanzaro") (collectively, "Plaintiffs" or "the Sanzaros "). Plaintiffs are homeowners and members of the Ardiente Homeowners Association ( "HOA"). This case involves three incidents between 2009 and 2011, during which Mrs. Sanzaro, alone or accompanied by Mr. Sanzaro, attempted to enter the Ardiente HOA clubhouse ("the Ardiente clubhouse") with Mrs. Sanzaro's alleged service animal, a Chihuahua named Angel. On each of these three occasions, Mrs. Sanzaro was denied access to the clubhouse while accompanied by Angel. The Court held a bench trial in this case on April 9, 2018, April 10, 2018, April 16, 2018, April 17, 2018, April 18, 2018, April 20, 2018, and May 11, 2018. The Court rules in favor of Plaintiffs based on the following findings of fact and conclusions of law.

## II.    PROCEDURAL HISTORY

Plaintiffs' operative Amended Complaint was filed on July 22, 2013. (ECF No. 78).

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 239 of 275
PageID# 12222
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 3 of 32

Plaintiffs brought 102 causes of action for "discrimination against the disabled, breach of contract and other torts," including claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, and the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-19, and NRS § 651.075. On November 29, 2017 the Court entered an order on various motions, including a motion for summary judgment filed by Plaintiffs, which the Court denied. (ECF No. 381). The remaining causes of action were Claims 1, 2, 6, 7, 11, and 12 which relate to the three incidents that took place on March 11, 2009 ("Incident 1"), July 26, 2010 ("Incident 2"), and January 29, 2011 ("Incident 3"). Based on these causes of action and the prior rulings of the Court, the issues remaining for trial were: (1) whether the HOA clubhouse was a place of public accommodation under the ADA and NRS § 651.075, and (2) whether Plaintiffs requested, and were ultimately refused, a reasonable accommodation under the FHA.[28]

### III.    JURISDICTION AND VENUE

This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 for claims arising under the ADA and the FHA. The Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367. Venue is proper because the underlying actions and corresponding damages occurred within Clark County, Nevada.

### IV.    FINDINGS OF FACT

Federal Rule of Civil Procedure 52(a)(1) requires the Court to "find the facts specially and state its conclusions of law separately" in a bench trial. Fed. R. Civ. P. 52(a)(1). Factual findings must be sufficient to indicate the basis for the Court's ultimate conclusion. Unt v. Aerospace Corp., 765 F.2d 1440, 1444–45 (9th Cir. 1985) (citing Kelley v. Everglades Drainage Dist., 319 U.S. 415, 422 (1943)). The findings must be "explicit enough to give the appellate court a clear

---

[28] All statutes cited herein refer to the operative versions in 2009, at the time of the first alleged incident of discrimination.

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 240 of 275
PageID# 12223
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 4 of 32

understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision." United States v. Alpine Land & Reservoir Co., 697 F.2d

2

851, 856 (9th Cir. 1983), cert. denied, 464 U.S. 863 (1983) (citations and quotation marks omitted). Accordingly, the Court makes the following findings of fact on this matter.

**1. The Ardiente HOA**

a.  Ardiente is a restricted-access residential HOA neighborhood located in North Las Vegas, Nevada. The community is gated and requires a remote transponder or access code for entry. Members of the public cannot enter the Ardiente community without prior permission from the property management unless they have assistance or consent from a current homeowner for a particular visit.

b.  In addition to private residences, the community contains common-use facilities such as the Ardiente clubhouse. The Ardiente clubhouse has several amenities including a gym, a pool and sauna, and rooms to rent for private events. The Ardiente clubhouse also has restricted access, monitored by Ardiente and property management staff. Members of the public cannot enter the Ardiente clubhouse without prior permission from staff. The office for Ardiente is located within the clubhouse.

c.  At all times relevant to this litigation, the Declarant—either Defendant Corona Ardiente ("Corona") or non-party Shea Homes—hosted programs called "Stay and Play" and "Taste of the Good Life," in which members of the public who were not residents of the Ardiente community could stay overnight in an Ardiente model home and access community facilities, including the clubhouse. The purpose of these programs was to induce these guests to purchase an Ardiente home. Members of the public were not permitted to access the Ardiente community and facilities

- -

unless they indicated potential interest in purchasing a home within the community and were part of the aforementioned marketing programs.

d. In October 2010, Shea Homes hosted a Grand Opening of the Ardiente community, which was advertised to the public in the local newspaper. As part of the Grand Opening, activities such as yoga, dog training, and line dancing occurred inside of

3

the clubhouse. The purpose of the event was to induce members of the public to purchase an Ardiente home.

**2. The Parties**

a. Since August 2007, Plaintiffs have been owners of a single family home within the Ardiente community located at 3609 Inverness Grove, North Las Vegas, Nevada. The value of Plaintiffs' home at the time of purchase was $212,800.00.

b. Plaintiffs lived in their Ardiente home from October 2008 to January 2018. Plaintiffs used the Ardiente clubhouse facilities without incident two to three times per day on average between November 2008 and March 2009. While Plaintiffs still own the home, they moved out of the home and away from the Ardiente community due to ongoing and persistent harassment and threats, which they continue to experience in connection with the events described herein.

c. Defendant Ardiente Homeowners Association ("Ardiente" or "the HOA") is the entity that maintains and operates the community. Ardiente is governed by a Board of Directors ("the Board") pursuant to its governing documents, including Bylaws, Rules & Regulations, and a Declaration of Covenants, Conditions, Restrictions ("CC&Rs") (collectively, "Ardiente's governing documents"). Plaintiffs received a copy of these governing documents when they purchased their home

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 242 of 275
PageID# 12225
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 6 of 32

d. Pursuant to Ardiente's governing documents, at the time Plaintiffs purchased their home and until 2010, the majority of the Board positions were filled by the Declarant, with remaining seats filled by homeowners.

e. Defendant Corona was the Declarant prior to non-party Shea Homes. Under the terms of the CC&Rs and Bylaws, the Declarant developed the community and sold lots to homeowners. The Declarant also had authority to appoint and oversee voting members to the Board.

f. Neither Ardiente nor Corona provided any training to their Board representatives or relevant employees about the requirements or prohibitions of the ADA, FHA, or

4

NRS § 651.075, such as what, if any, documentation is required to establish that an animal is a service or assistance animal.

g. Neither Ardiente nor Corona provided any training to their Board representatives about how to engage with homeowners seeking to bring service or assistance animals into the clubhouse.

h. Defendant RMI Management, LLC ("RMI") was the property management company hired by the community developer. RMI managed Ardiente between 2009 and 2011. During the Incidents at issue in this case, RMI property management staff were employed at Ardiente facilities, including at the Ardiente clubhouse. RMI employed property managers, called Community Managers, at all relevant times during the events that gave rise to this litigation.

i. RMI did not provide any training to its Community Managers about the requirements or prohibitions of the ADA, FHA, or NRS § 651.075, such as what, if any, documentation is required to establish that an animal is a service or assistance animal.

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 243 of 275
PageID# 12226
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 7 of 32

j.  RMI did not provide any training to its Community Managers about how to engage with homeowners seeking to bring service or assistance animals into the clubhouse.

k.  Defendant Scott Harris ("Harris") is a former member of the Ardiente Board and former appointee of Corona. Harris was a voting Board member during the first Incident involving the Sanzaros. Harris participated in and ratified decisions regarding the Sanzaros, including to prohibit them from accessing the clubhouse.

l.  Defendant Ryan Smith ("Smith") was a member of the Ardiente Board between February 2010 and January 2013. Smith took over the position from Harris. Smith was appointed to the Board by Corona, and was an employee of non-party successor Declarant Shea Homes. Smith was a voting Board member during the second and third Incidents involving the Sanzaros. Smith participated in and ratified decisions regarding the Sanzaros, including to prohibit them from accessing the clubhouse.

5

m.  Defendant Kevin Wallace ("Wallace") is the Chief Executive Officer of RMI. Wallace was not a member of the Board and had no authority to vote on Board decisions. Wallace never attended any Board meetings, and did not communicate directly with the Sanzaros.

n.  Defendant Laury Phelps was the Community Manager of the Ardiente community, and a former employee of RMI, between 2007 and 2010. She was the Community Manager during the first two Incidents involving the Sanzaros. During her tenure, Phelps sent out communications regarding animals in the Ardiente clubhouse to Ardiente homeowners, including the Sanzaros, on behalf of the Board. She also actively prevented the Sanzaros from entering the Ardiente clubhouse with Angel at the direction of the Board. However, she was not a voting member of the Board.

- -

Case 1:22-cv-00448-TFM-N   Doc# 321-1   Filed 08/12/25   Page 244 of 275
PageID# 12227
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 8 of 32

### 3. Mrs. Sanzaro's Disability and Use of an Assistance Animal

a. Mrs. Sanzaro became disabled on March 12, 2004. Her disability is permanent, impedes her ability to walk without assistance, and generates significant and ongoing incidents of pain.

b. As a result of her disability, Mrs. Sanzaro uses a walker.

c. Mrs. Sanzaro needed, and continues to need, the assistance of a service dog in or around October 2008 until the present, and began using the services of Angel, a Chihuahua, at that time.

d. Between November 2008 and February 2009, Angel was trained to assist Mrs. Sanzaro with her disability. Initially, Angel assisted Mrs. Sanzaro in coping with acute pain arising from Mrs. Sanzaro's disability. Angel was subsequently trained to retrieve Mrs. Sanzaro's walker and car keys in the event that those items were out of Mrs. Sanzaro's reach.

### 4. 2009 Incident and Interactions between Plaintiffs and Defendants

a. Incident 1 occurred at the clubhouse on March 11, 2009. That day, Mrs. Sanzaro entered the clubhouse with Angel and her walker. Defendant Phelps, then Community Manager of the HOA, was working at the clubhouse that day. Prior to

6

this incident, Phelps had seen Mrs. Sanzaro use her walker and was aware that Mrs. Sanzaro suffered from a physical impairment that significantly impaired her ability to walk. Phelps asked Mrs. Sanzaro why the dog was in the clubhouse. Sanzaro then explained that the dog assisted her with her disability as a service animal. Phelps asked Mrs. Sanzaro if she had with her any documentation for the dog, and Mrs. Sanzaro responded that she did not. Phelps then asked Mrs. Sanzaro to leave. When Mrs. Sanzaro refused to leave, Phelps called the HOA's attorney and also called security. After security was called, Mrs. Sanzaro left the clubhouse with Angel.

- -

Case 1:22-cv-00448-TFM-N     Doc# 321-1     Filed 08/12/25     Page 245 of 275
PageID# 12228
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 9 of 32

b. On March 13, 2009, Phelps sent an email on behalf of the HOA Board with subject line "RE: Animals in the clubhouse," stating in part: "Persons with service animals should notify the clubhouse staff about their service animal when they come into the clubhouse, or let the clubhouse staff know, if asked, that the animal is a service animal. If a homeowner refuses to say whether the animal is a service animal or not, the animal will have to stay outside of the clubhouse. If you do have certification papers, it would be helpful to provide them for inclusion in your file."

c. The same day, Mrs. Sanzaro entered the clubhouse with Angel, without incident.

d. Additionally on March 13, 2009, counsel for the HOA sent Plaintiffs a letter describing Incident 1 as a violation of the HOA's governing documents, and also informing Plaintiffs that a hearing before the HOA Board regarding the incident before the HOA Board would be set for March 30, 2009. The letter stated in part: "[T]his letter is a formal request that, at the hearing, you provide the [HOA] with additional documentation from Mrs. Sanzaro's doctors to substantiate the existence of a handicap/disability and the necessity for the presence of the dog in the clubhouse in order to accommodate that handicap/disability."

e. On March 16, 2009, Phelps sent another email to Ardiente homeowners on behalf of the Board, stating in part: "The clubhouse staff wants everyone to know that if someone enters the clubhouse with a legitimate service animal, and properly

7

advises the staff of such, that person will be granted all privileges and assistance by the staff to accommodate their disability. . . . If you have a service animal, and require them to be in the clubhouse, please advise the staff so that we can properly accommodate you and your service animal."

f. On March 29, 2009, non-party James Marsh ("Marsh"), then President of the HOA and homeowner representative on the HOA Board, sent a letter to Ardiente

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 246 of 275
PageID# 12229
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 10 of 32

homeowners regarding Plaintiffs' hearing set the following day. In the letter, Marsh stated that, although he was "not at liberty to discuss the nature and extent of the alleged violations" against the Sanzaros, he nonetheless "[could] ensure [homeowners] that Mr. Sanzaro's recitation of the facts is inaccurate, self-serving and intentionally misleading." He further informed homeowners that Mrs. Sanzaro did not introduce her dog as a service animal to staff and never presented documentation that the dog was a service animal during Incident 1. He concluded the letter by writing "I, and the Board, sincerely apologize to all of you that have had to endure Mr. and Mrs. Sanzaro's emails to assist him in furthering his personal vendetta against you, the HOA." Marsh sent the letter on behalf of the Board and at the direction of counsel for the HOA.

g.  On March 30, 2009, a hearing was held before the HOA regarding Incident 1. The meeting was conducted in "open" format such that other Ardiente homeowners were permitted to attend. Plaintiffs were not present.

h.  Beginning in March 2009 and at least through 2010, the Sanzaros received hate letters and emails as well as verbal harassment from other homeowners in the Ardiente community regarding the Sanzaros' dispute with the Board over Angel's documentation. At no point did representatives of Ardiente or Corona, Board member Harris, or Phelps take any action to discourage homeowners from harassing the Sanzaros despite being aware of the harassment and threats.

i.  After the March 30, 2009 hearing, an Ardiente homeowner anonymously sent the Sanzaros a letter that read in part: "We hear you are going to file a

8

lawsuit against the HOA and us. Jim [Marsh] was right when he told a large group of us at Sage Park a couple years ago that you are going to cost each of us a lot of money. . . . Leave this community. We don't want you here. . . . You and [Mrs. Sanzaro] have lost every action against the HOA. . . .

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 247 of 275
PageID# 12230
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 11 of 32

Don't sue us. Just get the hell out of here! If you sue us I hope your little dog gets loose and someone catches it and drops it deep in the desert. . . ."

ii.   On approximately June 21, 2009, the Sanzaros found a letter tucked inside of their door handle which read in part: "Our group has combined our efforts to rid our community of undesirables such as you two. The board meeting a few days ago was only a small example of our combined power. In a meeting attended by many homeowners our group devised a plan to disrupt the two of you from speaking at the board meeting. As you know it worked very well. You two looked like idiots trying to talk. Our group followed our plan and heckled and yelled obscenities at you until you were force [sic] to stop talking and sit down. Jim [Marsh] said he would not stop us from heckling you. . . . At first you two were a fun part of this community, but when you turned on Jim Marsh and Laury Phelps your fight against them and [Ardiente] became our fight against you two. A very good proverb works well here. An enemy of our friend is our enemy. Do our community a big favor, GET THE HELL OUT OF OUR COMMUNITY!" The letter was signed by "Ardiente Residents for Solidarity."

iii.   At some point in Summer 2009, an anonymous homeowner spray painted a threatening message on the Sanzaros' garage door, telling them to get out of the neighborhood. The message also included a death threat against Angel and the Sanzaros. Phelps and the Board were informed about this spray painted message.

iv.   On approximately June 22, 2009, the Sanzaros received by mail another letter which read in part: "We can tell by the message painted on your

9

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 248 of 275
PageID# 12231
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 12 of 32

garage that [anonymous homeowner A Concerned Ardiente Resident] ACAR wants you more than gone. . . . Dogs are not allowed in the clubhouse unless it is a service animal. Laury [Phelps] and Jim [Marsh] have told us several times that your dog is not a service animal. . . . Why won't you give Laury the documents that she wants and end your fight? We all know why. We know you cannot prove that Debbie [Sanzaro] is disabled and that her little dog is a service animal. . . . Stop bad mouthing Laury. You two are LIARS! You two are GARBAGE in the eyes of this community. Get the hell out of our community. We hate you for what you are doing to Laury."

The letter was signed by "The Ardiente Residents for Solidarity."

v.   On approximately August 18, 2009, the Sanzaros received by mail another letter from an anonymous individual, signed "A Concerned Ardiente Resident." The letter stated in part: "YOU LOST THE FIGHT AND MUST NOW PAY $19,000. GREAT NEWS! LAURY PHELPS SAID THE ARBITRATOR RULED THAT YOUR DOG IS NOT A SERVICE ANIMAL. THIS IS THE SAME THING SHE HAS ALWAYS SAID. LAURY ALSO SAID THAT THE ARBITRATOR RULES THAT ALL OF THE BOARDS [sic] ACTIONS HAVE BEEN LEGAL. THE BOARD HAS NEVER DONE ANYTHING WRONG. . . . UNFORTUNATELY WE WERE TOLD THAT OUR ASSOCIATION MUST PAY THE ALMOST $19,000 IN LEGAL FEES UNTIL THEY GET PAY[M]ENT FROM YOU. YOUR LAWSUIT HAS COST OUR COMMUNITY A LOT OF MONEY. OUR MEMBERS FOR SOLIDARITY HAVE TRIED AND FAILED TO FORCE YOU TO LEAVE OUR COMMUNITY BY MAKING YOU TWO SOCIAL OUTCASTS. LAURY PHELPS SAID WE CAN FORCE YOU TO LEAVE BY FORECLOSING ON YOUR HOUSE FOR THE $19,000 YOU OWE US. WHY DON'T YOU PAY US NOW AND LEAVE. SAVE US THE TIME AND MONEY TO

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 249 of 275
PageID# 12232
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 13 of 32

10

FORECLOSE ON YOU. AS A MEMBER OF THE ARDIENTE RESIDENTS FOR SOLIDARITY WE DO NOT WANT YOU LIVING IN OUR COMMUNITY."

vi. Plaintiffs filed a police report regarding the anonymous letters and the graffiti on their garage, and although an investigation was commenced, Plaintiffs never discovered the identity of the individuals that took these actions.

i. On April 9, 2009, counsel for the HOA sent Plaintiffs a letter with the results of the March 30, 2009 hearing. According to the letter, the Board found that Mrs. Sanzaro's entry into the clubhouse with Angel and subsequent failure to provide documentation about the dog's abilities as a service animal, was a violation of the HOA Rules & Regulations.[29] The Board found a second violation, as Mrs. Sanzaro brought Angel into the clubhouse on March 13, 2009. Plaintiffs were assessed a $100 fine for the March 11, 2009 incident and a $100 fine for Mrs. Sanzaro's entry into the clubhouse with Angel on March 13, 2009. Plaintiffs were also advised that they were required to pay the attorneys' fees and costs incurred by the HOA for enforcing its governing documents, in the amount of $752. The letter stated that the $200 fine would be waived if there was no subsequent violation during the next six months, but that fines would be imposed for any further violation.

**5. 2009 NRED Arbitration**

a. Plaintiffs filed a complaint with the Nevada Real Estate Division ("NRED") against (1) Corona; (2) Ardiente; (3) non-party Linda Kemper ("Kemper"), a member of the HOA Board at the time; (4) Marsh, as Board President; (5) Phelps, as

---

[29] The specific Rule & Regulation Plaintiffs were alleged to have violated was Article V, Section A.2, which provided: "Except for handicap assistance, animals are prohibited in the clubhouse."

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 250 of 275
PageID# 12233
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 14 of 32

Community Manager and an employee of RMI; and (6) RMI. The claim was submitted to a non-binding arbitrator.

b. On July 27, 2009, a non-binding arbitration was held before the NRED. Plaintiffs

11

were in attendance, as well as a representative of Corona, a representative of Ardiente, Kemper, Marsh, Phelps, and a representative of RMI, as well as their counsel.

c. During the arbitration, Mrs. Sanzaro testified that Angel provided assistance by helping Mrs. Sanzaro manage acute pain attacks arising from her disability.

d. The same day, at the request of the arbitrator, Plaintiffs sent a fax to the arbitrator with the following documents: (1) a doctor's statement requesting that Angel be registered as a service dog; (2) a notice of entitlement to disability benefits from the Social Security Administration; (3) a doctor's statement regarding Mrs. Sanzaro's disability; and (4) a statement from Mrs. Sanzaro explaining how Angel has been trained to assist her with her disabilities. Copies of the documents were also sent to counsel for the parties that attended the arbitration.

e. Representatives from Ardiente, Corona, and RMI, as well as Phelps, heard Mrs. Sanzaro explain how Angel assists her and received the information from the documents Plaintiffs submitted for the arbitration.

f. As a result of the faxed documentation being provided to Phelps and representatives of Ardiente, Corona, and RMI, Defendant Harris, as a member of the Board and representative of Corona during the time of the arbitration, became aware, at least as of this correspondence and testimony, of Mrs. Sanzaro's disability which resulted in a physical impairment that significantly impaired her ability to walk and Angel's assistance to her as a service animal.  This information was undisputed.

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 251 of 275
PageID# 12234
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 15 of 32

g.  On August 6, 2009, NRED Arbitrator Ara Shirinian entered a non-binding arbitration award in favor of Ardiente. The arbitrator found in part that "Mrs. Sanzaro's self-serving letter and a signed post-card to a private for-profit company without explanation of _why_ the dog is needed by Mrs. Sanzaro [was] unpersuasive." The arbitrator awarded fines related to the violations of the Ardiente governing documents as well as attorneys' fees incurred in the course of the arbitration.

12

h.  The arbitration was upheld by the Eighth Judicial District Court of Clark County, Nevada as well as by the Nevada Supreme Court.

**6. July 2010 Incident and Interactions between Plaintiffs and Defendants**

a.  Incident 2 occurred at the clubhouse on July 26, 2010. On that date, the Sanzaros attempted to enter the clubhouse to purchase a gate transponder, accompanied by Angel. During this incident, the Sanzaros were told that they could not come into the clubhouse unless they provided more documentation about Mrs. Sanzaro's disability and Angel's services, despite the documentation the Sanzaros provided to Ardiente, Corona, RMI, and Phelps in July 2009 as part of the NRED arbitration.

b.  Following Incident 2, Mr. Sanzaro sent a letter to Corona; Shea Homes, and Harris, as representatives of the Declarant; and Kemper, Smith, and non-party Sal Sirna ("Sirna") as members of the Board. In the letter, Mr. Sanzaro stated that he was lodging a formal written complaint against Phelps for disability discrimination. He also accused the Board of failing to properly supervise Phelps in her role as Community Manager.

c.  Mr. Sanzaro sent a similar letter directly to Phelps on August 1, 2010. In the letter, Mr. Sanzaro requested a response to his allegations.

- -

Case 1:22-cv-00448-TFM-N   Doc# 321-1   Filed 08/12/25   Page 252 of 275
PageID# 12235
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 16 of 32

d.   On August 1, 2010, Phelps sent a response letter to Mr. Sanzaro, on behalf of the Ardiente Board. She stated in part: "[U]ntil you provide proof that the dog in question is a registered service dog, I will have to respectfully disagree with your opinion. Unless you have recently provided documentation that we are not aware of, the dog is not a registered service dog and, therefore, I did not violate any of your rights."

e.   On August 8, 2010, Mr. Sanzaro sent separate letters to Corona, Smith, and Harris, detailing his allegation of disability discrimination by Phelps, noting her disability and describing Mrs. Sanzaro's need to access the Ardiente clubhouse. Mr. Sanzaro wrote that Mrs. Sanzaro required use of, amongst other things, the gym, sauna, pool, Jacuzzi, and library, but was being denied access to the clubhouse.

13

f.   As a result of the letters from Mr. Sanzaro, at least by August 8, 2010, Smith was aware of Mrs. Sanzaro's disability which resulted in a physical impairment that significantly impaired her ability to walk.

g.   Between September 2010 and December 2010, Plaintiffs sent letters to Corona and to individual Board members, including Smith, requesting mitigation and use of the Ardiente clubhouse.

h.   On January 20, 2011, counsel for Ardiente sent Plaintiffs a letter rejecting their requests to use the clubhouse. The letter stated in part: "[Y]ou still need to provide the Board with records and/or documents that demonstrate that Mrs. Sanzaro has such an impairment which affects one or more of her major life activities, and that the impairment is related to the need for her having the dog in question residing with her and accompanying her into the Common Areas [of the Ardiente community]. . . . [Ardiente's] request that you provide the proper documentation evidencing a certificate of training as a service dog for the chihuahua is well founded in Federal law. . . . You still have failed to furnish the proper documentation that the Association has been requesting since March 2009. Until such time that you

- -

Case 1:22-cv-00448-TFM-N  Doc# 321-1  Filed 08/12/25  Page 253 of 275
PageID# 12236
Case 2:11-cv-01143-RFB-CWH  Document 442  Filed 03/05/19  Page 17 of 32

furnish such documentation you will not be allowed to bring the Chihuahua into the [Ardiente] clubhouse as it is a violation of the [Ardiente] Rules and Regulations." The Ardiente Board was copied on this letter, which included Smith.

i.  On January 22, 2011, Mr. Sanzaro sent a letter to Corona, Shea Homes, and Harris, as representatives of the Declarant, and non-party Margo Hughen ("Hughen"), Smith, and Sirna as members of the Board, responding to the January 20, 2011 letter. Mr. Sanzaro disputed that documentation or certification of Angel's abilities was required by law, and stated that he and his wife, along with Angel, would appear at the clubhouse on January 29, 2011 at 4:00pm for the purpose of regaining access to the clubhouse. He requested that Board Members, representatives of Corona, and counsel for Ardiente be present on that date.

14

## 7. The January 2011 Incident

a. Incident 3 took place on January 29, 2011, when the Sanzaros appeared with Angel at the Ardiente clubhouse. Non-party Ron Winkel ("Winkel") was the Community Manager at the time, and had replaced Phelps at some point in 2010. Winkel refused the Sanzaros' entry into the clubhouse, and told them that the Board would not allow them to come into the Ardiente clubhouse with the dog until they provided documents that Angel was a service animal. Feeling intimidated by Winkel's presence, the Sanzaros left the clubhouse with Angel.

## 8. Other Actions Taken Against the Sanzaros

a. Following the assessments of fines and attorneys' fees and costs in conjunction with the incidents described above, Ardiente initiated foreclosure proceedings against the Sanzaros.

i.  On August 28, 2009, a Lien for Delinquent Assessments in the amount of $2,590.80 was recorded against Plaintiffs.

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 254 of 275
PageID# 12237
Case 2:11-cv-01143-RFB-CWH    Document 442    Filed 03/05/19    Page 18 of 32

ii. A Notice of Default and Election to Sell was recorded against Plaintiffs' home on October 13, 2009. Pursuant to the Notice, Plaintiffs owed $3,608.80 in assessments to the HOA.

b. As a result of the foreclosure proceedings being initiated, the Sanzaros were forced to file for Chapter 11 bankruptcy in August 2010.

c. Plaintiffs' debt was not discharged until October 28, 2013. Up to that date, they received notifications that their Ardiente home was in foreclosure. Prior to the discharge, Plaintiffs made payments to non-party Red Rock Financial Services, the debt collector for Ardiente, in the amount of $4,011.40.

## V.    CONCLUSIONS OF LAW

### A. Plaintiffs' Claims Under the ADA *i. Legal Standard*

Title III of the ADA prohibits discrimination in public accommodations, stating that "[n]o

15

individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a) (2009); Kohler v. Bed Bath & Beyond of California, LLC, 780 F.3d 1260, 1263 (9th Cir. 2015) (quoting Molski v. M.J. Cable, Inc., 481 F.3d 724, 730 (9th Cir. 2007)). To prevail on a Title III discrimination claim, the plaintiff must show that (1) she is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of her disability. Molski, 481 F.3d at 730.

In the context of ADA discrimination claims pertaining to service animals in particular, discrimination is defined in part as "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities . . . ." 42

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 255 of 275
PageID# 12238
Case 2:11-cv-01143-RFB-CWH    Document 442    Filed 03/05/19    Page 19 of 32

U.S.C. § 12182(b)(2)(A)(ii) (2009). The Department of Justice issued ADA regulations which state in part: "[g]enerally, a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability." 28 C.F.R. § 36.302(c)(1) (2009). "By this regulation the Department of Justice intended that 'the broadest feasible access be provided to service animals in all places of public accommodation[.]'" Lentini v. Cal. Ctr. for the Arts, Escondido, 370 F.3d 837, 843 (9th Cir. 2004) (citation omitted). However, failure to make such modifications does not automatically constitute discrimination where the entity "'can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations . . . .'" Id. at 844 (alteration in original) (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)). The Supreme Court has articulated different inquiries to make this determination: "whether the requested modification is 'reasonable,' whether it is 'necessary' for the disabled individual, and whether it would 'fundamentally alter the nature of' the [goods, services, etc.]." Id. (quoting PGA Tour, Inc. v. Martin, 532 U.S. 661, 683 n.38 (2001)).

### ii. Discussion

16

#### 1.  Mrs. Sanzaro is Disabled Under the ADA

All Defendants concede that Mrs. Sanzaro is a disabled individual and has had a disability at all relevant times during the events described above. Therefore, in consideration of the facts presented at trial, the Court finds that Mrs. Sanzaro is disabled as a matter of law. The Court also finds that she provided sufficient documentation about her disability to all Defendants. HOA Defendant Ardiente and business entity Defendants Corona and RMI were aware of Mrs. Sanzaro's disability at least as of July 27, 2009, the date of the NRED arbitration.

#### 2.  The Ardiente Clubhouse is Not a Place of Public Accommodation

42 U.S.C. § 12181(7) provides a list of private entities that are considered public accommodations for the purposes of the ADA, if those entities engage in operations that affect

- -

Case 1:22-cv-00448-TFM-N   Doc# 321-1   Filed 08/12/25   Page 256 of 275
PageID# 12239
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 20 of 32

commerce. The majority of the listed examples – including movie theaters and other places of entertainment, convention centers and other places of public gathering, and elementary schools and other places of education – are not analogous to the community facilities within an HOA. However, the statute includes as a place of accommodation "an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residents of such proprietor . . . ." 42 U.S.C. § 12181(7)(A) (2009). Despite this broad list of examples, the ADA does not apply to "private clubs or establishments exempted from coverage under Title II of the Civil Rights Act of 1964 (42 U.S.C. 2000-a(e)) . . . ." 42 U.S.C. § 12187 (2009). The Court must therefore determine whether the Ardiente clubhouse can be considered a place of lodging, such that it qualifies as a public accommodation under the ADA, or whether the clubhouse is a private establishment exempted from the ADA.

The Court finds that the Ardiente clubhouse does not qualify as a place of public accommodation. The Court finds that the entire Ardiente community including the Ardiente clubhouse was a private establishment. Although members of the public were invited to stay overnight in an Ardiente model home and were permitted to use the clubhouse during their stay, the Court finds that the general public did not have unrestricted, general or even limited access to the clubhouse. See Jankey v. Twentieth Century Fox Film Corp., 212 F.3d 1159, 1161 (9th Cir.

17

2000) ("[Plaintiff's] argument is premised on the assumption that if a facility falls within a § 12181 category, the [ADA] applies regardless of whether it is open to the public. This argument, for which we have found no support, ignores the plain language of § 12187 which . . . [like Title II] exempts from coverage any 'private club *or other establishment not in fact open to the public.*'") (alteration in original) (citation omitted); see also Clegg v. Cult Awareness Network, 18 F.3d 752, 755 n.3 (9th Cir. 1994) ("Congress . . . has drawn a distinction between [an] organization—a private club—and the facilities the organization operates. Only when the facilities are open to the public at large does Title II govern.").

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 257 of 275
PageID# 12240
Case 2:11-cv-01143-RFB-CWH    Document 442    Filed 03/05/19    Page 21 of 32

As a general matter, the Ardiente clubhouse and the overall community were not open to the general public. Members of the community could only access entry by use of a transponder to open the gates. Non-resident access to the community including the clubhouse required either obtaining permission for limited access from the community office, being escorted by a member of the community or being provided access by a member of the community. For those members of the public that participated in the "Stay and Play" and "Taste of the Good Life" programs, there was a condition imposed on their stay – namely, those guests had to explicitly indicate an interest in writing in purchasing a home within the Ardiente community prior to staying in the model home and obtaining access to the Ardiente clubhouse. The homes used for this program and the Ardiente clubhouse access provided with the programs were not open to the public as they would be for a hotel. This access was never advertised to the general public as an accommodation where individuals could simply pay money to stay, as they would with a hotel. Any member of the public interested in using these facilities had to explicitly indicate their interest in exploring the possibility of purchasing a home in the community. As interested guests could not access the clubhouse without first meeting this condition, the Ardiente clubhouse cannot be considered a place of lodging open to the public generally.

As the Ardiente clubhouse does not qualify as a place of public accommodation, Plaintiffs cannot establish a claim for disability discrimination under the ADA.

### B. Plaintiffs' Claims Under the FHA *i. Legal Standard*

18

In the Ninth Circuit, a plaintiff can bring discrimination claims under the FHA and assert either a theory of disparate treatment or disparate impact. Gamble v. City of Escondido, 104 F.3d 300, 304–05 (9th Cir. 1997) (citations omitted). Additionally, a plaintiff may bring suit under the section 3604(f)(3)(B) of the Fair Housing Act Amendments ("FHAA") for failure to make reasonable accommodations in handicapped housing. Id. at 305 (citation omitted). To advance a disparate treatment discrimination claim, Plaintiffs must first show: (1) Mrs. Sanzaro is a member

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 258 of 275
PageID# 12241
Case 2:11-cv-01143-RFB-CWH    Document 442    Filed 03/05/19    Page 22 of 32

of a protected class; (2) Mrs. Sanzaro applied for and was qualified for use of the clubhouse with Angel; (3) Mrs. Sanzaro was denied use of the clubhouse with Angel; and (4) Defendants allowed similarly situated parties to use the clubhouse. See Sanghvi v. City of Claremont, 328 F.3d 532, 536 (9th Cir. 2003) (citing Gamble, 104 F.3d at 305). Once Plaintiffs have established the prima facie case, the burden shifts to Defendants to "to articulate a legitimate, nondiscriminatory reason for its action." Gamble, 104 F.3d at 305. Finally, Plaintiffs must show by a preponderance of evidence that Defendants' proffered reason is pretextual. Id.

Regarding reasonable accommodation claims under the FHA, unlawful discrimination includes a housing provider's "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B) (2009). A plaintiff must prove five elements to prevail on an FHA reasonable accommodation claim under § 3604(f)(3)(B): "(1) that the plaintiff or his associate is handicapped within the meaning of 42 U.S.C. § 3602(h); (2) that the defendant knew or should reasonably be expected to know of the handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendant refused to make the requested accommodation." Dubois v. Ass'n of Apartment Owners of Kalakaua, 453 F.3d 1175, 1179 (9th Cir. 2006) (citations omitted), cert. denied, 549 U.S. 1216 (2007). "The reasonable accommodation inquiry is highly factspecific, requiring case-by-case determination." Id. (quoting United States v. Cal. Mobile Home Park Mgmt. Co., 107 F.3d 1374, 1380 (9th Cir. 1997)).

19

Although the FHA does not explicitly allow plaintiffs to assert a theory of vicarious liability for individual and business entity agents or employees acting on behalf of principals or employers, the Supreme Court has held that "it is well established that the [Fair Housing] Act provides for vicarious liability." Meyer v. Holley, 537 U.S. 280, 285 (2003). This is because "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious

Case 1:22-cv-00448-TFM-N   Doc# 321-1   Filed 08/12/25   Page 259 of 275
PageID# 12242
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 23 of 32

liability rules and consequently intends its legislation to incorporate those rules." Id. (citations omitted). Therefore, in determining whether an employer or principal can be held liable for the acts of an agent or employee, the Court must apply traditional vicarious liability rules which permit a finding of liability where the employee or agent acted within the scope of employment or agency. Id. (citations omitted). However, absent special circumstances, an officer or owner of a business entity may not be held vicariously liable, as it is the business entity that is the principal or employer. Id. at 286 (citations omitted).

### ii. Discussion[30]

#### 1. Ardiente, Corona, and RMI qualify as Housing Providers under the FHA

The Court first finds that the FHA applies to the HOA Defendant and the business entity Defendants in this case. Although Defendants do not contest the applicability of the FHA, the Court briefly addresses its scope. In agency guidance regarding reasonable accommodations under the FHA, the Department of Housing and Urban Development ("HUD") and the Department of Justice ("DOJ") recognized that the statute applies broadly and covers "individuals, corporations, associations and others involved in the provision of housing and residential lending, including property owners, housing managers, homeowners and condominium associations, lenders, real estate agents, and brokerage services." Joint Statement of the Dep't of Housing and Urban Dev. and the Dep't of Justice, Reasonable Accommodations Under the Fair Housing Act (May 17, 2004)

---

[30] To the extent that any factual statements in this "Discussion" section are not explicitly noted in the "Factual Findings" section, see supra, the Court incorporates them by reference into that section and makes such additional factual statements as factual findings based upon the record and in support of the order here.

Case 1:22-cv-00448-TFM-N   Doc# 321-1   Filed 08/12/25   Page 260 of 275
PageID# 12243
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 24 of 32

20

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 261 of 275
PageID# 12244
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 25 of 32

- -

Case 1:22-cv-00448-TFM-N   Doc# 321-1   Filed 08/12/25   Page 262 of 275
PageID# 12245
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 26 of 32

("HUD and DOJ Joint Statement"), at 3, https://www.hud.gov/sites/documents/DOC_7771.PDF.[4]

As the HOA, Ardiente is a provider of private residential housing and is required to follow the FHA in the sale of housing and in the provision of reasonable modifications and accommodations for use and enjoyment of those properties. As Declarant and developer of the community, Corona was also bound by the FHA and can be held liable for violations of its provisions. As the former property management company, RMI is also may be held liable for engaging in activity prohibited by the FHA.

As discussed below, these entities are vicariously liable for the acts of their agents and employees.

2. Mrs. Sanzaro is Handicapped Under the FHA

As discussed above in the context of ADA disability discrimination, the parties no longer

dispute that Mrs. Sanzaro qualifies as handicapped under the FHA.[5] Based upon the evidence presented at trial, the Court concludes as a matter of law that Mrs. Sanzaro has been, at all relevant times, a handicapped individual as defined by the FHA.

3. Defendants Were Reasonably Expected to Know of Mrs. Sanzaro's

Handicap

The Court finds that all Defendants knew and could reasonably have been expected to

know of Mrs. Sanzaro's handicap. They knew that her handicap requires the use of a walker, and Defendants do not dispute that her impairment was a visible one. Ardiente, through the Board members involved in the Incidents as well as correspondence from the Sanzaros, knew that Mrs. Sanzaro had a permanent handicap. Corona, as Declarant, had members on the Board during the

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 263 of 275
PageID# 12246
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 27 of 32

[4] The Court finds it appropriate to rely upon this agency guidance where the FHA itself is unclear as to its scope. See National Cable & Telecomm. Ass'n v. Brand X Internet Serv., 545 U.S. 967, 980 (2005) ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, Chevron requires a federal court to accept the agency's construction of the statute . . . .") (quoting Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843–44 & n.11 (1984)).

[5] The terms "disabled" and "handicapped" can be used interchangeably, as the Supreme Court has recognized that "the ADA's definition of disability is drawn almost verbatim from the definition of "handicapped individual" included in the Rehabilitation Act of 1973 . . . and the definition of "handicap" contained in the Fair Housing Amendments Act of 1988 . . . . Bragdon v. Abbott, 524 U.S. 624, 631 (1998) (citations omitted).

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 264 of 275
PageID# 12247
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 28 of 32

three Incidents, and also knew of Mrs. Sanzaro's handicap. RMI, as employer of the Community Manager, knew of Mrs. Sanzaro's handicap through its representation at the NRED arbitration and being named as a party in the Sanzaros' agency actions. Phelps was present at the NRED arbitration, and testified at trial that she knew that Mrs. Sanzaro had a handicap which significantly impaired her mobility. The Court therefore finds that by the July 27, 2009 arbitration these Defendants knew Ms. Sanzaro was disabled and that Angel assisted her with her disability when she had acute pain attacks. The Court also finds that they did not have any information that disputed this.

Smith and Harris, serving on the Board at the behest of the Declarant, knew of Mrs. Sanzaro's handicap due to their service on the Board and involvement in the decisions to exclude her and Mr. Sanzaro from the clubhouse with Angel. These Defendants thus knew that Mrs. Sanzaro had a qualifying impairment. However, Defendant Wallace did not attend the NRED arbitration and did not directly communicate with the Sanzaros. The Court does not find that he knew or could reasonably be expected to have known of Mrs. Sanzaro's handicap.

4. <u>An Accommodation was Necessary for Mrs. Sanzaro to Use and Enjoy the Clubhouse</u>

The Court finds that Mrs. Sanzaro was unable to use and enjoy the clubhouse without an accommodation related to her disability. The Court further finds that access to the clubhouse was necessary for the Sanzaros' enjoyment of their home or dwelling. First, the clubhouse provided various programming and a community meeting place for enjoyment by all homeowners in the community. Homeowners understood its programming, facilities, and meeting spaces to be an integral part of being a homeowner in the community. The Sanzaros purchased their home within the Ardiente community with the expectation that they would be able to use and enjoy the home with the shared amenities in the clubhouse. Indeed, the promotional materials published in the local newspaper advertising the Ardiente community specifically referred to the clubhouse amenities, for the purpose of enticing potential buyers. A buyer of a Shea Homes property not only purchases a home but also purchases access to community facilities that are only available to members of that community. Indeed, that is why clubhouse access and use was an explicit part of

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 265 of 275
PageID# 12248
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 29 of 32

22

the marketing programs, such as "Stay and Play." Second, the clubhouse was necessary for the enjoyment of the Sanzaros' home because it contained the office for the community. The office supported homeowners enjoyment of and access to their actual homes by providing, for example, the gate transponder devices that homeowners needed to enter the community itself. Thus, without access to the clubhouse, there could be no access to the community itself by a homeowner. When members of the community had issues within Ardiente the office in the clubhouse was the initial contact point for resolving issues under the jurisdiction or control of the HOA. The Court finds factually that Mrs. Sanzaro required regular and continuous access to the clubhouse to have full enjoyment of and access to her actual home.

The Court also separately finds that the Ardiente clubhouse qualifies as a dwelling under the FHA. A "dwelling" is defined as: "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." 42 U.S.C. §3602(b) (2009). Departmental regulations include public spaces and common use areas in the definition of "dwelling." 24 C.F.R. § 100.204 (2009). The FHA applies to property owners, housing managers, and homeowners and condominium associations. HUD and DOJ Joint Statement, at 3. The Court's finding that the FHA applies to the Ardiente clubhouse thus naturally follows as a reasonable interpretation of HUD guidance.

For these reasons stated, Mrs. Sanzaro required an accommodation to realize her expectation to use and enjoy the Ardiente clubhouse.

### 5. Permitting Angel to Accompany Mrs. Sanzaro in the Clubhouse was a Reasonable Accommodation

The Court finds that Angel qualifies as a service animal under the FHA, and Angel's entry into the clubhouse was a reasonable accommodation for Mrs. Sanzaro. In response to public comment, HUD provided guidance regarding the definition of "service animal." Pursuant to the 2008 Final Rule on public housing regulations, a housing provider may verify that a disability

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 266 of 275
PageID# 12249
Case 2:11-cv-01143-RFB-CWH    Document 442    Filed 03/05/19    Page 30 of 32

exists, and inquire as to the need for accommodation such as a service animal, if neither the disability nor the need is "readily apparent." Preamble to Final Rule, Pet Ownership for the Elderly

23

and Persons With Disabilities, 73 Fed. Reg. 63,833, 63,835 (Oct. 27, 2008).[31] HUD further clarified that, so long as a person with a disability demonstrates a nexus between the disability and the service the animal provides, specialized training is not required, as "[s]ome animals perform tasks that require training, and others provide assistance that does not require training." Id.

The Court finds that Angel assisted Mrs. Sanzaro with her acute pain attacks and with retrieving her walker. Except for Wallace, all Defendants knew that Angel provided this assistance to Mrs. Sanzaro, because she testified as such during the NRED arbitration and she provided documentation. The Court finds that these Defendants understood and knew that Angel provided these services. These Defendants also knew that Angel did not pose a risk or threat of harm to anyone in the clubhouse or in the community.

In this case, there is a clear nexus between Mrs. Sanzaro's disability and the services that Angel provides. Mrs. Sanzaro's disability involved difficulty walking and acute and debilitating pain attacks. Angel was trained and offered assistance with both of these aspects of her disability. Angel assisted Mr. Sanzaro with the alleviation of pain during an acute attack. Angel assisted Mrs. Sanzaro with having constant and easy access to her walker since she is unable to walk without her walker.

Moreover, Defendants have not identified why the accommodation would have been unreasonable. Angel was not disruptive, threatening or harmful to other residents in the community or in the clubhouse. She was so inconspicuous due to her small size and quiet disposition that individuals in the clubhouse entry often did not even notice her. The accommodation to allow Angel to accompany Mrs. Sanzaro into the clubhouse was clearly reasonable based upon the evidence introduced at trial.

---

[31] HUD also noted that there was no specific definition of the term "service animal," and used the term interchangeably with "assistance animal" in accordance with reasonable accommodation law.

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 267 of 275
PageID# 12250
Case 2:11-cv-01143-RFB-CWH    Document 442    Filed 03/05/19    Page 31 of 32

### 6. Defendants Refused to Make the Requested Accommodation

There is no dispute that, on each of the three Incidents discussed above, Defendants Harris, Smith, and Phelps directly refused to accommodate the Sanzaros' request to bring Angel into the clubhouse. The other Defendants were aware of the Sanzaros' request for an accommodation and

24

either approved of or ratified the denial of request for an accommodation. Ardiente as HOA directly refused the accommodation. Corona and RMI in addition to being directly contacted were vicariously liable for the acts of their agents or employees whom they oversaw and directed.

In addition to refusing the Sanzaros' entry with Angel, the Court finds factually that these Defendants repeatedly asked Plaintiffs for more documentation regarding Angel's services even when they knew the assistance she provided and had sufficient documentation of Angel's assistance as a service animal. Defendants all insisted on this documentation, in violation of the FHA. These Defendants, as well as Ardiente, Corona, and RMI as principals, are liable for failure to provide a reasonable accommodation to the Sanzaros.

The Court further notes that at no point were the Sanzaros required to submit a written request for accommodation even though they did make such a written request. See HUD and DOJ Joint Statement, at 10 ("An applicant or resident is not entitled to receive a reasonable accommodation unless she requests one. However, the Fair Housing Act does not require that a request be made in a particular manner or at a particular time. . . . [T]he requester must make the request in a manner that a reasonable person would understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability. . . [and] a reasonable accommodation request can be made orally or in writing . . . ."). All Defendants knew from the Sanzaros' actions and communications, including correspondence, that they were seeking an accommodation to allow Mrs. Sanzaro to bring Angel into the clubhouse with her. Each time

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 268 of 275
PageID# 12251
Case 2:11-cv-01143-RFB-CWH    Document 442    Filed 03/05/19    Page 32 of 32

the Sanzaros entered or attempted to enter the clubhouse with Angel, it was clear that they were seeking an exception to the policy of animals being prohibited in the clubhouse. This request was reinforced by the Sanzaros' communications and submission of documentation related to Angel. The Sanzaros also explicitly made a request for Angel to be allowed into the clubhouse. These Defendants' refusal to allow the Sanzaros to enter the clubhouse with Angel therefore constitutes a failure to reasonably accommodate their request.

The Court therefore finds in favor of Plaintiffs against all of Defendants, except Defendant Wallace, on their FHA reasonable accommodation claim.

25

**C. Plaintiffs' Claims Under NRS § 651.075 *i. Legal Standard***

Under Nevada law, "public accommodation" has a similar definition as set forth in the ADA. NRS § 651.050 (2009). Nevada law provides that it "is unlawful for a place of public accommodation to: (a) Refuse admittance or service to a person with a disability because the person is accompanied by a service animal" and "(f) Require proof that an animal is a service animal or service animal in training." NRS § 651.075(1) (2009); See, e.g., Clark Cty. Sch. Dist. v. Buchanan, 924 P.2d 716, 719 (Nev. 1996) (applying NRS § 651.075(1) to a plaintiff training a service dog). However, "[a] place of public accommodation may: (a) Ask a person accompanied by an animal: (1) If the animal is a service animal or service animal in training; and (2) What tasks the animal is trained to perform or is being trained to perform." NRS § 651.075(2) (2009). At the time of Incident 1, a service animal was defined under Nevada law as "an animal that has been trained to assist or accommodate a person with a disability." NRS § 426.097 (2009). ***ii. Discussion***

Plaintiffs' claim under NRS § 651.075 fails for the same reasons noted above regarding their ADA claim. The Ardiente community and clubhouse were part of a private establishment and cannot be considered public accommodations.

**D. Damages**

Based on its reasoning set forth above, the Court finds that damages are only available to Plaintiffs for violations of the FHA.

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 269 of 275
PageID# 12252
Case 2:11-cv-01143-RFB-CWH    Document 442    Filed 03/05/19    Page 33 of 32

Under the FHA, a plaintiff may seek actual and punitive damages, as well as injunctive relief, if the court finds evidence of a discriminatory housing practice. 42 U.S.C. § 3613(c)(1). In an action under the FHA, if a plaintiff establishes actual damages, the Court is required to award compensatory damages. U.S. v. City of Hayward, 36 F.3d 832, 839 (9th Cir. 1994) (citations omitted). "Although compensatory damages need not be determined with certainty, they may not be based upon 'mere speculation or guess.'" Silver Sage Partners, LTD v. City of Desert Hot Springs, 251 F.3d 814, 824 (9th Cir. 2001) (quoting Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931)). While a court may award lump sum damages, a damages

26

award must be sufficiently detailed. See Simeonoff v. Hiner, 249 F.3d 883, 891-92 (9th Cir. 2001) (finding that lump sum awards of $6500 for past lost wages and $130,000 for future lost wages did not specify how the amounts were calculated but that "the district court's findings of fact are adequately detailed to permit meaningful appellate review of any substantive challenge"). The Ninth Circuit will not reverse an award for damages "unless it is clearly unsupported by evidence, or it shocks the conscience." Id. at 893 (citation and quotation marks omitted).

To obtain punitive damages under the FHA, a plaintiff must show that defendants acted with reckless indifference. Fair Hous. Council of San Diego, Joann Reed v. Penasquitos Casablanca Owner's Ass'n, 381 Fed. Appx. 674, 676–77 (9th Cir. 2010) (citing Fair Housing of Marin v. Combs, 285 F.3d 899, 906 (9th Cir. 2002)). Reckless indifference is found where a defendant, at minimum, "discriminate[s] in the face of a perceived risk that its actions will violate federal law" but does not require that defendant "engage in conduct with some independent, egregious quality" to be subject to punitive damages. Id. (quoting Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535, 537 (1999)).

### i. Compensatory Damages

The Court finds that Plaintiffs have established actual damages resulting from the failure of a reasonable accommodation being provided. The Court finds that Plaintiffs have established

- -

Case 1:22-cv-00448-TFM-N   Doc# 321-1   Filed 08/12/25   Page 270 of 275
PageID# 12253
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 34 of 32

non-economic damages under the requisite legal standard. Plaintiffs incurred non-economic damages including pain and suffering, humiliation, and emotional distress due to being driven out of their Ardiente home, facing death threats and harassment from community members, being undermined publicly and privately by the Ardiente Board and Phelps, having to file bankruptcy, and being unable to use and enjoy the Ardiente clubhouse facilities with Angel for several years. The Court therefore imposes compensatory damages for these non-economic damages in the amount of $350,000 against Defendants Harris, Smith, Phelps, Ardiente, Corona, and RMI. These damages are joint and several. The Court's award is based upon the findings in this case, and the Court emphasizes the salient findings as to each defendant below.

The Court awards compensatory damages against Harris as an agent of Ardiente and Corona during the time of the first Incident. The Court finds that Harris is liable for requiring the

27

Sanzaros to provide documentation that the FHA did not require. Harris approved Phelps's communications on behalf of the Board that prevented the Sanzaros from using the Ardiente clubhouse with Angel without providing the requested documentation. Harris is additionally liable for ratifying the assessment of fines against the Sanzaros for bringing Angel into the Ardiente clubhouse in March 2009. Further, Harris directed Phelps to exclude the Sanzaros from the Ardiente clubhouse with Angel between March 2009 and February 2010.

The Court similarly awards compensatory damages against Smith as an agent of Ardiente and Corona during the time of Incidents 2 and 3. The Court finds that Smith participated in the decisions to continue to exclude the Sanzaros and Angel from the Ardiente clubhouse and unlawfully require certification of Angel's training between 2010 and 2013.

The Court imposes compensatory damages against Phelps as Community Manager and an agent of RMI. During Incident 1, Phelps initially excluded Mrs. Sanzaro from the Ardiente clubhouse and called HOA security because Angel was present in the facility despite Mrs. Sanzaro using Angel as an assistance animal at that time. Following the first Incident, Phelps sent multiple emails to other Ardiente homeowners with misleading information about the legal requirements

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 271 of 275
PageID# 12254
Case 2:11-cv-01143-RFB-CWH    Document 442    Filed 03/05/19    Page 35 of 32

for service animals, cultivating the atmosphere of open hostility toward the Sanzaros. Phelps attended the NRED arbitration and heard Mrs. Sanzaro testify about Angel's assistance tasks, and nonetheless continued to prevent the Sanzaros from obtaining a reasonable accommodation to use the clubhouse. Phelps's requests for documentation and certification were improper and her conduct was motivated by personal animus against the Sanzaros.

The Court imposes compensatory damages against Ardiente. The Court finds that Ardiente, through its Board of Directors, directed the exclusion of the Sanzaros and Angel from the clubhouse during all three Incidents. The Board, on behalf of Ardiente, also imposed fines upon the Sanzaros and required them to provide certification and other documentation related to Angel's training, despite the Sanzaros providing sufficient information in July 2009 to allow the Board to evaluate the nexus between Mrs. Sanzaro's disability and her need for Angel. The Board also took no action to address or mitigate the hostility and threats expressed by other members of the Ardiente community toward the Sanzaros, and in fact fomented this hostility. Additionally,

28

Ardiente failed to train its Board members on the requirements of discrimination law.

The Court awards compensatory damages against Corona as a principal of Harris and Smith and for ratifying their actions. The Court finds that, pursuant to Ardiente's governing documents, Corona, as Declarant, had the authority to appoint and did appoint and oversee voting members to the Ardiente Board during the Incidents at issue in this case. Corona exercised this authority and maintained majority representation on the Board until sometime in 2010. It retained representation during 2011, even though it no longer had majority control of the Board. Therefore, during all three Incidents, Corona had at least one voting member on the Ardiente Board. Corona is liable for actions described above, including the exclusion of the Sanzaros and Angel from the clubhouse and the failure to address at Board meetings or in correspondence with homeowners the threats against the Sanzaros. Corona also failed to train its Board representatives on the requirements of discrimination law.

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 272 of 275
PageID# 12255
Case 2:11-cv-01143-RFB-CWH    Document 442    Filed 03/05/19    Page 36 of 32

The Court awards compensatory damages against RMI as a principal and employer of Phelps and for ratifying and directing her actions. The Court finds that RMI failed to properly train Phelps on the requirements of federal and state discrimination law. RMI received complaints from the Sanzaros in 2009 following the first Incident, and nevertheless failed to inform Phelps that the law did not require the Sanzaros to provide further documentation of Angel's training. Neither federal nor state law operative in 2009 required any particular certification for a service animal. Furthermore, RMI sent a representative to the 2009 NRED arbitration, where Mrs. Sanzaro testified about how Angel assisted her. RMI received documentation from the Sanzaros about how Angel assisted Mrs. Sanzaro immediately after the NRED arbitration – that documentation was sufficient to establish that Mrs. Sanzaro was disabled and required assistance from Angel which included bringing Angel into the Ardiente clubhouse.

The Court declines to impose liability or damages against Wallace, CEO of RMI. The Court finds that vicarious liability cannot be imposed against Defendant Wallace, pursuant to Meyer v. Holley. Plaintiffs have produced no evidence that Wallace directly participated in the denial of the reasonable accommodation or ratified its denial. As Wallace cannot be held liable

29

merely for being an owner or officer of RMI, the Court does not award any damages against this Defendant.

### ii. Punitive Damages

The Court finds that certain Defendants acted with reckless indifference as to the rights of disabled individuals seeking reasonable accommodations. The Court therefore awards punitive damages to the Plaintiffs in the amount of $285,000 and finds that this amount appropriately "punish[es] unlawful conduct and deter[s] its repetition." Philip Morris USA v. Williams, 549 U.S. 346, 352 (2007) (citations and quotation marks omitted). The Court finds that the conduct of Defendants Ardiente, Harris, Smith, and Phelps in the violation of the Plaintiffs' rights under the FHA warrants the imposition of punitive damages. This conduct includes, but is not limited to, (1)

- -

Case 1:22-cv-00448-TFM-N   Doc# 321-1   Filed 08/12/25   Page 273 of 275
PageID# 12256
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 37 of 32

continuing to, in a harassing and malicious manner, request documentation about Mrs. Sanzaro's need for Angel's assistance even after sufficient documentation was provided to them regarding Mrs. Sanzaro's disability and the ways in which Angel assisted her; (2) actively and wantonly preventing the Sanzaros from using the clubhouse once that documentation was provided; (3) sending or directing to be sent communications on behalf of the Board that portrayed the Sanzaros as litigious and untruthful and knowing that such communications about the Sanzaros would contribute to a hostile, threatening and intimidating living environment; and (4) failing to discourage Ardiente residents from harassing and threatening the Sanzaros at open meetings and through anonymous letters. The Court further finds that these Defendants acted with personal animus toward the Sanzaros, which fueled the antagonism among the community.

Defendants Corona and RMI are vicariously liable for these reckless acts. At all times, these Defendants were aware of, oversaw and ratified the actions of their agents. The Court, based upon the above findings, awards punitive damages as follows: a. Defendant Ardiente: $150,000

b. Defendant Phelps: $25,000

c. Defendant Corona: $15,000

d. Defendant RMI: $75,000

e. Defendant Harris: $10,000

30

f. Defendant Smith: $10,000

### iii. Injunctive Relief

In their Complaint, Plaintiffs make the following requests for injunctive relief: (1) Plaintiffs request that the Court enjoin Defendants from committing any further discriminatory acts; (2) Plaintiffs ask the Court to order Ardiente to incorporate policies and procedures for the disabled into their governing documents; and (3) Plaintiffs seek to enjoin Defendants from enforcing any future amendments to governing documents that have not been legally implemented by a majority vote of the HOA's members, recorded with the Clark County Recorder, and mailed to all members

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 274 of 275
PageID# 12257
Case 2:11-cv-01143-RFB-CWH    Document 442    Filed 03/05/19    Page 38 of 32

of the HOA. The Court does not find it appropriate to order injunctive relief at this time. Plaintiffs have essentially asked this Court to order that Defendants follow the law. This is not a proper basis for injunctive relief in this case.

### E. Attorneys' fees and costs

The Court is authorized to award attorneys' fees and costs to the prevailing party in an FHA action. 42 U.S.C. § 3613(c)(2). The Court awards Plaintiffs attorneys' fees and costs to the extent available in an amount to be decided following the entry of Judgment.

## VI.    JUDGMENT

The Court finds in favor of Plaintiffs. The Court will award to Plaintiffs: $350,000 in compensatory damages, and $285,000 in punitive damages, pursuant to 42 U.S.C. § 3613(c)(1). The Court also awards attorneys' fees to the extent available and costs of litigation to Plaintiffs, pursuant to 42 U.S.C. § 3613(c)(2). Plaintiffs are ordered to submit a Motion for Attorneys' Fees and Costs and attached list of litigation costs to the Court within thirty days of entry of this order.

The Clerk of Court is instructed to enter judgment accordingly and to close this case.

///

///

///

///

///

31

## VII.    Outstanding Motion for Reconsideration

The Court now considers Plaintiffs' pending Motion for Reconsideration [ECF No. 432] of the Court's Order [ECF No. 403] taxing costs. The Court has reviewed the Court's Order and finds that the Order taxing costs is appropriate and shall not be reconsidered. To the extent that Plaintiffs have raised concerns about service, the Court is not convinced that there was not service. In any event, Plaintiffs have now viewed the itemization of costs and have not raised substantive or persuasive arguments as to the actual costs themselves. Moreover, the Court has now entered

- -

Case 1:22-cv-00448-TFM-N    Doc# 321-1    Filed 08/12/25    Page 275 of 275
PageID# 12258
Case 2:11-cv-01143-RFB-CWH   Document 442   Filed 03/05/19   Page 39 of 32

judgment as to all parties so there is no further issue of the Order being premature. The Order taxing costs shall remain in effect for the full amount.

**IT IS SO ORDERED.**

DATED: <u>March 5, 2019</u>.

_____

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

32

- -