IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MARK HEIMKES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIV. ACT. NO. 1:22-cv-448-TFM-N |
| | ) | |
| FAIRHOPE MOTORCOACH RESORT | ) | |
| CONDOMINIUM OWNERS | ) | |
| ASSOCIATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| SHEARLDINE MARIE ALLFREY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIV. ACT. NO. 1:22-cv-496-TFM-N |
| | ) | |
| FAIRHOPE MOTORCOACH RESORT | ) | |
| CONDOMINIUM OWNERS | ) | |
| ASSOCIATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter came before the Court for a twelve day non-jury trial that commenced on May 27 and concluded on July 15, 2025. The Court took the matters at issue under advisement. Pursuant to Fed. R. Civ. P. 52(a)(1) the Court issues this opinion with its findings of fact and conclusions of law.[1]

---

[1] "'[T]he judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts.'" *Stock Equip. Co., a Unit of Gen. Signal Corp. v. Tenn. Valley Auth.*, 906 F.2d 583, 592 (11th Cir. 1990) (quoting FED. R. CIV. P. 52 advisory committee's note to 1946 amendment).

## I.        JURISDICTION & VENUE

The Court has subject matter jurisdiction over the claims in this action pursuant to U.S.C. § 1331 (federal question).  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the events that gave rise to the claims in this matter occurred in this judicial district.

The Court finds sufficient support exists for both jurisdiction and venue, as Plaintiffs bring federal claims and the events that gave rise to these claims occurred in this district, in Fairhope, Alabama.[2]

## II.        PROCEDURAL HISTORY

On November 9, 2022, Plaintiff Mark Heimkes ("Mr. Heimkes") filed his Complaint with this Court against Fairhope Motorcoach Resort Condominium Owners Association, Inc. ("FMRCOA" or "Defendant").  Doc. 1.  Mr. Heimkes' Complaint asserts four counts against Defendant: failure to make a reasonable accommodation under the Fair Housing Act ("FHA") (Count I), denial of a reasonable accommodation under the FHA (Count II),[3] interference, coercion, or intimidation under the FHA (Count III),[4] and violation of the Americans with Disabilities Act ("ADA") (Count IV).  *Id.*  Defendant filed its answer to Mr. Heimkes' Complaint on January 31, 2023.  Doc. 31.

---

[2] The Court notes that Defendant has contested jurisdiction throughout this case on arguments of res judicata, collateral estoppel, and the Rooker Feldman Doctrine.  The Court addressed these arguments on summary judgment, and no facts presented at trial change the Court's analysis from the summary judgment stage.  *See* Doc. 196.

[3] Failure to make a reasonable accommodation and denial of a reasonable accommodation (Counts I and II) are, in effect, the same.

[4] The Court notes the Complaint mistakenly labels this as Count II, but the Count above it is also listed as Count II. Thus, the Court renumbers this Count as Count III. Similarly, the Complaint lists the final count as Count III. The Court also renumbers the Count listed as Count III in the Complaint as Count IV.

On December 16, 2022, Plaintiff Sheraldine Allfrey ("Mrs. Allfrey") (collectively, with Mr. Heimkes, "Plaintiffs") filed her Complaint against FMRCOA. Civ. Act. No. 1:22-cv-496-TFM-N (hereinafter, "*Allfrey*"), Doc. 1.  Mrs. Allfreys' Complaint asserts two counts against Defendant: violation of the ADA (Count I) and denial of reasonable accommodation under the FHA (Count II).  Though not separately listed as an independent count, Mrs. Allfrey also appears to have embedded a claim for harassment, retaliation, and intimidation under the FHA in Count II.

The parties have an extensive litigation history.  Numerous motions were filed in these cases, including those filed on the eve of trial as well as during trial.  The Court will not rehash the extensive history here, as it can all be decerned from a review of the record.

### III.    MOTIONS FOR DIRECTED VERDICTS

The Court notes that on July 14, 2025, Plaintiffs filed a motion for directed verdict pursuant to Fed. R. Civ. P. 50.  *See* Doc. 294.  The motion was filed on the docket sheet prior to Plaintiffs concluding the presentation of evidence in their case, so initially it was premature.  The transcript reflects the following exchange regarding the motion:

> COURT: There's a motion for directed verdict; but, of course, we are not at that point in the trial yet.
>
> ATTORNEY EATON: Yes. That was just preemptive filing, because I've got some other scheduled medical/doctor's appointments.

Doc. 312, Tr. at 24, lines 4-8.  At the conclusion of the Plaintiffs' case on July 14, 2025, Plaintiffs argued their motion for a directed verdict.  *Id*., Tr. at 156-173.  Additionally, though not docketed on the docket sheet until July 15, 2025, Defendant filed its own Motion for Judgment on Partial Findings pursuant to Fed. R. Civ. P. 52(c) in the trial on July 14, 2025.  *Id*., Tr. at 173-187.  Both motions were partially argued before the Court that day and were continued on July 15, 2025. Doc. 313, Tr. 7-51.  The Court took the motions under advisement.

At the outset, the Court notes that Rule 52 explicitly applies to bench trials, whereas Rule 50 explicitly applies to jury trials. *See Pinero v. 4800 W. Flagler L.L.C.*, 430 F. App'x 866, 868 n. 1 (11th Cir. 2011); *see also Hepsen v. Resurgent Capital Servs., LP*, 383 F. App'x 877, 884 (11th Cir. 2010) ("As the Court has explained and as Rule 50 clearly states, a Rule 50 motion applies only in civil cases tried to a jury."). Additionally, there are differences between the two rules and their standards. "In addressing a Rule 52(c) motion, the court does not view the evidence in the light most favorable to the nonmoving party, as it would in . . . a Rule 50(a) motion for judgment as a matter of law; instead, it exercises its role as factfinder." *United States v. $242,484.00*, 389 F.3d 1149, 1172 (11th Cir. 2004) (en banc). "The Rule 50(a) rubric requires the court to draw all inferences in the nonmoving party's favor, but Rule 52(c) has no such requirement."

Plaintiffs' Rule 50(a) motion is brought under the rule that is applicable to jury trials. Regardless, under that rule, the Court is required to view the evidence and draw all inferences in the nonmoving party's favor. At the conclusion of the Plaintiffs' evidence, since Plaintiffs were the movants under Rule 50, that means that all inferences must be drawn in favor of the non-movant Defendants. The Court is not required to correct or construe the motion to consider it under Rule 52(c). Rather, the Court simply takes the motion exactly as it was filed by counsel. Therefore, Plaintiffs' motion (Doc. 294) is **DENIED**.

Defendants' cross-motion under Rule 52(c) does not require such a presumption with all inferences being made in favor of the nonmovant Plaintiffs. The Court simply serves as a factfinder. Here, the Court declined to render any judgment until the close of the evidence. The Court is required to note its findings of fact and conclusions of law in any action tried without a jury, regardless of Defendant's motion. Fed. R. Civ. P. 52(a). As plainly noted by another judge in

this district:

> While Rule 52(c) authorizes district courts in non-jury trials to issue judgment on partial findings, it does not require them to do so, but instead allows district courts to "decline to render any judgment until the close of the evidence." Rule 52(c), Fed.R.Civ.P. Under the circumstances presented here, the difference between tackling the merits of a Rule 52(c) motion at the close of all the evidence and issuing Rule 52(a) findings of fact and conclusions of law appears to be largely one of semantics. There is no material difference between entering a judgment pursuant to Rule 52(a) and doing so under Rule 52(c) at the close of all the evidence; rather, the Motion for Judgment as a Matter of Law would entail the functional equivalent of the Rule 52(a) protocol that this Court must follow anyway. *See generally Bowen v. Celotex Corp.*, 292 F.3d 565, 566 (8th Cir. 2002) ("A district court must make credibility determinations and findings of fact under both Rule 52(a) and Rule 52(c) ..., so the district court would have likely written a nearly identical opinion had it nominally proceeded under Rule 52(c)."

*Nettles v. Utilities*, Civ. Act. No. 1:13-cv-605-WS-C, 2015 U.S. Dist. LEXIS 107829, at *2 n. 2, 2015 WL 4910983, at *1, n. 2 (S.D. Ala. Aug. 17, 2015).  Therefore, the Court determined that it was more appropriate to issue a ruling pursuant to Fed. R. Civ. P. 52(a) and therefore, Defendant's motion pursuant to Fed. R. Civ. P. 52(c) (Doc. 297) is likewise **DENIED**.[5]

## IV.    ADA

### A.  General Law

To prevail on an ADA claim, a plaintiff must prove: (1) that he is disabled; (2) that the defendant owns, leases, or operates a place of public accommodation; and (3) that the defendant discriminated against the plaintiff within the meaning of the ADA.  42 U.S.C. 12182(a); *see also Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1231 (11th Cir. 2021) (applying the same factors).

> Under the ADA regulations, "[i]ndividuals with disabilities shall be permitted to be accompanied by their service animals in all areas of a place of public accommodation where members of the public, program participants, clients, customers, patrons, or invitees, as relevant, are allowed to go." 28 C.F.R. §

---

[5] This would be equally true of the Plaintiffs' motion if the Court had construed it as one brought under the correct rule.

36.302(c)(7). A place of public accommodation is permitted to ask two questions to determine whether an animal qualifies as a service animal: (1) "if the animal is required because of a disability and" (2) "what work or task the animal has been trained to perform." 28 C.F.R. § 36.302(c)(6). However, "a public accommodation shall not require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal." 28 C.F.R. § 36.302(c)(6).

*Grill v. Park*, Civ. Act. No. 6:18-cv-1159-Orl-22KRS, 2018 WL 11478550, 2018 U.S. Dist. LEXIS 249358, at *8-9 (M.D. Fla. Oct. 29, 2018).

The ADA applies to "any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).  Title III of the ADA and the regulations promulgated to implement it explain that a place of public accommodation includes a "[p]lace of lodging" such as a "facility" that:

(A) Provides guest rooms for sleeping stays that primarily are short-term in nature (generally 30 days or less) where the occupant does not have the right to return to a specific room or unit after the conclusion of his or her stay; and

(B) Provides guest rooms under conditions and with amenities similar to a hotel, motel, or inn, including the following—

   (1) On- or off-site management and reservations services;
   (2) Rooms available on a walk-up or call-in basis;
   (3) Availability of housekeeping or linen service; and
   (4) Acceptance of reservations for a guest room type without guaranteeing a particular unit or room until check-in, and without a prior lease or security deposit.

28 C.F.R. § 36.104.

In *Dunn v. Phoenix West II, LLC*, Civ. Act. No. 15-00258-KD-N, 2016 WL 740294, 2016 U.S. Dist. LEXIS 22157 (S.D. Ala. Feb. 23, 2016), the court found that the defendant condominium association did not own the facility at issue because the Declaration which created the condominium association provided as to ownership: "[e]ach owner shall be entitled to an undivided interest in the common elements in the percentages expressed in this Declaration[.]". *Id.* at 9-10.  The Declaration further provided a "schedule setting for the percentage of undivided

interest of each unit in the common areas[.]" *Id.* at 10.  Given these statements in the Declaration, the defendant "relinquished its fee simple ownership in favor of condominium ownership[,]" the court found the defendant condominium association was not an "owner" liable under the relevant ADA provisions.  *Id.*

Having carefully considered the testimony and evidence submitted at trial, and having studied the numerous exhibits, pleadings, and arguments of counsel, the Court now enters the following Findings of Fact and Conclusions of Law as to Plaintiffs' ADA claims.

## B.  Findings of Fact

Fairhope Motor Coach Resort ("FMR) is a residential condominium facility that was formed on February 14, 2019, upon the recording of the Declaration of Condominium ("Declaration").  Doc 308 at 62-63; DEX 15.  FMRCOA is a non-profit corporation whose purpose is the operation, management, and maintenance of FMR and whose members are the owners of the condominium units.  FMR consists of fifty-seven individually owned condominium units and common elements.  The common elements consist of a pool, Owners' Lodge, common driveway, lake, landscaping, and the front gate.  The common areas are for the use of owners and their guests. Each unit owner is responsible for the maintenance, repair, and replacement of their unit.  Doc. 308 at 63; DEX 15. Unit owners are also responsible for payment of their unit's utilities.  Each unit owner owns an undivided pro-rata share of the common elements.  Doc. 308 at 67. Specifically, the Declaration provides:

> 5.10 Common Elements.  Any right, title or interest in a Unit shall automatically carry with it as an appurtenance and without the necessity of specific reference thereto its respective undivided share of the Common Elements and a right to use the Common Elements in conjunction with the other Unit Owners.

\*\*\*

Page 7 of 38

> 7.10 Ownership.  A schedule setting forth the percentage of undivided interest of each Unit in the Common Elements is attached hereto, marked Exhibit "C" and by reference made a part hereof.  The percentage of undivided interest of each Unit in the Common Elements is determined by dividing one (1) by the total number of Units [. . .].  For purposes of percentage of ownership in the Common Elements, percentage of Common Expenses, and percentage of Common Surplus, and voting on all matters requiring action by the Owners, the percentages as set out on Exhibit "C" shall govern.  The ownership interest in the Common Elements shall be an undivided interest, and except as provided in the ACT and this Declaration shall remain undivided.

DEX 15.  Pets are not permitted in the pool, pool area, or Owner's Lodge.  Doc. 308 at 64; DEX 15.  When not within a unit, pets are required to be on leashes not exceeding twelve feet.  Doc. 308 at 65.

FMRCOA is not a commercial campground.  *See id.* at 58.  All of the units at FMRCOA are owned by individual owners.  *Id.*  Unit owners at FMR are permitted to rent their units.  However, per an amendment to the Declaration, all rentals must go through a designated rental program.  Doc. 274 at 193; *see also* Doc. 276 at 143.  Owners are not permitted to rent out their units outside of the designated rental program.  Doc. 274 at 193.  Approximately 75 percent of the lots or units are owner-occupied and do not rent their units through the rental program.  Doc. 308 at 58.  FMRCOA does not own any of the units that are rented out.  *Id.* at 72.  The rental program was originally run by Alabama Beach Realty, but is now run by an individual realtor, Julie Stewart.  Between the time that Alabama Beach Realty managed the rental program before it switched over to Julie Stewart, FMRCOA managed the rental program.  Pat Achee, the developer of FMR, testified that FMRCOA managed the program during an "interim period [ . . .] before [they] could attract another company."  Doc. 276 at 131.  Achee further explained, "[Alabama Beach Realty] chose to leave the property, and we were unable to attract a company – they gave us a 30-day notice – we were unable to attract a company to come in, and we were granted permission to run

it on a temporary basis, an interim basis.  And then, eventually, Julie Stewart took the program, which she currently manages the rental program."  Doc. 308 at 73.

Renters pay an impact fee of $7.50 per day as a part of their rental costs.  Doc. 274 at 186. Sheila Rosenbaum, former Board Member and Treasurer of FMRCOA, testified that the impact fee was "for using the common area, the wear-and-tear on [the] streets, actually to use the pool, those type of things."  *Id.*; *see also* Doc. 308 at 76 (noting in testimony from Achee that the impact fee is used to offset the cost of maintenance and upkeep of the common areas).  The impact fee ultimately goes to FMRCOA's account and is used to offset the additional costs that are incurred by renters' presence at FMR, such as wear and tear on streets and the upkeep of the pool.  Doc. 274 at 186, 188-89.  Additionally, during the time that FMRCOA ran the rental program, a $50.00 "resort fee" was collected, which was used to pay work campers to cover the cost of cleaning off the lots before and after renters came in.  *Id.* at 195.  That work included blowing off and dusting furniture on lots with pergolas that had furniture, dusting off the kitchens, and blowing the concrete slab off.  *Id.* at 197.  FMRCOA does not make any profit on the rental program, and it does not receive any compensation from Julie Stewart related to her management of the rental program. Doc. 308 at 47; *see also* Doc. 274 at 214.

To reserve a rental unit, prospective renters visit a website called "Live Rez" where they can view the units available for rent on particular dates, select a specific unit, and make their reservation.  Doc. 276 at 115-16.  Rental units are not available on a same day drive-up or walk-in basis.  Doc. 308 at 73, 75.  Reservations can only be made through the Live Rez system.  *Id.* To be eligible to rent at FMR, a renter's RV must be a Class A, no older than ten years, and at least 32 feet in length.  Doc. 276 at 122; Doc. 308 at 74.

Renters can use the pool while renting at FMR, but the rules do not permit them to use the

Owner's Lodge unless they are invited as a guest of an owner. Doc. 276 at 124. However, FMRCOA did occasionally host events at the Owner's Lodge that renters were invited to. *Id.* at 126-27. Additionally, on one occasion, a church service was held in the Owner's Lodge. *See id.* at 128. With respect to the church service, Achee testified that "a group . . . asked to use it, and an owner agreed to have that, allowed them to have that service in the lodge. I think it was probably maybe eight couples." *Id.* at 128. Thus, the church-goers were guests invited by an owner.

There are no retail businesses, stores, or restaurants, located at FMR. Doc. 308 at 67. The Owner's Lodge and pool are not open to the public, and FMRCOA does not sell pool memberships. *Id.* Renters have access to the pool, but not the Owner's Lodge unless they are present as a guest of an owner. *Id.* at 74. There is no laundry service, linen service, or maid service. *See id.* at 74-75. The "cottages" that are present on some of the lots are inaccessible to renters. *Id.* at 75-76. There is an office located inside the Owner's Lodge. Outside of the board members or owners, the only person that uses the office is a real estate agent who is showing the property to a prospective buyer. *Id.* at 71. The front gate is closed after 5:00 p.m. and before 7:00 or 7:30 a.m. on weekdays, and remains closed on weekends and holidays. Doc. 308 at 68. Owners have a keypad code or sticker on their vehicle to open the gate and access their properties. *Id.*

While testifying, Achee was consistent and calm. Achee's demeanor was not evasive or defensive, and the Court finds his testimony credible.

## C. Conclusions of Law

The Court finds, beyond a reasonable doubt, that FMR is not a place of public accommodation, and therefore the ADA does not apply to this case. The regulations promulgated to implement Title III of the ADA provide various factors that weigh on whether a facility is a "place of lodging" that would make it a public accommodation subject to the ADA. *See* 28 C.F.R.

§ 36.104. Those factors include whether the facility:

> (C) Provides guest rooms for sleeping stays that primarily are short-term in nature (generally 30 days or less) where the occupant does not have the right to return to a specific room or unit after the conclusion of his or her stay; and
>
> (D) Provides guest rooms under conditions and with amenities similar to a hotel, motel, or inn, including the following—
>
>> (5) On- or off-site management and reservations services;
>> (6) Rooms available on a walk-up or call-in basis;
>> (7) Availability of housekeeping or linen service; and
>> (8) Acceptance of reservations for a guest room type without guaranteeing a particular unit or room until check-in, and without a prior lease or security deposit.

*Id.* In this case, while FMR does have short-term stays for those units enrolled in the rental program, there are no on-site management or reservation services, units are not available on a walk-up or call-in basis, there is no housekeeping or linen service, and when reservations are made, the renter is guaranteed the particular unit that they reserved on Live Rez.

Furthermore, even if FMR was considered a public accommodation, which this Court finds it is not, FMRCOA is not the "owner" of the common elements or units and therefore would not be the proper defendant for an ADA claim. *See Dunn*, 2016 WL 740294, 2016 U.S. Dist. LEXIS 22157, at *9-10 (holding that the defendant condominium association did not own the facility at issue because the Declaration which created the condominium association provided that "[e]ach owner shall be entitled to an undivided interest in the common elements in the percentages expressed in this Declaration[.]"). The Court agrees with the ownership analysis from the *Dunn* court. Much like the declaration in Dunn, the Declaration in this case provides that each owner has an undivided interest in the common elements. The plaintiff in *Dunn* rented a condominium unit at Phoenix West II for a family vacation. *Id.* at 2-3. During his visit, the plaintiff went

> throughout the Facility, including his rented condominium, the services areas, bathrooms, pool area, the pier, paths of travel, common areas, recreational areas,

the fitness center, and the men's sauna. The kitchen, bedroom, bathroom, balcony, and seating area in [his] rented condominium were not accessible to him, and [he] encountered architectural barriers to accessibility in other common areas of the Facility that he visited.

*Id.* at 3. The court found that the common elements were owned by the individual unit owners, not the condominium association, for the exclusive use of the owners and their guests and tenants, and ultimately held that they were not "public accommodations." *Id.* at 15. The court did note that the rental office on the premises may have been an exception subject to the ADA because Plaintiff alleged that there was an office in the facility where the public can walk in and make a reservation to rent a condominium unit. *Id.* However, because plaintiff did not allege that the rental office was not ADA compliant, it was irrelevant to the claims. *Id.*

In this case, the pool area at FMR is open to renters in the same way the pool was open to renters in *Dunn*. Further, none of the common areas, including the office in the Owner's Lodge, are open for the public to walk in as they please and make a reservation. Thus, the Court finds that, like in *Dunn*, the common areas at FMR are not "public accommodations." The Court further finds that FMRCOA is not an "owner" of the common areas such that it could be found liable under the ADA, even if the common areas were public accommodations within the meaning of the ADA.

## D. Conclusion

Plaintiffs' ADA claims fail because FMR is not a "public accommodation" and because FMRCOA is not an "owner" within the meaning of the ADA.

## V. FHA—Failure to Accommodate Claim

## A. General Law

A successful failure-to-accommodate claim has four elements. To prevail, one must prove that (1) he is disabled within the meaning of the FHA, (2) he requested a reasonable accommodation, (3) the requested accommodation was necessary to

afford him an opportunity to use and enjoy his dwelling, and (4) the defendants refused to make the accommodation.

*Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277, 1285 (11th Cir. 2014) (citing

*Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218-19 (11th Cir. 2008)).

> The FHA does not demand that housing providers immediately grant all requests for accommodation.  *Schwarz*, 544 F.3d at 1219 ("'[T]he duty to make a reasonable accommodation does not simply spring from the fact that the handicapped person wants such an accommodation made.'" (quoting *Prindable v. Ass'n of Apt. Owners*, 304 F. Supp. 2d 1245, 1258 (D. Haw. 2003), *aff'd sub nom. DuBois v. Ass'n of Apt. Owners*, 453 F.3d 1175 (9th Cir. 2005))). Once a provider knows of an individual's request for accommodation, the provider has "'an opportunity to make a final decision . . ., which necessarily includes the ability to conduct a meaningful review'" to determine whether the FHA requires the requested accommodation.

*Id.* (quoting *Prindable*, 304 F. Supp. 2d at 1258).

> Generally, housing providers need only the information necessary to apprise them of the disability and the desire and possible need for an accommodation." *Bhogaita*, 765 F.3d at 1286 (citing *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir. 2010)). A housing provider has the right to "request reliable disability-related information that (1) is necessary to verify that the person meets the [FHA's] definition of disability . . . (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation.

*Peklun v. Tierra Del Mar Condo. Ass'n*, Civ. Act. No. 15-CIV-80801-BLOOM/VALLE, 2015 U.S. Dist. LEXIS 163554, 2015 WL 8029840, at *44 (S.D. Fla. Dec. 7, 2015).  "It is reasonable to require the opinion of a physician who is knowledgeable about the subject disability and the manner in which a service dog can ameliorate the effects of the disability." *Id.* (citing *Hawn v. Shoreline Towers Phase I Condo. Ass'n, Inc.*, Civ. Act. No. 3:07-cv-97/RV/EMT, 2009 U.S. Dist. LEXIS 24846, 2009 WL 691378, at *7 (N.D. Fla. Mar. 12, 2009), *aff'd* 357 F. App'x 464 (11th Cir. 2009)).[6]

---

[6] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r*

Further, "[t]he failure to make a timely determination after meaningful review amounts to constructive denial of a requested accommodation, "as an indeterminate delay has the same effect as an outright denial." *Bhogaita*, 765 F.3d at 1286 (quoting *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000)).

The Eleventh Circuit previously held:

> We have yet to determine "precisely what form the request [for a reasonable accommodation] must take." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1261 n.14 (11th Cir. 2007). Several other circuits have addressed this issue in the context of Title I of the ADA, which includes a similar provision requiring employers to make reasonable accommodations for their employees with disabilities. See 42 U.S.C. § 12112(b)(5)(A); *Schwarz*, 544 F.3d at 1220 (noting that, in a failure to reasonably accommodate claim, "we look to case law under the [Rehabilitation Act] and the ADA for guidance on what is reasonable under the FHA"). The Third Circuit, for example, has stated that what matters is not "formalisms about the manner of the request," but that the employer has notice of the employee's disability and wish to be accommodated. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999). Similarly, the Tenth Circuit has emphasized that a plaintiff "need not use magic words" to express a request for accommodation. *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999) (en banc). However stated, a plaintiff can be said to have made a request for accommodation when the defendant has "enough information to know of both the disability and desire for an accommodation." *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003) (internal quotation marks omitted). We agree with the Third Circuit that "circumstances must at least be sufficient to cause a reasonable [housing provider] to make appropriate inquiries about the possible need for an accommodation." *Id.*

*Hunt v. Amico Props., L.P.*, 814 F.3d 1213, 1226 (11th Cir. 2016).

Further, "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *United States v. Hialeah Hous. Auth.*, 418 Fed. App'x 872, 876 (11th Cir. 2011) (quoting *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999); *see also Schwarz*, 544 F.3d at 1219 ("[A] plaintiff must actually request an accommodation and be refused in order to bring a reasonable accommodation claim

---

*of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

under the FHA."). "If a landlord is skeptical of a tenant's alleged disability or the landlord's ability to provide an accommodation, it is incumbent upon the landlord to request documentation or open a dialogue." *United States v. Hialeah Hous. Auth.*, 418 F. App'x 872, 875 (11th Cir. 2011) (quoting *Jankowski Lee & Assocs. v. Cisneros*, 91 F3d 891, 895 (7th Cir. 1996)).

Having carefully considered evidence submitted at trial, and having studied the numerous exhibits, pleadings, and arguments of counsel, the Court now enters the following Findings of Fact and Conclusions of Law as to Plaintiffs' FHA claims.

**B.      Findings of Fact**

      **i.    Factual Findings Pertaining to Plaintiff Heimkes**

Mr. Heimkes first arrived to FMR in November 2018 as a work camper. Doc. 308 at 78-79. He assisted in the maintenance around the property at FMR and would take guests to their lots and help them with parking their coaches or connecting to utilities. Doc. 308 at 80. He had Logan with him often when he was working and was never told to put him on a leash. Doc. 308 at 83. At the time Mr. Heimkes first arrived, there were no pet restrictions as FMR was still in the final stages of development and FMRCOA had not yet been formed. Doc. 308 at 82. Achee explained that in the early stages, he did not tell Mr. Heimkes to take Logan out of the pool or lodge areas because there were not many people at FMR and it was not an issue. Doc. 308 at 83. However, after the Board was formed and as the property matured and became more populated, it became an issue that the Board needed to address. Doc. 308 at 84; *see also* Doc. 274 at 253 (describing a growing problem with dogs off-leash at FMR).

Mr. Heimkes is a military veteran who suffers from some level of PTSD. Doc. 275 at 9. He testified that his PTSD "gives [him] a lot of fear going out in public. You get a flight or fight problem, suicide tendencies, suicidal attempts. It pretty much gives me whole day, every day

Page 15 of 38

[*sic*]." *Id.* Over the course of litigation, Mr. Heimkes provided a letter from the VA indicating that he has PTSD. *See* PEX 8. Mr. Heimkes testified that he was in combat during his time in service and that his PTSD stemmed from such experience, though his VA paperwork indicates "PTSD non-combat." *See* PEX 8. Mr. Heimkes also mentioned several other alleged disabilities, including balance issues. However, there was testimony and photographic evidence admitted at trial that showed Mr. Heimkes on top of a motorcoach, as well as doing work on top of a pergola, and describing him working on a ladder. Doc. 274 at 216; DEX 26. In light of that evidence, it does not appear that Mr. Heimkes alleged balance issues, or issues with his various joints, prevent him from everyday activities.

Over the course of this case, Mr. Heimkes has had three dogs whom he asserts perform or performed tasks for him as a service animal, and whom he asserts FMRCOA denied him a reasonable accommodation for—Logan, Rex, and Tatanka. He offered testimony as to each dog, and the Court addresses the facts as to each dog separately.

Mr. Heimkes and his wife both testified under oath that he did not make a request for a reasonable accommodation. *See* Doc. 272 at 11-12. While the Court could take them at their word and end the analysis there, a timeline of the vital communications indicates that Mr. Heimkes did communicate, in some roundabout way, a desire for an accommodation despite no specific request.

First, on March 12, 2020, Mr. Heimkes sent an email to Achee about the ADA. *See* PEX 24. In that email, Mr. Heimkes discussed his dog Logan, and noted that Logan is trained to perform 25 tasks for him. *Id.* At no point, however, did Mr. Heimkes indicate that he needed an accommodation for Logan, such as to be able to take him into the common areas or have him off leash, nor did he provide any documentation related to such need. *See id.* On April 10, 2020, Achee sent an email to all owners at FMR requesting that they keep their dogs, including service

Page 16 of 38

animals, on a leash.  *See* PEX 27.  Mr. Heimkes believed that this email singled him out, however nothing in the email mentioned Mr. Heimkes or Logan specifically.  *See id.*  On April 12, 2020, Mr. Heimkes sent a letter via email to Achee in response to Achee's April 10, 2020 email.  *See* PEX 28.  In that email, Mr. Heimkes claims he and Achee discussed Mr. Heimkes' need for an accommodation prior to Mr. Heimkes coming to FMR as a work camper.  *Id.*  However, the need mentioned by Mr. Heimkes only states a need for him to have Logan with him while he is working and to have him off leash while performing some work-related tasks.  *Id.*  Achee testified that no such discussion about a need for an accommodation occurred.  Doc. 308 at 81-82.  As previously noted, the Court finds Achee's testimony credible, including on this point.  However, even if that conversation did occur, by Mr. Heimkes' own account in the email it did not include having Logan with him in the common areas or even with him outside of when he was working.  *See id.*  Mr. Heimkes stopped being a work camper on or around May 1, 2020.  Thus, any accommodation to have his dog with him while performing work tasks would no longer be necessary after that point.

On December 2, 2020, FMRCOA sent Mr. Heimkes a letter directing him to discontinue bringing his dog to the common areas and to keep his dog on a leash.  *See* PEX 32.  On December 29, 2020, Mr. Heimkes' previous attorney, David Sheller, sent a letter in response to FMRCOA's December 2, 2020 letter.  *See* PEX 34.  In that letter, Mr. Sheller stated that "Mr. Heimkes is a disabled veteran with a trained Service Animal [. . .]" and that his "Service Dog does work for him and provides services relating to his disability [. . .]."  *Id.*  The letter does not state what accommodation, exactly, Mr. Heimkes sought for his dog, though it does indicate that, at the very least, he wanted to be able to have him off leash.  *See id.*  On January 11, 2021, counsel sent a letter on behalf of FMRCOA in response to Mr. Sheller's December 29, 2020 letter.  *See* PEX 36.  The letter notes that FMRCOA falls under the FHA, not the ADA, and states that "Mr. Heimkes

has yet to request a reasonable accommodation to the rules and regulations applicable to the Condominium. Once he makes a request for a reasonable accommodation and the Association verifies his need for the request the Association will be happy to work with him to meet his needs in accordance with the stated requirements of the FHA." *Id.* Evidently, there were conversations between Mr. Harrell and Mr. Sheller because on January 13, 2021, Mr. Harrell sent Mr. Sheller a letter confirming Mr. Sheller's statements on January 12, 2021 that "the only accommodation Mr. Heimkes is seeking is to have his dog on any portion of the condominium property without a leash[]" and that "the only specific training the dog has is to detect danger." PEX 38. On January 21, 2021, FMRCOA, reached out to Mr. Heimkes and offered to meet with him to try and "resolve their differences." DEX 28. FMRCOA also offered the possibility of mediation. *See* DEX 21. Mr. Heimkes testified that he declined to meet with FMRCOA on the advice of his counsel. Doc. 275 at 216.

A review of this timeline indicates that, as of January 12, 2021, Mr. Heimkes made a request for a reasonable accommodation through his attorney at the time, Mr. Sheller. The requested accommodation that was communicated by Mr. Sheller was for Mr. Heimkes to have his dog off leash anywhere on the property, and the task that the dog was trained to perform was to detect danger. *See* DEX 20. Mr. Heimkes testified that he "would omit the leash" and was more or less seeking just to have his dog with him on all common property. Doc. 275 at 176. In response to his attorney questioning if the specific training that his dog had was to detect danger, Mr. Heimkes responded: "No. He doesn't detect it, except when we—when I put him a building to search, he's looking for anybody in the house. Whether he's looking for danger or a stranger, I don't know." *Id.* at 176-77. Mr. Heimkes also noted that "Mr. Sheller didn't quite verbalize that very well to Mr. Harrell." *Id.* at 177.

As noted above, FMRCOA tried to meet with Mr. Heimkes to discuss their issues, which given the context, would have included the request. Mr. Heimkes declined the meeting and ultimately filed a lawsuit in state court almost two months later, on March 3, 2021. Much of Mr. Heimkes' testimony appears to imply that he believed it was obvious that he had a service animal, and that if FMRCOA had questions about his dogs and why he was bringing them to the pool area and lodge, it was incumbent on them to ask him and offer an accommodation, rather than the other way around. The amended complaint and second amended complaint filed in the state court lawsuit do not include information about Mr. Heimkes purported disability or why his requested accommodation is necessary. *See* DEX 24; DEX 25. Further, testimony at trial from all witnesses, along with the documentary evidence produced at trial, shows that Mr. Heimkes did not produce anything to FMRCOA providing verification of the need for his requested accommodation or the relationship between said disability and accommodation prior to this lawsuit. *See* DEX 36. Such documentation was not provided until after Mr. Heimkes filed the instant lawsuit, during a period of discovery and, in some cases, only after the Magistrate Judge ordered it to be produced.

a. Logan

Mr. Heimkes had Logan with him at FMR from November 2018 until September 2021. After FMR filed its declaration on February 14, 2019, officially forming FMRCOA, Mr. Heimkes testified that he continued to work as a work camper. He would park buses when renters came in, maintain leaf blowing, and overall assist with maintaining the property at FMR. Mr. Heimkes also testified about the various events at the Owner's Lodge that he would attend and sometimes help cook at, and how Logan would accompany him to those events wearing his service animal vest.

Mr. Heimkes testified that Logan did many tasks for him, including watching his back and alerting him to someone approaching behind him, walking in front of him during anxiety attacks,

reminding him to take medications, and assisting him with sleep problems and nightmares/disassociation. He also testified that there were a few tasks Logan would perform for him that required Logan be off leash, including finding his wife and searching or clearing a room before he enters. Logan was trained through a program called Soldier's Best Friend, and he graduated from that program in 2012. Doc. 275 at 22. At trial, Mr. Heimkes provided a letter and service dog certification from Soldier's Best Friend regarding Logan's training. *See* PEX 6. He further testified that when he first got Logan, Logan could perform five tasks for him, but towards the end of Logan's life, Logan performed "60, 70, 100" tasks for him. *Id.* at 31-32. He did not describe 60, 70, or 100 tasks. *See id.*

Mr. Heimkes testified that he believed when he first arrived at FMR, he was granted an accommodation for his service dog. *Id.* at 129. However, he is unable to point to a specific instance of when he requested a reasonable accommodation, and such accommodation was granted. His testimony can essentially be summarized as assuming that the developer of FMR, Achee, knew that Logan was a service animal and knew what sort of accommodations Mr. Heimkes needed for his disability, despite never explicitly communicating such needed accommodations to him. Rather, though Mr. Heimkes almost always had Logan with him at FMR while he was a work camper, Achee explained that he did not have concerns at the time because FMR was still being developed. *See* Doc. 308 at 86-88. Achee further explained that the problems with Logan started arising as the property matured and grew busier and there were more owners. *See id.* The Court finds Achee's testimony on this issue credible. Mr. Heimkes was first notified by FMRCOA to discontinue bringing Logan into the common areas by a letter dated December 2, 2020. As noted above, the earliest that Mr. Heimkes requested an accommodation was through his previous attorney on January 12, 2021. Following the January 12, 2021 request, FMRCOA

Page 20 of 38

sought additional information to verify Mr. Heimkes' disability and his necessity for a service animal and the requested accommodation.  *See* DEX 19; DEX 21. None of the requested information to verify Mr. Heimkes disability and his necessity for a reasonable accommodation or connection between the disability and the requested accommodation was provided until discovery during this litigation.

Additionally, the Court notes that there were numerous pictures submitted into evidence by Plaintiffs of Logan in a service animal vest.  There was also testimony from several witnesses about how they had seen Logan in a service animal vest, or attended events where Logan was photographed at wearing a service animal vest.  It is clear that Logan was on the property wearing his service vest beginning around the time Mr. Heimkes first came to FMR.  It is also clear that Mr. Heimkes had stickers on his truck indicating he is a veteran and that he had a service dog, as well as a plaque on his golf cart that indicated Logan was a service dog.  This is not enough to put FMRCOA on notice as to a request for a reasonable accommodation.  A service vest or stickers on a car do not tell FMRCOA what specific accommodation is needed.  That burden rests with the person requesting the accommodation.  Mr. Heimkes seems to put all his eggs in his belief that he need not make a specific request nor could the Defendant ask him for any specifics.  FMRCOA requested that Mr. Heimkes engage in an interactive process, and he declined to do so.

b.  Rex

Mr. Heimkes obtained Rex after Logan passed away, in mid-to-late October 2021.  He had Rex until sometime in 2023.  *See* Doc. 272 at 47 (testifying that they got rid of Rex about a year and a half after bringing him home).  Mr. Heimkes testified that he ultimately had to get rid of Rex because he couldn't pass a canine good citizenship test.  Doc. 275 at 138, 143-44.  Specifically, Mr. Heimkes stated, "[w]e couldn't get—one of final stages of the canine good citizenship is you

have to take your dog, walk through a crowd, and we usually have a dog in there, we have people dropping pales and buckets, and a wheelchair, and people on crutches.  If he can't—if the dog can't go through that without not barking, we fail. We have to go back. And that was tried multiple times with Rex."  Doc. 275 at 138.  Mrs. Heimkes also testified that they got rid of Rex because he could not complete his service dog training.  Doc. 272 at 47.

While he had Rex, Mr. Heimkes self-trained him.  He started training Rex about a week after bringing him back to FMRCOA.  He provided a self-created training log for Rex during the state court litigation, which indicates it was created on February 16, 2022.  *See* PEX 60.  Mr. Heimkes also testified that he and Rex worked with two other dog trainers to try and help Rex pass his "dog-on-dog" or canine good citizenship.  Doc. 275 at 171.  He testified that he did not request an accommodation for Rex because he believed he had an accommodation for Logan, and that the accommodation for Logan would keep going as to Rex.  *Id.* at 120-21.

Various witnesses testified as to Rex's behavior.  First, the Court heard from Pat Johnson, who stated that he saw Mr. Heimkes with Rex "only once" and that "it was unruly."  Doc. 271 at 24.  Mr. Johnson further explained that when he saw Rex, he thought he was aggressive and witnessed Rex barking, bearing his teeth, and pulling at the leash and that, in his view, "[t]hat dog would have attacked us."  *Id.* at 26-27.  Next, the Court heard from Emily Johnson, who stated that she had "seen Rex pull Mark across the road."  *Id.* at 74.  The Court also heard from Hall Overall, who testified regarding an incident that occurred with Rex when he was walking with his grandson and son-in-law to take his trash to the dumpster.  Doc. 272 at 209.  When Mr. Overall approached the dumpster, Mr. Heimkes was outside with Rex and Rex snapped at his grandson.  *Id.* at 218.  Another owner then walked around the corner with her dog and came up to talk to Mr. Overall and his grandson and Rex "went wild."  *Id.*  Specifically, Mr. Overall described Rex bearing his teeth,

growling, and barking. *Id.* He further stated that "if that dog would have gotten lose [*sic*], I do believe he would have mauled and killed my grandchild and would have hurt me." *Id.* The Court also heard from Charles Wolf, who testified about an incident that occurred with Rex in November 2022. Doc. 273 at 130. Mr. Wolf was sitting in the pool area with his back to the gate reading a book when Mr. Heimkes came in with Rex. *Id.* at 134. Mr. Wolf turned around when he heard Rex barking and witnessed Rex barking, growling, lunging, and dragging Mr. Heimkes toward him. *Id.* at 135. Mr. Wolf testified that he jumped out of the way and put the chair between him and the dog, and then left immediately. *Id.* at 136. Finally, both Mr. Heimkes and Mrs. Heimkes testified that Rex ultimately could not pass his canine good citizenship test. They explained that Rex had issues barking at other dogs that they were not able to train out of him, and ultimately they decided to give him away, at least in part because he was unable to pass the canine good citizenship test. *See* Doc. 275 at 138. Mrs. Heimkes explained that passing the good citizenship is a necessary component to taking a service animal out in public. *See* Doc. 271 at 234; Doc. 272 at 135.

        c.   <u>Tatanka</u>

The evidence presented at trial on Tatanka was much thinner than for Mr. Heimkes' previous two dogs. Given the limited record on Tatanka, along with the fact that Tatanka is not actually part of the controlling complaint and Mr. Heimkes did not move to amend his complaint to include Tatanka, the Court declines to make findings of fact or rule on Mr. Heimkes' FHA claims as they pertain to Tatanka.

**ii. Factual Findings Pertaining to Plaintiff Allfrey**

Plaintiff Sheraldine Allfrey began her testimony in person in Court. However, due to an apparent health event, Mrs. Allfrey was unable to finish her testimony in person. The parties agreed to supplement her trial testimony with the entirety of her deposition.

Additionally, as an initial matter, the Court notes that it has numerous reasons to question the credibility of Mr. and Mrs. Allfrey and their testimony. Ultimately, the Court does not credit the testimony of Mr. and Mrs. Allfrey. For example, both Mr. and Mrs. Allfrey explained in their testimony under oath that they did not acquire Dewey[7] to act as a service animal, but merely learned some time after acquiring him that he could detect Mrs. Allfrey's seizures. *See* Doc. 309 at 172-73, 178-79; *see also* Doc. 311 at 54, 60. However, counsel for Mrs. Allfrey stated in an email sent to Defendant's counsel on behalf of the Allfreys that they "acquired Dewey in 2014 because he comes from a line of SADs [Seizure Alert Dogs]." PEX 134. Further, Mrs. Allfrey testified that she has her driver's license and still drives, even as recently as two days prior to her testimony, and that no doctor has ever prohibited her from driving. Doc. 309 at 202. However, she also testified that lately she has seizures "quite a bit." *Id.* at 165. Alabama law provides that a person cannot hold a driver's license if they have a seizure disorder that causes "episodes of altered consciousness or loss of bodily control." *See* Ala. Admin. Code. R. 760-X-20-.10. Such a person may only obtain a driver's license if they have not had an "episode of altered consciousness or loss of bodily control" within the six months preceding application.[8] *Id.* If it is

---

[7] The Allfreys spell the dog's name as "Dewey." In the transcripts, the dog's name is spelled "Dewie." However, "Dewey" and "Dewie" reference the same animal in question.

[8] The Court notes that Mrs. Allfrey is from Ohio, and she may have an Ohio driver's license. Ohio law provides that an applicant for a license there must disclose:

> [w]hether the applicant is now or ever has been afflicted with epilepsy, or whether the applicant now has any physical or mental disability or disease and, if so, the

Page 24 of 38

true that Mrs. Allfrey has been having seizures "quite a bit" lately, the Court finds it somewhat concerning that she continues to drive, and odd that no doctor has discussed this with her. Additionally, the Court finds it telling that, when providing the doctor's note to FMRCOA along with the request for an accommodation, the Allfreys elected to black out the portion of the doctor's note that stated at least some of her seizures were controlled by medication. *See* Doc. 116; *see also* Doc. 312 at 118-20. The Allfreys also both testified that Dewey was not a lap dog. Doc. 309 at 170; *see also* Doc. 312 at 148. However, Bob Kunowski, a friend to the Allfreys who Plaintiffs called as a witness, testified that Dewey is "definitely a lap dog" and that he had seen Dewey sitting on Mrs. Allfrey's lap on occasion when she was not having an "event." Doc. 270 at 99, 120. Finally, the Allfreys both testified that Dewey would alert to her seizures 15 to 45 minutes prior to them occurring. Doc. 309 at 201; *see also* Doc. 312 at 148 ("From several minutes to almost an hour, yes."). However, Mr. Kunowski testified that he has seen Dewey alert on multiple occasions and there was no 15 to 45 minute warning ahead of time. Doc. 270 at 118. Taking all of these contradictions together, the Court does not find Mr. or Mrs. Allfrey credible, especially as to their testimony about the impact of Mrs. Allfrey's condition on her life and any tasks that they assert Dewey performs for her.

---

nature and extent of the disability or disease, giving the names and addresses of physicans [. . .] then or previously in attendance upon the applicant.

OHIO REV. CODE ANN. § 4507.06 (A)(1)(c). Ohio law further provides that the registrar of motor vehicles must ask questions as to the existence of a physical or mental condition that may impair the ability of the applicant to operate a motor vehicle safely, and the registrar "may require an examination of the applicant by a licensed physician as a prerequisite to the issuance of an operator's license." OHIO REV. CODE ANN. § 4501:1-1-18. It is not clear from the record which state Mrs. Allfrey holds a driver's license in, or whether she has disclosed her alleged seizure disorders to the appropriate authorities.

Mrs. Allfrey first visited FMR in June of 2019, when she and her husband stayed for a few days through the rental program.  Doc. 312 at 25.  After their June 2019 visit, the Allfreys rented a unit at FMRCOA at least three more times until eventually Mr. Allfrey's company, TLW Alabama Properties, LLC, purchased the lot that they currently reside on.  *Id.* at 31.  The Allfreys "rent" the lot purchased by TLW Alabama Properties, LLC.  *See id.* at 47.  Put simply, Mr. Allfrey rents the property out to himself and his wife through his own company.

Mrs. Allfrey has epilepsy, a condition that she has lived with since she was approximately twelve years old.  She also testified that she has PTSD and anxiety, though there is limited testimony on whether Dewey performs tasks related to her PTSD and anxiety and her request for an accommodation relates only to her seizures.  Doc. 309 at 165; *see also* PEX 116.  She takes daily medication for her epilepsy, which she testified limits but does not completely stop all of her seizures.  *Id.* at 168.  Mrs. Allfrey got Dewey when he was six months old and has had him for almost 12 years now.  *Id.*  at 172.  Though she did not initially get Dewey with the intention of him being a seizure alert dog, she testified that she discovered Dewey could detect her seizures some time after bringing him home.  *Id.* at 178.  During the beginning of their time at FMR, Mrs. Allfrey did not bring Dewey in public with her because he had an issue with barking.  *See id.* at 179-80.  However, after some training he overcame the barking and she began taking him out with her more often.  *See id.* at 180.

In response to her attorney questioning her on how Dewey alerts to her seizures, Mrs. Allfrey stated: "Depending on the severity, he can start sitting down on the ground, staring at me. And if I don't—if he doesn't get my attention, then, then he'll, like, climb up on my legs sometimes.  Not all the time but just sometimes.  And then he will get up in my lap.  Then he will get up on my chest.  And then, sometimes, get up on my shoulder." *Id.* at 169.  She further testified

that Dewey does not do the same thing every time when allegedly alerting to her seizure. *Id.* at 169-70. Further, much of the behaviors she describes as "alerting" are typical dog behaviors, such as looking at her or pawing at her.

Without a specific behavior that Dewey engages consistently every time to alert, the Court finds it incredible that Dewey is actually alerting to Mrs. Allfrey's seizures when he may, for example, be staring at her simply because she is his owner or because he wants attention. FMCROA, and the Court, for that matter, are not required to find that Dewey is trained to alert to Mrs. Allfrey's seizures simply because she says he does. This is particularly so where Mrs. Allfrey admits herself that Dewey does not always "alert" in the same way. Further, the Court was able to actually observe Mrs. Allfrey have what counsel purports to be a seizure during her testimony. The dog did not behave any differently than it has throughout the course of this case when it has accompanied Mrs. Allfrey in the courtroom. Furthermore, Mrs. Allfrey testified that she is able to determine on her own when a seizure is coming on, which would indicate that a seizure alert dog is not necessary to ameliorate her disability.

Approximately 14 minutes into her testimony at trial, Mrs. Allfrey stated, regarding Dewey, "[h]e's staring at me[,]" and then "[h]e's really staring hard now." *Id.* at 177. Another minute or so later, she stated "He's not going to stop. I'm going to pick him up, because he's like . . ." *Id.* at 178. Though she did not finish her sentence on what the dog was "like[,]" the Court was able to see the dog and did not see the dog doing anything other than sitting on the ground looking at its owner. He did not paw her or attempt to climb into her lap. Mrs. Allfrey's attorney asked her a second time, "[h]e doesn't do the same thing every time to alert you?" to which she responded "[n]o." *Id.* at 179. Mrs. Allfrey then had what she and her counsel claim to be a seizure. The Court observed Dewey and Mrs. Allfrey during this time and suspects the alleged seizure may

have been staged.  To the extent that the Court may be wrong and Mrs. Allfrey did suffer from a seizure, the Court could still see Dewey during that time and did not observe him do any of the things Mrs. Allfrey described as "alerting" to an oncoming seizure.  Ultimately, whether Mrs. Allfrey had a seizure on the stand or not, the dog did not alert in any measurable sense.

On January 29, 2022, Mrs. Allfrey requested an accommodation for Dewey through her husband, who emailed a letter to FMRCOA.  *See* PEX 116.  The letter stated that Mrs. Allfrey has epilepsy and that she has a seizure alert dog, Dewey, who "warns her of the oncoming seizure, provides comfort during the seizure, and alerts others of the seizure."  *Id.*  On January 31, 2022, Mr. Allfrey emailed FMRCOA a supplemental filing to the request for an accommodation, which included a letter from Mrs. Allfrey's nurse practitioner.  *See id.*  The letter had portions blacked out and merely stated that Mrs. Allfrey takes medication for Grand mal epilepsy.  *Id.*  It also notes that she has a history of petit-mal seizures.  *Id.*

On February 10, 2022, counsel for FMRCOA emailed counsel for Mrs. Allfrey, noting that he has not "stated the specific accommodation requested."  *See* PEX 123.  Indeed, the request sent by Mr. Allfrey and TLW Alabama Properties only provided, "[w]e hereby request an accommodation so Sherrie can have full and equal access to all of Fairhope Motorcoach Resort's facilities[,]" but did not specifically state what that accommodation would be.  *See* PEX 116.  Again, on February 10, 2022, counsel for FMRCOA sent another email to Mrs. Allfrey's counsel stating that no request for an accommodation has been made because "not once have you stated the accommodation requested."  PEX 125.  Counsel for Mrs. Allfrey responded that same day: "The specific accommodation again is pretty simple as well, she wants to take her seizure alert dog anywhere at FMR that other owner's visitors are allowed to be."  PEX 127.  Mrs. Allfrey's counsel further clarified in another email that day that she was seeking an accommodation to take

her dog into the Lodge, pool deck area, and all other common elements.  PEX 129.  It was at this point that Mrs. Allfrey, through her counsel, finally requested a specific accommodation under the FHA.  Counsel for FMRCOA acknowledged the request and further stated: "See my prior email for the additional information requested."  *Id.*  It appears, from the prior email, that FMRCOA was seeking: "independent documentation showing how the request ameliorates the disability."  *See* PEX 128.  FMRCOA also sought information about the type of dog and any records that it is trained, particularly to detect seizures.  *See* PEX 131.  In a response email, Mrs. Allfrey's counsel declined to provide any additional information.  *See* PEX 134.  Mrs. Allfrey also conceded that she has never provided FMRCOA with any information that Dewey is trained to detect seizures or any information from a doctor indicating a need for a service dog or what a service dog would do to ameliorate her disability.  *Id.* at 207-08.

Mrs. Allfrey testified that she has never discussed the need for a seizure alert dog with any doctor.  Doc. 309 at 201.  Both Mrs. Allfrey and Mr. Allfrey testified that, once they realized that Dewey could detect her seizures, they began training him themselves.  *See* Doc. 309 at 179.  They stated that they trained him both for his "good citizenship" so that he could be taken out in public without issue, as well as to reinforce him alerting to the seizures.  Mr. Allfrey claims to be Dewey's trainer, and stated that he did not keep a training log for Dewey's training.  Doc. 312 at 99.  He stated that he would train Dewey by rewarding him any time that he alerted to Mrs. Allfrey's seizures, after the seizure was over.  *Id.* at 55. Additionally, Mrs. Allfrey testified that Dewey alerts in a variety of ways and in no particular way every time. *See* Doc. 309 at 169-71, 179.

**C.      Conclusions of Law**

As an initial matter, much of the evidence that Plaintiffs' presented at trial was irrelevant to whether FMRCOA violated the FHA.  For example, the fact that Mr. Heimkes had a sticker on

Page 29 of 38

his car or plaque on his golf cart indicating that he is a veteran and has a service animal has no bearing on whether he requested a reasonable accommodation under the FHA, or whether FMRCOA properly handled any purported request.  Additionally, whether neighbors were friendly to the Plaintiffs after the issues with the dogs arose also has no bearing on whether FMRCOA violated the FHA.  FMRCOA does not have control over individual owners and cannot force them to smile and wave to the Plaintiffs.  Litigation is contentious and, often times, people do not want to associate with people that they may determine to be particularly litigious, or those who have sued them.[9]  These things have no bearing on whether FMRCOA violated the FHA.

As noted above,

> [t]o prevail [under the FHA], one must prove that (1) he is disabled within the meaning of the FHA, (2) he requested a reasonable accommodation, (3) the requested accommodation was necessary to afford him an opportunity to use and enjoy his dwelling, and (4) the defendants refused to make the accommodation.

*Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277, 1285 (11th Cir. 2014) (citing *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218-19 (11th Cir. 2008)).

It is clear from the record that both Plaintiffs have established that they have a disability within the meaning of the FHA.  Specifically, Mr. Heimkes has PTSD and Mrs. Allfrey has a seizure condition.  The Court also finds that both Plaintiffs eventually requested an accommodation.  Mr. Heimkes' requested an accommodation through his attorney as of January 12, 2021.  Mrs. Allfrey requested an accommodation as of January 29, 2022.

Both cases, however, fall on factors three and four—whether the requested accommodations were necessary and whether the defendants refused to make the

---

[9] Some of the witnesses called by Plaintiff explained this at trial.  *See, e.g.*, Doc. 271 at 39 (testimony from Pat Johnson at trial explaining that his relationship with Mr. Heimkes ended when "he sued me.").  Though the individual owners are not official parties in this lawsuit, the Court takes judicial notice of the related state law case where individual owners have been sued.

accommodations.  The FHA does not require a housing provider to make an accommodation just because an individual wants one and has some level of a disability.  "Once a provider knows of an individual's request for accommodation, the provider has 'an opportunity to make a final decision . . ., which necessarily includes the ability to conduct a meaningful review' to determine whether the FHA requires the requested accommodation."  *Id.* (quoting *Prindable*, 304 F. Supp. 2d at 1258).

> Generally, housing providers need only the information necessary to apprise them of the disability and the desire and possible need for an accommodation." *Bhogaita*, 765 F.3d at 1286 (citing *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir. 2010)). A housing provider has the right to "request reliable disability-related information that (1) is necessary to verify that the person meets the [FHA's] definition of disability . . . (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation.

*Peklun v. Tierra Del Mar Condo. Ass'n*, Civ. Act. No. 15-CIV-80801-BLOOM/VALLE, 2015 U.S. Dist. LEXIS 163554, 2015 WL 8029840, at *44 (S.D. Fla. Dec. 7, 2015).

In the present case, FMRCOA sought such reliable disability-related information from both Plaintiffs.  However, neither Plaintiff provided FMRCOA with information that shows the relationship between their disabilities and their needs for their requested accommodations until discovery in this lawsuit.  In fact, testimony from the Plaintiffs and argument from their counsel throughout the trial of this case revealed that they did not, and still do not, believe that the Defendant was entitled to any information aside from the Plaintiffs' own statements that they are disabled and that their dogs perform specific tasks for their disabilities.  Plaintiffs and their counsel conflate the ADA with the FHA.  Put simply, despite being told there were differences between the ADA and FHA, Plaintiffs went all in on their stance that nothing could be required of them beyond their word.

Page 31 of 38

Mr. Heimkes ultimately provided FMRCOA with information verifying his disability, along with his self-created training logs showing the tasks he has trained his dogs to perform in relation to his disability, but only during discovery of this case and only after a court order to do so.  The Court has not come across a case where such information was not provided until discovery.  In any event, FMRCOA did not have the information at the time the lawsuit was filed, and as such at that point it had good reason to deny Mr. Heimkes his requested accommodation until he provided them with such verification.  Furthermore, by the time Mr. Heimkes provided FMRCOA with the information about Logan's training, Mr. Heimkes no longer had Logan and FMRCOA could not retroactively grant him an accommodation for a dog he no longer had.  Thus, Mr. Heimkes did not show that his requested accommodation as to Logan was necessary, and it was reasonable for FMRCOA to deny him an accommodation based on that failure.

Mr. Heimkes also provided training information for his dog Rex during discovery in this case.  While Mr. Heimkes still had Rex at the time his training information was provided during discovery, the law is not clear whether, at that point, it would ever trigger a requirement for FMRCOA to grant him an accommodation since the contentious litigation was ongoing and the parties had staked out their respective legal positions.  Regardless, the Court need not reach that issue here because it finds that FMRCOA had the right to exclude Rex under the direct threat exception to the FHA.

The Department of Housing and Urban Development allows for the denial of a reasonable accommodation in the form of a service animal if the "animal's behavior poses a direct threat and its owner takes no effective action to control the animal's behavior so that the threat is mitigated or eliminated."  *Warren v. Delvista Towers Condo. Ass'n*, 49 F. Supp 3d 1082, 1087 (S.D. Fla. 2014).  The Court heard from several witnesses who described Rex's behavior, including Pat

Johnson, Emily Johnson, Hall Overall, and Charles Wolf. The Court finds their testimony credible. The credibility of their testimony is further bolstered by the fact that both Mr. and Mrs. Heimkes conceded that Rex could not pass his canine good citizenship test, which ultimately led to them giving him away. Taking all of this testimony together, Rex's behavior posed a direct threat that could not be effectively controlled by Mr. Heimkes. Thus, under the direct threat exception to the FHA, FMRCOA was permitted to exclude Rex and deny Mr. Heimkes' request for a reasonable accommodation.

As noted above, the Court declines to make any rulings as to Tatanka given the thin evidence presented at trial and given that Mr. Heimkes did not move to amend his complaint to include Tatanka. The only amendment Mr. Heimkes sought under Rule 15(b) was to add the defense counsel as parties, which the Court denied.

As for Mrs. Allfrey, she has still not provided information that indicates Dewey is trained to perform a task that ameliorates her disability. She and Mr. Allfrey both testified that they have trained Dewey to alert and respond to her seizures. It is true that a service dog may be individually trained at home and that it is not necessary to show a dog was trained by a "certified trainer." *Cordoves v. Miami-Dade Cnty.*, 92 F. Supp. 3d 1221, 1230 (citations omitted); *see also Reaves v. Immediate Med. Care, P.A.*, 770 F. Supp. 3d 1322, 1327 (M.D. Fla. 2025) ("DOJ regulations and commentary make clear that individuals may self-train service animals without obtaining formal certification."). Further, there are not specific requirements as to the training a service animal must have, the animal must merely be trained to perform a task for the benefit of a person with a disability. *Cordoves*, 92 F. Supp. 3d at 1230 (citations omitted). However, whether trained through a certified trainer or trained by its handler or another person, a service animal must be **trained** to perform a specific **task**. As the Court discussed previously in the findings of fact, Dewey does not

Page 33 of 38

reliably alert to Mrs. Allfrey's seizures. By her own admission, Dewey does not do the same thing every time when Mrs. Allfrey allegedly has a seizure. Further, Dewey's behaviors as described by Mrs. Allfrey are common dog behaviors that do not indicate a specific task is performed by Dewey relative to her disability.

To be clear, the Court does not find that a prescription from a doctor is required to prove that a service animal is necessary, nor does the Court find that a service animal must be trained or certified through any particular program or organization. Rather, the Court simply finds that both Plaintiffs' refusal to comply with FMRCOA's requests for more information and instead choosing to file a lawsuit prevented FMRCOA from conducting a meaningful review of their requested accommodations. *See Hawn*, 347 Fed. App'x at 468. Without additional information, FMRCOA had no opportunity to verify whether either Plaintiffs' requested accommodation was necessary to ameliorate the Plaintiffs' disabilities, nor did it have the opportunity to verify whether the animals were actually trained to perform a task for the Plaintiffs' respective disabilities.

**D.    Summary**

To put it simply:

1. Information regarding the connection between the disability and the alleged service animals was not provided to FMRCOA until after the filing of this lawsuit;

2. Information regarding the training of the alleged service animals was not provided to FMRCOA until after the filing of this lawsuit;

3. The evidence at trial did not show that Dewey was trained to perform a specific task to ameliorate Mrs. Allfrey's disability;

4. Mr. Heimkes' first dog, Logan, passed away before Mr. Heimkes ever provided any information regarding his specific training to FMRCOA thereby preventing FMRCOA

Page 34 of 38

from conducting a meaningful review of any accommodation for Logan prior to his passing;

5. Even if Rex was trained to perform a task to ameliorate Mr. Heimkes' disability, FMRCOA had the right to exclude him under the direct threat exception to the FHA;

6. The evidence presented on Tatanka at trial was extremely thin, and Mr. Heimkes has not amended his complaint to add claims regarding Tatanka. Thus, the Court declines to issue any ruling or finding as to Tatanka.

Based on the above, both Plaintiffs' claims under the FHA fail as a matter of law.

### VI.   FHA—Interference, Coercion, or Intimidation Claim

## A.  General Law

In addition to their failure to accommodate claims under the FHA, both Plaintiffs bring claims for interference, coercion, or intimidation under the FHA.

The FHA provides that it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of [. . .] any right granted or protected" by the FHA discrimination provisions. 42 U.S.C. § 3617; *Friedel v. Sun Cmtys., Inc.*, 2021 WL 3732992, 2021 U.S. App. LEXIS 25384, at *11 (11th Cir. 2021). "To establishe a prima facie case of retaliation [under the Fair Housing Act], a plaintiff must show that: (1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a causal link exists between the protected activity and the adverse action." *Philippeaux v. Apt. Inv. & Mgmt. Co.*, 598 F. App'x 640, 644 (11th Cir. 2015). "Under the FHA, an adverse action must 'coerce, intimidate, threaten, or interfere with the party." *Joseph's House & Shelter, Inc. v. City of Troy*, 641 F. Supp. 2d 154, 159 (N.D. N.Y. 2009); *see also Johnson v. Housing Auth. Birmingham Dist.*, Civ. Act. No. 2:17-cv-01474-AKK, 2018 U.S. Dist. LEXIS 14610, at *21, 2018 WL 619845 (N.D. Ala. Jan. 30, 2018)

(noting that the defendant's conduct must rise "to the level of threats, coercion, intimidation or interference necessary to rise to an adverse act under the FHA.").

Mr. Heimkes alleges that FMRCOA decided to use litigation and fines to coerce, intimidate, threaten, or interfere with Mr. Heimkes' enjoyment of his housing rights. Mrs. Allfrey alleges that FMRCOA treated her differently solely because of her disability and her request for a reasonable accommodation, did not want her residing at FMR after making her request, and harassed, retaliated, and intimidated her by stalking her off resort property, taking pictures of her, threatening fines for taking her dog in the pool and lodge areas, and threatening her with eviction.

## B. Findings of Fact

Both Plaintiffs presented evidence at trial that they had been fined by FMRCOA for various violations. Mr. Heimkes has been fined on multiple occasions for smoking on the common areas, and for bringing his dogs into the pool and lodge areas. *See* Doc. 309 at 95-96, Mrs. Allfrey has been fined for bringing her dog into the pool and lodge areas. *See* Doc. 309 at 186. As noted above, neither Plaintiff had been granted a reasonable accommodation to bring their dogs into the pool or lodge areas, and FMRCOA's denial of the requested accommodations was warranted as outlined in Part V of this opinion. Further, neither Plaintiff denies engaging in the conduct which resulted in their fines.

Both Plaintiffs testified that they felt they were treated differently after the issues with their respective dogs began, and after Mr. Heimkes filed his first state court lawsuit. However, neither Plaintiff could point to specific actions by FMRCOA that caused the different treatment. Instead, they noted various other owners and neighbors no longer said hello or waved, and several people would take pictures of them with or without their dogs. Mrs. Allfrey did not present any evidence to support her allegation that FMRCOA threatened her with eviction or that FMRCOA attempted

Page 36 of 38

to make housing unavailable to her.  Both Plaintiffs did present evidence of some owners taking photographs of them around FMR.  *See* Doc. 308 at 98-100, 140; Doc. 273 at 55; Doc. 274 at 205-06.  Witnesses testified that they did take photographs of the Plaintiffs, explaining that they did not support the Plaintiffs' lawsuits and they believed the photographs showed either that the Plaintiffs were dishonest about the necessity of their requested accommodations, or in Mr. Heimkes' case, that he was not abiding by a ruling issued by a state court judge.  *See* Doc. 309 at 22-25, 95-96.  Additionally, owners testified that their relationships ended with the Plaintiffs when Plaintiffs sued.  They explained this was more about taking sides in the litigation wars and feeling misled by the Plaintiffs, rather than the result of FMRCOA spreading negative information, as Plaintiffs claim.  *See* Doc. 271 at 38-47, 69.

## C.  Conclusions of Law

The Court finds that the fines issued to Mr. Heimkes and Mrs. Allfrey for their various violations were not retaliatory or issued with the intent to threaten or interfere with either Plaintiffs' attempts to exercise their rights under the FHA.  Both Plaintiffs knew of the rules at FMRCOA, and neither dispute that they engaged in the conduct that resulted in the fines.  Further, as noted in section V of this opinion, the denial of Plaintiffs' requests for reasonable accommodations was warranted, therefore Plaintiffs were not permitted to bring their dogs to the pool or Owner's Lodge, but chose to do so anyway.  Thus, the fines were warranted.

Additionally, the Court finds that the conduct of individual owners and/or renters, such as not being friendly to the Plaintiffs or taking photographs of the Plaintiffs, was also not the result of FMRCOA attempting to coerce, intimidate, threaten, or interfere with the Plaintiffs exercise of their rights under the FHA.  The individual owners were entitled to have their own opinions about their neighbors and the various lawsuits filed by the Plaintiffs.  Their choices to take pictures that

they thought may protect them from any current or future lawsuit do not amount to coercion, intimidation, threats, or interference by FMRCOA.  Finally, the individual owners are not required by law to be friends or even friendly with Mr. Heimkes or Mrs. Allfrey.  The FHA is not a civility statute.

After considering all of the evidence presented, neither Plaintiff presented evidence sufficient to show that FMRCOA interfered with, coerced, or intimidated the Plaintiffs under the FHA.

**D.  Conclusion**

Accordingly, Plaintiffs' claims for interference, intimidation, or coercion under the FHA fail.

## VII.    CONCLUSION

Based on the foregoing, the Court finds in favor of the Defendant as to all claims before the Court.  Additionally, Plaintiffs' motion for directed verdict (Doc. 294) and Defendant's motion for judgment on partial findings (Doc. 297) are both **DENIED**.

A separate judgment will be entered pursuant to Fed. R. Civ. P. 58.[10]

**DONE** and **ORDERED** this the 25th day of March 2026.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE

---

[10] The Court retains ancillary jurisdiction over the question of sanctions as to Plaintiff's counsel and will address those motions and issues by a separate opinion. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379-80 (1994) (holding that a court has ancillary jurisdiction over incidental proceedings that are closely related to a case that invoked federal subject matter jurisdiction).