**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MARK HEIMKES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIV. ACT. NO. 1:22-cv-448-TFM-N** |
| | ) | |
| **FAIRHOPE MOTORCOACH RESORT CONDOMINIUM OWNERS ASSOCIATION, INC.,** | ) ) ) | |
| | ) | |
| **Defendant.** | ) | |
| **SHEARLDINE MARIE ALLFREY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIV. ACT. NO. 1:22-cv-496-TFM-N** |
| | ) | |
| **FAIRHOPE MOTORCOACH RESORT CONDOMINIUM OWNERS ASSOCIATION, INC.,** | ) ) ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER ON SANCTIONS**

For ease of the reader, the Court first provides this short summary of the sanctions ruling followed by the detailed opinion. Attorney Franklin Hollis Eaton, Jr. filed several pleadings which contained fabricated citations and false statements of law that he failed to check or correct prior to submission. The Court had already discovered problems with Mr. Eaton's filings when Defendant filed its first motion flagging numerous misstatements of law. The Court then issued two show cause orders regarding the misstatements, which were partially acknowledged by Mr. Eaton, though he has failed to fully and accurately address the Court's numerous concerns despite as many opportunities to do so. From the outset, the Court notes that this case is not just about Mr.

Eaton's most recent misstatements of law, but rather about a pattern of conduct throughout this case that raises significant concerns about his competency to practice law.  In sum, the misstatements and misrepresentations were just the final straw.  After a careful review of the matter, the Court finds that Mr. Eaton's conduct amounts to bad faith. Therefore, the Court **SANCTIONS** him under Rule 11, Alabama R. 3.3, and the Court's inherent authority and **ORDERS** as follows:

1. Attorney Franklin Hollis Eaton, Jr. is hereby **REPRIMANDED** and this reprimand shall be published as follows:

    a. Attorney Franklin Hollis Eaton, Jr. shall file, not under seal, a copy of this Memorandum Opinion and Order in any case in any court wherein he has appeared as counsel and final judgment has not been entered;

    b.  Attorney Franklin Hollis Eaton, Jr. shall file, not under seal, a copy of this Memorandum Opinion and Order in any case in any court wherein he appears as counsel for twelve (12) months after the date of this order;

    c. Attorney Franklin Hollis Eaton, Jr. shall provide a copy of this Memorandum Opinion and Order to any jurisdiction in which he is licensed to practice law within two (2) business days of the issuance of this order.  He shall further file a notice of compliance with the Court no later than the third business day from the date of this opinion.

    d. The Clerk of Court shall send a copy of this Memorandum Opinion and Order to the General Counsel of the Alabama State Bar for review.  Though referred to the Alabama State Bar for any disposition it deems appropriate, the undersigned regrettably recommends that Attorney Franklin Hollis Eaton, Jr. be found

incompetent to practice law.

   e. The Clerk of Court shall send a copy of this Memorandum Opinion and Order to the Chief Judges for the Northern District of Alabama, the Middle District of Alabama, and the Southern District of Alabama.

   f. To further effectuate the reprimands and deter similar misconduct by others, the Clerk of Court is **DIRECTED** to submit this order for publication in the Federal Supplement.

2. Franklin Hollis Eaton, Jr. shall pay attorney fees in the amount of **$55,597.00** to Defense counsel for their time spent addressing Mr. Eaton's misstatements of law.

3. Pursuant to S.D. Ala. GenLR 83.4(a) and (h)(1), the undersigned refers to the Judges of the Southern District of Alabama a review of Franklin Hollis Eaton, Jr.

The Court now turns to the full Memorandum Opinion and Order.

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

## I.   BACKGROUND

This opinion is the result of the cumulation of numerous issues regarding the conduct of Attorney Franklin Hollis Eaton, Jr. ("Mr. Eaton").   First, near the outset of this case, Mr. Eaton failed to include a jury demand in both complaints.   Though he later stated during the scheduling conference that he wanted a jury, he still failed to make the proper request.   The Court laid out a roadmap early on for how Mr. Eaton should proceed to demand a jury, yet he failed to follow it. *See* Doc. 172.   While not sanctionable, this was the first instance where the Court saw Mr. Eaton display a lack of diligence.   Next, the Court notes that Mr. Eaton kept running into problems with

co-counsel, to the point where they would seek to withdraw.  Correspondence between Mr. Eaton his co-counsel also indicated that Mr. Eaton would file motions over their objections or would place their signature on the motions without consent.[1]  *See* Doc. 174.  The next incident demonstrating Mr. Eaton's lack of diligence which came to the attention of the Court was when Mr. Eaton failed to engage with counsel for Defendant in drafting and contributing to the joint pretrial document, as required by the Court's standing pretrial order.  *See* Doc. 220.  The Court could have dismissed the case at that point, but it chose not to, so as not to punish the clients for Mr. Eaton's lack of diligence, again.  *See* Docs. 59-1, 220, 251.

As for trial, Mr. Eaton informed the Court at the pretrial conference that he anticipated that he would need "two days [. . .] [i]f not less" to present the liability portion of the case.  *See* Doc. 277 at 9-10.  Mr. Eaton ultimately took approximately 12 days to present his case, 6 times the estimate he provided during the pretrial conference. As the Court reflects on the trial, it agrees that Mr. Eaton's liability portion should have only taken approximately two days in the hands of competent counsel.  Yet, Mr. Eaton appeared at for trial woefully unprepared—so unprepared, in fact, that the Court found it needed to impose time limits to Mr. Eaton's questioning of witnesses to keep things moving.  Prior to imposing the time limits, which the Court was loathe to do, the Court mentioned the plodding, rambling, unfocused, nature of the examinations in hopes that Mr. Eaton would keep things moving and on task.  Mr. Eaton often appeared unsure of what questions to ask the witnesses that he chose to call during his presentation of the evidence, instead coming up with questions on the fly and going on a fishing expedition for information which seemed largely irrelevant to the case at hand.  In many instances, several minutes would pass between the

---

[1] Similar problems were alluded to before the Magistrate Judge in hearings held during Spring 2024.  *See* Docs. 165, 169.

witnesses answering a question and Mr. Eaton asking the next question.  It appeared that he called witnessed simply because they appeared in the gallery to watch, and to serve as discovery for his related state cases.  Mr. Eaton's lack of preparedness at trial resulted in substantial delays that, quite frankly, wasted the Court's time.

Even before, and certainly by the conclusion of trial, the Court had increasing concerns about Mr. Eaton's competency to practice law.  The Court opted not to consider sanctions at those prior junctures because the case was almost over and the Court did not want the poor and ineffective advocacy infecting the merits of the case.  In fact, the Court was able to rule on the merits of this case after the bench trial, without any sanction issues impacting the ruling.  In this sanction opinion, though, the Court must consider what has transpired during the course of this case.  After the conclusion of the bench trial, the Court's concerns mounted when Mr. Eaton made several misstatements of law and misrepresentations to the Court, which were the subject of the Court's show cause orders and which the Court will now address in detail.

On July 15, 2025, Mr. Eaton filed a response in opposition to the Defendant's motion for directed verdict.  *See* Doc. 296.  The Court noticed blatant discrepancies in his citations and began a review.

Defense counsel also noticed the issues but moved faster on the record than the Court did.  Defendant filed a motion to strike the response and a motion for sanctions, noting several misrepresentations of the law and citations to cases that do not exist.  *See* Doc. 304.

In light of the seriousness of the issues, the Court continued its independent search related to the citations at issue.  Regarding the cases that allegedly do not exist, the Court's search revealed the same problems identified by Defendant in its motion and the allegations made by the Defendant were correct:  the cases either do not exist, citations did not go to the referenced names, and/or the

cases did not relate to the issues at hand.  For the cases that relate to misrepresentations or false quotations, the search did not fare any better for defending the use of those citations in the manner and context given.  Finally, the Court reviewed each citation provided by Mr. Eaton in the pleading at issue and found additional misstatements of the law not noted by Defendant.

On August 1, 2025 Mr. Eaton filed his proposed findings of fact and conclusions of law. *See* Doc. 315.  Defendant again filed a notice of Plaintiffs' misstatements of law in the proposed findings of fact and conclusions of law, along with a motion to strike.  *See* Doc. 317.  The Court, again, had separately and apparently simultaneously conducted an independent review and found the same concerns regarding misstatements of law as it found in the previous document filed by Mr. Eaton.

Therefore, the Court issued a show cause order stating these points and instructing Mr. Eaton to show cause why he should not be sanctioned under Fed. R. Civ. P. 11, the Court's inherent authority, S.D. Ala. GenLR 83.3(i), and/or Alabama Rule of Professional Conduct 3.3 for making false statements of fact or law to the Court.  *See* Doc. 316.  As part of the response, Mr. Eaton was ordered to append to his filing copies of each allegedly fabricated legal authority or if he could not provide such copies, to submit a sworn declaration that provides a thorough explanation for how the motion and allegedly fabricated cases were generated.  *Id*.  He was also directed to append copies of each case for which the Court found misstatements of the law, highlighting the portions of said cases that stand for the propositions that he claimed.  The Court also set a hearing for August 21, 2025.  *Id.*  After checking the citations in Mr. Eaton's proposed findings of fact and conclusions of law, the Court found the additional issues noted above and entered a supplemental show cause order in which it outlined the additional concerns for Mr. Eaton to address.  *See* Doc. 318.  The Court set these issues to be heard at the August 21, 2025 hearing.  *Id.*

On August 11 and 12, 2025, Mr. Eaton filed responses to the Court's show cause order and supplemental show cause order. *See* Docs. 319, 320, 321. Notably, every response filed by Mr. Eaton was untimely. The Court gave Mr. Eaton a deadline of 4:00 p.m. of August 11, 2025. *See* Doc. 316. The first response was filed on August 11, 2025 at 4:32 p.m. *See* Doc. 319. The second response came in at 7:34 p.m. *See* Doc. 320. The third came in on August 12, 2025 at 2:09 p.m. *See* Doc. 321. Mr. Eaton did not request an extension to file any of his responses out of time. While the Court could have declined to consider the responses as untimely, the Court still considered them. In his responses, Mr. Eaton petitioned that the Court discharge the show cause order, deny sanctions, and cancel the show cause hearing. The Court overruled the motion. *See* Doc. 323. After the Court overruled the motion to discharge the show cause order and cancel the show cause hearing, Mr. Eaton filed another response, essentially arguing that Defendant's accusations were baseless and again asking the Court to discharge the show cause order and seeking sanctions against Defendant. *See* Doc. 325. Each of Mr. Eaton's responses to the show cause order failed to fully address the Court's numerous concerns and to fully comply with the Court's directives. Mr. Eaton also filed yet another motion for recusal, seemingly in response to the show cause orders. *See* Doc. 326. This was not the first motion for recusal filed by Mr. Eaton. *See* Docs. 244, 262. The Court has already addressed and denied the motions for recusal. *See* Docs. 249, 251, 333.

On August 21, 2025, the Court convened the show cause hearing. Mr. Eaton attended. First, Mr. Eaton denied using AI to draft the pleadings at issue. *See* Doc. 331 at 10. Then, Mr. Eaton blamed a lack of sleep and working late into the night. *Id.* at 11-12. Then, he blamed poor eyesight and his glasses. *Id.* at 17. When the Court turned to the specific cases at issue, it became incredibly and painfully clear that Mr. Eaton was entirely unprepared to address the Court's

concerns that it had taken great care to outline in the show cause orders.  For example, when asked to explain his citation to certain cases and where in those cases they stated the propositions that Mr. Eaton claimed in his filings at issue, Mr. Eaton said that he did not know because he did not have the cases in front of him and he would need to review them to explain—which was the entire purpose of the hearing.  *See id.* at 14, 25.  Mr. Eaton said he did not bring his laptop with him to the hearing and was unable to look the cases up.  Mr. Eaton continuously stated that the cases he cited must state somewhere what he claimed they said.  As the Court pointed out in its two show cause orders, they do not.  Unfortunately, because Mr. Eaton ignored those orders and was so woefully unprepared, the Court was not able to meaningfully proceed with the show cause hearing on that day.  To do so would have been a further waste of time for both opposing counsel and the Court.  Thus, the Court reset the hearing to occur the following week, six days later.  *See* Doc. 327.  However, the Court notes it could have proceeded without Mr. Eaton's input but instead wanted a more meaningful review because of the seriousness of the misconduct.  Unfortunately, that would never occur.

On August 25, 2025, Mr. Eaton filed a motion to continue the show cause hearing set for August 27, 2025, stating that he was ill and unable to return to work until September 1, 2025.  Doc. 328.  Mr. Eaton also requested that, in addition to his illness, the show cause hearing be continued so that he could have additional time to retain independent counsel.  Mr. Eaton requested a thirty-day continuance.  The Court granted the motion to the extent that it continued the hearing due to Mr. Eaton's illness, but denied the motion to the extent that an additional 30 days to retain independent counsel was not warranted, particularly where Mr. Eaton had already been on notice since August 4, 2025 about the Court's specific, detailed concerns.  The Court reset the hearing for September 3, 2025.  *See* Doc. 329.

On the morning of September 3, 2025, less than two hours before the hearing was set to begin, Mr. Eaton emailed the Courtroom Deputy a generic doctor's note, stating that he may not return to work between 9/3/2025 and 9/8/2025. *See* Doc. 330. Mr. Eaton did not file a motion to continue the hearing or put anything official on the docket sheet. Within minutes of receiving the note, the Court instructed the Courtroom Deputy to contact Mr. Eaton to determine when the Court could finish the show cause hearing. Mr. Eaton failed to respond to both phone calls and emails. The Courtroom Deputy continued to attempt to reach Mr. Eaton without success that day. Meanwhile, counsel for the Defendant appeared for the hearing and indicated that they had not been shown the professional courtesy of any contact from Mr. Eaton that he would not be available for the hearing that day. Thus, the Court again cancelled the show cause hearing and reset it for September 12, 2025. The Court instructed the Courtroom Deputy to continue daily attempts to contact Mr. Eaton to ensure he would attend the new date for the show cause hearing. The Courtroom Deputy thus continued to attempt to reach Mr. Eaton by both phone and email every day until the day of the scheduled show cause hearing. The Court checked with the Courtroom Deputy daily, and she informed the Court that her attempts were to no avail.

On September 11, 2025, the Court entered an order documenting its attempts to reach Mr. Eaton to reset the show cause hearing. *See* Doc. 334. The Court also noted that, absent a further showing of good cause with more detail than a generic doctor's note, the Court would take the matter of sanctions under advisement without further input if Mr. Eaton failed to appear at the show cause hearing on September 12, 2025. *See id.* At that point, the Court concluded that Mr. Eaton was simply evading the Court and thought the entry of the order might spur him to contact the Court, which he belatedly did. On September 12, 2025, roughly an hour before the show cause hearing, the Court had a telephone conference with Mr. Eaton and counsel for the Defendant (*see*

Doc. 335) during which Mr. Eaton claimed he could not go forward with the hearing (which was to occur in less than one hour) because of medical issues. Mr. Eaton said he was ill with a virus, COVID, and long COVID.[2] He stated that he did not have any medical records and that he did not know he needed to provide them because he has not been at his desk or seen any emails and because he is unable to read anything due to his vision. The Court asked that Mr. Eaton sign a records release so that it could verify the proffered excuses, as Mr. Eaton's honesty and integrity were in question and the Court had grave concerns about the truthfulness as to the extent of his claimed medical issues and need to continue the hearing. Mr. Eaton agreed to sign the release. The Court informed Mr. Eaton that it would still convene the hearing at 9:00 am that day and that he could appear by video teleconference. Mr. Eaton stated that he was not going to appear at the hearing because he was not physically able, despite the option to appear remotely, and because the Court has, apparently, "forbidden" him from having counsel.[3] Mr. Eaton then further iterated that, on advice of counsel, he would not be participating in the hearing. The Court found it odd and confusing given that he stated previously he had not retained counsel and could only assume then that the advice was his own. No attorney has filed an appearance on his behalf to date. Ultimately, Mr. Eaton refused to and did not attend the show cause hearing. The Court continued with the show cause hearing without Mr. Eaton, as it had given him two extensions already and he had ample opportunity to explain himself at the first hearing, and several subsequent opportunities. The Court stated on the record that Mr. Eaton appeared perfectly able to talk and participate in a telephonic conference, despite his statements to the contrary, and saw no reason why he could not

---

[2] The medical records that were eventually provided to the Court indicated that Mr. Eaton tested negative for COVID.

[3] To be clear, the Court never prohibited Mr. Eaton from retaining counsel. Rather, the Court simply refused to permit further delay. Especially as the Court concluded Mr. Eaton was stalling and malingering.

defend his actions by means of a video teleconference.  The Court is not required to give him a second chance to explain himself.  It is the important business of the Court to adjudicate both this and other cases in a timely manner, which Mr. Eaton frustrated repeatedly.  Mr. Eaton's lack of competence has consumed an unnecessary and inordinate amount of time on the Court's docket.

Mr. Eaton's attempts to repeatedly request extensions and his timing in doing so, often without a formal motion or notice to the Court of his alleged need until the very last second, strike the Court as an attempt to put the show cause hearing off indefinitely and to not participate in this process.  The conclusion is inescapable in as much as Mr. Eaton came to the first show cause hearing wholly unprepared and seemingly unconcerned with the seriousness of the issues that Court directed him to address in its show cause orders.  Mr. Eaton's responses to the Court's show cause orders detract from, rather than give, the Court confidence in Mr. Eaton's competency.  For one, Mr. Eaton failed to take any, much less full responsibility for the issues outlined in the show cause orders and instead kept throwing out excuses.  Mr. Eaton failed to address or correct all of the issues outlined in the show cause orders, and he ultimately failed to fully comply with the Court's show cause orders.  In fact, his responses to the show cause orders only raised additional issues.  While Mr. Eaton denied that AI was the source of the issues raised by the Court, he attached various documents produced directly from Westlaw's AI service, Cocounsel, which also appear to be riddled with erroneous information and were, indeed, hundreds of pages of gibberish.  *See* Docs. 319-321.

Further, whenever the Court expresses issues with the timeliness of Mr. Eaton's filings, Mr. Eaton often blames an illness that he claims often prevents him from working.  Mr. Eaton again, during trial held during the Summer of 2025, claimed that the same illness prevented him from being fully prepared to try this case that had been lingering since 2022.  He claims his

mysterious illness prevented him from properly demanding a jury, which resulted in this case being tried as a bench trial rather than a jury trial.  He claims this illness prevented him from fully complying with discovery orders and from being able to efficiently question witnesses that he chose to call at trial—unnecessarily dragging out proceedings far beyond the number of days he stated he would need to try the case.

The Court concludes at this point that Mr. Eaton demonstrates an unwillingness or inability to meet the minimum standard of competence to practice law.  He has demonstrated incompetence throughout these proceedings, which have ultimately culminated in numerous misrepresentations of the law, as outlined in this Court's previous show cause orders.  *See* Docs. 316, 318.  If Mr. Eaton is as sick as he claims he is, and said sickness impacts his ability to practice to the extent that he is frequently unable to appear in Court or adhere to important deadlines, then he is obviously not fit for litigation practice.  However, as the Court previously noted in an order, Mr. Eaton manages to file robust motions and responses in the same time frame he is suddenly too ill to appear in Court.  *See* Doc. 184.   In fact, the Court previously told Mr. Eaton, when he again requested a continuance due to his ongoing health issues, that at some point it is this Court's responsibility to bring this case to its conclusion, and that if Mr. Eaton's health issues were ultimately going to prevent that, his clients must either find another attorney to represent them or proceed pro se.  *Id.*  Mr. Eaton and his clients chose to continue with Mr. Eaton as their attorney in this matter.  In fact, it appeared to the Court that Mr. Eaton had no health issues preventing him from continuing in the matter when he filed seven motions the day before trial began.  It seems, rather, that Mr. Eaton's health issues only arise when there is a deadline or ruling that Mr. Eaton does not agree with, or when his own actions are under scrutiny.

Additionally, the Court notes that this is not this first time Defendant has raised the issues

of sanctions as to Mr. Eaton.  Defendant first filed a motion for sanctions on May 26, 2025.  *See* Doc. 247.  Defendant's argument in that motion for sanctions was primarily that Mr. Eaton should be sanctioned because the motion for recusal he filed on the eve of trial, along with 11 other filings, were frivolous.  *See id.* at 2, 4.  The Court denied that motion—again, to divorce the incompetence of advocacy from the merits of the cases and avoid penalizing the Plaintiffs.  *See* Docs. 251, 333. On June 6, 2025 Defendant filed a renewed motion for sanctions, which remains pending and is part of this order.  *See* Doc. 264.  In the renewed motion for sanctions, Defendant moves the Court to sanction Mr. Eaton for "prohibited and abusive litigation conduct[,]" including improperly seeking recusal again and misrepresenting the trial proceedings and holdings of cited cases.  *See id.*  Because the arguments in the renewed motion for sanctions are similar to those set out in the Court's show cause order, the Court also considers them in issuing this opinion.  The Court also, *sua sponte*, previously raised an issue with Mr. Eaton misrepresenting caselaw.  Specifically, Mr. Eaton relied on the *Chevron* doctrine as articulated in *Chevron U.S.A., Inc. v. National Resources Defense Counsel*, Inc., 467 U.S. 837 (1984) in one of his filings, misrepresenting the status of the law.  *See* Doc. 214.  The Court pointed out to Mr. Eaton that the *Chevron* case has been very clearly overturned by *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), first by calling Mr. Eaton to point out what the Court thought may have been an inadvertent error, and then, after Mr. Eaton failed to correct the error, by Court order.  *See* Doc. 216 at 4.  Rather than correct his error, Mr. Eaton doubled down on his citation to *Chevron* and then filed a Motion to Disclose Ex Parte Communications, *see* Doc. 223, in which he accused one of the Court's law clerks who contacted him of communicating with him ex parte though she called him—at Judge Moorer's request—as a courtesy to flag his reliance on the overruled doctrine as a potential Rule 11 issue and to give him the opportunity to correct the error.  This point becomes salient as Mr. Eaton asked the Court,

during the first show cause hearing on August 21, 2025, why it failed to give him such a courtesy for the newest citation issues that are the subject of this order. The Court finds it incredible that Mr. Eaton would expect such a call, when it previously accused the Court and its staff of misconduct for doing exactly that.

## II.   DISCUSSION AND ANALYSIS

"Many harms flow from the submission of fake opinions." *Mata v. Avianca, Inc.*, 678 F. Supp.3d 443, 448 (S.D.N.Y. 2023). This concept is well known and is a longstanding principle in the practice of law. Yet, the improper use of generative AI is a problem that sadly is not going away despite the general knowledge in the legal community that AI can hallucinate and make up cases. AI hallucination has been reported on extensively in media (not just in the legal context, but at large) and the subject of many seminars and continuing legal education trainings offered by bar associations, articles written in legal journals, and numerous well reported instances of courts sanctioning attorneys. Somehow the message still has not been hammered home as the epidemic of citing fake cases continues unabated. *See, e.g. Park v. Kim*, 91 F.4th 610, 615 (2d Cir. 2024); *United States v. McGee*, 806 F. Supp. 3d 1264 (S.D. Ala. 2025); *Johnson v. Dunn*, 792 F. Supp. 3d 1241 (N.D. Ala. 2025); *Benjamin v. Costco Wholesale Corp.*, 779 F. Supp. 3d 341 (E.D.N.Y. 2025); *Ferris v. Amazon.com Servs., LLC*, 778 F. Supp. 3d 879 (N.D. Miss. 2025); *United States v. Hayes*, 763 F. Supp. 3d 1054 (E.D. Cal. 2025), *reconsideration denied*, Civ. Act. No. 2:24-cr-0280-DJC, 2025 U.S. Dist. LEXIS 68016, 2025 WL 1067323 (E.D. Cal. Apr. 9, 2025); *Sanders v. United States*, 176 Fed. Cl. 163 (Fed. Cl. 2025); *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489 (D. Wyo. 2025); *Elizondo v. City of Laredo*, Civ. Act. No. 5:25-cv-50, 2025 U.S. Dist. LEXIS 140572, 2025 WL 2071072 (S.D. Tex. July 23, 2025); *Willis v. U.S. Bank Nat'l Ass'n as Tr., Igloo Series Tr.,* Civ. Act. No. 3:25-CV-516-BN, 2025 U.S. Dist. LEXIS 79916, 2025 WL 1224273

(N.D. Tex. Apr. 28, 2025); *Bevins v. Colgate-Palmolive Co.*, Civ. Act. No. 25-CV-576, 2025 U.S. Dist. LEXIS 68399, 2025 WL 1085695, at *7 (E.D. Pa. Apr. 10, 2025); *Gordon v. Wells Fargo Bank N.A. Inc.*, Civ. Act. No. 24-CV-388, 2025 U.S. Dist. LEXIS 66601, 2025 WL 1057211 (M.D. Ga. Apr. 8, 2025); *Dehghani v. Castro*, Civ. Act. No. 25-CV-0052, 2025 U.S. Dist. LEXIS 63641, 2025 WL 988009 (D.N.M. Apr. 2, 2025), *aff'd by Dehghani v. Castro*, 782 F. Supp. 3d 1051 (D.N.M. May 9, 2025); *Gauthier v. Goodyear Tire & Rubber Co.*, Civ. Act. No. 1:23-cv-281, 2024 U.S. Dist. LEXIS 214029, 2024 WL 4882651 (E.D. Tex. Nov. 25, 2024).

The Court notes this enormous string citation is only a small segment of what the undersigned found. Simply put, the legal community is well aware of the dangers and pitfalls of using AI shortcuts without further review or supervision. To be clear, the Court is not saying that AI has no place in the practice of law. AI can absolutely be a useful tool. But in the same realm as supervising subordinate's work or checking citations found indirectly, a lawyer is absolutely responsible for the citations and submissions to courts.

AI is, unfortunately, not the Court's only concern regarding Mr. Eaton. Mr. Eaton has refused to take full responsibility, doubled down on misrepresentations to the Court, and refused to participate in the process of inquiring into the numerous issues raised by the Court. Mr. Eaton has refused to engage in the process – thus the Court is unable to determine if this is an AI specific issue, a health issue, or some other problem that has resulted in Mr. Eaton making such gross misrepresentations. Mr. Eaton claims that the misstatements of law in his filings were not the result of AI. However, the same harms mentioned above are perpetuated when an attorney makes false statements of law to the Court, whether produced by AI or otherwise. In any event, whatever the cause, the Court concludes Mr. Eaton is incompetent to practice law given the circumstances outlined above and observed in this case.

**A.      Sanctions Authorities**

Alabama Rule of Professional Conduct 3.3 provides that "[a] lawyer shall not knowingly . . . [m]ake a false statement of material fact or law to a tribunal". Ala. Rules of Prof'l Conduct 3.3(a)(1). The comments to the Rule further state "[a]n advocate is responsible for pleadings and other documents prepared for litigation…" Ala. Rules of Prof'l Conduct 3.3, cmt. Further, "an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." *Id*. The comment further provides that "[l]egal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities." *Id*.

Next, the Southern District of Alabama also has encompassed in its local rules the following:

> Standards for Professional Conduct; Obligations. Attorneys appearing before this Court shall adhere to this Court's Local Rules, the Alabama Rules of Professional Conduct, and the Alabama Standards for Imposing Lawyer Discipline. Attorney misconduct, whether or not occurring in the course of an attorney/client relationship, may be disciplined by disbarment, suspension, reprimand, monetary sanctions, removal from this Court's roster of attorneys eligible for practice before it, or such other sanction as the Court may deem appropriate.

S.D. Ala. GenLR 83.3(i). Next, the local rules also provide a section on attorney discipline which states:

> When alleged attorney misconduct is brought to the attention of the Court, whether by a Judge, any lawyer admitted to practice before the Court, any officer or employee of the Court, or otherwise, the Court may, in its discretion, dispose of the matter through the use of its inherent, statutory, or other powers; refer the matter to an appropriate State Bar agency for investigation and disposition; refer the matter to the Local Grievance Committee as hereinafter defined; or take any other action the Court deems appropriate. These procedures are not mutually exclusive.

S.D. Ala. GenLR 83.4(a).  The American Bar Association has its own equivalent to Rule 3.3 which states "[a] lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer [or] (2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel".

MODEL RULES OF PRO. CONDUCT R. 3.3.  Moreover, the comments state

> An advocate is responsible for pleadings and other documents prepared for litigation…
>
> . . .
>
> Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities. Furthermore, as stated in paragraph (a)(2), an advocate has a duty to disclose directly adverse authority in the controlling jurisdiction that has not been disclosed by the opposing party. The underlying concept is that legal argument is a discussion seeking to determine the legal premises properly applicable to the case.

MODEL RULES OF PRO. CONDUCT R. 3.3 cmt.

> Additionally, Fed. R. Civ. P. 11 provides:
>
> **Representations to the Court.**  By presenting to the court a pleading, written motion, or other paper-whether by signing, filing, submitting, or later advocating it-an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]

FED. R. CIV. P. 11(b)(2).  A court can impose an appropriate sanction on an attorney who violates Rule 11(b) on its own initiative.  *See* FED. R. CIV. P. 11(c)(1), (3).

"Rule 11 sanctions are properly assessed (1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has

no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; or (3) when the party files a pleading in bad faith for an improper purpose." *Burgos v. Option One Mortg. Corp.*, 786 F. App'x 231, 233 (11th Cir. 2019)[4] (cleaned up) (citing *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996)); *see also Gulisano v. Burlington, Inc.*, 34 F.4th 935, 942 (11th Cir. 2022).

"The initiating court must employ (1) a 'show-cause' order to provide notice and an opportunity to be heard; and (2) a higher standard ('akin to contempt') than in the case of party-initiated sanctions." *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (2003). The Eleventh Circuit has not elaborated on this "akin to contempt" standard and whether this stricter requirement for sua sponte Rule 11 necessitates a finding of subjective bad faith. *Deutsche Bank Nat'l Tr. Co. v. Thomason*, Civ. Act. No. 2:24-CV-517-ECM, 2025 U.S. Dist. LEXIS 29317, 2025 WL 552672, at \*5 (M.D. Ala. Feb. 19, 2025). "However, the Eleventh Circuit has upheld a district court's sua sponte imposition of Rule 11 sanctions where an attorney filed a 'factually and legally inaccurate' writ of execution where no judgment had been entered." *Id.* at \*7 (citing *iParametrics, LLC v. Howe*, 522 F. App'x 737, 739 (11th Cir. 2013) (upholding district court's sanctioning of attorney under Rule 11 where the lawyer "could readily have discovered and corrected his pleadings, but instead his misrepresentations went undetected for over a year.")).

Sanctions ought to be effective deterrents that prevent repetition of the punished conduct. *See Regions Bank v. Kaplan*, Civ. Act. No. 17-15478, 2021 U.S. App. LEXIS 31542, 2021 WL 4852268, at \*8 (11th Cir. Oct. 19, 2021). These sanctions are exceedingly flexible, and can include

---

[4] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

attorneys' fees, required educational courses, formal reprimands, apologies to the represented parties, reimbursement of plane tickets, or even community service.  *Id.*; *Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1315 (11th Cir. 2021); *Rowe v. Gary*, 773 F. App'x 500, 503 (11th Cir. 2019); *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 466 (2023).

Finally, the Court turns to its inherent authority to sanction.  "It has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'"  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *United States v. Hudson*, 11 U.S. 32, 34 (1812)).  "An attorney who violates his or her ethical obligations is subject to professional discipline, including sanctions, suspension, and disbarment."  *Connick v. Thompson*, 563 U.S. 51, 66 (2011).  Additionally, "[c]ourts have long recognized an inherent authority to suspend or disbar lawyers . . . derive[d] from the lawyer's role as an officer of the court which granted admission.  *In re Snyder*, 472 U.S. 634, 643 (1985) (citations omitted); *see also Chambers*, 501 U.S. at 43 (citing *Ex parte Burr*, 22 U.S. 529, 530 (1824)) ("a federal court has the power to control admission to its bar and to discipline attorneys who appear before it.").  These inherent powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."  *Link v. Wabash R. Co.*, 370 U.S. 626, 630-631 (1962).

Yet, "[a] court must, of course, exercise caution in invoking its inherent power," and "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power."  *Chambers*, 501 U.S. at 50 (internal citation omitted).  "[I]f in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power."  *Id*.

## B.       Findings of Fact and Conclusions of Law

Turning now to this particular case.  The harms that flow from the submission of "hallucinated," "false," and misrepresented cases are not minimal.  Recently a sister court in the Northern District of Alabama articulated them at length.

> "The opposing party wastes time and money in exposing the deception," and "[t]he client may be deprived of arguments based on authentic judicial precedents." *Mata*, 678 F. Supp. 3d at 448. While the court takes time to investigate, other cases may be disrupted or deprived of judicial attention. Other harms affect the judicial system:
>
> There is potential harm to the reputation of judges and courts whose names are falsely invoked as authors of the bogus opinions and to the reputation of a party attributed with fictional conduct. It promotes cynicism about the legal profession and the American judicial system. And a future litigant may be tempted to defy a judicial ruling by disingenuously claiming doubt about its authenticity. *Id*. at 448-49. And the public (whose taxpayer dollars pay the lawyers at issue here) is justifiably horrified and outraged when filings in a court of law substitute lazy, convenient fictions for the truth.
>
> Even in cases like this one, where lawyers who cite AI hallucinations accept responsibility and apologize profusely, much damage is done. The opposing party expends resources identifying and exposing the fabrication; the court spends time reviewing materials, holding hearings, deliberating about sanctions, and explaining its ruling; the substance of the case is delayed; and public confidence about the trustworthiness of legal proceedings may be diminished.

*Johnson*, 792 F. Supp. 3d at 1256-57.  While this analysis is in the context of "hallucinated" cases, the same harms occur when an attorney cites to a real case for a proposition that the case simply does not state.

Since Mr. Eaton denies the use of AI, though he clearly used it at some point in his responses, the Court further finds in reviewing the sanction authorities that it is not completely clear whether this conduct fits squarely within the Rule 3.3 of the Alabama Rules of Professional Conduct and the ABA Model Rules of Professional Conduct.  As pointedly noted in the *Johnson* case:

> Further, it is unclear to the court that Alabama Rule of Professional Conduct 3.3 applies to the misconduct at issue here. On the one hand, inserting into court filings unverified legal citations generated by AI is wholly inconsistent with the duty of candor that Rule 3.3 enumerates. On the other hand, by its terms Rule 3.3 forbids only knowing misstatements of law, and these false statements occurred because none of the three attorneys at issue bothered to verify the hallucinated citations … As far as the court can discern, the Alabama Supreme Court has not yet had the opportunity to consider whether Rule 3.3 applies to this specific kind of misconduct. Absent such guidance, the court will not extend that rule beyond its plain terms.

792 F. Supp. 3d at 1260.  This Court agrees with the sentiment and analysis.  However, Mr. Eaton claims that the misstatements of law were not the result of AI use.  Rather, he states that any misstatement was a copy and paste or typographical error on his end.  The Court's extensive show cause orders clearly illustrate that these errors are not mere typographical errors.  Frankly the Court simply finds that incredible.  But, even if the Court takes him at his word that he did not use AI, then the conduct falls squarely within Rule 3.3 because the citations were then deliberately represented to the Court as precedent.  Further, Mr. Eaton has been on notice of the errors for a significant period of time now, and still failed to correct them.  Thus, his misstatements of law qualify as "knowing" misstatements under Rule 3.3.

Regardless of whether Mr. Eaton's misstatements of law are the result of AI use or not, the Court is not powerless.  The Court also finds sanctions are warranted under Rule 11.  Specifically, Mr. Eaton's conduct in this case fits into the second and third categories described by the Eleventh Circuit for sanctions under Rule 11: when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law, and when the party files a pleading in bad faith for an improper purpose.  Mr. Eaton filed multiple pleadings with the Court that included argument based on misrepresentations and misstatements of law.  A pleading based on such misstatements and misrepresentations simply had no reasonable chance of success, thus meeting the second category.  As to the third category,

the Court has no trouble finding Mr. Eaton filed the pleadings at issue in bad faith. As an attorney filing pleadings in this matter, he had a duty to review his filings and ensure that his citations were accurate and that is arguments were based on law. Instead, he filed multiple pleadings that made arguments that the cases he cited simply did not stand for. When the Court pointed this out to him, he did not fully correct the issues. When the Court gave him multiple opportunities to explain himself at show cause hearings, he first showed up unprepared, and later chose to not show up at all. He further argued that the Court should have given him a courtesy call to give him the opportunity to fix the misstatements—despite the fact that the last time the Court extended him that courtesy, he made allegations that the Court staff was engaging in ex parte communications. Mr. Eaton's pattern of behavior easily amounts to bad faith.

Finally, to the extent the other rules are determined inapplicable, the Court also relies on its inherent authority. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) (noting that courts should rely on the Federal Rules of Civil Procedure for sanctions before turning to their inherent powers).

The Court again notes that Mr. Eaton claims his misstatements were not the result of AI and any misstatement were merely his own clerical errors. As to the hallucinated citations, Mr. Eaton claims they were mistakenly included in his filing, and he attempted to provide additional cases that he had intended to cite. However, even those cases often did not stand for the propositions for which Mr. Eaton claimed. Further, in his responses to the Court's show cause orders, Mr. Eaton failed to fully address all of the Court's outlined concerns, including several cases where the Court noted that the cases and statutes cited by Mr. Eaton did not say what he purported them to say. Mr. Eaton has, to this day, not corrected those issues pointed out by the Court in their entirety. Rather, Mr. Eaton's misstatements of law and misrepresentations of the

Court appear to be a habit from which he is simply unwilling and unable to break. Moreover, when called to task, he simply offers unbelievable excuses and blame.

It does not matter that there *may* be actual authorities that stand for the proposition that the bogus or inaccurate authorities were offered to support. Ultimately, the Court finds that to be irrelevant and does not remediate the wasted time, additional work, and harm caused by the misconduct. "[A]ny sanctions discount on this basis would amplify the siren call of unverified AI for lawyers who are already confident in their legal conclusion." *Johnson*, 792 F. Supp. 3d at 1262. This Court agrees and rejects any such notion that because some authority exists to support a legal proposition it should negate the harm caused by false and hallucinated cases. Put bluntly – absolutely not; period; end of story; all stop.

The Court further has no difficulty finding that Mr. Eaton's misconduct was more than mere recklessness. The Court notes that errors can happen in filings despite attorneys' (and even judges') best efforts. Yet the insertion of bogus citations and misrepresentation of authorities is not a mere typographical error, nor the subject of reasonable debate. It is just wrong. The Court tried, in two separate show cause orders,[5] to bring Mr. Eaton's attention to the various issues with the authorities he cited. And, despite filing numerous responses, Mr. Eaton never fully addressed all of the Court's concerns or corrected all of the misrepresentations. He further failed to participate in this process by showing up to the first show cause hearing entirely unprepared, and then repeatedly requesting continuances and creating excuses for why he was unable to attend future hearings. The Court finds that Mr. Eaton is either lying about his health situation or, if true, he is no longer capable of practicing trial law and should file for disability. Thus, the Court will

---

[5] And this is not even including the earlier issue on the Chevron doctrine and misrepresentations involved there which the Court could (and probably should) have sanctioned when it occurred.

impose an appropriate sanction under the various authorities the Court has at its disposal.

## C.    Sanctions

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id*. at 44-45; *see also J.C. Penney Corp., Inc. v. Oxford Mall, LLC*, 100 F.4th 1340, 1346 (11th Cir. 2024) (citing *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) ("The inherent powers of the federal courts include the authority to fashion sanctions for conduct that abuses the judicial process."). A court may exercise this power "to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013) (citing *Chambers*, 501 U.S. at 45-46 and *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 257-59 (1975); *see also Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) (quoting *Marx* and holding same).

> The "key to unlocking" that power is a finding of bad faith. [*Purchasing Power*, 851 F.3d at 1223]. But a blank conclusion that a party acted in bad faith is not enough; the court instead needs to make specific findings about which conduct justifies sanctions. *DeLauro [v. Porto]*, 645 F.3d [1294], 1304 [11th Cir. 2011]. And those findings must show "subjective bad faith," meaning intentional and not just reckless behavior. *Purchasing Power*, 851 F.3d at 1224-25. Still, that intent can be inferred "if an attorney's conduct is so egregious that it could only be committed in bad faith." *Id*.

*J.C. Penney*, 100 F.4th at 1346. Furthermore, this power is "for rectifying disobedience, regardless of whether such disobedience interfered with the conduct of the trial." *Purchasing Power*, 851 F.3d at 1225. Because bad faith applies both to one category of Rule 11 sanctions and to the Court's inherent authority, that is the standard that the Court will focus on regarding Mr. Eaton's conduct.

The Court already made its initial findings above, but notes specifically here that the conduct was intentional and in bad faith. While Mr. Eaton claimed the misstatements of law were an oversight due to copy and paste errors, he has failed to correct the numerous "oversights" noted by the Court. Further, many of his purported "corrections" in his responses to the show cause order—all of which were untimely filed—did not actually resolve the Court's concerns and in many cases doubled down on his erroneous assertions and tried to blame Defendant and the Court for the problems instead. The Court gave Mr. Eaton several opportunities to correct the errors and to explain in the show cause hearing, how exactly the errors came to be. Unfortunately, Mr. Eaton did not take the Court's concerns seriously, evidenced by his complete and utter unpreparedness at the first show cause hearing. Mr. Eaton's failure to fully correct the errors, particularly once the Court put him on notice of them, amounts to intentionality. This is so even if they were initially simply mistakes, as Mr. Eaton claims they were. This is more than mere negligence or simple recklessness. It is unacceptable and caused significant delay of this case, as the time that this Court could have been drafting its opinion on the bench trial but instead scarce and precious hours had to be spent reviewing numerous cases and statutes cited by the Plaintiff and discovering that they did not stand for the propositions for which Mr. Eaton claimed they stood, which then caused the Court to spend significant time drafting show cause orders outlining the extensive deficiencies, and then reviewing Mr. Eaton's extensive and untimely responses that failed to address the majority of the Court's concerns and indeed were nonsensical. The most basic principle is that an attorney who signs a motion filed with the Court takes responsibility for that submission and risks serious sanctions when they make no effort to ensure the motion is grounded in the truth (in fact or in law).[6] Accordingly, this misconduct is not just tantamount to bad faith. It is bad faith, and it

---

[6] At its core, an attorney who signs a legal document certifies that they have "read the document,

is and sanctionable under each of the authorities available to the Court as noted above.

To rectify the bad-faith misconduct in this case and vindicate the lawful authority of federal courts to keep proceedings free from falsehoods such as the ones at issue here, the Court will impose the least severe sanction that it finds likely to deter future similar misconduct. In exercising its inherent authority, the Court assigns a significant value to the deterrent function of a sanction. It has become clear that basic reprimands and small fines are not sufficient to deter this type of misconduct because if it were, we would not be here. "If fines and public embarrassment were effective deterrents, there would not be so many cases to cite. And in any event, fines do not account for the extreme dereliction of professional responsibility that fabricating citations reflects, nor for the many harms it causes." *Johnson*, 792 F. Supp. 3d at 1266. In any event, a fine would not rectify the <u>egregious</u> misconduct in this case.

### i.    Referral to the Alabama State Bar

Unfortunately in this case, Mr. Eaton has still failed to take responsibility for his conduct. He failed to correct his errors and frequently blames his health, the Defendant, or the Court— which seem to be the ongoing scapegoats for his numerous deficiencies in this case—for the problems that have arisen. The legal profession is self-regulated, which means it is incumbent on the members of the profession to recognize when its fellow attorneys demonstrate an incompetence to continue in the practice of law. The Court unfortunately must find that Mr. Eaton has reached that level of incompetence. And it serves to the detriment of the client who rely on him. Whether that is because of his purported medical condition (which the Court does not believe) or he uses it

---

[have] conducted a reasonable inquiry into the facts and the law and [are] satisfied that the document is well grounded in both, and is acting without any improper motive." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 542 (1991). While this statement is made in the context of Rule 11, it holds no less true for any submission an attorney makes to the Court.

as a convenient shield—the Court need not resolve that issue here and defers that determination to the licensing authority. The Court therefore will refer this matter to the Alabama State Bar for whatever disposition they deem appropriate, though it is this Court's conclusion that Mr. Eaton, by his conduct and actions in this case, is not fit to continue to practice law—certainly not in litigation which requires court appearances and meeting deadlines.

### ii.    Monetary Sanctions

The Court further finds that a sanction of attorney fees paid by Mr. Eaton to Defendant's counsel for the time Defendant's counsel spent on the issues related to Mr. Eaton's misstatements of law is warranted. First, as the Court noted during the hearing held on September 12, 2025, Defense counsel should not have to bear the expense of the time spent addressing Mr. Eaton's misstatements of law. Second, payment of attorney fees is likely to serve as a deterrent to future conduct such as Mr. Eaton's. Defendant filed a motion for attorney fees at the Court's direction following the September 12, 2025 show cause hearing. The Court will award only those fees that are reasonable.

"[T]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Watford v. Heckler*, 765 F.2d 1562, 1568 (11th Cir. 1985) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). "The first step in calculating a reasonable attorney's fee award is to determine the 'lodestar'—the product of multiplying reasonable hours expended times a reasonable hourly rate." *Martinez v. Hernando Cnty. Sheriff's Off.*, 579 F. App'x 710, 713 (11th Cir. 2014) (citing *Am. Civil Liberties Union of Ga. v. Barnes*, 168 F.3d 423, 427 (11th Cir. 1999)); *see also Bivins v. Wrap It Up, Inc.,* 548 F.3d 1348, 1350 (11th Cir. 2008) ("The product of these two figures is the lodestar and there is a 'strong presumption' that the lodestar is the reasonable sum the attorneys

deserve.").

"In determining what is a 'reasonable' hourly rate and what number of compensable hours is 'reasonable,' the court is to consider the 12 factors enumerated in *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974)."[7]  *Id.*  "The *Johnson* factors include: (1) the time and labor required; (2) the difficulty of the issues; (3) the skill required; (4) the preclusion of other employment by the attorney because he accepted the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases."  *Faught v. Am. Home Shield Corp.,* 668 F.3d 1233, 1242-43 (11th Cir. 2011) (citations omitted).  And, after determination of the lodestar, that "number" may then be "adjusted after considering other factors, such as the results obtained."  *Martinez,* 579 F. App'x at 713 (citations omitted).  Although the "*Johnson* factors are to be considered in determining the lodestar figure; they should not be reconsidered in making either an upward or downward adjustment to the lodestar-doing so amounts to double-counting."  *Bivins,* 548 F.3d at 1352 (citing *City of Burlington v. Dague*, 505 U.S. 557, 562-63 (1992)).

"'Fee applicants must exercise what the Supreme Court has termed 'billing judgment,' which requires the exclusion of excessive, redundant, or otherwise unnecessary hours."  *Smith v. Werner Enters., Inc.*, Civ. Act. No. 14-0107-WS-B, 2015 U.S. Dist. LEXIS 153536, at *12, 2015 WL 7185503, at *4 (S.D. Ala. Nov. 13, 2015) (citations and internal quotation marks omitted).

---

[7] The Eleventh Circuit has adopted as binding precedent the decisions of the Fifth Circuit that were decided prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

Indeed, "[i]f fee applicants do not exercise billing judgment, courts are obligated to do it for them, to cut the amount of hours for which payment is sought, pruning out those that are 'excessive, redundant, or otherwise unnecessary.'" *Barnes,* 168 F.3d at 428. "Courts are not authorized to be generous with the money of others, and it is as much the duty of courts to see that excessive fees and expenses are not awarded as it is to see that an adequate amount is awarded." *Id.* "Excluding excessive or otherwise unnecessary hours under the rubric of 'billing judgment' means that a lawyer may not be compensated for hours spent on activities for which he would not bill a client of means who was seriously intent on vindicating similar rights, recognizing that in the private sector the economically rational person engages in some cost benefit analysis." *Norman,* 836 F.2d at 1301. "Moreover, because an assessment of the reasonableness of the hours requested (at least when objection is adequately raised by the defendant) contemplate[s] a task-by-task examination of the hours billed, plaintiffs' counsel is required to record each task, and the time associated with each, with sufficient clarity that the Court can evaluate the reasonableness of the expenditure of time." *Smith*, 2015 U.S. Dist. LEXIS 153536, at *12, 2015 WL 7185503*,* at *4 (citations and internal quotation marks omitted).

In determining the proper lodestar in this case, the undersigned first considers how many hours were reasonably expended in pursuing this matter then what hourly rates are reasonable. In so doing, the Court keeps in mind that "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley,* 461 U.S. at 437.

The following are the claimed hourly rates and hours worked by Defendant's counsel:

|  | Claimed Hourly Rate ($) | Claimed Hours Worked |
|---|---|---|
| D. Greg Dunagan | 205 | 83.6 |
| C. Andrew Harrell | 205 | 33.6 |
| H. Cannon Lawley | 350 | 78.7 |
| Margaret P. Wolf | 190 | 1.1 |
| Elizabeth F. Baker | 190 | 17.6 |
| Amanda L. Oakes | 110 | 4.3 |

Defendant attached to the motion for attorneys' fees the affidavits of its counsels, D. Greg Dunagan and C. Andrew Harrell, Jr., that support counsels' hourly rate request.[8]  Doc. 338-1. Included in the affidavits are detailed accountings of the work that was performed related to Mr. Eaton's misstatements of law, and by whom.  *Id.*

### a.  Hours Reasonably Expended

"'Fee applicants must exercise what the Supreme Court has termed 'billing judgment,' which requires the exclusion of excessive, redundant, or otherwise unnecessary hours." *Smith*, 2015 U.S. Dist. LEXIS 153536, at *12, 2015 WL 7185503*, at *4 (citations and internal quotation marks omitted).  Indeed, "[i]f fee applicants do not exercise billing judgment, courts are obligated to do it for them, to cut the amount of hours for which payment is sought, pruning out those that are 'excessive, redundant, or otherwise unnecessary.'" *Barnes,* 168 F.3d at 428.  "Courts are not authorized to be generous with the money of others, and it is as much the duty of courts to see that excessive fees and expenses are not awarded as it is to see that an adequate amount is awarded."

---

[8] The Court notes that Margaret P. Wolf and Elizabeth F. Baker are associates at the law firm Carr Allison which represents the Defendant in this matter.  While they have not filed formal notices of appearance in the case, it is not uncommon for only certain attorneys to appear in court while other attorneys and paralegals work behind the scenes.

*Id.* "Excluding excessive or otherwise unnecessary hours under the rubric of 'billing judgment' means that a lawyer may not be compensated for hours spent on activities for which he would not bill a client of means who was seriously intent on vindicating similar rights, recognizing that in the private sector the economically rational person engages in some cost benefit analysis." *Norman v. Hous. Auth. of the City of Montgomery,* 836 F.2d 1292, 1301 (11th Cir. 1988). "Moreover, because an assessment of the reasonableness of the hours requested (at least when objection is adequately raised by the defendant) contemplate[s] a task-by-task examination of the hours billed, plaintiffs' counsel is required to record each task, and the time associated with each, with sufficient clarity that the Court can evaluate the reasonableness of the expenditure of time." *Smith*, 2015 U.S. Dist. LEXIS 153536, at *12, 2015 WL 7185503, at *4 (citations and internal quotation marks omitted). "[T]he general subject matter of the time expenditures ought to be set out with sufficient particularity so that the district court can assess the time claimed for each activity." *Norman*, 836 F.2d at 1303. "In addition to a reduction for block billing, a time entry may be further discounted where the description of the work performed is overly vague." *Bujanowski v. Kocontes*, Civ. Act. No. 8:08-cv-0390-T-33EAJ, 2009 U.S. Dist. LEXIS 50659, at *5, 2009 WL 1564263, at *2 (M.D. Fla. Feb. 2, 2009) (citation omitted). Further, "'[b]lock billing' occurs when an attorney lists all the day's tasks on a case in a single entry, without separately identifying the time spent on each task." *Ceres Envtl. Servs., Inc. v. Colonel McCrary Trucking, LLC*, 476 F. App'x 193, 203 (11th Cir. 2012). Block billing "makes it difficult, if not impossible, to calculate with any precision the number of hours an attorney devoted to a particular task." *Barnes*, 168 F.3d at 429. "Courts have . . . approved across-the-board reductions in block-billed hours to offset the effects of block billing." *Ceres*, 476 F. App'x at 203.

Defendant claims its attorneys expended a total of 218.9 hours of work in this matter, which

includes 83.6 hours by Mr. Dunagan, 33.6 hours by Mr. Harrell, and 78.7 by Mr. Lawley, 1.1 hours by Ms. Wolf, 17.6 hours by Ms. Baker, and 4.3 hours by Ms. Oakes. The accounting of the attorney and paralegal work that was performed in this matter includes a description of the work performed, amount of time expended to perform the work, the date the work was performed, the hourly rate, and the total amount billed for the described work based on the hourly rate and time expended.

Each time entry provides a detailed description of the specific work that was performed, and there are no instances of block billing. While 218.9 hours may initially seem like a lot, the Court spent a similar amount of time addressing the various misstatements of law by Mr. Eaton between cite checking everything, drafting orders, and reviewing Mr. Eaton's responses to the show cause orders. Thus, the Court is acutely familiar with the amount of time it took to address this particular issue and finds that 218.9 hours is reasonable, as the Court staff similarly spent countless hours reviewing these matters. This is particularly so where the time entries are so detailed, and the detailed descriptions do not reveal any concerns or discrepancies.

### b.  Reasonable Hourly Rates

> "The Eleventh Circuit has instructed that a reasonable hourly rate is 'the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience and reputation.'" *McDonald* [*v. ST Aerospace Mobile, Inc.,* Civ. Act. No. 12-0313-CG-C], 2013 WL 1389976, [at] *3 [(S.D. Ala. April 4, 2013)] (citing *Norman,* 836 F.2d at 1303). "The general rule is that the 'relevant market' for purposes of determining the reasonable hourly rate for an attorney's services is 'the place where the case is filed.'" [ ]*Barnes,* 168 F.3d [ ] at 437 (citing *Cullens v. Ga. Dep't of Transp.,* 29 F.3d 1489, 1494 (11th Cir. 1994)[)]. However, "[i]f the fee applicant desires to recover the non-local rates of an attorney who is not from the place in which the case was filed, he must show a lack of attorneys practicing in that place who are willing to handle his claims." *Barnes*, 168 F.3d at 437. The fee applicant "bears the burden of producing satisfactory evidence that the requested rate is in line with prevailing market rates." *Norman,* 836 F.2d at 1299. "Satisfactory evidence at a minimum is more than the affidavit of the attorney performing the work." *Norman,* 836 F.2d at 1299.

*Cormier v. ACAC Inc*., Civ. Act. No. 13-0158-CG-M, 2013 U.S. Dist. LEXIS 173659, at * 2, 2013

WL 6499703, at *2 (S.D. Ala. Dec. 11, 2013).  "Also, the court is familiar with the prevailing rates in this district and may rely upon its own 'knowledge and experience' to form an 'independent judgment' as to a reasonable hourly rate."  *Garrett Invs., LLC v. SE Prop. Holdings, LLC*, 956 F. Supp. 2d 1330, 1339 (S.D. Ala. 2013) (citing *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994)).

However, "a court should hesitate to give controlling weight to prior awards, even though they may be relevant."  *Dillard v. City of Greensboro*, 213 F.3d 1347, 1355 (11h Cir. 2000).  In the situation at hand, the undersigned recognizes that it has been many years since there has been a market study of prevailing rates.  Further, the Court is well-aware that rates have increased considerably over the last decade.  Therefore, the Court finds the prior awards have little value to the rates today especially as many awards seem to rely upon hourly rates established between 2000-2010. The Court relies upon its own independent experience and analysis of the local market in determining appropriate hourly rates.

Defendant requests an hourly rate of $205 for Mr. Dunagan and Mr. Harrell, $359 for Mr. Lawley, $190 for Ms. Wolf and Ms. Baker, and $110 for Ms. Oakes.  Doc. 338 at 4.

Mr. Dunagan is a shareholder who has practiced law for over thirty years.  Mr. Harrell is a partner who has practiced law for over twenty years.  Both attorneys were hired by Defendant through Defendant's insurer to handle this matter.  Thus, their respective hourly rates of $205 is extremely reasonable given the extensive amount of experience they have.  The Court is aware of the general hourly rates in the Mobile area, and $205 is well below what a partner of Mr. Dunagan and Mr. Harrell's experience would typically charge.

Mr. Dunagan states in his affidavit that Ms. Wolf and Ms. Baker are associate attorneys and Ms. Oakes is a paralegal who worked with him on this matter. Doc. 338-1 at 2.  He further

states that their respective hourly rates are Defendant's insurer's approved rates.

Mr. Lawley is a partner who has been practicing law for over twenty years. Mr. Lawley was retained directly by Defendant, rather than through Defendant's insurer, thus, his hourly rate charged is a higher rate than that of the lower insurer-negotiated rate that Mr. Harrell and Mr. Dunagan billed in this matter.

The Court finds the hourly rates that were charged are all reasonable. In fact, all of the rates charged in this matter are lower than the rates that this Court has more recently found to be reasonable.

### c.  Lodestar Calculation & Adjustments

As no adjustments were necessary to the hours expended or rates charged, the lodestar is $55,597.00.

While the Supreme Court has made clear that "[t]he product of reasonable hours times a reasonable rate does not end the inquiry[,]" *Hensley*, 461 U.S. at 434, this Court does bear in mind that "there is a strong presumption that the lodestar is the reasonable sum the attorneys deserve." *Bivins*, 548 F.3d at 1350 (citations and quotation marks omitted). "When the number of compensable hours and the hourly rate are reasonable, a downward adjustment to the lodestar is merited only if the prevailing party was partially successful in its efforts." *Id.* at 1350-51 (citation omitted). Here, Defendant was successful, as the Court found sanctions were appropriate and necessary against Mr. Eaton, and the claimed attorney fees pertain only to the sanctions issues. Therefore, no further downward adjustment to the lodestar is warranted.

Based on the above, the Defendant's Motion for Attorneys' Fees (Doc. 338, filed 9/22/25) is **GRANTED**. The Court finds the appropriate amount to recover for attorneys' fees is **$55,597.00**. To be clear, this assessment is against Mr. Eaton, not his clients in this matter.

### III.  DEFENDANT'S MOTIONS FOR SANCTIONS

Defendant's renewed motion for sanctions (Doc. 264) and Defendant's motion to strike and motion for sanctions (Doc. 304) are due to be **GRANTED in part and DENIED in part**. The motions are granted to the extent that the Court issues the above-mentioned sanctions for Mr. Eaton's misrepresentations and misstatements of law.  The motions are denied to the extent that they request any additional relief not addressed in this opinion, and the Court declines to strike Document 296.  Rather, the Court simply rejects the "legal" arguments set forth in the document but does not strike as it must remain a part of the record in light of this sanctions opinion.

### IV.  CONCLUSION

As noted above, Defendant's renewed motion for sanctions (Doc. 264) and Defendant's motion to strike and motion for sanctions (Doc. 304) are **GRANTED in part and DENIED in part**.  Additionally, Defendant's Motion for Attorneys' Fees (Doc. 338) is **GRANTED**.

As a result of the Court's determination, it **ORDERS** the following:

1. Attorney Franklin Hollis Eaton, Jr. is hereby **REPRIMANDED** and this reprimand shall be published as follows:

    a. Attorney Franklin Hollis Eaton, Jr. shall file, not under seal, a copy of this Memorandum Opinion and Order in any case in any court wherein he has appeared as counsel and final judgment has not been entered;

    b.  Attorney Franklin Hollis Eaton, Jr. shall file, not under seal, a copy of this Memorandum Opinion and Order in any case in any court wherein he appears as counsel for twelve (12) months after the date of this order;

    c. Attorney Franklin Hollis Eaton, Jr. shall provide a copy of this Memorandum Opinion and Order to any jurisdiction in which he is licensed to practice law within

two (2) business days of the issuance of this order.  He shall further file a notice of compliance with the Court no later than the third business day.

d. The Clerk of Court shall send a copy of this Memorandum Opinion and Order to the General Counsel of the Alabama State Bar for review.  Though referred to the Alabama State Bar for any disposition it deems appropriate, the undersigned regrettably recommends that Attorney Franklin Hollis Eaton, Jr. be found incompetent to practice law.

e. The Clerk of Court shall send a copy of this Memorandum Opinion and Order to the Chief Judges for the Northern District of Alabama, the Middle District of Alabama, and the Southern District of Alabama.

f. To further effectuate the reprimands and deter similar misconduct by others, the Clerk of Court is **DIRECTED** to submit this order for publication in the Federal Supplement.

2. Franklin Hollis Eaton, Jr. shall pay attorney fees in the amount of **$55,597.00** to Defense counsel for their time spent addressing Mr. Eaton's misstatements of law.

3. Pursuant to S.D. Ala. GenLR 83.4(a) and (h)(1), the undersigned refers to the Judges of the Southern District of Alabama a review of Franklin Hollis Eaton, Jr.

**DONE** and **ORDERED** this 31st day of March, 2026.

/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE